## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **MAXWELL HODGKINS, et al.** | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No.  09-00587 (JR) |
| | ) | |
| **ERIC HOLDER,** | ) | |
| Attorney General of the | ) | |
| United States | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

### DEFENDANT'S MOTION TO DISMISS

Defendant Eric Holder, through his undersigned counsel, moves this Court for an order, pursuant to Fed. R. Civ. P. 12(b)(1), dismissing this case with prejudice.  This motion is supported by the attached memorandum of points and authorities.

Respectfully submitted,

TONY WEST
Assistant Attorney General

CHANNING D. PHILLIPS
Acting United States Attorney

SANDRA M. SCHRAIBMAN
Assistant Branch Director
U.S. Department of Justice
Civil Division, Federal Programs Branch

  _/s/ John R. Coleman_____
JOHN R. COLEMAN
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, NW, Room 6118
Washington, D.C. 20530
(202) 514-4505

john.coleman3@usdoj.gov

*Counsel for Defendant*

Date: June 26, 2009

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **MAXWELL HODGKINS, et al.** | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No.  09-00587 (JR) |
| | ) | |
| **ERIC HOLDER,** | ) | |
| Attorney General of the | ) | |
| United States | ) | |
| | ) | |
| Defendant. | ) | |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ | ) | |

## DEFENDANT'S MEMORANDUM IN SUPPORT
## OF HIS MOTION TO DISMISS

Plaintiffs, two United States citizens who reside abroad and an organization that advocates against gun control, bring this lawsuit seeking a declaratory judgment pursuant to 28 U.S.C. § 2201 that two federal gun control provisions—18 U.S.C. § 922(a)(9) & (b)(3)—are unconstitutional.  The challenged provisions, in combination with the definition of "State of residence" in the implementing regulations, 27 C.F.R. § 478.11, prevent United States citizens without a domestic residence from acquiring new firearms during visits to the United States. The challenged provisions do not, however, prevent expatriate citizens from using previously acquired firearms or renting firearms for lawful sporting purposes while visiting the United States.  One of the individual plaintiffs alleges a desire to acquire new firearms for purposes other than lawful sporting purposes during some future visit to the United States.  Plaintiffs contend that his inability to do so without subjecting himself to possible criminal prosecution violates his rights under the Second and Fifth Amendments to the United States Constitution. This case should be dismissed for lack of jurisdiction.

-1-

Under binding D.C. Circuit precedent, plaintiffs lack standing to bring their pre-enforcement challenge under the Declaratory Judgment Act.  Plaintiff Dearth does not allege that he has been singled out for prosecution under the challenged provisions, a prerequisite for this Court to exercise jurisdiction over his pre-enforcement challenge.  As a result, Dearth's vague allegation of an intention to acquire a firearm on some future visit to the United States does not give rise to a live controversy as required by Article III of the Constitution and the Declaratory Judgment Act.  Plaintiff Hodgkins' standing would fail for the same reasons if he had alleged a similar intention to acquire firearms on some future visit to the United States.  He does not allege any such intention, however, but alleges only that he intends to access previously purchased firearms, which is not prohibited by the challenged provisions.  As a result, his standing to seek declaratory relief regarding the constitutionality of these provisions is even more clearly deficient.  Finally, plaintiff Second Amendment Foundation, Inc. (SAF) lacks standing because it does not allege that either it or any of its members is currently suffering some cognizable injury on account of the challenged laws.  As a result, this case must be dismissed for lack of jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1).

## STATUTORY BACKGROUND

## I.    CONGRESS'S REGULATION OF INTERSTATE FIREARM SALES

Plaintiffs' lawsuit challenges the constitutionality of two provisions of the federal gun control laws that impose conditions on the commercial sale of arms.  The first of these provisions to be enacted, codified at 18 U.S.C. § 922(b)(3), makes it "unlawful for any licensed importer, licensed manufacturer, licensed dealer, or licensed collector to sell or deliver—

> (3) any firearm to any person who the licensee knows or has reasonable cause to believe does not reside in (or if the person is a corporation or other business entity, does not maintain a place of business in) the State in which the licensee's place of business is located, except that this paragraph (A) shall not apply to the sale or delivery of any rifle or shotgun to a resident of a State other than a State in which the licensee's place of business is located if the transferee meets in person with the transferor to accomplish the transfer, and the sale, delivery, and receipt fully comply with the legal conditions of sale in both such States (and any licensed manufacturer, importer or dealer shall be presumed, for purposes of this subparagraph, in the absence of evidence to the contrary, to have had actual knowledge of the State laws and published ordinances of both States), and (B) shall not apply to the loan or rental of a firearm to any person for temporary use for lawful sporting purposes.

