IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| MAXWELL HODGKINS, et al., | ) | Case No. 08-CV-0587-JR |
| | ) | |
| Plaintiffs, | ) | MEMORANDUM OF POINTS AND |
| | ) | AUTHORITIES IN OPPOSITION TO |
| v. | ) | DEFENDANT'S MOTION TO DISMISS |
| | ) | |
| ERIC HOLDER, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS

COME NOW the Plaintiffs, Maxwell Hodgkins, Stephen Dearth, and the Second

Amendment Foundation, Inc., by and through undersigned counsel, and submit their

memorandum of points and authorities in opposition to Defendant's motion to dismiss.

Dated: July 10, 2009

Respectfully submitted,

Alan Gura (D.C. Bar No. 453449)
Gura & Possessky, PLLC
101 N. Columbus Street, Suite 405
Alexandria, VA 22314
703.835.9085/Fax 703.997.7665

By:  /s/Alan Gura_____
       Alan Gura

Attorney for Plaintiffs

## TABLE OF CONTENTS

Table of Authorities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

Preliminary Statement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Summary of Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

I.      THE ADMINISTRATIVE DENIALS OF PLAINTIFFS' ATTEMPTS TO
        PURCHASE FIREARMS ARE INJURIES-IN-FACT PLAINLY
        ESTABLISHING STANDING. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

II.     PLAINTIFFS HAVE PRE-ENFORCEMENT STANDING. . . . . . . . . . . . . . . . 14

        A.      Standing To Assert A Pre-Enforcement Challenge Is Established
                Whenever A Plaintiff Foregoes Activity Based On A Credible
                Fear Of Enforcement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

        B.      The D.C. Circuit Acknowledges That Requiring An Imminent
                Prosecutorial Threat Conflicts With Supreme Court And Other
                Circuit Precedent. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

III.    PLAINTIFFS WHO HAVE STANDING IN ONE VENUE CANNOT BE
        FORCED TO LITIGATE THEIR CASES IN VENUES WHERE THEY
        WOULD LACK STANDING. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

IV.     PLAINTIFF SECOND AMENDMENT FOUNDATION, INC. HAS
        ORGANIZATIONAL AND REPRESENTATIONAL STANDING. . . . . . . . . . 25

        A.      Plaintiff Second Amendment Foundation, Inc. Has
                Organizational Standing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

        B.      Plaintiff Second Amendment Foundation, Inc. Has
                Representational Standing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

TABLE OF AUTHORITIES

<u>Cases</u>

*Babbitt* v. *United Farm Workers Nat'l Union*, 442 U.S. 289 (1979) . . . . . . . . . . . . . . 15, 20, 21

*Bach* v. *Pataki*, 408 F.3d 75 (2nd Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Brady Campaign to Prevent Gun Violence* v. *Salazar*,
     2009 U.S. Dist. LEXIS 22077 (D.D.C. March 19, 2009). . . . . . . . . . . . . . . . . . . . . . . 27

*Bronson* v. *Swensen*, 500 F.3d 1099 (10th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Carhart* v. *Gonzales*, 413 F.3d 791 (8th Cir. 2005),
     *rev'd*, 550 U.S. 124 (2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Coalition of New Jersey Sportsmen* v. *Whitman*,
     44 F. Supp. 2d 666 (D.N.J. 1999),
     *aff'd*, 263 F.3d 157 (3d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Ctr. for Individual Freedom* v. *Carmouche*,
     449 F.3d 655 (5th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 23

*Doe* v. *Bolton*, 410 U.S. 179 (1973). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Doe* v. *Duling*, 782 F.2d 1202 (4th Cir. 1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Epperson* v. *Arkansas*, 393 U.S. 97 (1968). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Fair Employment Council* v. *BMC Mktg. Corp.*, 28 F.3d 1268 (D.C. Cir. 1994). . . . . . . . . . . . 26

*Fraternal Order of Police* v. *United States*, 152 F.3d 998 (1998),
     *on reh'g*, 173 F.3d 898 (D.C. Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 26

*Gillespie* v. *City of Indianapolis*, 185 F.3d 693 (7th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . 17

*Golden* v. *Zwickler*, 394 U.S. 103 (1969). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Grid Radio* v. *FCC*, 278 F.3d 1314 (D.C. Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

*Haitian Refugee Ctr.* v. *Gracey*, 809 F.2d 794 (D.C. Cir. 1987). . . . . . . . . . . . . . . . . . . . . . . 26

*Havens Realty Corp.* v. *Coleman*, 455 U.S. 363 (1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Hoffman* v. *Blaski*, 363 U.S. 335 (1960). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 25

*Houghton* v. *Shafer*, 392 U.S. 639 (1968). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Int'l Brotherhood of Teamsters* v. *United States*, 431 U.S. 324 (1977). . . . . . . . . . . . . . . . . . . . 8

*Marbury* v. *Madison*, 5 U.S. (1 Cranch.) 137 (1803). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Maryland State Conf. of NAACP Branches* v. *Maryland Dep't of State Police*,
    72 F. Supp. 2d 560 (D. Md. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Medimmune, Inc.* v. *Genentech, Inc.*, 549 U.S. 118 (2007). . . . . . . . . . . . . . . . . . . . . . . 15, 17

*Mobil Oil Co.* v. *Attorney Gen. of Va.*, 940 F.2d 73 (4th Cir. 1991). . . . . . . . . . . . . . . . . . . . 18

*Navegar, Inc.* v. *United States*, 103 F.3d 994 (D.C. Cir. 1997). . . . . . . . . . . . . . 18-22, 24, 25

*New Hampshire Hemp Council, Inc.* v. *Marshall*, 203 F.3d 1 (1st Cir. 2000). . . . . . . . . . . . . . 16

*O'Donoghue* v. *United States*, 289 U.S. 516 (1933). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Parker* v. *District of Columbia*, 478 F.3d 370 (D.C. Cir. 2007). . . . . . . . . . . 8, 10-13, 20-22, 27

*People's Rights Org.* v. *City of Columbus*, 152 F.3d 522 (6th Cir. 1998). . . . . . . . . . . 17, 20, 22

*Peyote Way Church of God, Inc.* v. *Smith*, 742 F.2d 193 (5th Cir. 1984). . . . . . . . . . . . . . . . . 18

*Piper Aircraft Co.* v. *Reyno*, 454 U.S. 235 (1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 25

*Planned Parenthood* v. *Farmer*, 220 F.3d 127 (3d Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . 15

*Prayze FM* v. *FCC*, 214 F.3d 245 (2nd Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Pruess* v. *Udall*, 359 F.2d 615 (D.C. Cir. 1965). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Rempfer* v. *United States Dep't of Air Force Bd. for Corr.*,
    538 F. Supp. 2d 200 (D.D.C. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Reno* v. *ACLU*, 521 U.S. 844 (1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Schecher* v. *Purdue Pharma L.P.*,
    317 F. Supp. 2d 1253 (D. Kan. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

iii

*Seegars* v. *Ashcroft*, 396 F.3d 1248 (D.C. Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19-22

