# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued September 18, 2009      Decided December 4, 2009

No. 08-7094

ROBERT L. ORD,
APPELLANT

v.

DISTRICT OF COLUMBIA,
APPELLEE

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:08-cv-00704)

———

*Matthew A. LeFande* argued the cause and filed the briefs for appellant.

*Todd S. Kim*, Solicitor General, Office of the Attorney General for the District of Columbia, argued the cause for appellee.  With him on the brief were *Peter J. Nickles*, Attorney General, and *Donna M. Murasky*, Deputy Solicitor General.

*Alan Gura* and *Arthur B. Spitzer* were on the brief for *amici curiae* Second Amendment Foundation, Inc. and American Civil Liberties Union of the National Capital Area in support of appellant.

2

Before: ROGERS, TATEL, and BROWN, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* TATEL.

Opinion dissenting in part filed by *Circuit Judge* BROWN.

TATEL, *Circuit Judge*:   Appellant, a Virginia Special Conservator of the Peace authorized to carry weapons within the Commonwealth, brought suit against the District of Columbia alleging that it lacked probable cause to secure an arrest warrant against him for allegedly violating D.C. firearms laws.   Because appellant was never arrested, the district court treated his suit as a preenforcement challenge and, finding that appellant failed to demonstrate that he faces a genuine and imminent risk of prosecution, dismissed it for lack of standing.   For the reasons set forth in this opinion, we reverse.

## I.

In 2007, the Virginia Circuit Court of Orange County appointed appellant Robert Ord a Special Conservator of the Peace (SCOP).   That order authorized Ord to carry firearms while acting in the course of his duties.   It also designated him a "Qualified Law Enforcement Officer" with respect to certain provisions of Virginia and federal law, including the federal Law Enforcement Officers Safety Act of 2004. Known as LEOSA, that statute allows officers to carry concealed firearms notwithstanding contrary state law.   *See* 18 U.S.C. § 926B.

Ord owns Falken Industries, a private security company holding a Detective Agency License issued by the D.C. Metropolitan Police Department (MPD).   Since 2006, Falken has provided private security services within the District of

3

Columbia. In 2008, sowing the seeds of this litigation, Falken contracted to provide armed security at a District of Columbia Head Start school. Because certain aspects of that contract required MPD approval, Ord discussed it with an MPD officer and submitted requested paperwork. Although Ord was told that "all things looked 'OK,'" Appellant's Aff. ¶ 16, he learned a few days later that the MPD had arrested Falken employees stationed at the school for carrying weapons without permits. An MPD officer then told Ord that a warrant had been issued for his arrest for violating D.C. Code § 7-2502.01(a), which prohibits carrying a firearm without a license. The next day Ord noticed several MPD officers near Falken's Virginia headquarters.

After learning of the warrant, Ord's attorney contacted the D.C. Office of the Attorney General (OAG), supplied evidence of Ord's SCOP status, and demanded nullification of the warrant because of Ord's exemption from the District of Columbia's firearms law. Although an OAG official initially indicated that the office would "not go forward with this warrant," Compl. ¶ 26, OAG changed its position several hours later, informing counsel that it might enforce the warrant. Ord's attorney immediately asked the D.C. Superior Court to quash the warrant. Again reversing course and shortly before a scheduled hearing, OAG declared a nolle prosequi. Ord was never arrested.

Fearing future prosecution and claiming injury from the arrest warrant, Ord brought suit in federal district court, seeking damages for a Fourth Amendment violation under 42 U.S.C. § 1983. In his complaint, Ord alleged that MPD officers filed the affidavit in support of the warrant in bad faith and without probable cause. According to Ord, MPD officers knew not only that Ord is an SCOP, but also that SCOP status exempts him from section 7-2502.01(a)'s ban on

4

possessing weapons in the District of Columbia. He cited section 7-2502.01(b), which provides that "any law enforcement officer or agent of the government of any state or subdivision thereof" is exempt from the statute if he is "authorized to possess . . . a firearm . . . while on duty in the performance of official authorized functions."

In support of his damages claim, Ord alleged that the issuance of an arrest warrant without probable cause required him to incur substantial attorney's fees and forced his company to abandon contracts to provide armed security in the District of Columbia—contracts that were worth several hundred thousand dollars. Alleging that the MPD may arrest him in the future in order to intimidate him from competing with off-duty MPD officers for private security contracts, Ord also sought declaratory and injunctive relief. Specifically, Ord asked the court to declare him (1) a "law enforcement officer or agent of the government of any state or subdivision thereof" for the purposes of D.C. law and (2) exempt from D.C. Code § 7-2502.01(a) and "other such District of Columbia firearms regulations wherein law enforcement officers or agents are exempt therefrom." Compl. ¶¶ 48–49. Finally, Ord asked the court to enjoin the District of Columbia from enforcing or prosecuting "such laws" against him. *Id*. ¶ 50.

The district court, focusing on Ord's request for declaratory and injunctive relief, labeled his claim a "preenforcement challenge" and dismissed the complaint for lack of standing under Federal Rule of Civil Procedure 12(b)(1). *Ord v. District of Columbia*, 573 F. Supp. 2d 88 (2008). Although the court acknowledged that "[a] credible and imminent threat of prosecution . . . 'can simultaneously ripen a preenforcement challenge and give the threatened party standing,'" *id*. at 92 (quoting *Navegar, Inc. v. United*

5

*States*, 103 F.3d 994, 998 (D.C. Cir. 1997)), it nonetheless ruled that Ord had no basis for asserting such a credible and imminent threat of prosecution because "the affirmative step by the District to nullify the warrant is strong evidence that the District does not presently intend to prosecute Ord," *id.* at 94–95. The court also rejected Ord's reliance on a memorandum the MPD sent to Reserve Corps Members, which stated that LEOSA authorizes only "employees of government agencies" to carry firearms within the District of Columbia, *see* 18 U.S.C. § 926B(c), and warned that SCOPs not "covered" by LEOSA will be subject to all relevant criminal penalties for violating D.C. firearms laws, Mem. of Victor Brito, Inspector/Director, MPD (Feb. 2, 2008). Pointing out that "this memorandum was not sent to [Ord] and does not include him as a member of its general audience," the district court found that the memorandum's "general recognition of, or even intention to enforce, the District's firearms laws does not establish that Ord was specifically targeted" for prosecution as required by our standing cases. *Ord*, 573 F. Supp. 2d at 95.

