IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| STEPHEN DEARTH, et al., | ) | Case No. 09-CV-0587-RLW |
| | ) | |
| Plaintiffs, | ) | MEMORANDUM OF POINTS AND |
| | ) | AUTHORITIES IN SUPPORT OF |
| v. | ) | PLAINTIFFS' MOTION FOR |
| | ) | SUMMARY JUDGMENT |
| ERIC HOLDER, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

**COME NOW** the Plaintiffs Stephen Dearth and the Second Amendment Foundation,

Inc., by and through undersigned counsel, and submit their Memorandum of Points and

Authorities in Support of Plaintiffs' Motion for Summary Judgment.

Dated: October 14, 2011

Respectfully submitted,

Alan Gura (D.C. Bar No. 453449)
Gura & Possessky, PLLC
101 N. Columbus Street, Suite 405
Alexandria, VA 22314
703.835.9085/Fax 703.997.7665


By:  /s/Alan Gura                          
     Alan Gura

Attorney for Plaintiffs

TABLE OF CONTENTS

Table of Authorities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

Preliminary Statement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Procedural History. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Statement of Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      1.    *Federal Restrictions on Expatriated Americans'*
          *Ability to Acquire Firearms.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      2.    *The Challenged Laws' Impact on Plaintiffs.* . . . . . . . . . . . . . . . . . . . . . . . 3

Summary of Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

      I.    THE SECOND AMENDMENT SECURES A FUNDAMENTAL RIGHT TO ACQUIRE
          FIREARMS FOR SELF-DEFENSE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

      II.    BARRING LAW-ABIDING CITIZENS FROM ACQUIRING FIREARMS FOR SELF-
          DEFENSE IS UNCONSTITUTIONAL. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

      III.   BARRING FIREARMS SALES TO OTHERWISE QUALIFIED AMERICANS FOR
          LACK OF DOMESTIC RESIDENCE VIOLATES THE SECOND AMENDMENT. . . . . . . . 12

          A.    Laws Restricting the Purchase of Firearms By Responsible,
               Law-Abiding Individuals Are Subject to Strict Scrutiny. . . . . . . . . . . . . 13

          B.    Barring Law-Abiding, Responsible Americans from Purchasing
               Firearms for Lack of Domestic Residence Serves No Compelling
               Government Interest. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

          C.    Even Were There Some Interest in Restricting the Purchase of
               Firearms By Law-Abiding, Responsible Americans for Lack
               of Domestic Residence, the Challenged Laws Are Not
               Narrowly Tailored. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

i

IV.   RESTRICTING THE FIREARMS RIGHTS OF EXPATRIATED AMERICANS
      VIOLATES THE FUNDAMENTAL RIGHT TO INTERNATIONAL TRAVEL. . . . . . . . . . 20

      A.   American Citizens Enjoy A Fundamental Right to International
           Travel, Including the Right to Reside Overseas.. . . . . . . . . . . . . . . . . . . 20

      B.   Restrictions Upon the Right to International Travel Are Subject to
           Strict Scrutiny Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

      C.   Restricting the Domestic Firearms Rights of Expatriated Americans
           Does Not Narrowly Satisfy Any Interest in Regulating the Right to
           International Travel. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

V.    BY FORCING INDIVIDUALS TO SELECT FROM AMONG THEIR CONSTITUTIONAL
      RIGHTS, THE CHALLENGED PROVISIONS VIOLATE THE UNCONSTITUTIONAL
      CONDITIONS DOCTRINE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

VI.   THE CHALLENGED PROVISIONS VIOLATE PLAINTIFFS' RIGHTS TO
      EQUAL PROTECTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

TABLE OF AUTHORITIES

<u>Cases</u>

*Andrews* v. *State*,
     50 Tenn. 165 (1871)........................................................ 7

*Apethaker* v. *Secretary of State*,
     378 U.S. 500 (1964) .......................................... 21, 24, 25

*Banner* v. *United States*,
     428 F.3d 303 (D.C. Cir. 2005) (per curiam). ................................. 16

*Bolling* v. *Sharpe*,
     347 U.S. 497 (1954)....................................................... 26

*Buckley* v. *Valeo*,
     424 U.S. 1 (1976) ........................................................ 26

*Bulluck* v. *Washington*,
     468 F.2d 1096 (D.C. Cir. 1972) ............................................ 26

*Carey* v. *Pop. Serv. Int'l*,
     431 U.S. 678 (1977)....................................................... 8

*Cent. Hudson Gas & Elec. Corp.* v. *Public Serv. Comm'n*,
     447 U.S. 557 (1980) ...................................................... 15

*Dearth* v. *Mukasey*,
     516 F.3 413 (6th Cir. 2008). ............................................... 2

*District of Columbia* v. *Heller*,
     554 U.S. 570 (2008)................................................. 7, 9, 18

*Ezell* v. *City of Chicago*,
     2011 U.S. App. LEXIS 14108 (7th Cir. July 6, 2011)................... 10, 14-16

*Griswold* v. *Connecticut*,
     381 U.S. 479 (1965)....................................................... 8

*Heller* v. *District of Columbia*,
     2011 U.S. App. LEXIS 20130 (D.C. Cir. Oct. 4, 2011) ................. 13, 14, 16

*Hernandez* v. *Cremer*,
  913 F.2d 230 (5th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Hodgkins* v. *Mukasey*,
  271 Fed. Appx. 412 (5th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Kent* v. *Dulles*,
  357 U.S. 116 (1958) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Lynd* v. *Rusk*,
  389 F.2d 940 (D.C. Cir. 1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*McDonald* v. *City of Chicago*,
  130 S. Ct. 3020 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 10

*Nordyke* v. *King*,
  2011 U.S. App. LEXIS 8906 (9th Cir. May 2, 2011) . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Parker* v. *District of Columbia*,
  478 F.3d 370 (D.C. Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 14

*Patsone* v. *Pennsylvania*,
  232 U.S. 138 (1914) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Perry* v. *Sindermann*,
  408 U.S. 593 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Reliable Consultants, Inc.* v. *Earle*,
  517 F.3d 738 (5th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Richmond Newspapers* v. *Virginia*,
  448 U.S. 555 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Romer* v. *Evans*,
  517 U.S. 620 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Saenz v. Roe*,
  526 U.S. 489 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 23

*Schneider* v. *Rusk*,
  377 U.S. 163 (1964) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Simmons* v. *United States,*
    390 U.S. 377 (1968). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Small* v. *United States,*
    544 U.S. 385 (2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Springfield, Inc.* v. *Buckles,*
    116 F. Supp. 2d 85 (D.D.C. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Springfield, Inc.* v. *Buckles,*
    292 F.3d 813 (D.C. Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*United States* v. *Bass,*
    404 U.S. 336 (1971). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*United States* v. *Chester,*
    628 F.3d 673 (4th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 15