18 U.S.C. § 922(b)(3).[1]

A complementary provision that plaintiffs do not challenge, codified at § 922(a)(5), applies a similar prohibition to unlicensed individuals.  It prohibits—

> any person (other than a licensed importer, licensed manufacturer, licensed dealer, or licensed collector) to transfer, sell, trade, give, transport, or deliver any firearm to any person (other than a licensed importer, licensed manufacturer, licensed dealer, or licensed collector) who the transferor knows or has reasonable

---

[1]  This provision was initially enacted as part of the Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. No. 90-351, Title IV, § 902, 82 Stat. 230 (1968), but was amended before its effective date by the Gun Control Act of 1968, Pub. L. No. 90-618, § 102, 82 Stat. 1218 (1968).  In 1986, Congress again amended this provision to expand the exception in subpart (A) beyond its prior limitation to contiguous states, and to eliminate another exception. *See* Firearm Owners Protection Act of 1986, Pub. L. No. 99-308, § 102, 100 Stat. 451 (1986).

> cause to believe does not reside in . . . the State in which the transferor resides;
> except that this paragraph shall not apply to (A) [bequests to an individual who
> may lawfully possess the firearm under the laws of his State of residence, and]
> (B) the loan or rental of a firearm to any person for temporary use for lawful
> sporting purposes.

18 U.S.C. § 922(a)(5); *see also* 27 C.F.R. § 478.30.

As a result of these provisions, in combination with the implementing regulations of the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) that define "State of residence," federally licensed firearms dealers and unlicensed individuals may not provide firearms to United States citizens who they should know do not maintain a residence in the United States, with one exception: they "may lend or rent a firearm to any person for temporary use off the premises of the licensee for lawful sporting purposes" provided the person is not otherwise prohibited from possessing a firearm, the licensee conducts a background check, and the dealer completes and retains the required records for the transaction.  27 C.F.R. § 478.97; *see also* 27 C.F.R. §§ 478.96, 478.99.  Section 922(a)(9) buttresses the effective prohibition on sales to those without a residence in the United States, but directs its prohibition at the recipient instead of the seller.  This provision makes it unlawful—

> for any person, other than a licensed importer, licensed manufacturer, licensed
> dealer, or licensed collector, who does not reside in any State to receive any
> firearms unless such receipt is for lawful sporting purposes.

18 U.S.C. § 922(a)(9);[2] *see also* 27 C.F.R. § 478.29a.

––––––––––––––––––––

[2]  Although enacted as § 110514 of the Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, 108 Stat. 2019 (1994), this provision had been introduced in Congress as early as 1991.  *See* 137 Cong. Rec. S1369-01, S1448 (Jan. 31, 1991).  It was intended to prohibit the purchase of weapons by aliens who were legally in the United States but had not yet established residency in any state.  *See* 137 Cong. Rec. S1369-01, S1449-S1450 (Jan. 31, 1991).  Prior to its enactment, such aliens could have acquired firearms from unlicensed

(continued...)

These provisions are an integral part of Congress's regulation of interstate and international firearms commerce that is intended "to aid state and local gun control efforts by reducing the flow of firearms from loose-control to tight-control states."  Franklin E. Zimring, *Firearms & Federal Law: The Gun Control Act of 1968*, 4 J. Legal Stud. 133, 134 (1975).[3]  They work in concert with other federal gun control provisions that (1) generally limit interstate transactions in firearms to transactions between licensed individuals, *see* § 922(a)(1), (a)(2), (e), (f); (2) generally prevent individuals from transporting firearms received outside of their state of residence into their State of residence, *see* § 922(a)(3), and (3) prohibit false statements when acquiring a firearm from a licensed dealer, *see* § 922(a)(6).  *See generally Navegar, Inc. v. United States*, 192 F.3d 1050, 1060-61 & n. 6 (D.C. Cir. 1999) (describing § 922's regulation of interstate commerce in firearms).  Congress's "principal purpose" in enacting these provisions was "to strengthen Federal controls over interstate and foreign commerce in firearms and to assist the States effectively to regulate firearms traffic within their borders."  *Id.* at 1063 (quoting H.R. Rep. No. 90-1577, at 6 (1968), *as reprinted in* 1968 U.S.C.C.A.N. 4410, 4411).

The creation of this regulatory regime was based on legislative findings that "existing Federal controls over [interstate traffic in firearms] do not adequately enable the states to control

---

[2](...continued)
individuals based on false statements regarding their residence without violating the law because § 922(a)(6)'s prohibition of false statements only applies to transactions with licensed dealers, and § 922(a)(5) doesn't prohibit unlicensed individuals from transferring firearms to those without a state of residence unless they know or have reasonable cause to believe that those individuals do not reside in the same state.