*Seegars* v. *Gonzales*, 413 F.3d 1 (D.C. Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Sinochem Int'l Co. Ltd.* v. *Malaysia Int'l Shipping*, 549 U.S. 422 (2007). . . . . . . . . . . . . 23, 25

*Speaks* v. *Kruse*, 445 F.3d 396 (5th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Stafford* v. *Briggs*, 444 U.S. 527 (1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*United Food & Commercial Workers Union Local 751* v. *Brown Group, Inc.*,
     517 U.S. 544 (1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Virginia v. American Booksellers Ass'n,* 484 U.S. 383 (1988) . . . . . . . . . . . . . . . . . . . . . . . . 21

*Warth* v. *Seldin*, 422 U.S. 490 (1975). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Younger* v. *Harris*, 401 U.S. 37 (1971). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Constitutional Provisions

U.S. Const., art. III. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  passim

Statutes

16 U.S.C. § 8251. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

18 U.S.C. § 922(v)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

28 U.S.C. § 1391. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 24

28 U.S.C. § 1404. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 10, 23-25

28 U.S.C. § 1406. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 23, 24

28 U.S.C. § 2201. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14

42 U.S.C. § 1983. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 13

47 U.S.C. § 301. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

47 U.S.C. § 402.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

47 U.S.C. § 501.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

5 U.S.C. § 706. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Other Authorities

S. Rep. No. 1992, 87th Cong., 2d Sess. (1962). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS

PRELIMINARY STATEMENT

The "case or controversy" at issue here arises from two independent sets of transactions.

First, the individual Plaintiffs in this case sought to purchase firearms and, in furtherance of these

attempts, began filling out the government's "Form 4473" required of all retail firearms

purchasers in the United States. But Plaintiffs could not complete the forms, and thus were denied

their transactions, on account of the laws challenged in this case. Such administrative denials

constitute injuries in fact establishing standing in every federal jurisdiction – including this circuit.

This is not a controversial point of law, and it disposes of the government's motion.

Second, the individual Plaintiffs in this case have refrained from exercising what they

plausibly believe to be their constitutional rights for fear of arrest and prosecution under the

challenged provisions. This type of "pre-enforcement standing" is debatable only within this

circuit, but the Supreme Court makes clear that it, too, plainly satisfies Article III's requirements.

Defendant largely ignores the first basis for standing, which suffices to defeat the motion

even if the attack on the second basis for standing were correct – and it is not. Indeed, the

government's earlier success in challenging Plaintiffs' original choices of venue now bars its D.C.-

based jurisdictional defense. Defendants cannot have it both ways, defeating venue where

jurisdiction exists, only to raise a *venue-specific* jurisdictional defense. Congress created

nationwide venue against the government in part to protect this Court's docket; this Court should

not now make itself a magnet for undeserving jurisdictional defenses.

In any event, the D.C.-specific jurisdictional defenses are unavailing. The D.C. Circuit has cautioned that the cases relied upon by the government are at odds with Supreme Court precedent, the precedent of other jurisdictions, and even other precedential lines within the D.C. Circuit. The D.C. Circuit has also explained that these cases lack persuasive rationale. Not surprisingly, they have been distinguished on very similar facts. Finally, the challenge to the Second Amendment Foundation's standing is without merit. The Foundation plainly has both organizational and representational standing.

## STATEMENT OF FACTS

A brief review of the complaint's essential factual allegations, which are assumed true for purposes of this motion, is warranted. Moreover, as the parties agree that this dispute's procedural history may be illuminating, that, too is recounted, although Plaintiffs do not agree with the government's interpretation of that history.[1] Plaintiffs Maxwell Hodgkins and Stephen Dearth are natural-born American citizens who do not maintain a residence within the United States. Complaint, ¶¶ 1, 2. Both individual plaintiffs have many friends and relatives in the United States whom they enjoy visiting, and whom they intend to continue visiting on a regular basis. Complaint, ¶¶ 7, 10. Hodgkins legally owns firearms securely stored within the United States. Complaint, ¶ 8. Hodgkins and Dearth each hold a valid permit to publicly carry a handgun recognized in numerous states. Complaint, ¶¶ 9, 12.[2]

---

[1]The government's lengthy description of the challenged laws' rationale and legislative history, and voluminous supporting exhibit, are irrelevant to the question of standing. Whether these are persuasive should be determined within the context of Plaintiffs' summary judgment motion.

[2]A handful of states do not require any permit to carry a handgun, usually on the condition that the gun be carried openly.

2

Hodgkins and Dearth are both over the age of 21. Complaint, ¶¶ 9, 12. Neither is under

indictment, nor has either been convicted of a felony or misdemeanor crime of domestic violence,

nor is either Plaintiff a fugitive from justice. *Id.* Hodgkins and Dearth are not unlawful users of or

addicted to any controlled substance, and neither plaintiff has been adjudicated a mental defective

or committed to a mental institution. *Id.* Hodgkins and Dearth have not been discharged from the

Armed Forces under dishonorable conditions, have never renounced their citizenship, and have

never been the subject of a restraining order relating to a child or an intimate partner. *Id.* In sum,

neither Plaintiff is a "prohibited person" barred from possessing firearms under federal law.

However, owing to Plaintiffs' expatriated status, their activities within the United States

are significantly curtailed. As the government explains,

> while those U.S. citizens who only reside abroad will be effectively prohibited from
> receiving firearms for purposes other than sporting purposes while in the United States,
> those U.S. citizens who generally reside abroad but continue to maintain a home in the
> United States may purchase firearms in that State for any purpose while they are residing
> in their United States home.

Mot. to Dismiss, 6/26/09, 7-8.

To implement this (and other) federal gun laws, the government requires all firearms

purchasers within the United States who do not possess a Federal Firearms License, meaning,

virtually all ordinary civilian consumers of firearms, to complete "Form 4473, Firearms

Transaction Record Part I – Over-The-Counter," administered under Defendant's authority. 27

CFR 478.124. Question 13 on Form 4473 provides, "What is your State of residence (*if any*)?

_____" Complaint, ¶ 17.

If an American citizen otherwise fully qualified to buy a firearm cannot provide an answer

to Question 13 on Form 4473, the transaction must be canceled. Complaint, ¶ 18. The challenged

provisions, as applied to plaintiffs and to similarly situated individuals, are presently causing said individuals injury in that they prevent presently-intended firearms purchases. Complaint, ¶ 19.

Indeed, with respect to these particular Plaintiffs, the challenged provisions do more than prevent presently-intended behavior. Completely ignored by the government, but clearly alleged in the complaint and beyond dispute, the challenged provisions *have* thwarted Plaintiffs' conduct. Dearth attempted to buy a firearm within the United States on or about January 28, 2006. Complaint, ¶ 22. However, he could not provide a response to Question 13 on Form 4473, and advised the dealer that he does not reside in any state. *Id.* On account of Mr. Dearth's foreign residence and inability to answer Question 13, the transaction was terminated. *Id.* Mr. Dearth subsequently spoke with an official at the Federal Bureau of Investigations, who confirmed that Dearth could not adequately complete Form 4473, and could not purchase a firearm on account of his lack of domestic residence. *Id.*

Dearth subsequently sought to purchase a firearm within the United States in June, 2007. Complaint, ¶ 23. Dearth truthfully advised the seller that he did not reside in any state, and on account of that fact, the transaction could not proceed. *Id.*

On or about October 1, 2008, Mr. Hodgkins sought to purchase a firearm within the United States.  Mr. Hodgkins truthfully advised the seller that he did not reside in any state, and on account of that fact, the transaction could not proceed. Complaint, ¶ 24.