Ord appeals, arguing that he has sufficiently alleged standing based on the previous arrest warrant, his allegations of bad faith, and the MPD memorandum. Amici curiae, the Second Amendment Foundation and the American Civil Liberties Union of the National Capital Area, urge us to overrule our preenforcement standing cases because, in their view, they conflict with Supreme Court doctrine.

## II.

As an initial matter, the District of Columbia urges us to convert its motion to dismiss into a motion for summary judgment because the district court considered matters outside the pleadings, namely Ord's affidavit describing his business, the events surrounding the arrest warrant, and his concerns

6

about future prosecution. *See* Fed. R. Civ. P. 12(d). But because Rule 12(d)'s conversion mechanism applies only to motions under Rule 12(b)(6) or 12(c), "the impropriety of transforming Rule 12(b)(1) motions into summary-judgment motions is well-settled." *Haase v. Sessions*, 835 F.2d 902, 906 (D.C. Cir. 1987) (internal quotation marks omitted). To be sure, the District of Columbia filed motions to dismiss under both Rules 12(b)(1) and 12(b)(6), but the district court ruled only on the Rule 12(b)(1) motion. We thus consider Ord's complaint and the parties' arguments under standards applicable to a motion to dismiss. Specifically, reviewing de novo, *see, e.g.*, *Doe v. Metro. Police Dep't*, 445 F.3d 460, 465 (D.C. Cir. 2006), we "must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party," *Warth v. Seldin*, 422 U.S. 490, 501 (1975).

With this standard in mind, we first consider whether Ord has sufficiently alleged Article III standing. Then in Part III we consider the District of Columbia's alternative jurisdictional argument, namely that Ord's preenforcement and damages claims are too insubstantial to invoke federal jurisdiction.

### *Preenforcement Challenge*

To establish Article III standing, "[a] plaintiff must have suffered an 'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (internal quotation marks and citations omitted). The plaintiff's injury must be "fairly traceable to the challenged action of the defendant," and likely to be "redressed by a favorable decision." *Id.* at 560–61 (internal quotation marks and alterations omitted).

7

Where a plaintiff has yet to face prosecution under a statute he seeks to challenge, the Supreme Court, in *Babbitt v. United Farm Workers*, requires that he establish Article III standing by (1) "alleg[ing] an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute," and (2) demonstrating that "there exists a credible threat of prosecution thereunder." 442 U.S. 289, 298 (1973). In *Navegar, Inc. v. United States*, however, we held that plaintiffs must show more than a "credible threat" of prosecution: they must demonstrate an "imminent" threat. 103 F.3d at 999; *see also Parker v. District of Columbia*, 478 F.3d 370, 375 (D.C. Cir. 2007), *aff'd in part sub nom. District of Columbia v. Heller*, 128 S. Ct. 2783 (2008); *Seegars v. Gonzales*, 396 F.3d 1248, 1255 (D.C. Cir. 2005). To prove that a threat is both credible and imminent, we require plaintiffs to demonstrate that their prosecution results from a special law enforcement priority, namely that they have been "singled out or uniquely targeted by the . . . government for prosecution." *Parker*, 478 F.3d at 375.

In *Navegar*, we considered gun manufacturers' preenforcement challenges to provisions of the Violent Crime Control and Law Enforcement Act of 1994, which barred manufacturing and possessing semiautomatic assault weapons. 18 U.S.C. §§ 921–924 (1994). Certain provisions of the statute banned specific weapons by name. *Navegar*, 103 F.3d at 997. Observing that this specificity "show[ed] that the law place[d] a high priority" on prosecuting the companies that manufactured the named weapons, we found that those companies had standing to challenge the provisions of the statute that banned their products. *Id.* at 1000. By contrast, we found that no plaintiff had standing to challenge other parts of the statute prohibiting weapons not by name, but by general characteristics. Given that the statute

8

described those weapons only in general terms, we concluded that their manufacturers had failed to show that the government placed a special priority on enforcing the law against them.  *Id*. at 1001–02.

Acknowledging that our case law demands more than does *United Farm Workers*, we have nonetheless continued to require plaintiffs to demonstrate that enforcing the law against them represents a "'special priority' for the government." *See Seegars*, 396 F.3d at 1255 (quoting *Navegar*, 103 F.3d at 1001).  For example, in *Seegars* we held that where plaintiffs alleged nothing more than that but for the District of Columbia's gun laws they would have obtained and registered pistols to keep and carry in their homes, they "ha[d] not shown a threat of prosecution reaching the level of imminence required by *Navegar*." *Id*.  "[N]othing in the record," we explained, demonstrated that plaintiffs had been "personally threatened with prosecution" or that their prosecution had "any special priority for the government."  *Id*. (internal quotation marks omitted).  Similarly, in *Parker v. District of Columbia*, we felt "obliged to look for an allegation that appellants . . . ha[d] been singled out or uniquely targeted by the D.C. government for prosecution." 478 F.3d at 375.  We were unable to find such an allegation because, with one exception, the plaintiffs claimed only that (1) they wished to own prohibited firearms and (2) the District of Columbia had declared its intention to prosecute all violators.  We found those threats insufficient given that they expressed no "'special priority' for preventing *these* [plaintiffs] from violating the gun laws, or a particular interest in punishing *them* for having done so." *Id*.  Instead, the District of Columbia merely expressed "a sentiment ubiquitous among stable governments the world over, to wit, scofflaws will be punished." *Id.*

9

Ord argues that he has satisfied our preenforcement standing requirements because the previous warrant for his arrest demonstrates that enforcing the law against him is a "special priority" of the District of Columbia.  Challenging the district court's conclusion that the warrant's nullification was "strong evidence that the District [did] not presently intend to prosecute" him, *Ord*, 573 F. Supp. 2d at 94–95, Ord argues that D.C.'s only motivation for quashing the warrant was to prevent judicial review of his claimed exemption from the District's firearms laws.  According to Ord, the District of Columbia's bad faith in securing and then belatedly quashing the warrant, together with the MPD's determination to drive his company from the District of Columbia, proves that he faces a credible and imminent threat of future prosecution. Ord also claims that the MPD memorandum supports his fear of future prosecution, emphasizing its statement that "SCOP[s] who [are] not covered by 18 U.S.C. § 926B and carr[y] firearm[s] in the District of Columbia will be subject to all relevant criminal penalties."  Mem. of Victor Brito.