*United States* v. *Jackson,*
    390 U.S. 570 (1968). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23-25

*United States* v. *Marzzarella,*
    614 F.3d 85 (3d Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 13, 14

*United States* v. *Masciandaro,*
    638 F.3d 458 (4th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15

*United States* v. *Reese,*
    627 F.3d 792 (10th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States* v. *Skoien,*
    614 F.3d 638 (7th Cir. 2010) (en banc). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*United States* v. *Williams,*
    616 F.3d 685 (7th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Virginia* v. *Am. Booksellers Ass'n,*
    484 U.S. 383 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Williams* v. *Morgan,*
    478 F.3d 1316 (11th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Woodward* v. *Rogers*,
    344 F. Supp. 974 (D.D.C. 1972). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Zemel* v. *Rusk*,
    381 U.S. 1 (1965) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

<u>Statutes and Rules</u>

18 U.S.C. § 921(20). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

18 U.S.C. § 922(a)(9) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 9, 10, 12, 18, 22

18 U.S.C. § 922(b)(3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 11, 12, 22

18 U.S.C. § 924(a)(1)(D). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

27 C.F.R. § 478.11. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

27 C.F.R. § 478.124. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

27 C.F.R. § 478.29a. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 12

27 C.F.R. § 478.96. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

27 C.F.R. § 478.96(c)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

27 C.F.R. § 478.99. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

<u>Other Authorities</u>

http://publicsafety.utah.gov/bci/FAQother.html
    (last visited October 14, 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

THE WRITINGS OF THOMAS JEFFERSON
    (T.J. Randolph, ed., 1830). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

PRELIMINARY STATEMENT

Plaintiff Stephen Dearth is fully qualified to obtain, own and possess firearms under federal law—but for his lack of residence in the United States. The law does not consider Dearth a danger with guns: he is permitted access to firearms for "sporting purposes," a trust not provided felons, mental incompetents, or other categories of people disqualified from possessing weapons for readily obvious and compelling safety reasons. And were Dearth merely to relocate to the United States, he would face no federal firearms restrictions whatsoever.

However, because Dearth happens to make his home across the border in Canada, Dearth risks arrest and prosecution should he attempt to acquire a firearm in the United States for self-defense. Indeed, Dearth cannot buy a gun within the United States, for any reason, by sole virtue of his foreign residence.

The relevant law governing this case is well-established. The Second Amendment secures a fundamental right to keep and bear functional firearms for a variety of non-sporting purposes, including self-defense. The government lacks any legitimate reason to restrict a citizen's constitutionally-protected access to firearms for self-defense, simply for that citizen's lack of domestic residence. The challenged laws impermissibly encroach upon Dearth's Second Amendment right to keep and bear arms, and his Fifth Amendment rights to travel overseas and enjoy the equal protection of the law. Plaintiff Second Amendment Foundation joins in this lawsuit, as it and its members and supporters are likewise impacted by operation of these laws.

PROCEDURAL HISTORY

Plaintiffs first brought suit challenging the expatriated citizen firearms restrictions in the United States District Court for the Southern District of Ohio, as that district was the primary place in which Dearth was refraining from possessing firearms. A companion lawsuit, brought by Plaintiff SAF and former plaintiff Maxwell Hodgkins, was brought before the United States District Court for the Northern District of Texas, where Hodgkins possessed and would acquire firearms. The government successfully defeated both lawsuits on venue grounds, arguing that no events or omissions occurred in those districts, and that Ohio and Texas were inconvenient fora for the United States. *Dearth* v. *Mukasey*, 516 F.3 413 (6th Cir. 2008); *Hodgkins* v. *Mukasey*, 271 Fed. Appx. 412 (5th Cir. 2008).[1]

Plaintiffs correctly predicted that these venue challenges were forum shopping for a friendlier jurisdictional defense, given the D.C. Circuit's uniquely restrictive pre-enforcement standing doctrine. When Plaintiffs re-filed their action here, Defendant raised precisely that claim, conspicuously absent from the earlier cases, and found initial success before this Court. But the D.C. Circuit reversed. The case must now be resolved on its merits.

STATEMENT OF FACTS

1.     *Federal Restrictions on Expatriated Americans' Ability to Acquire Firearms.*

Title 18 U.S.C. § 922(a)(9) provides: "It shall be unlawful – for any person, other than a licensed importer, licensed manufacturer, licensed dealer, or licensed collector, who does not reside in any State to receive any firearms unless such receipt is for lawful sporting purposes."[2]

---

[1]Both earlier lawsuits were dismissed without prejudice.

[2]Unless otherwise noted, all statutory references are to Title 18.

2

A violation of this section is punishable by fine and/or imprisonment of up to five years. 18

U.S.C. § 924(a)(1)(D). "No person, other than a licensed importer, licensed manufacturer,

licensed dealer, or licensed collector, who does not reside in any State shall receive any firearms

unless such receipt is for lawful sporting purposes." 27 C.F.R. § 478.29a. "An individual resides

in a State if he or she is present in a State with the intention of making a home in that State." 27

C.F.R. § 478.11.

Title 18 U.S.C. § 922(b)(3), and 27 C.F.R. §§ 478.96, 478.99, bar a firearms dealer from

selling firearms to individuals who do not reside within the state in which the dealer's place of

business is located.  An exception to this prohibition allows a dealer to sell rifles and shotguns to

residents of states where the dealer does not maintain a place of business, as long as the

transaction would be legal "in both states," that is, the purchaser's state, and the dealer's state.

By operation of this section, otherwise qualified American citizens wishing to buy firearms

cannot do so unless they maintain a residence within the United States.

All firearms purchasers within the United States who do not possess a Federal Firearms

License, meaning, virtually all ordinary civilian consumers of firearms, must complete "Form

4473, Firearms Transaction Record Part I – Over-The-Counter, OMB 1140-0020," administered

under Defendant's authority, in order to purchase a firearm. 27 C.F.R. § 478.124. Question 13 on

Form 4473 provides, "What is your State of residence (*if any*)? _____" The failure to

complete Form 4473, including Question 13, voids a firearms transaction.