[3]  *See also* Philip J. Cook, Stephanie Molliconi, & Thomas B. Cole, *Regulating Gun Markets,* 86 J. Crim. L. & Criminology 59, 66 (1995) ("One objective of federal gun control law is to insulate states so that stringent regulations on firearms commerce adopted in some states will not be undercut by greater availability of guns in other states.").

this traffic within their own borders through the exercise of their police power;" that such traffic "is a significant factor in the prevalence of lawlessness and violent crime in the United States;" and "that only through adequate Federal control over interstate and foreign commerce in these weapons, and over all persons engaging in the business of importing, manufacturing, or dealing in them, can this grave problem be properly dealt with, and effective State and local regulation of this traffic be made possible."[4]  And, Congress specifically found "that the sale or other disposition of concealable weapons [(*i.e.*, handguns)] by importers, manufacturers, and dealers holding Federal licenses, to nonresidents of the State in which the licensees' places of businesses are located, has tended to make ineffective the laws, regulations, and ordinances in the several States and local jurisdictions regarding such firearms."  *Id.*

The legislative history accompanying the Omnibus Crime Control and Safe Streets Act of 1968 supports these findings.  The Senate report cited testimony from "Massachusetts authorities . . . that 87 percent of the 4,506 crime guns misused in that State were purchased outside of Massachusetts in neighboring states."  S. Rep. No. 90-1097 (1968), *as reprinted in* 1968 U.S.C.C.A.N. 2112, 2164.  "The result," the Senate Report noted, "is that their stringent controls which are applicable to the sale of firearms and primarily handguns, are considerably reduced in effectiveness."  *Id.*  Similarly, "[t]he prosecuting attorney of Wayne County, Mich., which includes the city Detroit, testified that 90 out of every 100 crime guns confiscated in Detroit are

---

[4]  Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. No. 90-351, Title IV, § 901, 82 Stat. 225 (1968); *see also* Gun Control Act of 1968, Pub. L. No. 90-618, § 101 (1968), 82 Stat. 1213-14 (purpose of Gun Control Act is to "provide support to Federal, State, and local law enforcement officials in their fight against crime and violence.").  The factual findings of the Omnibus Crime Control and Safe Streets Act of 1968 are equally applicable to the Gun Control Act of 1968.  *See Navegar*, 192 F.3d 1063 & n.8.

not purchased and registered in Michigan and that the prime source of these crime guns is by

purchases in neighboring Ohio, where controls on firearms are minimal." *Id.* at 2164-65.   Thus,

§ 922(b)(3) and the related provisions of § 922 were "designed to prevent the avoidance of state

and local laws controlling firearms . . . by the simple expediency of crossing a State line to

purchase one." *Id.* at 2204; *see also* H. Rep. No. 90-1577, *as reprinted in* 1968 U.S.C.C.A.N.

4410, 4420 (same statement for House Report accompanying Gun Control Act of 1968).

## II.   DEFINITION OF STATE OF RESIDENCE

The effect of these provisions on any one particular individual will depend on that

individual's "State of Residence," which is defined by regulation as "[t]he State in which an

individual resides." 27 C.F.R. § 478.11.  The regulations explain that "[a]n individual resides in

a State if he or she is present in a State with the intention of making a home in that State." *Id.*

Individuals may have more than one State of residence if they reside in different homes during

different parts of the year.  The regulations provide the following example:

> A is a U.S. citizen and maintains a home in State X and a home in State Y.  A
> resides in State X except for weekends or the summer months of the year and in
> State Y for the weekends or the summer months of the year.  During the time that
> A actually resides in State X, A is a resident of State X, and during the time that
> A actually resides in State Y, A is a resident of State Y.

*Id.*  Based on this example, ATF has ruled that college students may be deemed residents of the

State in which they attend college while they are attending college, and considered residents of

their home State while they reside in their home State.  *See* ATF Rul. 80-21, Federal Firearms

Regulations Reference Guide, 126-27 (2005) (attached as Exhibit A).  Thus, while those U.S.

citizens who only reside abroad will be effectively prohibited from receiving firearms for

purposes other than sporting purposes while in the United States, those U.S. citizens who

generally reside abroad but continue to maintain a home in the United States may purchase firearms in that State for any purpose while they are residing in their United States home.

## FACTUAL BACKGROUND

Plaintiff Maxwell Hodgkins is a United States citizen who currently resides in the United Kingdom.  Compl. ¶ 1.  Although he does not maintain a residence in the United States, Hodgkins occasionally visits friends and family in the United States, and intends to continue visiting the United States.  *Id.* at ¶¶ 1, 7.  According to the complaint, "Hodgkins legally owns firearms securely stored within the United States," and "intends to access such firearms for lawful sporting purposes as well as for other purposes, including self-defense, while visiting the United States."  *Id.* at ¶ 8.  Hodgkins alleges that he attempted to purchase a firearm within the United States on October 1, 2008, but was unable to do so due to the fact that he resides outside of the United States.  *Id.* at ¶ 24.