In addition to being denied the purchase of firearms on account of the challenged provisions, Plaintiffs also fear, reasonably, that simply violating federal gun laws would lead to negative consequences at Defendant's hands. Complaint, ¶¶ 20, 21.

4

The complaint alleges that Defendant is tasked with enforcing these laws and in fact, presently does so. Complaint, ¶ 4. Notably, the government will not deny that allegation.

\* \* \*

Recalling that Congress established nationwide venue against the federal government in civil actions, *see Stafford* v. *Briggs*, 444 U.S. 527 (1980), Plaintiffs filed their initial constitutional challenges in the federal judicial districts where their desired exercise of constitutional rights were thwarted – districts where "a substantial part of the . . . omissions giving rise to the claim occurred." 28 U.S.C. § 1391(e)(2).

Defendant's two predecessors-in-interest, Attorneys General Gonzales and Mukasey, objected. Allowing that standing might exist in those judicial districts where Plaintiffs had actually tested the law,[3] *see infra*, the government claimed that, essentially, "nothing happened" in the Plaintiff's chosen venues – Columbus, Ohio and Dallas, Texas – leaving the only available venue the defendant's "official" Washington, DC residence.[4] Additionally, claimed the government, a discretionary transfer to Washington was due owing to the alleged inconvenience of defending civil claims in Ohio and Texas. *Contra Stafford*, 444 U.S. at 542 ("[r]equiring the Government to defend Government officials and agencies in places other than Washington would not appear to be a burdensome imposition") (quoting S. Rep. No. 1992, 87th Cong., 2d Sess., 3 (1962)).[5]

---

[3] At the time, Hodgkins had not yet attempted to purchase a gun and Dearth had only completed his first attempt.

[4] Were Dearth and Hodgkins residing in their home states, the government could not challenge their venue choices. Plaintiff SAF's home state of Washington was another possibility.

[5] Plaintiffs have always disclaimed any need for the Attorney General to be personally involved in this litigation.

Plaintiffs took seriously their duty of candor with the courts, and explained that the government was shopping for a better – although ultimately unsatisfying – jurisdictional defense. Moreover, the federal transfer statutes provide that a case should only be transferred "to any district or division in which it could have been brought,"28 U.S.C. § 1406(a), or "where it might have been brought." 28 U.S.C. § 1404(a), and the Supreme Court has explained that a transferee court's jurisdiction and willingness to entertain the claim is a decisive factor in venue disputes. *See infra*. Plaintiffs were thus constrained to discuss the jurisdictional defenses unique to this circuit, at which the government had hinted in their moving papers.

The government ultimately prevailed in its venue challenges, but both district courts agreed to Plaintiffs' contingent request for dismissal without prejudice in lieu of an immediate transfer to this Court.[6] The Fifth and Sixth circuits affirmed the venue-based dismissals.

Plaintiffs re-filed their litigation in the government's preferred venue, and as Plaintiffs predicted, the government raises the venue-specific jurisdictional defense for which it shopped.

## SUMMARY OF ARGUMENT

Three times, Plaintiffs attempted to purchase firearms. Three times, their transactions were thwarted by Defendant's enforcement of the challenged provisions. The government's motion barely, and ineffectively, addresses this most-obvious and clearly pled basis of Plaintiffs' standing, although it has previously acknowledged standing is created under these circumstances. The case for subject matter jurisdiction here is not difficult. Although the great bulk of the parties' arguments relating to pre-enforcement standing and the consequences of venue adjudication may

---

[6]The orders of dismissal were appealable; orders transferring the cases would not have been.

6

be interesting in an academic sense, the Court can summarily deny the motion to dismiss on the basis of routine administrative action alone.

Of course, Plaintiffs do have, in addition to standing based on their administrative denial, pre-enforcement standing to challenge criminal enactments without first obtaining the government's permission to file suit. There do exist federal statutory schemes (e.g. Title VII) specifically requiring a government-issued "right to sue" letter before proceeding in district court. The Declaratory Judgment Act has no such requirement, which would utterly defeat the purpose of allowing pre-enforcement claims in the first place. The D.C. Circuit has cautioned that its unique precedent requiring – only in limited circumstances – specific prosecutorial threats, rests on shaky grounds. It should not be expanded here.

Moreover, the government's forum-shopping behavior counsels rejection of its venue-specific jurisdictional defense. Although the previous district courts declined to consider the availability of standing in this Court, this Court has an independent duty to consider the consequences of the government's previous litigation behavior. Now that the government has obtained exactly what it wanted – a new venue in Washington, D.C. – it cannot be heard to assert jurisdictional defenses theoretically available only in this Court, because it is axiomatic that transfers cannot have the effect of destroying jurisdiction. And if there were any question that the Ohio and Texas courts lacked jurisdiction, this motion would have been brought two years ago in those courts without the preliminary forum-shopping, where it would have doubtless been rejected – just as it must be rejected here.

For its part, Plaintiff Foundation alleges that it exists to deal with the consequences of gun control. It plainly follows, and sufficiently to establish organizational standing, that the

7

enforcement of gun control regimes such as that challenged here taxes SAF. Moreover, SAF's

members are impacted by the challenged laws directly, their presence in the litigation is not strictly

required, and the lawsuit is germane to SAF's purposes. Organizational and representational

standing thus exist.

ARGUMENT

I.   THE ADMINISTRATIVE DENIALS OF PLAINTIFFS' ATTEMPTS TO PURCHASE
     FIREARMS ARE INJURIES-IN-FACT PLAINLY ESTABLISHING STANDING.

    The D.C. Circuit's heavy administrative law docket would not exist but for a basic feature

of Article III standing: regulatory behavior denying permission to engage in some desired conduct

is not merely a contingent threat of hypothetical criminal enforcement. It is an injury-in-fact,

presently restraining a petitioner or plaintiff. In this respect, the D.C. Circuit's standing precedent

is unremarkable: when the government says "no," a justiciable controversy exists. *See Parker* v.

*District of Columbia*, 478 F.3d 370, 376 (D.C. Cir. 2007) (collecting cases), *aff'd sub nom*

*District of Columbia* v. *Heller*, 128 S. Ct. 2783 (2008).[7]

    Plaintiffs' attempts at purchasing firearms, thwarted only by Form 4473's thirteenth

question, is an unremarkable source of standing sufficient to terminate this motion. Indeed, it is

doubtful that even this much should be required of Plaintiffs. A well-established corollary to the

basic rule that Article III standing arises upon some negative governmental action is the futile act

doctrine: if circumstances make clear that an administrative application is hopeless, a plaintiff need

not go through the futile ritualistic act of submitting paperwork. *See, e.g. Int'l Brotherhood of*

---

[7]Although Judge Henderson dissented from the panel's ruling on the merits, she agreed
that the denial of Heller's permit application afforded him standing. *Parker*, 478 F.3d at 402 n.2
(Henderson, J., dissenting).