The District of Columbia's position with regard to Ord's standing has evolved during this litigation.  In the district court, it "ma[de] much ado about the fact that the Office of the Attorney General declared a nolle prosequi of the Information in support of the warrant" and insisted that this action negated any inference of a credible and imminent threat of future prosecution. *Ord*, 573 F. Supp. 2d at 93.  On appeal, however, the District of Columbia now agrees with Ord that "his showing regarding the likelihood that [future] prosecution [will] occur [is] sufficient" because "Ord's allegations that the District applied for an arrest warrant against him [are] sufficient to show . . . a special priority." Appellee's Br. 24.

Given the District of Columbia's concession, the previous arrest warrant, Ord's claims of bad faith, and the arrests of Falken employees, Ord's allegations support his standing under *Navegar*.   Indeed, Ord's position is quite similar to that of the *Navegar* plaintiffs whose products the statute banned by name.   Just as the statute's identification of certain weapons by name evidenced "a high priority" on prosecuting the companies that produced those weapons, the warrant for Ord's arrest reveals that the District of Columbia has already targeted him for prosecution, and its concession signals that it expects to prosecute him in the future.   In addition, Ord's allegation that the MPD remains determined to drive his company from the city suggests that the District of Columbia places a special priority on enforcing the laws against him.

Indeed, Ord has alleged a more genuine and imminent threat of prosecution than did the *Navegar*, *Seegars*, and *Parker* plaintiffs whose standing we rejected.   In *Navegar*, the manufacturers whose weapons were unnamed by the statute pointed only to the high-profile nature of their business, the publicity surrounding enactment of the law, visits from ATF agents, and a letter they all received from ATF describing the newly enacted statute.   *See Navegar*, 103 F.3d at 1001.   The *Seegars* and *Parker* plaintiffs showed even less: the *Seegars* plaintiffs pointed to nothing more than the firearms laws and alleged that the threat of prosecution discouraged them from keeping guns within the District of Columbia, *see* 396 F.3d at 1255; the *Parker* plaintiffs (again, with one exception) also pointed to the existence of the gun laws and relied on general threats of their enforcement, *see* 478 F.3d at 375.   Here, by contrast, the previous arrest warrant, the District of Columbia's appellate concession, the arrests of Falken employees, and Ord's allegations of continuing bad faith all demonstrate the District of Columbia's special priority on

11

enforcing the law against him.  Thus, even without relying on the MPD memorandum—the significance of which the parties dispute—we conclude that Ord has sufficiently shown a credible and imminent threat of prosecution.

The dissent faults us for "read[ing] 'imminence' out of our precedents," Dissenting Op. at 10, and contends that a special law enforcement priority constitutes "simply one factor" in the imminence analysis, *id*. at 9.  In *Navegar*, however, we chiefly relied on the fact that the statute expressly targeted particular weapons manufacturers, pointing out that "[t]he visits by the ATF agents to appellants' places of business merely provide[d] a bit of additional support for a fear of prosecution *already firmly grounded* in the language of the Act itself."   103 F.3d at 1000 (emphasis added).  Following *Navegar*'s lead, *Seegars* and *Parker* looked only for a "special priority" of prosecution.  *See Seegars*, 396 F.3d 1255; *Parker*, 478 F.3d at 375.  Thus, our case law makes clear that such a special priority is sufficient to establish imminence.

Our dissenting colleague, stating that Ord "faces a certainty of no prosecution" because he has decided to avoid entering D.C. with a firearm, argues more generally that "[a] prosecution is unlikely to be imminent if individuals refrain from violating the law out of fear of prosecution."  Dissenting Op. at 10, 11.   *Navegar*, however, demonstrates that imminence is not defeated simply because the plaintiff complies with the challenged statute.   There, we acknowledged that plaintiffs had ceased manufacturing the banned weapons, *Navegar*, 103 F.3d at 997, but ruled that such compliance did not extinguish their preenforcement standing.  Rather, "[i]t is . . . th[e] threat of prosecution which creates the 'injury in fact' required under standing doctrine, for the threat forces appellants to forego the manufacture and

12

transfer of the weapons specified in the Act." *Id.* at 1001. So too here. Ord's injury stems from his inability to travel to D.C. and carry on his security business here while armed without fear of prosecution. That injury is imminent because the District of Columbia has made clear its specific intention to prosecute him.

The District of Columbia insists that Ord also lacks standing because he has failed to satisfy *United Farm Workers*' first requirement: that a preenforcement plaintiff "allege[] an intention to engage in a course of conduct . . . proscribed by a statute." *United Farm Workers*, 442 U.S. at 298. To be sure, as the District of Columbia emphasizes, Ord never alleges in so many words that he intends to enter the District of Columbia while armed. But at this stage of the litigation, we must make all reasonable inferences in Ord's favor, *see supra* at 6, and viewed through that lens, Ord's complaint and affidavit can only be understood to mean that if the threat of arrest is removed, he intends to travel to D.C. while armed to engage in his security business. *See Seegars*, 396 F.3d at 1251 (plaintiff need not express an unconditional intent to engage in the prohibited behavior regardless of whether the statute is invalidated). Specifically, Ord alleges in his affidavit that Falken Industries possesses an MPD license and that it had several contracts to provide armed security services in the District of Columbia until forced to abandon them once D.C. issued the warrant for his arrest and actually arrested Falken employees. Although Ord's abandonment of the contracts could suggest that he no longer plans to enter the District while armed, his affidavit indicates just the opposite:

> While I was once able to enter the District of Columbia with my firearm as a police officer, I can no longer do so for fear of my unlawful arrest. It is

13

> impossible for me to go from one location in
> Virginia where I need my firearm to perform my
> duties to another location in the District of
> Columbia. I have no means to secure and leave my
> gun somewhere when I enter the District of
> Columbia.