2.      *The Challenged Laws' Impact on Plaintiffs*

Plaintiff Stephen Dearth is a natural born citizen of the United States and a resident of

Canada. Separate Statement of Undisputed Material Facts ("SUF") 1. He does not maintain a

3

residence in the United States. SUF 2. Dearth is over the age of 21, is not under indictment, has

never been convicted of a felony or misdemeanor crime of domestic violence, is not a fugitive

from justice, is not an unlawful user of or addicted to any controlled substance, has not been

adjudicated a mental defective or committed to a mental institution, has not been discharged

from the Armed Forces under dishonorable conditions, has never renounced his citizenship, and

has never been the subject of a restraining order relating to a child or an intimate partner. SUF 3.

Dearth holds a valid Utah permit to publicly carry a handgun, which is recognized in numerous

states. SUF 4.

Dearth has many friends and relatives in the United States whom he enjoys visiting, and

whom he intends to continue visiting on a regular basis. Dearth also travels to the United States

on business. SUF 5. Dearth intends to purchase firearms within the United States, which he

would store securely at his relatives' home in Mount Vernon, Ohio, and which he would access

for lawful sporting purposes as well as for other purposes, including self-defense, while visiting

the United States. SUF 6.

Unaware of the federal restrictions on firearms acquisition by expatriated Americans,

Dearth attempted to buy a firearm within the United States on or about January 28, 2006. SUF 7.

However, he could not provide a response to Question 13 on Form 4473, and advised the dealer

that he does not reside in any state. On account of Dearth's foreign residence and inability to

answer Question 13, the transaction was terminated. SUF 8. Dearth subsequently spoke with an

official at the Federal Bureau of Investigations, who confirmed that Dearth could not adequately

complete Form 4473, and could not purchase a firearm on account of his lack of domestic

residence. SUF 9. Dearth subsequently sought to purchase a firearm within the United States in

4

June, 2007. Dearth truthfully advised the seller that he did not reside in any state, and on account of that fact, the transaction could not proceed. SUF 10.

Dearth reasonably fears arrest, prosecution, incarceration and/or fine were he to provide false state residence information on a Form 4473 in order to purchase firearms, and cannot purchase firearms at retail if he truthfully declines to list a state of residence on Form 4473. SUF 11. The enforcement of the federal restrictions on firearms acquisition by expatriated Americans is presently interfering with Dearth's efforts to acquire firearms for self-defense. SUF 12.

Plaintiff Second Amendment Foundation, Inc. ("SAF"), is a non-profit membership organization incorporated under the laws of Washington with its principal place of business in Bellevue, Washington. SUF 8. SAF has over 650,000 members and supporters nationwide. SUF 13. The purposes of SAF include education, research, publishing and legal action focusing on the Constitutional right to privately own and possess firearms, and the consequences of gun control. SAF's members and supporters are highly conscious of, and place great value upon, their various constitutional rights, including the right to keep and bear arms. SUF 14. Many of SAF's members and supporters purchase handguns for traditional lawful purposes, including self-defense. SUF 15. Many of SAF's members and supporters also enjoy overseas travel, and on occasion reside overseas for an indefinite amount of time, while still returning to the United States on visits during which they enjoy exercising their Second Amendment rights. For example, Stephen Dearth and Maxwell Hodgkins are SAF members. SUF 16. Owing to SAF's mission, SAF's resources are taxed by inquiries into the operation and consequences of federal firearms restrictions based on residence and travel. SUF 17.

## SUMMARY OF ARGUMENT

Few laws are as obviously unconstitutional as the ones challenged in this action. The Second Amendment secures a fundamental individual right to keep and bear arms for traditional lawful purposes, including self-defense. While the government may disarm dangerous or irresponsible individuals whose possession of guns would lie at the Second Amendment's fringes, or prevent the possession or use of arms for improper purposes, here the government's conduct targets *only* activity that lies at the Second Amendment's core. It disarms plainly law-abiding, responsible Americans, largely and specifically to the extent they would exercise their right to bear arms for self-defense.

Moreover, the Fifth Amendment secures for all Americans the fundamental right of international travel. Restricting the Second Amendment rights of individuals who choose to reside overseas impermissibly burdens the right of international travel, as Americans cannot be forced to choose among their fundamental rights.

And because the government improperly classifies individuals in the exercise of fundamental constitutional rights, it also violates the Fifth Amendment's guarantee of equal protection. Indeed, the challenged laws would fail even a rational-basis level of scrutiny. Not only is it irrational to classify expatriates differently from other law-abiding citizens, but the government also differentiates between Americans who purchased guns prior to leaving the country, who are unencumbered in their access and use of their firearms, and those who did not make such preparations, who are almost completely disarmed.

Alas, it is not the Court's role to make sense of these restrictions, but merely to apply the Constitution's requirements. Plaintiffs are accordingly entitled to summary judgment.

ARGUMENT

I.    THE SECOND AMENDMENT SECURES A FUNDAMENTAL RIGHT TO ACQUIRE
      FIREARMS FOR SELF-DEFENSE.

This much is now settled law: the Second Amendment secures a fundamental right to

possess functional firearms for self-defense. *District of Columbia* v. *Heller*, 554 U.S. 570 (2008);

*McDonald* v. *City of Chicago*, 130 S. Ct. 3020 (2010); *see also Patsone* v. *Pennsylvania*, 232

U.S. 138, 143 (1914) ("pistols . . . may be supposed to be needed occasionally for self-defence.").

Indeed, the interest in self-defense is the "*central component* of the [Second Amendment] right

itself." *Heller*, 554 U.S. at 599 (emphasis original).

Because there is a right to keep and bear firearms, there is, necessarily, a right to acquire

them. "[C]ertain unarticulated rights are implicit in enumerated guarantees . . . fundamental

rights, even though not expressly guaranteed, have been recognized by the Court as indispensable

to the enjoyment of rights explicitly defined." *Richmond Newspapers* v. *Virginia*, 448 U.S. 555,

579-80 (1980). "The right to keep arms, necessarily involves the right to purchase them . . ."

*Andrews* v. *State*, 50 Tenn. 165, 178 (1871). The Second Amendment does not merely protect the

right to possess the guns that someone might manufacture from raw materials at home for private

use (in any event, a highly-regulated activity). A complete ban on gun commerce would violate

the Second Amendment right at its core. *United States* v. *Marzzarella*, 614 F.3d 85, 92 n.8 (3d

Cir. 2010).

"Our citizens have always been free to make, *vend* and export arms. It is the constant

occupation and livelihood of some of them." 3 THE WRITINGS OF THOMAS JEFFERSON 230 (T.J.