Plaintiff Stephen Dearth, a United States citizen residing in Canada, also enjoys visiting his family and friends in the United States, and intends to continue visiting the United States.  *Id.* at ¶¶ 2, 10.  Unlike Hodgkins, Dearth does not allege that he currently owns firearms stored in the United States, but claims that he "intends to purchase firearms within the United States, which he would store securely at his relatives' home in Mount Vernon, Ohio, and which he would access for lawful sporting purposes as well as for other purposes, including self-defense, while visiting the United States."  *Id.* at ¶ 11.  Dearth claims to hold "a valid Utah permit to publicly carry a handgun, which is recognized in numerous states."  *Id.* at ¶ 12.  Dearth alleges that he attempted to buy firearms within the United States on two prior occasions, in January,

2006 and June, 2007, but that the seller refused to sell Dearth a firearm because he resides in Canada.  *Id.* at ¶¶ 22, 23.

Plaintiff SAF "is a non-profit membership organization incorporated under the laws of Washington with its principal place of business in Bellevue, Washington." Compl. ¶ 3.  SAF claims to have "over 650,000 members and supporters nationwide," *id.*, but does not allege that any of its members have been unable to purchase a firearm on account of the challenged provisions.

**ARGUMENT**

I.      **To Have Standing to Bring this Pre-Enforcement Challenge Under the Declaratory Judgment Act Plaintiffs Must Show that They Have Been Singled Out or Uniquely Targeted For Prosecution**

Article III of the Constitution requires "those who seek to invoke the power of federal courts [to] allege an actual case or controversy." *O'Shea v. Littleton*, 414 U.S. 488, 493 (1974). An important aspect of Article III's case or controversy requirement is standing, which requires plaintiffs to allege (and ultimately prove) "an 'injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical.'" *Seegars v. Gonzales*, 396 F.3d 1248, 1251 (D.C. Cir. 2005) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).  Plaintiffs must also show a "causal connection between the injury and the conduct complained of" and "that the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 560-61 (internal citations and quotations omitted).

Plaintiffs have not been prosecuted under either of the challenged provisions.  Rather, plaintiffs have brought a pre-enforcement challenge pursuant to the Declaratory Judgment Act, based on their alleged fear of future prosecution.  *See Seegars*, 396 F.3d at 1251; *see also* Compl. ¶¶ 25-37.  To satisfy Article III, the Declaratory Judgment Act allows courts to "declare the rights and other legal relations of . . . interested part[ies] seeking such a declaration" only if plaintiffs can demonstrate "a case of *actual controversy* within its jurisdiction."  28 U.S.C. § 2201 (emphasis added).  In addition, the Declaratory Judgment Act requires that there be an "actual controversy" at all times during the pendency of the litigation, and plaintiffs suing under this statute cannot rest their claims on past injury. *Golden v. Zwickler*, 394 U.S. 103, 108-10 (1969); *see also Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 210-11 (1995) ("[T]he fact

-10-

of past injury, 'while presumably affording [the plaintiff] standing to claim damages, does nothing to establish a real and immediate threat that he would again' suffer similar injury in the future.") (quoting *Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983)).  In determining whether there is a continuing "actual controversy" for purposes of the Declaratory Judgment Act, "'the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, *of sufficient immediacy and reality* to warrant the issuance of a declaratory judgment.'" *Golden*, 394 U.S. at 108 (quoting *Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273 (1941)) (emphasis added).

Accordingly, plaintiffs' pre-enforcement challenge to § 922(a)(9) & (b)(3) is justiciable only if they "can demonstrate that [they] face[] a threat of prosecution under the statute which is credible and immediate, and not merely abstract or speculative."  *Navegar, Inc. v. United States*, 103 F.3d 994, 998 (D.C. Cir. 1997).  To demonstrate that the threat of prosecution is "credible and immediate," plaintiffs must allege "more than a credible statement . . . of intent to commit violative acts and a conventional background expectation that the government will enforce the law."  *Seegars*, 396 F.3d at 1253.  Instead, plaintiffs must allege that they have been "personally threatened with prosecution or that [their] prosecution has . . . 'special priority' for the government."  *Id.* at 1255 (quoting *Navegar*, 103 F.3d at 1001).  The instances in which a plaintiff can make this showing are "exceedingly rare."  *Steffel v. Thompson*, 415 U.S. 452, 476 (1974) (Stewart, J., concurring).