*Teamsters* v. *United States*, 431 U.S. 324, 365-66 (1977) (minority job applicants need not test a "whites only" sign before filing a Title VII claim); *Houghton* v. *Shafer*, 392 U.S. 639, 640 (1968) (per curiam) (inmate need not file hopeless administrative appeal to sustain a facial challenge).

The Second Circuit's holding in *Bach* v. *Pataki*, 408 F.3d 75 (2nd Cir. 2005) is instructive. In *Bach*, the plaintiff, a Virginia resident, frequently visited his parents in New York, and challenged that state's prohibition on the issuance of firearms carry permits to those who neither permanently reside nor work in the state. Because the prohibition clearly applied to the plaintiff, he did not bother applying for a firearms permit. Both the District Court and the Second Circuit rejected the defendants' standing challenge:

> The State Police informed Bach that he was statutorily ineligible for a carry license.  Bach had nothing to gain thereafter by completing and filing an application . . . . Imposing a filing requirement would force Bach to complete an application for which he is statutorily ineligible and to file it with an officer without authority to review it. We will not require such a futile gesture as a prerequisite for adjudication in federal court.

*Bach*, 408 F.3d at 82-83 (footnotes, citations and internal quotation marks omitted). This is no different than forcing Plaintiffs to attempt completion of Form 4473, though they have already tried doing so.

This circuit's precedent is in accord. In *Grid Radio* v. *FCC*, 278 F.3d 1314 (D.C. Cir. 2002), an unlicensed radio broadcaster challenged the constitutionality of the FCC's ban on microbroadcasting. The FCC asserted that because the broadcaster did not apply for a license, he lacked standing to challenge the policy forbidding the issuance of such licenses. The D.C. Circuit rejected the claim:

> The record before us is clear: But for the ban, Szoka would have applied for a license, and the Commission points to no individual characteristics – of either Szoka or Grid Radio – that would have led it categorically to deny his application in the absence of the ban.

*Grid Radio*, 278 F.3d at 1319 (citing *Prayze FM* v. *FCC*, 214 F.3d 245, 251 (2nd Cir. 2000)).

Had the broadcaster persisted in broadcasting notwithstanding the lack of an FCC permit, he would have been in criminal violation of 47 U.S.C. § 301 and subject to the penalties of 47 U.S.C. § 501. Yet the D.C. Circuit did not require the broadcaster to allege, much less prove, that it faced an imminent and credible threat of criminal prosecution. The injury in fact was the ban on issuance of permits that would have legalized the desired behavior.

Plaintiffs' standing here is indistinguishable from *Grid Radio* – except that they have, in fact, tested the law by seeking to complete a Form 4473. And their injury is identical to that found sufficient to confer standing in *Parker*, where a gun registration attempt "constitute[d] an injury independent of the District's prospective enforcement of its gun laws." *Parker*, 478 F.3d at 376.

Indeed, when the government was claiming that nothing had occurred in Ohio and Texas – where Plaintiffs were refraining from acquiring and using firearms – it was eager to point out that something had occurred in Minnesota, where Plaintiff Dearth first unsuccessfully tried to buy a gun on one of his travels through the United States. *See, e.g.* Exh. A, Motion to Dismiss, at 8 ("'events' relevant to this case occurred in . . . Minnesota"); Exh. B, Appellees' Br., at 12 ("plaintiffs' allegations pertaining to the attempted Minnesota purchase made Minnesota an appropriate forum choice").

Lest the government again accuse Plaintiffs of confusing standing with venue,[8] it bears pointing out here that the government went so far as to deny that standing was asserted on a pre-

---

[8] It is not the Plaintiffs who are confused. The concepts distinct, but related in two ways: (1) where the law recognizes that a coerced omission or event is an injury in fact (standing), the location of that recognized injury – which must occur *somewhere* – supplies the venue; and (2) if a prospective transferor court has jurisdiction but a prospective transferee court lacks jurisdiction, the latter is not a permissible venue. 28 U.S.C. § 1404(a); *see* discussion *infra*.

enforcement theory, and explicitly suggested the purchase denial was the true basis for standing: "[a]lthough plaintiffs sought to recharacterize their suit as a pre-enforcement challenge based on plaintiff Dearth's apprehensions in Ohio, the only district in which plaintiff Dearth allegedly endeavored to buy a handgun was in Minnesota." Exh. B, at 23. And before the Fifth Circuit, the government egged Hodgkins on to test the law in Texas:

> Plaintiffs state that "[i]f the venue question turns entirely on Hodgkins testing 18 U.S.C. § 922(b)(3) within the Northern District of Texas, that deficiency could be cured upon his next visit there." They are correct. Plaintiffs' suit has been dismissed without prejudice. If plaintiffs wish to invoke § 1391(e)(2), plaintiff Hodgkins may complete an application to purchase a weapon upon his next visit . . .

Exh. C, Appellee's Br., at 20-21 (citations omitted).[9] Now that Hodgkins has done so, Complaint, ¶ 24,[10] presumably his claim, too, should not be completely "recharacterize[d] . . . as a pre-enforcement challenge." Exh. B, at 23.

Now that venue is no longer at issue, the government must confront squarely the meaning of Dearth's Minnesota denial, and that of the two additional futile acts it prompted in Ohio and Texas by Dearth and Hodgkins, respectively – and the consequence of everything it urged about the impact of these events. If the lawsuit cannot be "recharacterized as a pre-enforcement challenge," because the law has actually been tested, then what else could it be?

The government senses this is a problem, and seeks to distinguish *Parker* by alleging that while 42 U.S.C. § 1983, under which relief in that case was obtained, allows remedies for past

---

[9]Dearth's second test of the law occurred in the formerly disputed Ohio venue.

[10]Defendant's citation to Hodgkins' earlier explanation to the Texas court that the D.C. Circuit's standing doctrine "would likely cause a non-merits dismissal," Mot. to Dismiss, 6/26/09, at 19, n.10 (citation omitted) is unavailing. This was written before Hodgkins tested the law. Plaintiffs always maintained such a result would be wrong, and that their venue choices could not be rejected absent finding their jurisdictional concerns unfounded.

injuries, the Declaratory Judgment Act "do[es] not provide a remedy for past injuries, but only for a 'specific *live* grievance.'" Mot. to Dismiss, 6/26/09, 17 (quoting *Golden* v. *Zwickler*, 394 U.S. 103, 110 (1969) (adding emphasis)). The argument fails on multiple levels.

First, it rests on an incredible assumption that where an injurious event occurred in the past, there is no current case or controversy. This is a specious argument. The whole point of *Parker*, and of every one of the innumerable cases in which the federal courts adjudicate a dispute based upon the government's denial of some permission, is that the administrative denial *does*, in fact, create a current grievance. The injury, once complete, does not automatically float into non-existence merely because the ink has dried on the stamped disapproval.[11] If there is no Article III standing because Plaintiffs' injuries upon being denied permission to purchase guns are now in the past, then likewise there was no standing in *Parker* or any of the administrative law cases routinely heard in this circuit. Indeed, on this view of standing, the Supreme Court never should have reached the merits in *Marbury* v. *Madison*, 5 U.S. (1 Cranch.) 137 (1803), because Madison's refusal to deliver Marbury's judicial commission was a completed event that occurred in the past, regardless of how aggrieved Marbury must have felt in bringing the action.