Appellant's Aff. ¶ 30. Moreover, Ord's request for relief—a
declaratory judgment and an injunction prohibiting the
District of Columbia from enforcing its firearms laws against
him—makes sense only if he actually intends to return to D.C.
while armed to service his clients. We thus conclude that Ord
has standing to bring his preenforcement claim.

Our dissenting colleague, who raises several interesting
points, would en banc this case "*sua sponte* and overrule
*Navegar*." Dissenting Op. at 1. But because we have
concluded—without "strain[ing]," *id.*—that Ord has standing
under *Navegar*, this is simply not a case of "exceptional
importance" warranting the attention of the full court, Fed. R.
App. P. 35(a)(2). Nor, for the same reason, would an *Irons*
footnote be appropriate. *See* D.C. Cir., Policy Statement on
*En Banc* Endorsement of Panel Decisions 2 (Jan. 17, 1996)
("The panel also should be satisfied that deciding the question
is *necessary* to an adequate disposition of the case."
(emphasis added)); *see also LaShawn v. Barry*, 87 F.3d 1389,
1395 (D.C. Cir. 1996) (en banc). We thus turn to Ord's
standing to bring his claim for damages flowing from the
issuance of the warrant.

### *Damages Claim*

This issue is easy. The District does not challenge Ord's
standing to bring his damages claim, and for good reason. To
begin with, Ord has plainly alleged injury in fact. According
to his complaint, an MPD officer caused a warrant to issue for

14

Ord's arrest on the basis of a false affidavit and without probable cause, forcing him to abandon lucrative armed security contracts within the District of Columbia. Ord has also sufficiently alleged causation: the arrest warrant prevented him from entering D.C., which in turn required him to abandon the contracts. Finally, an award of damages would obviously redress his injuries.

## III.

This brings us to the District of Columbia's argument that Ord's preenforcement and damages claims are too insubstantial to invoke federal court jurisdiction. Federal courts are "without power to entertain claims otherwise within their jurisdiction if [the claims] are 'so attenuated and unsubstantial as to be absolutely devoid of merit.'" *Hagans v. Lavine*, 415 U.S. 528, 536 (1974) (quoting *Newburyport Water Co. v. Newburyport*, 193 U.S. 561, 579 (1904)). To warrant dismissal for insubstantiality, "claims [must] be flimsier than 'doubtful or questionable'—they must be 'essentially fictitious.'" *Best v. Kelly*, 39 F.3d 328, 330 (D.C. Cir. 1994) (quoting *Hagans*, 415 U.S. at 536–37) (finding claim sufficiently substantial where plaintiffs had not "suggested any bizarre conspiracy theories, any fantastic government manipulations of their will or mind, any sort of supernatural intervention"). Although we have said that "[t]he Rule 12(b)(1) 'substantiality' doctrine is, as a general matter, reserved for complaints resting on truly fanciful *factual* allegations," *id.* at 331 n.5, a legal claim may be so insubstantial as to deprive federal courts of jurisdiction if "prior decisions inescapably render the claims frivolous." *Hagans*, 415 U.S. at 538. That said, "previous decisions that merely render claims of doubtful or questionable merit do not render them insubstantial." *Id.* Thus, to qualify as insubstantial, a claim's "unsoundness [must] so clearly result[] from the previous decisions of [the Supreme Court] as

15

to foreclose the subject and leave no room for the inference that the question sought to be raised can be the subject of controversy." *Ex parte Poresky*, 290 U.S. 30, 32 (1933) (internal quotation marks omitted).  The substantiality inquiry is, however, a separate question from whether a complaint is subject to dismissal under Federal Rule of Civil Procedure 12(b)(6) for failing to state a claim on which relief may be granted. *See, e.g.*, *Hagans*, 415 U.S. at 542; *Bell v. Hood*, 327 U.S. 678, 682 (1946); *Best*, 39 F.3d at 331 & n.5. "Jurisdiction, therefore, is not defeated . . . by the possibility that the averments might fail to state a cause of action on which petitioners could actually recover." *Bell*, 327 U.S. at 682.

### Preenforcement Challenge

The District of Columbia contends that Ord's preenforcement challenge is insubstantial because "under binding precedent, Ord has a Fourth Amendment claim as to a future arrest only if the invalidity of such an arrest is obvious." Appellee's Br. 12.  In support, the District of Columbia relies on *Michigan v. DeFillippo*, 443 U.S. 31 (1979), in which the Supreme Court held that an arrest for violating an ordinance later found to be unconstitutionally vague did not run afoul of the Fourth Amendment.  The *DeFillippo* court reasoned that probable cause existed because, at the time of the arrest, the officer had a factual basis for concluding that the arrestee had violated the ordinance and the officer was not "required to anticipate that a court would later hold the ordinance unconstitutional." *Id*. at 37–38.  Similarly, in *Barwood, Inc. v. District of Columbia*, 202 F.3d 290, 294 (D.C. Cir. 2000), also relied on by the District, we concluded that arrests of taxicab drivers for violating an allegedly invalid D.C. law would not necessarily contravene the Fourth Amendment.  The District of Columbia takes *DeFillippo* and *Barwood* to mean that "the mere

16

possibility that a court would hold as a matter of law" that Ord is exempt from the District's firearms laws "clearly should not negate probable cause." Appellee's Br. 15. Thus, according to the District of Columbia, *DeFillippo* and *Barwood* make clear that Ord's Fourth Amendment claim cannot succeed and thus "inescapably render [it] frivolous." *Hagans*, 415 U.S. at 538.