Randolph, ed., 1830). The government can no more ban the sale of protected guns than it can ban

the sale of protected books, *Virginia* v. *Am. Booksellers Ass'n*, 484 U.S. 383, 393 (1988); contraceptives, *Carey* v. *Pop. Serv. Int'l*, 431 U.S. 678 (1977); *Griswold* v. *Connecticut*, 381 U.S. 479 (1965), or perhaps even the sale of sex toys, *Reliable Consultants, Inc.* v. *Earle*, 517 F.3d 738 (5th Cir. 2008); *but see Williams* v. *Morgan*, 478 F.3d 1316 (11th Cir. 2007).

A right to keep and bear arms, without the right to *acquire* arms, would be meaningless. To be sure, the government may regulate the acquisition of arms. But it can only do so in a manner consistent with the regulation of a fundamental right.

II.   BARRING LAW-ABIDING CITIZENS FROM ACQUIRING FIREARMS FOR SELF-DEFENSE IS UNCONSTITUTIONAL.

There is no squaring the Second Amendment's guarantee of the right to acquire arms *for self-defense* with 18 U.S.C. § 922(a)(9) and 27 C.F.R. § 478.29a, barring non-residents from "receiv[ing] any firearms unless such receipt is for lawful sporting purposes." The Gun Control Act of 1968 does not define what a "sporting purpose" is, but "legislative history indicates that 'sporting purposes' refers to target shooting and hunting." *Springfield, Inc.* v. *Buckles*, 116 F. Supp. 2d 85, 90 (D.D.C. 2000), *aff'd*, 292 F.3d 813 (D.C. Cir. 2002). As used elsewhere in the Gun Control Act, the term "sporting purpose" "comprehends only particular uses of a firearm that have attained general recognition as having a 'sporting purpose,' and only activities that are traditional sports." *Springfield*, 292 F.3d at 818 (citation and internal quotation marks omitted). The term is construed narrowly, excluding various popular shooting activities, including plinking and practical shooting. *Id.*, at 818-19. Plainly, whatever recreational or competitive activities fall within the Act's definition of "sporting purpose," defending oneself from violent crime is not among them.

8

Accordingly, these provisions on their face proscribe conduct that lies within the Second Amendment's protection. They simply cannot survive judicial review.

In drafting Section 922(a)(9) and its corresponding regulation, Congress and the Bureau of Alcohol, Tobacco, Firearms and Explosives ("BATFE"), respectively, lacked the benefit of the Supreme Court's guidance as set forth in *Heller* (if they considered the Second Amendment at all). One would like to imagine that such laws would not be enacted today, but in any event, this Court is required to enforce the Constitution's strictures, and in doing so it is now bound by *Heller*.

In *Heller*, the Supreme Court notably declined to employ any specific "level of scrutiny" in striking down two laws—a handgun ban and a functional firearm ban—and directing the application of a third law—a home carry-permit requirement, under the Second Amendment. Washington's functional firearm ban and home-carry permit scheme simply conflicted with the Second Amendment's core right. With respect to the District of Columbia's complete ban on the possession of functional firearms within the home, the Court simply offered that the ban "makes it impossible for citizens to use [guns] for the core lawful purpose of self-defense and is hence unconstitutional." *Heller*, 554 U.S. at 630.[3]

This same process, identifying at first whether a regulation directly conflicts with a "core protection" of the Amendment without resort to any type of means-ends scrutiny, resolved

---

[3]*Heller* also struck down a categorical handgun ban upon a finding that handguns are a class of "arms" whose possession and use the Second Amendment secures. This case involves no laws addressing particular classes or types of arms. Nonetheless, the Supreme Court's treatment of the handgun ban is instructive in demonstrating that once a law is determined to prohibit some activity literally secured by the Second Amendment, it must be enjoined.

9

Heller's challenge to a requirement that he obtain an unavailable permit to move a handgun

inside his home. The D.C. Circuit found the restriction violated the Second Amendment's core:

> It is sufficient for us to conclude that just as the District may not flatly ban the keeping of a handgun in the home, obviously it may not prevent it from being moved throughout one's house. Such a restriction would negate the lawful use upon which the right was premised–i.e, self-defense.

*Parker* v. *District of Columbia,* 478 F.3d 370, 400 (D.C. Cir. 2007), *aff'd sub nom, Heller*.

The Supreme Court affirmed on the same reasoning. Having already found that Heller

enjoyed the right to have a handgun at home for self-defense, the Court held that the city lacked

discretion to refuse issuance of the home-carry permit. *Heller*, 554 U.S. at 635.

A law limiting the acquisition of firearms to "sporting" purposes simply cannot survive,

because individuals clearly have the right to acquire firearms for *self-defense* as well—the

interest that lies at the core of the traditional right to arms, and the interest that Plaintiffs

primarily have in seeking to acquire firearms. To be sure, the Second Amendment secures

various other interests. For example, individuals enjoy the right to use firearms for hunting not

merely as a means of sport, but for sustenance. *McDonald*, 130 S. Ct. at 3042 n.27 ("settlers'

dependence on game for food and economic livelihood, moreover, undoubtedly undergirded"

state protections of the right to arms). And of course, individuals have the right to use firearms

for lawful sporting purposes. *Cf. Ezell* v. *City of Chicago*, 2011 U.S. App. LEXIS 14108 (7th Cir.

July 6, 2011). Forbidding Americans from keeping arms for any of these or other traditional

purposes plainly violates the Second Amendment.

Even if the Court were to analyze Section 922(a)(9) under a means-ends level of scrutiny,

a mechanism discussed at greater length below in the context of Plaintiffs' as-applied challenge

to Section 922(b)(3), the analysis would end quickly under any standard of review for the simple

lack of any conceivable governmental interest in restricting firearms use to a "sporting purpose."

The very existence of self-defense as a core traditional aspect of rights secured by the Second

Amendment bars the government from having any interest in abridging the use of firearms for

self-defense. The governmental interest here cannot be public safety—there is no logical reason

to imagine why Plaintiffs are perfectly safe while engaging in "sporting" activity with a firearm,

but pose risks to themselves or to others if they are *not* engaging in "sporting" activity. Indeed,

the opposite is more likely correct: firearms sports inherently involve shooting. But a gun

possessed for self-defense is unlikely to be fired, except in case of emergency.

      If Plaintiffs cannot be entrusted with firearms for reasons of public safety, they should be

categorically barred from accessing firearms. That has always been the logic of barring classes of

people from possessing firearms, be they felons, drug addicts, or the subject of domestic violence

restraining orders. Such prohibited individuals are not allowed to have firearms at all, even if

they agree to limit their gun possession to "sporting purposes." Likewise, there is no reason to

suppose that Plaintiffs are trustworthy with firearms for some purposes, but not for others, or that

such distinctions would be related to Plaintiffs' lack of domestic residence. Indeed, the

government does not forbid the continued possession, *for any purpose*, of guns acquired by

citizens prior to their relinquishment of domestic residence. That fact alone underscores the

government's complete lack interest in preventing replacing their pre-possessed firearms, or from

acquiring new ones.