Thus, in *Navegar*, the United States Court of Appeals for the District of Columbia Circuit held that the plaintiff gun manufactures had standing to seek a declaratory judgment that certain

provisions of the Violent Crime Control & Law Enforcement Act of 1994 were unconstitutional because (1) those provisions "in effect single[d] out the [manufacturers] as its intended targets, by prohibiting weapons that only the [manufacturers] make;" (2) agents from ATF had visited the manufacturers' "facilities on the day of enactment to inform them of the law's prohibitions and to begin quarantining 'grandfathered' units;" and (3) soon thereafter ATF sent the manufacturers "a letter reminding them of the prohibitions of the Act." *Navegar*, 103 F.3d at 1000.  By contrast, the Court of Appeals found that the same gun manufacturers did not have standing to challenge "portions of the Act which refer to weapons and accessories sharing certain features, rather than to particular brands and models of weapons," notwithstanding the existence of many of the same "circumstances that [the Court of Appeals] found relevant to the justiciability of their challenges to the portions of the Act that name individual weapons, including the high-profile nature of their business and the publicity accorded to the Act, the visits by the ATF agents, and the letter from the ATF." *Id.* at 1001.  Unlike the provisions that the gun manufacturers had standing to challenge, these provisions lacked "the one factor that [the Court of Appeals] found most significant in [its] analysis of the other challenges—the statute's own identification of the particular products manufactured only by the [plaintiff gun manufacturers]." *Id.*

The Court of Appeals explained why the absence of this factor rendered the gun manufactures' alleged fear of prosecution insufficient for purposes of Article III:

> In the absence of this factor, the threat of prosecution becomes far less imminent, and these parties' claims to standing concomitantly much weaker.  These generic portions of the Act could be enforced against a great number of weapon manufacturers or distributors, and although the government has demonstrated its interest in enforcing the Act generally, nothing in these portions indicates any special priority placed upon preventing these parties from engaging in specified

conduct. In such circumstances we cannot say that a genuine threat of enforcement has given rise to the requisite "injury in fact" and thus given these parties standing.

*Id.* Thus, *Navegar* requires plaintiffs in pre-enforcement challenges brought pursuant to the

Declaratory Judgment Act to demonstrate that they have been "singled . . . out for prosecution."

*Parker v. District of Columbia*, 478 F.3d 370, 374 (D.C. Cir. 2007).

*Navegar's* standard has been "faithfully appl[ied]" to pre-enforcement challenges by

would-be gun purchasers like plaintiffs in this case. *Seegars*, 396 F.3d at 1254. For example, in

*Seegars* plaintiffs challenged "provisions of the District of Columbia's criminal code that bar

them from registering and lawfully possessing pistols within the District of Columbia, or

maintaining firearms in their homes free of mandates that they be unloaded and disassembled, or

secured by a trigger lock." *Seegars*, 396 F.3d at 1250. The Court of Appeals held that plaintiffs

did not have standing "under 28 U.S.C. § 2201 [to] seek a declaration that the challenged

provisions are unlawful," notwithstanding plaintiffs' allegations that "they live in high-crime

neighborhoods and would like to possess loaded weapons in their homes for protection, not

secured by a trigger lock," but that "because of the threat of criminal prosecution, they forego

what they believe would be the additional security of possessing pistols or possessing a shotgun

ready for immediate use." *Id.* at 1251. As the Court of Appeals explained, the plaintiffs had

never "been personally threatened with prosecution," nor was there anything in the record

suggesting "that [plaintiffs'] prosecution ha[d] any 'special priority' for the government." *Id.* at

1255 (quoting *Navegar*, 103 F.3d at 1001). As a result, the Court of Appeals held that "no

plaintiff ha[d] demonstrated a threat of prosecution sufficiently imminent under circuit law" to

create a "justiciable case or controversy." *Id.* at 1256.

The recent decision in *Parker v. District of Columbia*, 478 F.3d 370 (D.C. Cir. 2007),[5] likewise applied *Navegar's* "singled out for prosecution" standard to deny individual plaintiffs standing to seek a declaratory judgment that the District of Columbia's gun control laws violated the Second Amendment. *See id.* at 374-78. The Court of Appeals found that none of the plaintiffs had alleged that they had "been singled out or uniquely targeted by the D.C. government for prosecution," and therefore found that none of plaintiffs had standing to seek a declaratory judgment pursuant to 28 U.S.C. § 2201. *Id.* at 375. The Court of Appeals did find, however, that plaintiff Heller had standing to bring an action pursuant to 42 U.S.C. § 1983,[6] because the District of Columbia's denial of Heller's application for a registration to own a handgun "constitute[d] an injury independent of the District's prospective enforcement of its gun laws, and an injury to which the stringent requirements for pre-enforcement standing under *Navegar* and *Seegars* would not apply." *Id.* at 376.

As set forth below, none of the plaintiffs can satisfy the D.C. Circuit's standard for bringing a pre-enforcement challenge to § 922 pursuant to the Declaratory Judgment Act.

----

[5] The Supreme Court denied plaintiffs' conditional cross-petition for a writ of certiorari to review the Court of Appeals' ruling relating to the plaintiffs' standing. *See Parker v. District of Columbia*, 128 S.Ct. 2994 (June 27, 2008). The Supreme Court granted the District of Columbia's petition for a writ of certiorari and, on the merits, affirmed. *See District of Columbia v. Heller*, —U.S.—, 128 S.Ct. 2783 (2008).