The Declaratory Judgment Act's requirement of a live case or controversy, while memorialized in the statutory text, refers to the *constitutional* requirement – and is the same Article III requirement present in all cases. Article III does not govern Declaratory Judgment Act cases differently than it does other types of cases, nor does the government attempt to describe

---

[11] Plaintiffs' complaint was filed well-within the six year statute of limitations for Declaratory Judgment Act cases. *Rempfer* v. *United States Dep't of Air Force Bd. for Corr.*, 538 F. Supp. 2d 200, 206 (D.D.C. 2008). In *Golden*, the only case or controversy was hypothetical. The plaintiff sought to speak against the re-election of a Member of Congress who had become a judge during the pendency of the litigation.

what that difference might be. Standing is standing. It exists, or it does not. That an administrative denial is an injury-in-fact for Article III purposes is indisputable, and therefore, it triggers the Court's authority under the Declaratory Judgment Act.

The statutory text makes this plain: "In a case of actual controversy within its jurisdiction [notwithstanding certain exceptions]," this Court "may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). The question of whether there is "a case of actual controversy" is one of the Court's authority under Article III. The fact that Congress enacted many separate statutory mechanisms to resolve other specific "cases or controversies" dealing with different government actors, as in Section 1983, is completely irrelevant. Indeed, there is no difference between the Declaratory Judgment Act's provisions for granting declaratory and injunctive relief, and the same relief sought by and awarded in *Parker* under Section 1983. None of the *Parker* plaintiffs sought money damages for past injuries, and the *Parker* court did not reach the merits of the Declaratory Judgment Act claim, most likely because it proved unnecessary to do so.

The government argues further that "[n]one of the cases relied upon by the Court of Appeals for the proposition that a license or permit denial is a sufficient injury for Article III purposes were brought pursuant to the Declaratory Judgment Act," Mot. to Dismiss, 6/26/09, at 18 n.8, citing cases decided under 47 U.S.C. § 402, 5 U.S.C. § 706, and 16 U.S.C. § 8251(b). But it is unclear why this should be important. No explanation is offered for why the Declaratory Judgment Act's declaratory and injunctive relief mechanisms are governed by a different, undefined version of Article III than that which controls, apparently, all other grants of authority to render declaratory and injunctive relief in the United States Code.

13

If the Court has subject matter jurisdiction to resolve a live "case or controversy" by issuing declaratory and injunctive relief, then it may do so under any relevant statutory mechanism whose elements have been established. The Declaratory Judgment Act's plain text establishes that its relief is available "whether or not further relief is or could be sought." 28 U.S.C. § 2201(a).

The existence of Article III standing here, based on specific events, is obvious.

II.     PLAINTIFFS HAVE PRE-ENFORCEMENT STANDING.

The plain existence of an Article III injury described above, flowing from Plaintiffs' thwarted attempts to purchase firearm, renders the balance of this pleading – like the bulk of the motion to which it responds – academic. But Plaintiffs are constrained to address the government's other arguments nonetheless, especially as pre-enforcement standing is a separate, sufficient jurisdictional ground.

   A.     Standing To Assert A Pre-Enforcement Challenge Is Established Whenever A
          Plaintiff Foregoes Activity Based On A Credible Fear Of Enforcement.

Discussion of the federal courts' various standing doctrines can often devolve into abstractions, but it is important to recall what is essentially at stake: the right of an individual to access Article III courts for the vindication of civil rights claims. This right is to be enjoyed within the District of Columbia as it is elsewhere in the United States. *O'Donoghue* v. *United States*, 289 U.S. 516, 540 (1933).

The Supreme Court has fashioned pre-enforcement standing guidelines that reflect a practical, common-sense approach to distinguish those claims that are merely hypothetical from those that seek to resolve actual, live "cases or controversies." Outside this Circuit, and before the Supreme Court, it is not a controversial legal principle that the government creates an actual case

14

or controversy whenever its laws or policies cause reasonable people to forego behavior that might be held permissible by a competent court. As the Supreme Court declared in its most recent examination of pre-enforcement standing,

> [W]here threatened action by government is concerned, we do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat -- for example, the constitutionality of a law threatened to be enforced. *The plaintiff's own action (or inaction) in failing to violate the law eliminates the imminent threat of prosecution, but nonetheless does not eliminate Article III jurisdiction.*

*Medimmune, Inc.* v. *Genentech, Inc.*, 549 U.S. 118,129 (2007) (emphasis added).

In *Medimmune*, the Supreme Court reviewed its own history of cases affirming the constitutionality of pre-enforcement standing, explaining,

> [i]n each of these cases, the plaintiff had eliminated the imminent threat of harm by simply not doing what he claimed the right to do . . . That did not preclude subject-matter jurisdiction because the threat-eliminating behavior was effectively coerced.

*Medimmune*, 549 U.S. at 129.

The Supreme Court could not have spoken more clearly: standing exists even if "the imminent threat of prosecution" has been eliminated by the plaintiff's coerced compliance.

The touchstone of a pre-enforcement injury is thus not an "imminent threat of prosecution," *Medimmune*, 549 U.S. at 129, but "a *credible* threat of prosecution." *Babbitt* v. *United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979) (emphasis added). The existence of a credible prosecutorial threat plainly satisfies the elements of standing: injury in fact, causation by the defendants, and redressability by the requested relief. *Planned Parenthood* v. *Farmer*, 220 F.3d 127, 146 (3d Cir. 2000).

The requirement that a prosecutorial threat be "credible" is meant to eliminate those cases where plaintiffs are challenging a statutory relic which no prosecutor is likely to assert. For

15

example, the Fourth Circuit rejected the credibility of the prosecutorial threat in declining to hear a challenge to Virginia's ancient bans on fornication and cohabitation, the last recorded convictions for which had occurred in 1849 and 1883, respectively. *Doe* v. *Duling*, 782 F.2d 1202 (4th Cir. 1986); *see also Bronson* v. *Swensen*, 500 F.3d 1099 (10th Cir. 2007) (no standing to challenge polygamy laws unenforced under plaintiff's circumstances).

As a rule, however, pre-enforcement challenges are permitted where the statutes being challenged are "not moribund." *Doe* v. *Bolton*, 410 U.S. 179, 188 (1973). As recently as 1968, the Supreme Court let a teacher challenge Arkansas' "monkey law," notwithstanding the possibility that "the statute is presently more of a curiosity than a vital fact of life." *Epperson* v. *Arkansas*, 393 U.S. 97, 102 (1968). Nothing in the government's motion suggests the challenged provisions are mere curiosities.