We disagree that *DeFillippo* and *Barwood* foreclose all debate on Ord's allegations. Neither decision addresses the precise question Ord raises: whether a warrant or arrest would lack probable cause where the responsible officer, knowing that the arrestee is exempt from the criminal statute, nonetheless files an affidavit in bad faith—an allegation we must take as true at this stage of the litigation. Indeed, unlike the issues addressed in *DeFillippo* and *Barwood*, the question here bears directly on the existence of probable cause, for it requires an inquiry into whether "facts and circumstances within the officer's knowledge [could be] sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *DeFillipo*, 443 U.S. at 37. Moreover, even were we to agree with the District of Columbia that Ord's allegations ultimately fail to state a Fourth Amendment claim—a question we leave for the district court to resolve in the first instance—that would provide no basis for finding that Ord's claim is so insubstantial as to deprive the district court of jurisdiction.

*Damages Claim*

We are equally unpersuaded by the District of Columbia's argument that Ord's claim for damages caused by the warrant is so insubstantial as to deprive the district court of jurisdiction. According to the District of Columbia, Ord's claim is frivolous because he was never arrested. The Fourth

17

Amendment, D.C. insists, protects only against unreasonable "searches" and "seizures," and "there is no seizure without actual submission." *Brendlin v. California*, 551 U.S. 249, 254 (2007).

To be sure, the Supreme Court often speaks of the Fourth Amendment exclusively in terms of "searches" and "seizures," *see, e.g.*, *County of Sacramento v. Lewis*, 523 U.S. 833, 843 (1998), but none of those cases considered a claim, like the one at issue here, which alleges that the issuance of a warrant without probable cause may *itself* deprive a person of his liberty in violation of the Fourth Amendment.  True, Ord may not have been seized in the traditional sense, but the arrest warrant effectively exiled him from the District of Columbia, thus restricting his ability to travel and causing him substantial injury.  *Cf. Albright v. Oliver*, 510 U.S. 266, 277–79 (1994) (Ginsburg, J., concurring) (suggesting that a criminal defendant facing pending prosecution remains "continually seized" after release from custody due, in part, to the travel restrictions and reputational and employment consequences that often flow from a criminal prosecution). Because neither Supreme Court nor D.C. Circuit case law forecloses the possibility that Ord's allegations raise a constitutional issue, his damages claim is sufficiently substantial to confer federal jurisdiction.  Although we leave open the question whether injury from the issuance of a warrant without arrest is cognizable under the Fourth Amendment, we are sure that Ord's claim is neither "fictitious," "fantastic," nor "fanciful," and thus that the district court has jurisdiction to entertain it.  *Best*, 39 F.3d at 330–31 (internal quotation marks omitted).

18

## IV.

For the foregoing reasons, we reverse the dismissal of Ord's claims and remand to the district court for further proceedings consistent with this opinion.

*So ordered.*

BROWN, *Circuit Judge*, dissenting in part: For more than a decade, this circuit has offered a wary allegiance to the imminence standard, first articulated in *Navegar, Inc. v. United States*, 103 F.3d 994, 998 (D.C. Cir. 1997). Today's opinion labors to extend that line of cases, barring preenforcement claims for declaratory relief unless the plaintiff can show a threat of imminent prosecution, and thus denying access to Article III courts to District of Columbia litigants seeking vindication of  civil rights claims—access they would have under  applicable Supreme Court precedent. Whether Ord's allegations meet *Navegar*'s stringent standard is a close question, but this controversy demonstrates why litigants should not be required to jump through such hoops to get past the courthouse door.  Consequently, while I agree Ord has standing to bring his claim for damages under 42 U.S.C. § 1983, and agree his claims are not so insubstantial as to deprive the federal courts of jurisdiction over them, I do not think we can or should strain to fit this case within *Navegar*'s standard based on the government's belated concession.  I do think the en banc court can and should rehear this appeal *sua sponte* and overrule *Navegar*.

According to Ord's complaint and affidavit, his security firm, Falken Industries, is licensed by the Metropolitan Police Department (MPD).  Aff. ¶ 10.  Using information Ord voluntarily provided to the MPD, the MPD and the D.C. Office of the Attorney General (OAG) arrested and jailed Ord's employees in D.C. and obtained a warrant for Ord's arrest.  Compl. ¶ 19; Aff. ¶¶ 16–18, 20.  MPD officers used the ruse of asking Ord to pick up his employee's vehicle to try to lure him back into D.C.  Aff. ¶ 19.  When that failed, they staked out Falken's Virginia office.  *Id.* ¶¶ 24, 26.  Ord had also seen a memorandum the MPD sent to its Reserve Corps Members warning them that Special Conservators of the Peace who were not government "employee[s]" under the

2

Law Enforcement Officers Safety Act of 2004 (LEOSA), 18 U.S.C. § 926B(c), would be subject to all relevant criminal penalties for violating D.C.'s firearms laws.  Compl. ¶ 18. Thus, Ord effectively was exiled from D.C. by his fear of being prosecuted if he ever returned.  Aff. ¶ 30.

Under Supreme Court doctrine, these facts would be more than sufficient to establish Ord's standing under Article III to bring a claim under the Declaratory Judgment Act (DJA), 28 U.S.C. § 2201.  As the Supreme Court repeatedly has confirmed, "where threatened action by government is concerned, we do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat . . . .  The plaintiff's own action (or inaction) in failing to violate the law eliminates the imminent threat of prosecution, but  .  .  .  does not eliminate Article III jurisdiction."  *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128–29 (2007) (emphasis omitted).  Thus, the District's decision to declare a nolle prosequi, and thereby to eliminate the threat of imminent prosecution, would be no impediment to Ord's standing under Supreme Court standards.  *Navegar* turns this easy case into a close call; and worse, it makes Ord's access to federal court depend on the government's litigation strategy.