      But at least with respect to this restriction, there is no need to explore the government's

purpose, because the law literally conflicts with the core constitutional guarantee. Just like the

District of Columbia's former functional firearms ban, Section 922(a)(9) and its implementing

provision, 27 C.F.R. § 478.29a, "make[] it impossible for citizens to use [guns] for the core

lawful purpose of self-defense and [are] hence unconstitutional." *Heller*, 554 U.S. at 630. No

further analysis was required to deal with *Heller*'s functional firearm law, and no further analysis

is required here to dispense with the sporting use restrictions imposed on the acquisition of

firearms by Americans residing overseas.

III.   BARRING FIREARMS SALES TO OTHERWISE QUALIFIED AMERICANS FOR LACK OF
       DOMESTIC RESIDENCE VIOLATES THE SECOND AMENDMENT.

With respect to Section 922(b)(3) and its implementing regulations, Plaintiffs do not

challenge the requirement that firearms consumers residing in the United States disclose their

state of residence. Doing so enables the dealer, and the government, to ensure the transaction

complies with valid state and local laws. For example, consumers may purchase rifles or

shotguns across state lines provided that the transaction is legal "in both such states." 18 U.S.C. §

922(b)(3). The seller is presumed to know, and required to comply with, the relevant state laws.

*Id.*; 27 C.F.R. § 478.96(c)(2).[4]

But the issue here is different—whether the state disclosure requirement can be enforced

against non-residents, consequently imposing a complete ban on their purchase of firearms.

Because disclosure of a state of residence does not, without more, conflict with the constitutional

guarantee, and does not otherwise require the use of specific categorical tests (e.g., the common

---

[4]SAF is separately litigating the issue of whether interstate handgun transfers ought to be treated in the same manner as long gun transfers. But in neither that case nor here do Plaintiffs facially challenge Section 922(b)(3)'s residence disclosure requirement.

12

use test for protected arms), application of this provision should be examined under a means-ends level of scrutiny.

As many Second Amendment cases concern laws of this nature—laws that can be said to regulate, but do not literally conflict with the Amendment's core or trigger a specific test—courts have frequently had occasion to followed a two-step doctrinal approach to cases potentially implicating the Second Amendment. *Heller* v. *District of Columbia*, 2011 U.S. App. LEXIS 20130 (D.C. Cir. Oct. 4, 2011) ("*Heller II*");[5] *Marzzarella*, 614 F.3d at 89; *United States* v. *Reese*, 627 F.3d 792, 800 (10th Cir. 2010). The first step is to consider whether the particular exercise of government power regulates conduct falling within the actual scope of the Second Amendment. *Heller II*, 2011 U.S. App. LEXIS 20310 at *16; *United States* v. *Chester*, 628 F.3d 673, 680 (4th Cir. 2010). As the Second Amendment plainly secures a right to acquire guns, a regulation demanding that firearms purchasers disclose a state of residence implicates the Amendment. The Court must then apply the second step, a means-ends level of scrutiny. *Heller II*, 2011 U.S. App. LEXIS 20310 at *16-*17; *Chester*, 628 F.3d at 681-682; *Marzzarella*, 614 F.3d at 89; *Reese*, 627 F.3d at 800-801.

In this case, the appropriate standard is strict scrutiny. But the application of residence disclosure requirements to non-residents cannot survive any level of scrutiny.

A.     Laws Restricting the Purchase of Firearms By Responsible, Law-Abiding Individuals Are Subject to Strict Scrutiny.

Following the prevailing trend, the D.C. Circuit has cautioned that there is no single standard of review applicable in all Second Amendment cases. "As with the First Amendment,

---

[5]Although Plaintiffs' counsel was counsel for Heller in the original *Heller* litigation, he has had no involvement in the separate *Heller II* case.

the level of scrutiny applicable under the Second Amendment surely depends on the nature of the

conduct being regulated and the degree to which the challenged law burdens the right." *Heller II*,

2011 U.S. App. LEXIS 20310 at *30 (citations omitted). "The protections of the Second

Amendment are subject to the same sort of reasonable restrictions that have been recognized as

limiting, for instance, the First Amendment." *Parker*, 478 F.3d at 399. "[A]s has been the

experience under the First Amendment, we might expect that courts will employ different types

of scrutiny in assessing burdens on Second Amendment rights, depending on the character of the

Second Amendment question presented." *United States* v. *Masciandaro,* 638 F.3d 458, 470 (4th

Cir. 2011); *cf. Marzzarella*, 614 F.3d at 96; *United States* v. *Williams*, 616 F.3d 685, 692 (7th

Cir. 2010) (declining to "adopt a level of scrutiny applicable to every disarmament challenge . . .

"). Without specifying the exact level of heightened scrutiny, the Ninth Circuit recently held that

"regulations which substantially burden the right to keep and bear arms trigger heightened

scrutiny under the Second Amendment." *Nordyke* v. *King*, 2011 U.S. App. LEXIS 8906 at *6 &

n.9 (9th Cir. May 2, 2011).[6]

 "Borrowing from the Court's First Amendment doctrine, the rigor of this judicial review

will depend on how close the law comes to the core of the Second Amendment right and the

severity of the law's burden on the right." *Ezell*, 2011 U.S. App. 14108 at *43-*44 (citations

omitted). As the Seventh Circuit explained,

> Labels aside, we can distill this First Amendment doctrine and extrapolate a few general
> principles to the Second Amendment context. First, a severe burden on the core Second

---

 [6]On June 13, 2011, the Ninth Circuit ordered the *Nordyke* Appellees to respond to a
motion for re-hearing *en banc*. Considering the case's "long and tangled procedural history"
since 1999, *Nordyke*, 2011 U.S. App. LEXIS at *6, it would be no surprise were the panel
opinion soon vacated.

> Amendment right of armed self-defense will require an extremely strong public-interest
> justification and a close fit between the government's means and its end. Second, laws
> restricting activity lying closer to the margins of the Second Amendment right, laws that
> merely regulate rather than restrict, and modest burdens on the right may be more easily
> justified. How much more easily depends on the relative severity of the burden and its
> proximity to the core of the right.