[6] This statute provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . ." 42 U.S.C. § 1983.

II.     **Plaintiff Stephen Dearth Lacks Standing to Challenge the Provisions Because He Has Not Alleged that He Has Been Singled Out or Uniquely Targeted For Prosecution**

Plaintiff Stephen Dearth does not have standing to bring this declaratory judgment action. Neither of these provisions have "singled out [Dearth] for prosecution," nor is there any allegation that the federal government has made prosecution of Dearth a "special priority." *Parker*, 478 F.3d at 374.  Indeed, to the extent his asserted injury is based on the fear of his own imminent prosecution under either of the challenged provisions, such alleged injury is wholly "chimerical."  *Poe v. Ullman*, 367 U.S. 497, 508 (1961).  He cannot be prosecuted under 18 U.S.C. § 922(b)(3), as the prohibition contained in this provision applies only to "any licensed importer, licensed manufacturer, licensed dealer, or licensed collector," 18 U.S.C. § 922(b)(3), and Dearth is none of these things.  Nor has he alleged a credible threat of prosecution under 18 U.S.C. § 922(a)(9).  As his allegations demonstrate, Compl. ¶¶ 22-23, an individual such as Dearth "who does not reside in any State" but would like to purchase a firearm from a licensed dealer is unlikely to face prosecution under § 922(a)(9) because he will "receive" a firearm for purposes other than sporting purposes only if a licensed dealer violates the independent prohibition of § 922(b)(3).  Thus, Dearth has not demonstrated a "threat of prosecution under the statute [that] is credible and immediate, [as opposed to] merely abstract or speculative." *Navegar*, 103 F.3d at 998.  As a result, under the binding law of this judicial circuit, he does not have standing to seek a declaratory judgment that these provisions violate the Constitution.

Nor does it matter that the complaint suggests that Dearth's injury is not based on his own fear of prosecution, but on the (as yet unidentified) federally licensed firearms dealer's fear of prosecution under 18 U.S.C. § 922(b)(3), that will allegedly prevent Dearth from acquiring

firearms in the United States at some indeterminate time in the future.  Compl. ¶ 19.  Any

federally licensed firearms dealers would be unable to challenge the prohibition of 18 U.S.C.

§ 922(b)(3) for fear of prosecution under the *Navegar-Seegars-Parker* precedents, because this

provision does not single out any specific firearms dealer.  *Parker*, 478 F.3d at 374.  It follows

that Dearth's derivative injury based on the probable consequences of the hypothetical firearm

dealer's fear of prosecution should he violate the prohibition of § 922(b)(3)—refusal to sell a

firearm to Dearth—does not give rise to an injury in fact under the Declaratory Judgment Act.

Furthermore, Dearth's allegation that 18 U.S.C. § 922(b)(3) is "presently causing" him

injury by "prevent[ing] presently-intended firearms purchases," Compl. ¶ 19, is a "legal

conclusion couched as a factual allegation" and, as a moment of reflection demonstrates, clearly

not true.  *Ashcroft v. Iqbal*, —U.S.—, 129 S.Ct. 1937, 1949-50 (2009) (quoting *Bell Atlantic

Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  In fact, the challenged provisions are not

presently preventing Dearth from acquiring firearms because he is presently at his home in

Canada.[7]  Accordingly, Dearth's alleged injury—his inability to acquire a new firearm for

purposes other than sporting purposes—is not "presently" harming him; it will arise only if he

attempts to acquire a firearm for purposes other than sporting purposes during his next visit to

the United States.

And, in this respect, the complaint is devoid of any allegations that any such visit  or

attempt to purchase a firearm is "imminent."  *Parker*, 478 F.3d at 374.  Dearth alleges that he

intends to visit the United States "on a regular basis," and that he "intends to purchase firearms

---

[7]  And, should he seek to use firearms during some future visit to the United States, he is
not prevented by federal law from bringing firearms he owns in Canada with him.  *See* 18 U.S.C.
§ 925(d).

within the United States, which he would store securely at his relatives' home in Mount Vernon,

Ohio." Compl. ¶¶ 10-11. But he does not state when in the future he intends to visit the United

States, or whether he intends to purchase a firearm for purposes other than sporting purposes

during that visit. To allege an "actual controversy" under the Declaratory Judgment Act, it is not

sufficient "for [Dearth] to assert generally that he might one day return to [the United States].

More immediate and concrete plans are necessary." *Haase v. Sessions*, 835 F.2d 902, 911 (D.C.

Cir. 1987). As the Supreme Court has explained, "'some day' intentions—without any

description of concrete plans, or indeed any specification of *when* the someday will be—do not

support a finding of the 'actual or imminent' injury that our cases require." *Lujan*, 504 U.S. at

564; *see also Nat'l Rifle Ass'n v. Magaw*, 132 F.3d 272, 293 (6th Cir. 1997) ("Plaintiffs'

assertions that they 'wish' or 'intend' to engage in proscribed conduct is not sufficient to

establish an injury-in-fact under Article III.") (citing *Lujan*, 504 U.S. at 564).