If anything, "[t]here may be a trend in favor of . . . a practical approach" to standing, where "courts are content with any realistic inferences that show a likelihood of prosecution." *New Hampshire Hemp Council, Inc.* v. *Marshall*, 203 F.3d 1, 5 (1st Cir. 2000); *cf. Maryland State Conf. of NAACP Branches* v. *Maryland Dep't of State Police*, 72 F. Supp. 2d 560, 565 (D. Md. 1999) ("plaintiffs' likelihood of injury depends only on their status as a member of a minority group and their need to travel on I-95").

Thus, courts routinely allow challenges to statutes immediately upon their effective date, without waiting for historical evidence of prosecution. *See, e.g.*, *Reno* v. *ACLU*, 521 U.S. 844, 861 (1997) ("immediately after the President signed the statute, 20 plaintiffs filed suit against the Attorney General of the United States and the Department of Justice") (footnote omitted); *Carhart* v. *Gonzales*, 413 F.3d 791, 792 (8th Cir. 2005) ("[t]he day the President signed the Act

16

into law, plaintiffs filed suit"), *rev'd on other grounds*, 550 U.S. 124 (2007). The government

does not get any "free" prosecutions before the Declaratory Judgment Act may be invoked.

That no actual threat need be directed at a pre-enforcement plaintiff is readily obvious –

and in any event, very clear after the Supreme Court's last word on the topic in *Medimmune*,

*supra*. Where the Supreme Court's precedent on the topic is followed, the government's theory

that plaintiffs require an imminent threat of prosecution to sustain pre-enforcement standing is

simply not the law. *See*, *e.g. Ctr. for Individual Freedom* v. *Carmouche*, 449 F.3d 655, 659-660

(5th Cir. 2006); *People's Rights Org.* v. *City of Columbus*, 152 F.3d 522 (6th Cir. 1998) (standing

to challenge vagueness of "assault weapons" ban); *Gillespie* v. *City of Indianapolis*, 185 F.3d

693, 710-11 (7th Cir. 1999) (standing to assert Second Amendment challenge to ban on firearms

possession by misdemeanant police officers); *Coalition of New Jersey Sportsmen* v. *Whitman*, 44

F. Supp. 2d 666, 673 n.10 (D.N.J. 1999), *aff'd*, 263 F.3d 157 (3d Cir. 2001) (standing for various

constitutional challenges to state ban of certain firearms).

It is easy to see why the government would desire conditioning pre-enforcement standing

on an "imminent" threat of prosecution. Doing so effectively grants the government a pocket veto

over a broad swath of pre-enforcement claims. Because the credibility of enforcement is then

based not on the government's conduct, but its communication to a putative plaintiff, a plaintiff

can be deprived of pre-enforcement standing merely if the government is silent or deliberately

vague about its intentions. However, once the government initiates a prosecution, courts must

ordinarily abstain from entertaining a pre-enforcement challenge. *Younger* v. *Harris*, 401 U.S. 37

(1971).

17

The challenger may not sue before he is truly injured; yet he may not wait until he is charged with a crime. He may invoke federal jurisdiction only if he can move through the narrow door between prematurity and exclusive state jurisdiction.

*Peyote Way Church of God, Inc.* v. *Smith*, 742 F.2d 193, 199 (5th Cir. 1984). An imminence requirement slams this "narrow door" shut, rendering the Declaratory Judgment Act a nullity. Unless the government has personally threatened, yet refrained from arresting the plaintiff, the pre-enforcement challenge is either too early or too late. This sort of "predicament – submit to a statute or face the likely perils of violating it – is precisely why the declaratory judgment cause of action exists." *Mobil Oil Co.* v. *Attorney Gen. of Va.*, 940 F.2d 73, 74 (4th Cir. 1991).

B.    The D.C. Circuit Acknowledges That Requiring An Imminent Prosecutorial Threat <u>Conflicts With Supreme Court And Other Circuit Precedent</u>.

Notwithstanding the Supreme Court's clear instructions regarding the nature of the threat necessary to sustain pre-enforcement standing, the D.C. Circuit has adopted a requirement that the prosecutorial threat not only be "credible," but in some cases, imminently so. *Navegar, Inc.* v. *United States*, 103 F.3d 994 (D.C. Cir. 1997). The appellate court has also signaled that this requirement, where it applies, is erroneous, precisely because it lacks any rationale and is squarely at odds with controlling Supreme Court precedent (to say nothing of its unworkable nature). This is the essence of the government's defense – and it is unique to this circuit.

*Navegar* concerned a challenge by weapons manufacturers to the now-expired federal ban on "assault weapons," 18 U.S.C. § 922(v)(1). The law specifically banned certain firearms by name, and banned others by characteristics. The court held that as to the former category of guns, the plaintiffs had standing. *Navegar*, 103 F.3d at 999. After all, federal agents had visited plaintiffs on the day the law went into effect, and took inventories of previously manufactured,

18

grandfathered weapons identified by name in the statute. Subsequently, the government instructed

plaintiffs not to violate the new law. This much of *Navegar* is not controversial.

However, with respect to the second category of weapons, which arguably fell within the

ban's ambit, the D.C. Circuit held the plaintiffs were not suffering from a sufficiently imminent

fear of prosecution so as to make their claims justiciable. *Navegar*, 103 F.3d at 1001. The D.C.

Circuit would discover the problems inherent in this approach.

Oddly, *Navegar* did not prove a problem in *Fraternal Order of Police* v. *United States*,

152 F.3d 998 (1998), *on reh'g*, 173 F.3d 898 (D.C. Cir. 1999), where the court found that

plaintiffs had standing to challenge the ban on the possession of firearms by misdemeanant police

officers, and proceeded to consider constitutional challenges to the ban. The court did not require

that any police officer show an imminent threat of prosecution for possession of a firearm, despite

the fact the law was new and lacked a record of wide enforcement. The injury in fact was the

mere ban itself. But *Navegar*'s difficulties surfaced in *Seegars* v. *Ashcroft*, 396 F.3d 1248 (D.C.

Cir. 2005), a pre-enforcement challenge to Washington, D.C.'s bans on the possession of

handguns and all functional firearms. Applying *Navegar*, a reluctant 2-1 majority held none of the

plaintiffs had standing to challenge the gun bans because none could demonstrate that they,

specifically, would be targeted for prosecution, notwithstanding the well-known fact that virtually

all violators are prosecuted.

The *Seegars* majority observed, "[w]e cannot help noting that *Navegar*'s analysis is in

sharp tension with standard rules governing preenforcement challenges to agency regulations,"

*Seegars*, 396 F.3d at 1253, and that "[t]here is also tension between *Navegar* and our cases

upholding preenforcement review of First Amendment challenges to criminal statutes." *Id.* at

19

1254. The court also conceded that *Navegar* was inconsistent with the pre-enforcement standing

requirements of at least one circuit. *Id.* at 1255 (noting conflict with *People's Rights*

*Organization*, *supra*, 152 F.3d 522 (6th Cir. 1998)) (arising in same judicial district as Dearth's

original suit).

And as explained on petition for rehearing en banc, "[a]s a panel we were constrained by

[*Navegar*], even though, as my opinion for the court made clear, it appeared to be in conflict with

an earlier Supreme Court decision, [*United Farm Workers*]." *Seegars* v. *Gonzales*, 413 F.3d 1, 2

(D.C. Cir. 2005) (Williams, Senior Circuit Judge).