There are, of course, sensible constraints on litigants' access to federal courts.  Even in suits seeking declaratory or injunctive relief, federal courts have jurisdiction only if there exists an actual case or controversy.  U.S. Const. art. III, § 2. These "constitutional boundaries" are "measure[d] through the application of standing, mootness, and ripeness doctrines."  *Worth v. Jackson*, 451 F.3d 854, 857 (D.C. Cir. 2006).   The doctrine at issue here, standing, requires the plaintiff to establish an injury-in-fact that is fairly traceable to the challenged conduct and that will likely be redressed by a

3

favorable decision on the merits. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). The injury, in turn, must be "distinct and palpable," not "abstract," "conjectural," or "hypothetical." *Allen v. Wright*, 468 U.S. 737, 751 (1984) (internal quotation marks omitted). And even when these constitutional criteria are met, standing may be denied on prudential grounds where, for example, the plaintiff seeks to raise another person's legal rights or seeks to adjudicate a mere generalized grievance. *See Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 12 (2004). These limitations ensure federal courts are not "'called upon to decide abstract questions of wide public significance even though other governmental institutions may be more competent to address the questions and even though judicial intervention may be unnecessary to protect individual rights.'" *Id.* (quoting *Warth v. Seldin*, 422 U.S. 490, 500 (1975)). But these limitations do *not* exist to give law enforcement agencies *carte blanche* to violate individual rights.

There is nothing unique about suits brought under the DJA that requires a special jurisdictional analysis. *See Franchise Tax Bd. of California v. Constr. Laborers Vacation Trust*, 463 U.S. 1, 17 (1983) (DJA "was intended to affect only the remedies available in a federal district court, not the court's jurisdiction"). As the Supreme Court has long made clear, if a plaintiff has been placed "between the Scylla of intentionally flouting state law and the Charybdis of forgoing what he believes to be constitutionally protected activity in order to avoid becoming enmeshed in a criminal proceeding," he has suffered an injury sufficient to establish standing to seek declaratory relief without "first expos[ing] himself to actual arrest or prosecution." *Steffel v. Thompson*, 415 U.S. 452, 462 (1974). All that is required is that the threat of prosecution be "credible"—as it would be with any regularly enforced statute—rather than "imaginary or speculative" as

4

would be the case if a statute were obsolete and never enforced. *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979) (internal quotation marks omitted).

Although *Navegar* purported to rely on the standard articulated in *United Farm Workers*, it actually grafted an imminence requirement onto the credible threat standard seemingly from whole cloth. *See Navegar*, 103 F.3d at 998 (citing *United Farm Workers*, 442 U.S. at 298–99, but referring to a "threat of prosecution . . . which is credible and *immediate*" and a "credible threat of *imminent* prosecution" (emphasis added)). Of course, *United Farm Workers* and *Navegar* are distinguishable but those differences do not account for *Navegar*'s divergence. *United Farm Workers* was the product of a lengthy evolution. The Supreme Court's doctrine began to take shape in *Poe v. Ullman*, 367 U.S. 497, 509 (1961) (plurality), where the Court denied standing to plaintiffs seeking a declaration that a state law, which prohibited contraceptives but had not been enforced in decades, was unconstitutional. The Court explained, "the mere existence of a state penal statute . . . constitute[s] insufficient grounds to support a federal court's adjudication of its constitutionality . . . if real threat of enforcement is wanting." *Id.* at 507.

The Court reached the opposite result in *Doe v. Bolton*, 410 U.S. 179, 188 (1973), holding physicians had standing to challenge a criminal abortion statute even though none of them had "been prosecuted, or threatened with prosecution, for violation" of the law. Unlike the obsolete statute in *Poe*, here the statute was "recent and not moribund." *Doe*, 410 U.S. at 188. Finding the statute, if enforced, would "directly operate" against the plaintiffs, the Court held they could sue immediately rather than waiting for "a criminal prosecution as the sole means of seeking relief." *Id.* The statute's mere

5

existence constituted "a sufficiently direct threat of personal detriment." *Id.*

The following year, in *Steffel*, the Court held a plaintiff who wished to distribute handbills protesting American involvement in Vietnam had standing to seek a declaration that the state law prohibiting such conduct was unconstitutional. 415 U.S. at 459. Because the plaintiff had been told by police that continuing to ignore their warnings would likely lead to prosecution, the plaintiff's fears were not "imaginary or speculative." *Id.* (internal quotation marks omitted). Thus, it was "not necessary that [the plaintiff] first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights." *Id.* at 459.

These principles coalesced in *United Farm Workers* where the Court held plaintiffs have preenforcement standing when they have "alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." 442 U.S. at 298. The Court held the plaintiffs had standing to challenge a state criminal law prohibiting certain union practices because, although the "criminal penalty provision ha[d] not yet been applied," "the State ha[d] not disavowed any intention of invoking the . . . provision against unions that commit unfair labor practices." *Id.* at 302.

Clearly, *Navegar*'s imminence requirement is not derived from *United Farm Workers*. Instead, its language seems to echo the injury-in-fact element of standing—requiring "an invasion of a legally protected interest that is . . . 'actual or imminent.'" *Navegar*, 103 F.3d at 998 (quoting *Lujan*, 504 U.S. at 560–61). As the *Navegar* court perceived the axis

6

between injury and enforcement, the terms are near
synonyms. That may be because standing and ripeness tend
to merge in preenforcement challenges to criminal statutes.
Perhaps, then, the *Navegar* court believed that if a plaintiff
seeking to challenge a criminal statute does not face an
"actual" prosecution, he must at least face an "imminent" one.
However, by erroneously conflating a plaintiff's injury and
the government's prosecution, *Navegar* ignored the injurious
effect of the mere existence of a regularly enforced statute
that prohibits conduct a plaintiff believes is protected.
Requiring a threat of imminent prosecution also ignores the
injurious effect of other types of government coercion, such
as harassment and intimidation. The Supreme Court has
repeatedly made clear the DJA was designed to provide relief
in precisely such circumstances. *See, e.g.*, *Steffel*, 415 U.S. at
462–63. Standing exists because the plaintiff's abstention is
itself an actual injury, regardless of whether a prosecution is
imminent. *See Poe*, 367 U.S. at 508 (noting that a plaintiff
has preenforcement standing when his "compliance with the[]
statutes is []coerced by the risk of their enforcement").