*Ezell*, 2011 U.S. App. LEXIS 14108 at *59; *cf. Cent. Hudson Gas & Elec. Corp*. v. *Public Serv.

Comm'n*, 447 U.S. 557, 563 n.5 (1980) (First Amendment: intermediate standard of review may

apply to an enumerated right under circumstances where the right's exercise is "of less

constitutional moment.").

Under this approach, where the Second Amendment's standard of review depends on the

nature of the claim, the Fourth Circuit applies strict scrutiny to cases implicating the Second

Amendment's fundamental core. "[W]e assume that any law that would burden the

'fundamental,' core right of self-defense in the home by a law-abiding citizen would be subject to

strict scrutiny." *Masciandaro*, 638 F.3d at 470. But that court applies intermediate scrutiny where

the "claim is not within the core right identified in *Heller*—the right of a law-abiding,

responsible citizen to possess and carry a weapon for self-defense." *Chester*, 628 F.3d at 683.

"[I]ntermediate scrutiny is more appropriate than strict scrutiny for [domestic violence

misdemeanant] and similarly situated persons." *Id.*

Likewise, the Seventh Circuit applied intermediate scrutiny in reviewing the

constitutionality of the federal firearms prohibition directed at perpetrators of domestic violence.

*See, e.g. United States* v. *Skoien*, 614 F.3d 638 (7th Cir. 2010) (en banc). But enjoining

Chicago's ban on the operation and use of gun ranges, the Seventh Circuit concluded that "a

15

more rigorous showing than that applied in *Skoien* [intermediate scrutiny] should be required, if not quite 'strict scrutiny.'" *Ezell*, 2011 U.S. App. LEXIS 14108 at *60.

In following the trend favoring flexibility in the selection of scrutiny standards, the D.C. Circuit applied intermediate scrutiny to test the District's registration and "assault weapons" laws, as it found these were not substantial burdens on core Second Amendment rights. *Heller II*, 2011 U.S. App. LEXIS 20130 at *32 and *44. But the Court's opinion, its earlier statements in *Parker*, and the example of the other circuits that the D.C. Circuit has carefully followed, leaves little doubt that in this case, the correct standard is strict scrutiny. As the D.C. Circuit instructs, fundamental rights are ordinarily subjected to strict scrutiny analysis. *See, e.g. Banner* v. *United States*, 428 F.3d 303, 307 (D.C. Cir. 2005) (per curiam). And here, the burden is substantial, implicating the core rights of responsible, law-abiding citizens to obtain any sort of firearm, and to use it in self-defense. The government must satisfy a high burden indeed to justify such restrictions.

B.     Barring Law-Abiding, Responsible Americans from Purchasing Firearms for Lack of Domestic Residence Serves No Compelling Government Interest.

Plainly, were Dearth to borrow a gun from a neighbor for a hunting expedition, or a visit to a skeet or target range, no federal law would condemn his actions. And Dearth would not be prohibited from using firearms in the United States for *any* lawful purpose, if only he had the foresight to acquire those firearms prior to moving overseas. Under such circumstances, the government would deem Dearth to be in continuous possession of the firearms notwithstanding his overseas travel, and thus not reached by conditions imposed upon the acquisition of firearms.

16

"Receive" and "possess" have different meaning throughout the Gun Control Act of 1968. *See, e.g. United States* v. *Bass*, 404 U.S. 336, 342-43 (1971).

Yet despite allowing Dearth to acquire firearms for some purposes, and to do whatever he might otherwise lawfully do with pre-possessed firearms, Section 922(b)(3) operates to prohibit Dearth from purchasing new firearms for any purpose. As with the mysterious reason for limiting the acquisition of firearms by perfectly safe individuals to those activities that inherently include shooting (as opposed to self-defense, where the firing of guns is merely a possibility), the complete prohibition on firearms purchases does not obviously serve any purpose, let alone a compelling one.

And again, if Plaintiffs cannot be entrusted with firearms for reasons of public safety, they should be categorically barred from accessing firearms. There is no reason to suppose that Plaintiffs are trustworthy with firearms possessed prior to moving overseas, but not trustworthy with firearms possessed after moving overseas.

The possibility that overseas residents might be engaging in disqualifying criminal activity undetectable to domestic authorities is irrelevant. Foreign convictions are not reported to the National Instant Criminal Background Check System, and with good reason: the Supreme Court has held that convictions in foreign courts do not disqualify Americans from possessing guns under federal law. *Small* v. *United States*, 544 U.S. 385 (2005).[7] Were Dearth to return permanently to the United States, he would immediately be free of the challenged restrictions.

---

[7]Many nations criminalize conduct that is permissible, even constitutionally protected, within the United States. Notions of due process also vary widely amongst nations. Even within the United States, states are obligated to respect each other's criminal justice systems; a felony conviction is only disqualifying if the individual's conduct was felonious in the state where the conviction occurred. 18 U.S.C. § 921(20).

17

And there is no reason to suppose that Americans are more law-abiding in foreign countries if they are only passing through on temporary visits, as opposed to relocating overseas for an extended period of time. Intuitively, the reverse appears more likely.

      C.      Even Were There Some Interest in Restricting the Purchase of Firearms By Law-Abiding, Responsible Americans for Lack of Domestic Residence, the Challenged Laws Are Not Narrowly Tailored.

Even were there some conceivable public safety reason for limiting Plaintiffs' Second Amendment rights on the basis of overseas residence, the complete sales ban is hardly limited and narrowly tailored. For example, Dearth is licensed to carry a concealed handgun in public by the state of Utah, a license that allows him to carry in 30 states. http://publicsafety.utah.gov/ bci/FAQother.html (last visited October 14, 2011). To obtain this license, Dearth underwent a criminal background check, and a required training course. Yet on the mere basis of Dearth's overseas residence, the challenged laws presumptively trump his demonstrated capacity for responsible firearms access.

The fact of Dearth's concealed handgun permit is only one example of the challenged provisions' overbreadth. The structure of our constitution and legal institutions presumes that American society is generally law-abiding. The Second Amendment reflects a judgment that, absent some disqualifying circumstance, individual Americans should be free to have guns. *Heller*, 554 U.S. at 635 ("Assuming that Heller is not disqualified from the exercise of Second Amendment rights, the District must permit him to register his handgun and must issue him a license to carry it in the home."). Yet without further distinction, Section 922(b)(3) and its implementing regulations forbid all Americans from purchasing guns, should they establish their

residence in another country. No American is beyond these sections' reach, regardless of individual characteristics, if he or she were to move overseas.