Finally, Dearth's allegations concerning his past unsuccessful attempts to purchase

firearms—the most recent of which occurred two years ago, Compl. ¶¶ 22, 23—do not

demonstrate his standing to bring a *pre-enforcement* challenge to § 922 pursuant to the

Declaratory Judgment Act. *See Haase*, 835 F.2d at 910-11. The decision of the Court of

Appeals in *Parker* is not to the contrary. In *Parker*, the Court of Appeals held that the District of

Columbia's denial of plaintiff Anthony Heller's registration certificate to own a handgun

constituted a sufficient injury for Heller "to raise his [42 U.S.C.] § 1983 challenge to specific

provisions of the District's gun control laws." *Parker*, 478 F.3d at 378. Significantly, the Court

of Appeals did not hold that Heller had standing to assert his *independent* claim brought pursuant

to 28 U.S.C. §§ 2201 and 2202, as a result of his prior unsuccessful attempt to obtain a

-17-

registration certificate.  *Id.* at 374 ("Appellants sought declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201, 2202, and 42 U.S.C. § 1983.").[8]  This is appropriate because, unlike 42 U.S.C. § 1983, 28 U.S.C. §§ 2201 and 2202 do not provide a remedy for past injuries, but only for a "specific *live* grievance."  *Golden*, 394 U.S. at 110 (emphasis added).  Dearth has not brought a claim pursuant to 42 U.S.C. § 1983 (nor could he against federal defendants),[9] but brings claims pursuant to 28 U.S.C. §§ 2201 and 2202 only.  *See* Compl. ¶¶ 25-37.  As a result, his past attempt to purchase a firearm does not demonstrate the "credible and immediate," *Navegar*, 103 F.3d at 998, threat of injury required in order for Dearth to maintain this suit for declaratory and injunctive relief.

As the foregoing demonstrates, Dearth's asserted injury—his presumed inability to obtain a firearm from some unknown dealer in an unidentified state at some indeterminate future date—is even less "credible and immediate," *Navegar*, 103 F.3d at 998, than that of the individuals in *Seegars* and *Parker* who were found not to have standing despite credible allegations that they were presently prevented from possessing handguns in the District of Columbia on account of the District of Columbia's challenged laws.  *See Seegars*, 396 F.3d at 1254-55; *Parker*, 478 F.3d at 375.  Accordingly, as plaintiffs' counsel has virtually conceded in

---

[8]  None of the cases relied upon by the Court of Appeals for the proposition that a license or permit denial is a sufficient injury for Article III purposes were brought pursuant to the Declaratory Judgment Act.  *See Parker*, 478 F.3d at 376 (citing *Cassell v. F.C.C.*, 154 F.3d 478, 480 & n.1 (D.C. Cir. 1998) (reviewing denial of license application to operate a private land mobile radio service brought pursuant to 47 U.S.C. § 402); *Wilkett v. I.C.C.*, 710 F.2d 861, 863 (1983) (reviewing denial of application for expanded trucking license brought pursuant to the 5 U.S.C. § 706); *City of Bedford v. F.E.R.C.*, 718 F.2d 1164, 1168 (reviewing denial of a preliminary hyrdoelectric permit brought pursuant to 16 U.S.C. § 825l(b)).

[9]  *See Settles v. U.S. Parole Comm'n*, 429 F.3d 1098, 1104 (D.C. Cir. 2005) ("Section 1983 does not apply to federal officials acting under color of federal law.") (citing cases).

prior litigation challenging these provisions,[10] under the binding precedent of this judicial circuit Dearth does not have standing to bring a Declaratory Judgment action to challenge these provisions.

### III. Plaintiff Maxwell Hodgkins Lacks Standing to Challenge the Provisions Because He Has Not Alleged that He Has Been Singled Out or Uniquely Targeted For Prosecution And Because He Has Not Even Alleged An Intention to Acquire New Firearms While Visiting the United States

Plaintiff Maxwell Hodgkins does not have standing to bring this pre-enforcement challenge because—like Dearth—he has not alleged that he has been "singled out or uniquely targeted by the [federal] government for prosecution." *Parker*, 478 F.3d at 375. But, Hodgkins' standing allegations are even more deficient than Dearth's because Hodgkins does not even allege an intention to attempt to purchase or otherwise "receive" a firearm on his next visit to the United States. Rather, he alleges that he already "legally owns firearms securely stored in the United States," and "intends to access such firearms for lawful sporting purposes as well as for other purposes, including self-defense, while visiting the United States." Compl. ¶ 8. This does not give rise to an injury in fact, however, because the provisions challenged by plaintiffs do not criminalize Hodgkins' mere *possession* of firearms that he legally acquired before residing abroad, but only his *receipt* of additional firearms if for purposes other than lawful sporting purposes. *See* 18 U.S.C. § 922(a)(9).