Having explained that *Navegar* stands in conflict with Supreme Court precedent and case

law from another circuit, not to mention its "sharp tension with standard rules" in other cases,

*Seegars*, 396 F.3d at 1253, and "tension" with yet another set of circuit precedent, *Seegars*, 396

F.3d at 1254, the court searched for a rationale to justify applying the *Navegar* doctrine once

more. All that could be said in *Navegar*'s defense was that "it represents the only circuit case

dealing with a non-First Amendment preenforcement challenge to a criminal statute that has not

reached the court through agency proceedings." *Seegars*, 396 F.3d at 1254 (citations omitted).

Among the votes for en banc review was that of the current Chief Justice of the United States.

The low point of *Navegar*'s imminence doctrine arrived with *Parker*, another, ultimately

more successful challenge to the same laws at issue in *Seegars*. The record of pre-enforcement

threats in *Parker* was quite stark. When the District Court inquired whether the plaintiffs would

be prosecuted for violating the law, defendants' counsel rejected the District Court's suggestion

that plaintiffs would get "a free ride" on account of their litigation activity, and referred to "the

fact that if, in fact, they break the law and we would enforce the law that they're breaking."

20

Appellants' Br., 04-7041 at 9. Indeed, upon the filing of the litigation, city officials ominously proclaimed to a newspaper that the plaintiffs' behavior would harm children and "is not what we want." *Id.* at 10 (citation omitted).

The district court in *Parker* had paid great attention to the standing dispute, even repeatedly ordering additional briefing on the subject. But in the end, it must have found the city's attacks on standing unavailing, for it proceeded directly to the merits of the claim. On appeal, the D.C. Circuit reached a somewhat different conclusion. With respect to the plaintiffs who did not test the law, the court found that the government's threatening statements were insufficiently so. But with respect to the one plaintiff who had tested the law, the D.C. Circuit found the pre-enforcement standing question *irrelevant*, because he had an actual injury-in-fact owing to the government's denial of his access to a gun, *Parker*, 478 F.3d at 375-76 – just like Plaintiffs here.

Yet as in *Seegars*, the *Parker* court carefully noted that its decision on pre-enforcement standing was questionable:

> The unqualified language of *United Farm Workers* would seem to encompass the claims raised by the *Seegars* plaintiffs, as well as the appellants here. Appellants' assertions of Article III standing also find support in the Supreme Court's decision in *Virginia v. American Booksellers Ass'n,* 484 U.S. 383, 108 S. Ct. 636, 98 L. Ed. 2d 782 (1988) . . . In that case, the Court held it sufficient for plaintiffs to allege "an actual and well-founded fear that the law will be enforced against them," *id.* at 393, without any additional requirement that the challenged statute single out particular plaintiffs by name. In both *United Farm Workers* and *American Booksellers*, the Supreme Court took a far more relaxed stance on pre-enforcement challenges than *Navegar* and *Seegars* permit. Nevertheless, unless and until this court en banc overrules these recent precedents, we must be faithful to *Seegars* just as the majority in *Seegars* was faithful to *Navegar*.

*Parker*, 478 F.3d at 395 (footnote omitted).

In sum, the D.C. Circuit's imminence doctrine in selected pre-enforcement challenges (not First Amendment, not agency review) has been repeatedly declared by the D.C. Circuit to be at

21

odds with Supreme Court precedent and the practice in other courts, and it lacks any persuasive

rationale. It is an almost accidental feature of *Navegar*, and one that is unlikely to survive much

longer even in its limited state.[12] For purposes of this case, it is enough to follow either the

Supreme Court, or *Parker*'s other holding – that an actual administrative denial is an injury-in-fact

shielded from the effects of the D.C. Circuit's unsettled pre-enforcement standing doctrines.[13]

But there is yet another reason to avoid the *Navegar* doctrine.

III.   PLAINTIFFS WHO HAVE STANDING IN ONE VENUE CANNOT BE FORCED TO
       LITIGATE THEIR CASES IN VENUES WHERE THEY WOULD LACK STANDING.

In one respect, the government's motion is gratifying to Plaintiffs: it confirms their oft-

repeated allegations that the government's earlier venue challenges were exercises in forum-

shopping (these allegations were reciprocated, with numerous accusations of "manipulative"

behavior leveled at Plaintiffs for selecting and trying to maintain their original venues). But there

is at least one sort of bargain not available under the transfer statutes: a jurisdiction-free venue.

The government's standing arguments are specific to this venue – made under precedents

that are unique to this circuit, and which this circuit has explained are inconsistent with Supreme

Court precedent. Indeed, *Seegars* specifically noted that it was at odds with a Sixth Circuit case

that would have governed Dearth's earlier lawsuit. *Seegars*, 396 F.3d at 1255 (noting conflict

with *People's Rights Organization*, *supra*, 152 F.3d 522 (6th Cir. 1998), and the Fifth Circuit's

standing doctrine, which would have governed any 12(b)(1) motion in that case, is no different.

---

[12]The conditional cross-petition for certiorari filed by the non-surviving *Parker* plaintiffs
was submitted to conference twice, and held for the entire term.

[13]*Parker* also fails to acknowledge *Medimmune*, which was announced shortly after
*Parker* was argued. The *Parker* court was notified of that decision through a Rule 28(j) letter.
*Medimmune*'s plain language, quoted *supra*, is utterly inconsistent with the *Navegar* theory.

*Carmouche*, *supra*, 449 F.3d at 659-660; *Speaks* v. *Kruse*, 445 F.3d 396, 399 (5th Cir. 2006).

So while the government would not file a 12(b)(1) motion in the other courts, it now files

that motion after fighting for this venue, based on venue-specific law. This is not permitted.

"[D]ismissal [based on venue] would not be appropriate where the alternative forum does not

permit litigation of the subject matter of the dispute." *Piper Aircraft Co.* v. *Reyno*, 454 U.S. 235,

255 n.22 (1981) (citation omitted). For example, the Supreme Court made clear that if a

transferee court lacks personal jurisdiction,"it is not a district 'where [the action] might have been

brought'" under Section 1404(a)." *Hoffman* v. *Blaski*, 363 U.S. 335, 344 (1960) (citation

omitted). This is so even if the defendant waives personal jurisdiction. *Id.* Unlike personal

jurisdiction, the absence of subject matter jurisdiction cannot be waived. Thus, it is equally true

that a transferee court is not one "where [the action] might have been brought" where the court

lacks subject-matter jurisdiction. *See, e.g. Schecher* v. *Purdue Pharma L.P.*, 317 F. Supp. 2d

1253, 1256 (D. Kan. 2004) (footnote omitted).

These concepts pre-exist the codification of the transfer rules among the federal district

courts in 28 U.S.C. §§ 1404 and 1406. They remain in effect under the somewhat narrower *forum

non conveniens* doctrine that still governs foreign-court transfers."A federal court has discretion

to dismiss a case on the ground of *forum non conveniens* 'when an alternative forum has

jurisdiction to hear [the] case.'" *Sinochem Int'l Co. Ltd.* v. *Malaysia Int'l Shipping*, 549 U.S.