In the decade since it was decided, we have repeatedly
expressed grave misgivings about *Navegar*. We have noted
that *Navegar*'s analysis is in "sharp tension with standard
rules governing preenforcement challenges to agency
regulations" and freely admit it is contrary to our cases
"upholding preenforcement review of First Amendment
challenges to criminal statutes." *Seegars v. Gonzales*, 396
F.3d 1248, 1253–54 (D.C. Cir. 2005). We have said (and the
court says again today) *Navegar* appears to demand more
than the credible threat the Supreme Court found sufficient in
*United Farm Workers*. *See Parker v. District of Columbia*,
478 F.3d 370, 375 (D.C. Cir. 2007), *aff'd in part sub nom.*
*District of Columbia v. Heller*, 128 S. Ct. 2783 (2008); Op. at
7. In *Parker*, we were even more forthright, noting the

7

Supreme Court's decision in *Virginia v. American Booksellers Ass'n*, 484 U.S. 383 (1988), "held it sufficient for plaintiffs to allege 'an actual and well-founded fear that the law will be enforced against them,' . . . without any additional requirement that the challenged statute single out particular plaintiffs by name."   *Parker*, 478 F.3d at 375 (quoting *Am. Booksellers*, 484 U.S. at 393 (internal citation and footnote omitted)).   We noted: "In both *United Farm Workers* and *American Booksellers*, the Supreme Court took a far more relaxed stance on pre-enforcement challenges than *Navegar* and *Seegars* permit."   *Id.*

*MedImmune* can now be added to the list of Supreme Court cases conflicting with *Navegar*.   *Navegar* reasons that "a credible threat of imminent prosecution can injure the threatened party by putting her between a rock and a hard place[:] . . . either forego possibly lawful activity because of her well-founded fear of prosecution, or willfully violate the statute."   *Navegar*, 103 F.3d at 998.   But *MedImmune* makes clear that this dilemma exists even before the threatened prosecution becomes imminent.   A plaintiff may "eliminate[] the imminent threat of harm by simply not doing what he claimed the right to do," but will still have preenforcement standing "because the threat-eliminating behavior was effectively coerced."   *MedImmune*, 549 U.S. at 129.   Indeed, "[t]he dilemma posed by that coercion—putting the challenger to the choice between abandoning his rights or risking prosecution—is 'a dilemma that it was the very purpose of the Declaratory Judgment Act to ameliorate.'"   *Id.* (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 152 (1967)). Thus, failing to violate the statute, or, as in this case, convincing the government to suspend its enforcement action, eliminates the imminent threat but not Article III jurisdiction.

8

*Navegar*'s conflict with Supreme Court doctrine notwithstanding, the court strains—unpersuasively in my view—to fit this case within its standard. The court bases its conclusion that "Ord's allegations support his standing under *Navegar*" on the District's "concession" that "'Ord's allegations that the District applied for an arrest warrant against him [are] sufficient to show . . . a special priority.'" Op. at 9–10 (quoting Appellee's Br. 24) (alterations in original). But, by issuing a warrant, arresting Ord's employees, and following Ord to another jurisdiction, the authorities already had passed that threshold. The concession adds nothing.

*Navegar* speaks of requiring a "credible threat of imminent prosecution," not merely a showing that the authorities have placed a special priority on enforcing the law against the plaintiff. 103 F.3d at 998. True, in *Parker* and *Seegars*, we emphasized that the plaintiffs had not been singled out for prosecution and relied on that fact to hold their allegations of standing insufficient under *Navegar*. *See Parker*, 478 F.3d at 375; *Seegars*, 396 F.3d at 1255–56. But while this means it is necessary to show special targeting to establish standing under *Navegar*, it does not necessarily mean such a showing is sufficient. Indeed, the district court reasonably read *Navegar* to demand special targeting plus imminence, and noted that once the warrant was nullified, there was no longer "'a threat of prosecution reaching the level of imminence required by *Navegar*.'" *Ord v. District of Columbia*, 573 F. Supp.2d 88, 95 (D.D.C. 2008) (quoting *Seegars*, 396 F.3d at 1255). By contrast, the court concludes that plaintiffs meet the *Navegar* "credible and imminent" standard by demonstrating that "their prosecution results from a special law enforcement priority, namely that they have been 'singled out or uniquely targeted by the . . . government

9

for prosecution.'"  Op. at 7 (quoting *Parker*, 478 F.3d at 375 (alteration in original)).

*Navegar*'s analysis began with an observation: "whether a threat of prosecution adequate to satisfy the requirements of justiciability is present in any particular preenforcement challenge is a factual and case-specific" determination, requiring courts to "look to a variety of factors."  103 F.3d at 999.   The court then explained, "[t]he most important circumstance . . . [here] is that the Act in effect singles out the appellants as its intended targets." *Id.* at 1000.  Thus, the fact that the plaintiffs had been "single[d] out" was simply one factor, albeit a significant one.  *See also id.* at 1001 (noting, with respect to the second part of the statute, that "[i]n the absence of this factor, the threat of prosecution becomes far less imminent").    The court proceeded to uphold the plaintiffs' standing by examining the unique factual circumstances and drawing a connection between the targeting in the statute and the existence of a threat of imminent prosecution. *See id.* at 1000–01.  It was the whole constellation of events—the specificity of the statute, the agents' visits to the manufacturing facility, and the ongoing "pro-enforcement activities"—that convinced the court the government would not "sit idly by" if the statute was violated. *Id.* at 1000.  But what if the government had pledged to sit idly by?