The only theoretical regulatory interests in tying domestic residence to the acquisition of firearms would relate to concerns about the firearms being exported from the country, or to their safe storage within the country. In neither case can these laws be considered narrowly tailored. There is no reason to suppose that overseas residents are any more capable of unlawfully exporting firearms than are U.S. residents traveling overseas. If the government wishes to restrict the export of guns, it can do so generally at ports and border crossings. Indeed, the transfer of firearms across our international borders is heavily regulated.

If the government fears that non-residents acquiring arms might be unable to store their weapons properly, it could theoretically enact laws of general application that require the safe storage of firearms. Yet no laws specifically govern the storage of firearms pre-possessed by Americans traveling abroad, and there is no reason why citizens living abroad cannot secure their firearms safely within the United States while they are overseas. The same holds true for American residents leaving their firearms at home or in storage while traveling domestically.

Were the government concerned about expatriated citizens shipping their firearms overseas, or leaving them behind in the United States, it could regulate such interests specifically. There is no need for a broad prohibition on the acquisition of firearms, and many readily obvious less restrictive alternatives.

19

IV.   RESTRICTING THE FIREARMS RIGHTS OF EXPATRIATED AMERICANS VIOLATES THE
      FUNDAMENTAL RIGHT TO INTERNATIONAL TRAVEL.

    A.   American Citizens Enjoy A Fundamental Right to International Travel,
        Including the Right to Reside Overseas.

"The right to travel is a part of the 'liberty' of which the citizen cannot be deprived without the due process of law under the Fifth Amendment." *Kent* v. *Dulles*, 357 U.S. 116, 125 (1958).[8] "Travel abroad, like travel within the country, may be necessary for a livelihood. It may be as close to the heart of the individual as the choice of what he eats, or wears, or reads. Freedom of movement is basic in our scheme of values." *Kent*, 357 U.S. at 126 (citations omitted).

In *Kent*, the Secretary of State purported to exercise his discretion to deny plaintiffs' passport applications, based on their communist sympathies. The Supreme Court, recognizing a critical constitutional right had been implicated, refused to accept that Congress had granted the Secretary such broad discretion to grant or deny passport applications.

"[T]he right of exit is a personal right included within the word 'liberty' as used in the Fifth Amendment. If that 'liberty' is to be regulated, it must be pursuant to the law-making functions of the Congress. And if that power is delegated, the standards must be adequate to pass scrutiny by the accepted tests." *Kent*, 357 U.S. at 529. The Supreme Court observed that historically, passports had been denied only to those who were not citizens of or sufficiently loyal to the United States, or to those fleeing the criminal justice system. Accordingly, the Court

---

[8]This right of international travel exists in addition to the right of interstate travel. *Saenz v. Roe*, 526 U.S. 489, 498 (1999).

refused to accept that without more, the executive branch was authorized by Congress to deny

passports for other reasons.

Inherent in "the freedom of movement" overseas is the freedom to remain overseas for

any length of time, even to reside overseas indefinitely. In *Schneider* v. *Rusk*, 377 U.S. 163

(1964), the Supreme Court struck down an act purporting to denaturalize once-naturalized

American citizens who thereafter resided, for three continuous years, in their nation of origin:

> The discrimination aimed at naturalized citizens drastically limits their *rights to live and
> work abroad* in a way that other citizens may . . . Living abroad . . . is no badge of lack of
> allegiance and in no way evidences a voluntary renunciation of nationality and allegiance.
> It may indeed be compelled by family, business, or other legitimate reasons.

*Schneider*, 377 U.S. at 168-69 (emphasis added). The right of international travel has no time

limit. It necessarily includes the right to live and work overseas for any length of time. The

government may not, consistent with the right of international travel, arbitrarily restrict the

comings and goings of American citizens or frustrate their choice of residence.

B.     Restrictions Upon the Right to International Travel Are Subject to
       Strict Scrutiny Review.

"Where activities of enjoyment, natural and often necessary to the well-being of an

American citizen, such as travel, are involved, we will construe narrowly all delegated powers

that curtail or dilute them." *Kent*, 357 U.S. at 129 (citations omitted); *Hernandez* v. *Cremer*, 913

F.2d 230, 237 (5th Cir. 1990). "[S]tatutory limitations [of the right to travel] will be strictly

construed." *Lynd* v. *Rusk*, 389 F.2d 940, 945 (D.C. Cir. 1967); *see also Apethaker* v. *Secretary of

State*, 378 U.S. 500 (1964) (strict scrutiny invalidates ban on application or use of passports by

communists).

21

C.      Restricting the Domestic Firearms Rights of Expatriated Americans Does Not
        Narrowly Satisfy Any Interest in Regulating the Right to International Travel.

Courts are sensitive to even coincidental infringements of the right of international travel. The D.C. Circuit summarily affirmed, without opinion, a decision striking down a requirement that citizens pledge a loyalty oath as a condition of obtaining a passport as a violation of the international travel right. *Woodward* v. *Rogers*, 344 F. Supp. 974 (D.D.C. 1972), *aff'd*, 486 F.2d 1317 (D.C. Cir. 1973).

This Court struck down the loyalty oath requirement despite expressing skepticism about, and declining to consider, the plaintiff's First Amendment objections. *Woodward*, 344 F. Supp. at 989. The court found that the oath's only practical function was "to prohibit foreign travel by those persons who find a public affirmation of loyalty repugnant to their integrity and conscience. No serious national purpose is served by singling out those people and curtailing their Fifth Amendment right to travel." *Woodward,* 344 F. Supp. at 988.

Likewise, laws conditioning a citizen's fundamental right of international travel upon surrendering the ability to acquire firearms serve "no serious national purpose," even in the absence of a Second Amendment right to keep and bear arms. The mere intrusion upon the right to travel, in a manner that cannot satisfy strict scrutiny, renders such laws unenforceable.

Under this established standard, sections 922(a)(9) and 922(b)(3) violate Plaintiffs' right to travel. Plaintiffs are told they must surrender their ability to acquire firearms for non-sporting purposes, and surrender completely their ability to purchase firearms, as a condition of moving overseas. Like the loyalty oath struck down in *Woodward*, such restrictions on the right to travel

22

serve "no serious national purpose," let alone in a manner that is narrowly tailored and admitting

of no less restrictive alternatives.

V.      BY FORCING INDIVIDUALS TO SELECT FROM AMONG THEIR CONSTITUTIONAL RIGHTS,
        THE CHALLENGED PROVISIONS VIOLATE THE UNCONSTITUTIONAL CONDITIONS
        DOCTRINE.