---

[10]  *See* Plaintiffs' Opposition to Defendant Gonzales's Motion to Dismiss or, in the Alternative, Transfer, at pp. 24-25, in *Dearth v. Gonzales*, Case No. 2:06-cv-1012 (S.D. Ohio) (attached as Exhibit B); Plaintiffs' Opposition to Defendant Gonzales's Motion to Dismiss or, in the Alternative, Transfer, at pp. 20-24, in *Hodgkins v. Gonzales*, Case No. 3:06-CV-2114-B (N.D. Tex.) (attached as Exhibit C); Plaintiffs' Notice of Recent Decision, in *Hodgkins v. Gonzales*, Case No. 3:06-CV-2114-B (N.D. Tex.) (arguing that "the D.C. Circuit's unique and plainly erroneous standing doctrine would likely cause a non-merits dismissal" if the case were transferred to this circuit) (attached as Exhibit D).

The terms "receive" and "possess" are given independent meaning throughout 18 U.S.C. § 922.  For example, 18 U.S.C. § 922(g) makes it unlawful for certain people, such as those convicted of a crime punishable by more than one year, fugitives from justice, the mentally defective, and others, "to *possess* in or affecting commerce, any firearm or ammunition; or to *receive* any firearm or ammunition which has been shipped or transported in interstate or foreign commerce." 18 U.S.C. § 922(g) (emphasis added); *see also* 18 U.S.C. § 922(h), (k), (p) (giving the words "receive" and "possess" independent meaning).  Furthermore, the Supreme Court has expressly acknowledged that the term "receive" does not include mere "possession."  *See United States v. Bass*, 404 U.S. 336, 342-43 (1971) (prior version of § 922(g) "does not reach possessions or intrastate transactions at all, but is limited to the sending or receiving of firearms. . . ."); *see also Ball v. United States*, 470 U.S. 856, 865 (1985) (recognizing that receipt and possession of a firearm by a convicted felon are independent offenses); *Tot v. United States*, 319 U.S. 463, 472 (1943) (striking down statutory presumption that mere possession was sufficient evidence of receipt prior to effective date of statute).  That the challenged provisions do not prohibit the mere possession of previously acquired firearms by non-resident U.S. citizens should not be disputed.  Plaintiff acknowledges that "Section 922(a)(9) and 27 C.F.R. § 478.29a allow non-resident Americans to use pre-possessed firearms for all reasons." Compl. ¶ 30. Accordingly, Hodgkins does not have standing to seek declaratory relief for all the reasons that Dearth does not have standing, and because he does not even allege the same vague desire to acquire additional firearms on returning to the United States alleged by Dearth.

**IV.     The Second Amendment Foundation Has Not Alleged Injury to It or Any of Its Members and Therefore Lacks Standing**

Plaintiff SAF has not alleged that it has suffered any injury traceable to the provisions it challenges, and therefore must seek to rest its standing on the standing of its members.  An association may sue on behalf of its members if it demonstrates that: (1) its members would otherwise have standing to sue in their own right, (2) the interests it seeks to protect are germane to the organization's purpose, and (3) the claims asserted and the relief requested do not require the participation of individual members in the lawsuit.  *See Friends of the Earth, Inc. v. Laidlaw Envt'l Svcs.(TOC), Inc.*, 528 U.S. 167, 181 (2000) (citing *Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977)); *Renal Physicians Ass'n v. U.S. Dep't of Health & Human Svcs.*, 489 F.3d 1267, 1276 (D.C. Cir. 2007).  SAF alleges that it "has over 650,000 members and supporters nationwide." Compl. ¶ 3.  But, it does not allege that any of these members are U.S. citizens residing abroad who have been "singled out or uniquely targeted by the [federal] government for prosecution" under the challenged provisions.  *Parker*, 478 F.3d at 375.  Indeed, SAF does not even allege that any of its members are U.S. citizens residing abroad who—like Dearth—have a vague desire to purchase firearms at some indeterminate point in the future.  Accordingly, SAF lacks standing.

## CONCLUSION

For the foregoing reasons, defendant respectfully request that this Court grant

defendant's motion to dismiss.

Respectfully submitted,

TONY WEST
Assistant Attorney General

CHANNING D. PHILLIPS
Acting United States Attorney

SANDRA M. SCHRAIBMAN
Assistant Branch Director
U.S. Department of Justice
Civil Division, Federal Programs Branch

  _/s/ John R. Coleman_____
JOHN R. COLEMAN
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, NW, Room 6118
Washington, D.C. 20530
(202) 514-4505
john.coleman3@usdoj.gov

*Counsel for Defendant*

Date:   June 26, 2009