422, 429 (2007) (citation omitted) (emphasis added). "A forum non conveniens dismissal . . . is a

determination that the merits should be adjudicated elsewhere." *Sinochem*, 549 U.S. at 432

(citations omitted).

23

Plaintiffs advised the earlier courts that if the case were transferred to this District, the government would invoke the *Navegar* doctrine – and that is exactly what has occurred. The Texas and Ohio courts did not wish to pass overtly on the standing question under the laws of this circuit. But now the "transfer" has occurred, with venue-based dismissals suggesting this is the proper forum.

Thus, the question before this Court is: could the venue-based dismissals have been made if there were no standing here owing to factors unique to this circuit, e.g., *Navegar*? On the one hand, the Ohio and Texas courts found venue to not actually exist in their jurisdiction, accepting the "nothing happened," administrative-denial based theory of the cases urged by the government, and dismissed for lack of venue per Section 1406. That makes the venue dispute irrelevant to this Court – what happened, did not happen in those judicial districts – but it confirms that these are not strictly pre-enforcement cases, and establishes standing based on the actual purchase attempts.

But if this is a pre-enforcement case, as the government *now* claims, then the relevant "omissions" under Section 1391 occurred where Plaintiffs were refraining from obtaining and using firearms: Ohio and Texas. Under the government's new theory of the case, the dismissals could only have been made pursuant to the government's Section 1404 arguments, as indeed, the Texas court asserted as an alternative ground of decision. And if that were so, then inherent in those dismissals must have been the preclusion of venue-specific jurisdictional defenses.

The problem is that the government does not have a consistent theory of the case. When it wants to shop for a better forum, it is an administrative-denial case; "nothing happened" where Plaintiffs would violate the law. In this venue, with its unusual defense to pre-enforcement cases, it is a pre-enforcement case; never mind where the coerced omissions occurred, as that would

24

have rendered the earlier venue based dismissal impossible and obviated the subsequent refiling of the case before this Court. The correct answer is: this case has both forms of standing. The Plaintiffs challenged the laws, and they are refraining from violating them outright.

Finally, under 28 U.S.C. § 1404(a), the transferee court's possible lack of jurisdiction renders a transfer contrary to "the interests of justice." And here, this Court should carefully guard its interests and those of the local public, by not inviting additional *Navegar*-inspired transfers to its docket. Congress specifically created nationwide venue against the federal government in part "to relieve the courts in the District of Columbia of some of their case load." *Pruess* v. *Udall*, 359 F.2d 615, 618 (D.C. Cir. 1965). Unfortunately, this argument proved unpersuasive to the Texas court, which found the government's Washington-based convenience claims trumped Plaintiffs' choice of venue. There is little that this Court can do to resist such transfers, but the Court can and should remove the government's incentive to file such motions by sensibly confirming that inherent in any discretionary transfer here is the idea that jurisdiction cannot thereby be destroyed, consistent with the plain language of Section 1404(a) and the Supreme Court's holdings from *Hoffman* to *Piper* to *Sinochem*.

## IV.  PLAINTIFF SECOND AMENDMENT FOUNDATION, INC. HAS ORGANIZATIONAL AND REPRESENTATIONAL STANDING.

Plaintiff SAF alleges that it is a membership organization with over 650,000 members and supporters. Complaint, ¶ 3. "The purposes of SAF include education, research, publishing and legal action focusing on the Constitutional right to privately own and possess firearms, and the consequences of gun control. SAF brings this action on behalf of itself and its members." *Id.*

This much plainly suffices to establish both organizational and representational standing.

A.    Plaintiff Second Amendment Foundation, Inc. Has Organizational Standing.

"There is no question that an association may have standing in its own right to seek judicial relief from injury to itself and to vindicate whatever rights and immunities the association itself may enjoy." *Warth* v. *Seldin*, 422 U.S. 490, 511 (1975). When an organization is forced to spend resources, devoting its time and energy to dealing with certain conduct, it has standing to challenge that conduct. *See, e.g. Havens Realty Corp.* v. *Coleman*, 455 U.S. 363 (1982).

SAF educates, researches, and publishes about gun control and its consequences. It has to educate its members, and the public, about the government's enforcement of gun laws. When people have questions about the government's firearms policies, they turn to SAF. The government's enforcement of the challenged provisions thus directly impacts the organization. *Fair Employment Council* v. *BMC Mktg. Corp.*, 28 F.3d 1268, 1276 (D.C. Cir. 1994); *Haitian Refugee Ctr.* v. *Gracey*, 809 F.2d 794, 799 (D.C. Cir. 1987).

B.    Plaintiff Second Amendment Foundation, Inc. Has Representational Standing.

An association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*United Food & Commercial Workers Union Local 751* v. *Brown Group, Inc.*, 517 U.S. 544, 553 (1996) (citation omitted).

In this respect, SAF's representational standing is identical to that which the D.C. Circuit found sufficient to sustain a pre-enforcement challenge against a gun control law in *Fraternal Order of Police* v. *United States* ("*FOP*"), *supra*,152 F.3d 998. In *FOP*, the only question was whether chief law enforcement officers, who were members of the *FOP*, could assert the rights of

their employees. Answering this question in the positive, the D.C. Circuit found the *FOP* satisfied all three prongs of representational standing. Since Hodgkins, Dearth, and other SAF members have standing to challenge the law (SAF believes many of its members enjoy exercising their right to arms and right to international travel), the presence of individual plaintiffs is not strictly necessary, and the issue is germane to SAF's purpose, SAF has representational standing. *Cf. Brady Campaign to Prevent Gun Violence* v. *Salazar*, 2009 U.S. Dist. LEXIS 22077 at *70 (D.D.C. March 19, 2009).

CONCLUSION

Administrative denials supply an Article III injury-in-fact. Within this circuit (as in others), the denial of permission to obtain a firearm creates a justiciable controversy. *Parker*, 478 F.3d at 376. Plaintiffs were denied permission to purchase firearms by Defendant's enforcement of the challenged laws. Because an "actual controversy" within this Court's subject matter jurisdiction thus exists, the Court is empowered to grant declaratory and injunctive relief.

As for the bulk of Defendants's motion, addressed to pre-enforcement standing, it, too, lacks merit. The arguments are flatly and unambiguously foreclosed by recent Supreme Court precedent, much of it acknowledged even when not always followed by the D.C. Circuit. In any event, the claims are inapplicable under this circuit's precedent given the specific facts of this case. And because the jurisdictional defense is unique to this particular venue, it is foreclosed by the government's previous forum-shopping. And there is no question that SAF has organizational as well as representational standing.

The government should be ordered to answer the complaint.

Dated: July 10, 2009                    Respectfully submitted,

                                        Alan Gura (D.C. Bar No. 453449)
                                        Gura & Possessky, PLLC
                                        101 N. Columbus Street, Suite 405
                                        Alexandria, VA 22314
                                        703.835.9085/Fax 703.997.7665


                                   By:  /s/Alan Gura
                                        Alan Gura

                                        Attorney for Plaintiffs

28