Here, it is obvious—even without the District's "concession"—that the MPD has, in some sense, "targeted" or "singled out" Ord by obtaining a warrant for his arrest. But it does not follow that Ord faces a threat of imminent prosecution.  The court finds that the District's "concession signals that it expects to prosecute [Ord] in the future." Op. at 10. Even assuming this is a valid inference, an expectation of future prosecution is not even remotely the same as a threat of

10

imminent prosecution.   Ord currently is abstaining from reentering D.C. with a firearm.  *See* Aff. ¶ 30.  Of course, the court is correct in finding that Ord has alleged a desire to reenter D.C. with his firearm, *see* Op. at 12–13, and no doubt he would do so if he did not fear that a criminal prosecution would result.  But we cannot say here, as we said in *Navegar*, that "if these provisions of the statute are enforced at all, they will be enforced against th[is] appellant[]."  103 F.3d at 1000.  Under the status quo, not only does Ord not face a threat of imminent prosecution, but in light of the nolle prosequi and his decision to avoid reentering D.C. with a firearm, he faces a certainty of no prosecution.  Is it absurd that Ord lacks standing to challenge a law merely because the prosecutors decided at the last moment to nullify the warrant for his arrest?  Yes, but such is the result of our doctrine.

The court attempts to rehabilitate *Navegar* by asserting that, because Ord's "injury is imminent," he has satisfied the *Navegar* standard.  Op. at 12.  I accept the premise, but not the conclusion.  If an imminent *injury* were all *Navegar* required, it would be on all fours with Supreme Court doctrine.  *See Lujan*, 504 U.S. at 560 (injury-in-fact must be "actual or imminent").  Instead, *Navegar* requires a threat of imminent *prosecution*.  103 F.3d at 998.  Thus, while Ord's "inability to travel to D.C. and carry on his security business here while armed without fear of prosecution," Op. at 12, would establish his injury-in-fact under Supreme Court standards, it is beside the point under *Navegar*.  Only by redefining the word "imminent" beyond recognition is the court able to conclude that Ord faces a threat of imminent prosecution.    While  the  court's  willingness  to  read "imminence" out of our precedents on a case-by-case basis may occasionally benefit plaintiffs whose standing would be indisputable under Supreme Court standards, such an ad hoc

11

approach provides no guidance to lower courts and no certainty to litigants.[1]

Not only does *Navegar* conflict with Supreme Court doctrine, but our reliance on it has anomalous and injurious practical consequences. A prosecution is unlikely to be imminent if individuals refrain from violating the law out of fear of prosecution. Yet, even under the court's reading of *Navegar*, individuals only have preenforcement standing if they come close enough to violating the law to become "singled out" or "uniquely targeted" by law enforcement. *See* Op. at 7. And if they do violate the law, declaratory relief in federal court becomes unavailable as soon as the government initiates a prosecution. *See Younger v. Harris*, 401 U.S. 37, 40–41 (1971); *see also Samuels v. Mackell*, 401 U.S. 66, 73 (1971) (extending *Younger* to declaratory relief); *JMM Corp. v. District of Columbia*, 378 F.3d 1117, 1125 (D.C. Cir. 2004) (treating D.C. as a state for purposes of *Younger* abstention). However, as the Supreme Court has made clear, the DJA was designed to provide "'an alternative to pursuit of the arguably

---

[1] The court contends that *Navegar* "makes clear that . . . a special priority is sufficient to establish imminence." Op. at 11. To the contrary, any such mechanical and inflexible rule would have contravened *Navegar*'s opening remark that preenforcement standing analysis is "factual and case-specific" and involves "a variety of factors." 103 F.3d at 999. The singling out of the *Navegar* plaintiffs in the text of the statute was strong evidence they faced a threat of imminent prosecution; but *Navegar* did not suggest that every time someone is singled out by law enforcement officers he is transformed automatically into a plaintiff with preenforcement standing, regardless of other circumstances. In any event, by now requiring, in effect, "a credible threat of specially prioritized prosecution," the court continues to mold our doctrine around the peculiar facts of the cases that come before us, rather than simply applying the straightforward doctrine developed by the Supreme Court.

12

illegal activity.'"   *MedImmune*, 549 U.S. at 129 (quoting *Steffel*, 415 U.S. at 480 (Rehnquist, J., concurring)).   *Navegar* essentially nullifies this Congressional intent.

An even more pernicious effect of *Navegar*'s imminence requirement is that it places access to preenforcement relief entirely in the hands of the government.   As the court below explained, "[a]t first glance," the fact that the MPD obtained a warrant for Ord's arrest "seems to establish that the threat of prosecution against Ord is not imaginary or speculative." *Ord*, 573 F. Supp.2d at 94 (internal quotation marks omitted). However, the district court correctly found that after "the Office of the Attorney General declared a nolle prosequi of the Information in support of the warrant," the warrant ceased to have effect and the threat of prosecution ceased to be imminent.   *Id.* at 94–95.   In effect, *Navegar*'s imminence requirement gave the government a "pocket veto" over Ord's effort to seek preenforcement relief.   Amici Br. 13.   Even here on appeal, the court only finds *Navegar* satisfied by relying on a concession in the District's brief.   *See* Op. at 9–10. Thus, both the district court and this court agree that, under *Navegar*, a plaintiff's standing depends on the affirmative actions of the prosecuting authorities.   Our doctrine thereby enables the government to deprive a plaintiff of preenforcement standing simply by being silent or deliberately vague about its intentions.   Unless declaratory relief is available, prosecutors can act strategically to protect criminal laws or arbitrary enforcement procedures from judicial review.   That is essentially what happened here.   The District avoided a judicial decision about the validity of its interpretation of LEOSA by withdrawing its warrant without throttling back the level of threat.   Were we content to follow the Supreme Court's doctrine, we would simply ask whether Ord's current compliance with D.C. law has been effectively coerced by his reasonable fear that he would be prosecuted if

13

he reentered D.C. with a firearm. *See MedImmune*, 549 U.S. at 129. We would answer this question in the affirmative without being distracted by the District's "evolving" litigation stratagems. *See* Op. at 9.

It is long past time to recognize *Navegar*'s flaws and articulate a preenforcement standing doctrine consistent with decades of Supreme Court precedent. There can be no valid jurisprudential rationale for prolonging error. *Stare decisis* is an enduring principle, but it was never intended to preserve mistakes, like an insect in amber, and prevent them from ever being corrected. To borrow a trope from Theodore Roosevelt: "Nine-tenths of wisdom consists in being wise in time." In that spirit, I urge the court to rehear this appeal en banc and overrule *Navegar*.