As an elementary principle of constitutional law, the government is forbidden from

imposing conditions upon the exercise of rights, or the receipt of benefits, that it could not

impose directly. The unconstitutional conditions doctrine is sufficiently broad so as to forbid the

government from demanding people forfeit rights in exchange for benefits, even where there is

no entitlement to the benefit in the first instance. *See, e.g. Perry* v. *Sindermann*, 408 U.S. 593

(1972) (public employment cannot be conditioned on forfeiture of First Amendment rights);

*Saenz*, *supra*, 526 U.S. 489 (welfare benefits cannot be conditioned on forfeiture of interstate

travel right).

The unconstitutional conditions doctrine is sufficiently broad to forbid the government

from merely discouraging, even inadvertently, the exercise of core constitutional rights. In *United

States* v. *Jackson*, 390 U.S. 570 (1968), the Supreme Court held unconstitutional a provision

which directed that a defendant could only be sentenced to death upon a jury's recommendation.

The provision's effect discouraged defendants from exercising their Fifth Amendment right to

enter a not guilty plea, and their Sixth Amendment right to trial by jury. A defendant who

insisted upon the benefit of these rights did so at the additional risk of hanging, a condition that

would tend to encourage coercive guilty pleas and forfeiture of the jury trial right. That the

statute had a benign ameliorative goal rather than a punitive one made no difference:

23

> Whatever might be said of Congress' objectives, they cannot be pursued by means that needlessly chill the exercise of basic constitutional rights. The question is not whether the chilling effect is 'incidental' rather than intentional; the question is whether that effect is unnecessary and therefore excessive.

*Jackson*, 390 U.S. at 582 (citations omitted).

Perhaps nowhere is the unconstitutional conditions doctrine more clearly implicated than in those situations where the government encourages individuals to choose from among their constitutional rights. Where an individual ordinarily enjoys two constitutional rights, the government cannot demand that the exercise of one right be conditioned upon the discouragement or forfeiture of the other. People are entitled to *all* of their constitutional rights, and may freely exercise them in any combination as they see fit.

An excellent example of such an unconstitutional condition is described in *Simmons* v. *United States,* 390 U.S. 377 (1968). In *Simmons*, the Supreme Court held that a criminal defendant who wishes to assert Fourth Amendment rights in challenging the admissibility of evidence cannot be expected to do so at the risk that such potentially self-incriminating testimony might be used against him later at trial.

> Garrett was obliged either to give up what he believed, with advice of counsel, to be a valid Fourth Amendment claim or, in legal effect, to waive his Fifth Amendment privilege against self-incrimination. In these circumstances, we find it intolerable that one constitutional right should have to be surrendered in order to assert another.

*Simmons*, 390 U.S. at 394.

*Apethaker* provides an even more relevant example of an unconstitutional condition between two constitutional rights. In striking down that portion of the Subversive Activities Control Act, forbidding international travel on account of one's association with communist

24

organizations, the Supreme Court specifically rejected the argument that plaintiffs had

voluntarily forfeited their right to travel by choosing to exercise their right of free association:

> The restrictive effect of the legislation cannot be gainsaid by emphasizing, as the Government seems to do, that a member of a [communist] organization could recapture his freedom to travel by simply in good faith abandoning his membership in the organization. Since freedom of association is itself guaranteed in the First Amendment, restrictions imposed upon the right to travel cannot be dismissed by asserting that the right to travel could be fully exercised if the individual would first yield up his membership in a given association.

*Apethaker*, 378 U.S. at 507 (footnote omitted); *compare Zemel* v. *Rusk*, 381 U.S. 1, 16 (1965)

(ban on travel to Cuba, for legitimate national security reasons, does not violate First

Amendment where "appellant is not being forced to choose between membership in an

organization and freedom to travel."); *accord Jackson*, 390 U.S. at 583 ("A procedure need not

be inherently coercive in order that it be held to impose an impermissible burden upon the

assertion of a constitutional right.").

    *Apethaker* is directly on-point as applied to the facts of this case. Plaintiffs cannot,

without more, have their right to travel overseas conditioned upon abandonment of their Second

Amendment rights. Conversely, Plaintiffs cannot, without more, have their Second Amendment

right to keep and bear arms conditioned upon forfeiting their right of international travel, which

includes the right to live overseas. The condition itself is unconstitutional, unless each

infringement on the right to travel and the right to keep and bear arms is itself justified under the

high levels of scrutiny by which restrictions on such rights are to be scrutinized.

    That the challenged laws would condition the exercise of one of these rights upon the

forfeiture of the other does not ameliorate their unconstitutionality. Rather, such conditioning has

the opposite effect. The conditional relationship is itself unconstitutional.

VI.    THE CHALLENGED PROVISIONS VIOLATE PLAINTIFFS' RIGHTS TO EQUAL PROTECTION.

The Fifth Amendment's Due Process Clause has long been understood to bind the federal government to standards of equal protection. *Bolling* v. *Sharpe*, 347 U.S. 497, 499 (1954); *Bulluck* v. *Washington*, 468 F.2d 1096, 1100 n.9 (D.C. Cir. 1972). "Equal protection analysis in the Fifth Amendment area is the same as that under the Fourteenth Amendment." *Buckley* v. *Valeo*, 424 U.S. 1, 93 (1976) (citations omitted). Equal protection analysis demands that heightened scrutiny be applied in cases which burden fundamental rights or target suspect classes. *Romer* v. *Evans*, 517 U.S. 620, 621 (1996).

Plaintiffs do not contend that Americans living abroad constitute a suspect class for purposes of equal protection analysis. However, it is plainly clear that the challenged laws burden two fundamental rights: the Fifth Amendment right of international travel, and the Second Amendment right to keep and bear arms. Responsible, law abiding Americans who are otherwise identically situated are classified differently in their exercise of one of these rights only on account of exercising the other fundamental right. For the reasons discussed *supra*, these classifications plainly violate the equal protection principles secured by the Fifth Amendment.

## CONCLUSION

Some laws regulating firearms and international travel are plainly constitutional, as the government has significant regulatory interests in these fields. Yet just as plainly, restricting the domestic firearms rights of responsible, law abiding Americans on account of their overseas residence offends the Second and Fifth Amendments. Plaintiffs respectfully request that the Court grant their motion for summary judgment.

26

Dated: October 14, 2011         Respectfully submitted,

Alan Gura (D.C. Bar No. 453449)
Gura & Possessky, PLLC
101 N. Columbus Street, Suite 405
Alexandria, VA 22314
703.835.9085/Fax 703.997.7665

By: /s/Alan Gura_____
     Alan Gura

Attorney for Plaintiffs