**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **STEPHEN DEARTH and SECOND AMENDMENT FOUNDATION, INC.,** | **Case No. 09-cv-0587-RLW** |
| **Plaintiffs,** | |
| **vs.** | |
| **ERIC H. HOLDER, Jr., Attorney General of the United States,** | |
| **Defendant.** | |

**DEFENDANT'S COMBINED MOTION FOR JUDGMENT ON THE PLEADINGS OR,
IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT AND OPPOSITION
TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

Pursuant to Fed. R. Civ. P. 12(c) and 56, Defendant hereby moves this Court for

judgment on the pleadings or, in the alternative, to enter summary judgment for Defendant.  In

accordance with Local Civil Rule 7, this motion is accompanied by a memorandum of points and

authorities in support of this motion and a proposed order.

Dated: November 21, 2011

Respectfully Submitted,

TONY WEST
Assistant Attorney General

RONALD C. MACHEN
United States Attorney

SANDRA M. SCHRAIBMAN
(D.C. Bar No. 188599)
Assistant Branch Director
U.S. Department of Justice
Civil Division, Federal Programs Branch

   /s/ Daniel Riess
DANIEL RIESS
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, NW, Room 6122
Washington, D.C. 20530
(202) 353-3098
Daniel.Riess@usdoj.gov

*Attorneys for Defendant*

## **TABLE OF CONTENTS**

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATUTORY AND REGULATORY BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

I.      Statutes and Regulations at Issue. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

II.     Legislative History. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

STANDARD OF REVIEW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

PROCEDURAL BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

I.      THE COURT SHOULD ENTER JUDGMENT ON THE PLEADINGS FOR
        DEFENDANT ON PLAINTIFFS' SECOND AMENDMENT CLAIM.. . . . . . . . . . . . . 16

        A.      The Second Amendment Right to Keep and Bear Arms. . . . . . . . . . . . . . . . . . . 16

                1.      District of Columbia v. Heller, 554 U.S. 570 (2008). . . . . . . . . . . . . . . . 16

                2.      Heller v. District of Columbia ("Heller II"), __ F.3d __,
                        2011 WL 4551558 (D.C. Cir. Oct. 4, 2011). . . . . . . . . . . . . . . . . . . . . . . 18

        B.      The State Residency Requirement is Presumptively Lawful
                Because Laws Conditioning the Purchase or Possession of Firearms on
                Residence in a U.S. State Are Longstanding in American Law.. . . . . . . . . . . . . 20

        C.      In Any Event, the State Residency Requirement Is Constitutional
                Because It Relates Substantially to the Compelling Government Interest
                in Combating Violent Crime and Protecting Public Safety.. . . . . . . . . . . . . . . . 22

                1.      The Court Should Apply No More Than Intermediate Scrutiny
                        Because the Laws at Issue Here, Like Those at Issue in Heller II,
                        Do Not Severely Limit the Possession of Firearms.. . . . . . . . . . . . . . . . 23

                2.      The State Residency Requirement Substantially Relates to
                        the Important Governmental Interest in Protecting Public
                        Safety and Combating Violent Crime.. . . . . . . . . . . . . . . . . . . . . . . . . . .  26

II.     THE CHALLENGED PROVISIONS DO NOT INFRINGE PLAINTIFFS'
        FREEDOM TO TRAVEL INTERNATIONALLY.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

III.    BECAUSE THE CHALLENGED PROVISIONS DO NOT VIOLATE
        THE SECOND OR FIFTH AMENDMENTS, THEY DO NOT IMPLICATE
        THE UNCONSTITUTIONAL CONDITIONS DOCTRINE.. . . . . . . . . . . . . . . . . . . . . 39

IV.     THE STATE RESIDENCY REQUIREMENT DOES NOT VIOLATE
        THE EQUAL PROTECTION COMPONENT OF THE DUE PROCESS
        CLAUSE.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

V.      TO THE EXTENT THAT SAF'S CLAIMS ARE PREMISED ON AN
        ASSERTION OF ORGANIZATIONAL STANDING, THOSE CLAIMS
        ARE BARRED BY COLLATERAL ESTOPPEL.. . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **STEPHEN DEARTH and SECOND AMENDMENT FOUNDATION, INC.,**<br><br>   **Plaintiffs,**<br><br>**vs.**<br><br>**ERIC H. HOLDER, Jr., Attorney General of the United States,**<br><br>   **Defendant.** | **Case No. 09-cv-0587-RLW** |

**MEMORANDUM IN SUPPORT OF DEFENDANT'S COMBINED MOTION FOR
JUDGMENT ON THE PLEADINGS OR, IN THE ALTERNATIVE, FOR
SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS'
<u>MOTION FOR SUMMARY JUDGMENT</u>**

**INTRODUCTION**

Stephen Dearth, a U.S. citizen who resides in Canada, and the Second Amendment

Foundation, Inc. ("SAF"), bring this action to challenge the constitutionality of two federal

firearms laws, 18 U.S.C. §§ 922(a)(9) and 922(b)(3).  The challenged provisions, in combination

with the definition of "State of residence" contained in the implementing regulations, 27 C.F.R.

§ 478.11, prevent expatriate U.S. citizens without a domestic residence from purchasing new

firearms while visiting the United States.  The challenged provisions do not, however, prevent

expatriate citizens from using previously-acquired firearms or from renting firearms for lawful

sporting purposes while visiting the United States.  Plaintiff Dearth alleges a desire to purchase

new firearms for purposes other than lawful sporting purposes during some future visit to the

United States, and contends that his inability to do so violates his rights under the Second and

Fifth Amendments.  The Court should enter judgment on the pleadings for Defendant or, in the

alternative, enter summary judgment for Defendant.

Plaintiffs fail to state a cognizable claim that the challenged provisions, as applied to Plaintiff Dearth, infringe his Second Amendment rights.  Dearth may legally transport the firearms that he owns in Canada into the United States – including both handguns and long guns – if they are useful for legitimate hunting and sporting purposes.  While in the United States, he may use these firearms for self-protection or for sporting purposes.  He may also receive additional firearms while visiting the United States for lawful sporting purposes, and possess firearms owned by another person for lawful sporting purposes.  Thus, the challenged provisions do not prevent Plaintiff Dearth from keeping or bearing arms and therefore do not infringe a core constitutional right.  And even assuming that the challenged provisions did affect the core Second Amendment right, they are constitutional because requirements that an individual must reside in the State where he or she purchases or possesses firearms – or that he or she must reside in the United States – are longstanding in American law, and thus presumptively lawful.  In any event, the challenged provisions do not violate the Second Amendment because they relate substantially to Congress's compelling interest in combating violent crime and protecting public safety by regulating interstate traffic in firearms and supplementing State law enforcement efforts.  Accordingly, because the challenged provisions do not violate the Second Amendment, the Court should enter judgment for Defendant on Plaintiffs' Second Amendment claim.

Plaintiffs' challenges under the Fifth Amendment fare no better.  Plaintiff Dearth claims that he has a fundamental right to travel internationally and that the provisions at issue here infringe on that alleged right.  This claim is a makeweight argument with no substance or legal support.  First, contrary to Plaintiffs' claims, there is no fundamental right to travel internationally.  Plaintiff's reliance on <u>Kent v. Dulles</u>, 357 U.S. 116 (1958), for this contention is

misplaced because the Supreme Court has since clarified that the freedom to travel internationally is not a fundamental right, but only an aspect of "liberty" protected by the Due Process Clause that is subject to reasonable government regulation.  The challenged provisions do not burden Plaintiffs' Fifth Amendment liberty interest in international travel without due process of law because these laws do not restrict Plaintiff Dearth's ability to travel internationally, nor do they affect his ability to reside abroad or to travel to the United States. Any alleged incidental effect on his ability to reside abroad is justified by Congress's need to regulate interstate commerce in firearms in order to combat violent crime, and assist state law enforcement efforts.  Because there is no fundamental constitutional right to travel, and because Plaintiffs cannot demonstrate a violation of the Second Amendment, their "unconstitutional conditions doctrine" argument must also fail.  Finally, Plaintiffs' equal protection claim should be dismissed because the challenged provisions do not burden a fundamental right, and expatriate U.S. citizens are not similarly situated with U.S. citizens residing in the United States.  In any event, Congress possessed a rational basis for enacting the State residency requirement.  Indeed, the relief Plaintiffs seek would provide U.S. citizens residing abroad with fewer restrictions on the purchase of firearms than U.S. citizens residing in the United States.  Accordingly, the Court should enter judgment for Defendant on Plaintiffs' Second and Fifth Amendment claims.

## STATUTORY AND REGULATORY BACKGROUND

### I.    Statutes and Regulations at Issue

Congress has authority to "impos[e] conditions and qualifications on the commercial sale of arms," District of Columbia v. Heller, 554 U.S. 570, 626-27 (2008), as part of its regulation of interstate commerce in firearms.  See generally Navegar, Inc. v. United States, 192 F.3d 1050,

1057-64 (D.C. Cir. 1999).  These laws reflect "the widely accepted knowledge that there is a vast interstate market in firearms that makes the states unable to control the flow of firearms across their borders or to prevent the crime inevitably attendant to the possession of such weapons once inside their borders." Id. at 1063.

Plaintiffs' suit challenges the constitutionality of two such statutory provisions, together with their implementing regulations.  The first provision, 18 U.S.C. § 922(b)(3), makes it "unlawful for any licensed importer, licensed manufacturer, licensed dealer, or licensed collector to sell or deliver –

> (3) any firearm to any person who the licensee knows or has reasonable cause to believe does not reside in (or if the person is a corporation or other business entity, does not maintain a place of business in) the State in which the licensee's place of business is located, except that this paragraph (A) shall not apply to the sale or delivery of any rifle or shotgun to a resident of a State other than a State in which the licensee's place of business is located if the transferee meets in person with the transferor to accomplish the transfer, and the sale, delivery, and receipt fully comply with the legal conditions of sale in both such States (and any licensed manufacturer, importer or dealer shall be presumed, for purposes of this subparagraph, in the absence of evidence to the contrary, to have had actual knowledge of the State laws and published ordinances of both States), and (B) shall not apply to the loan or rental of a firearm to any person for temporary use for lawful sporting purposes.

18 U.S.C. § 922(b)(3).[1]  As a result of this statute, and the implementing regulations of the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), federally-licensed firearms dealers may not provide firearms to U.S. citizens who do not maintain a residence in the United States, except that "[a] licensee may lend or rent a firearm to any person for temporary use off the

---

[1] This provision was initially enacted as part of the Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. No. 90-351, Title IV, § 902, 82 Stat. 230 (1968), but was amended before its effective date by the Gun Control Act of 1968, Pub. L. No. 90-618, § 102, 82 Stat. 230 (1968).  In 1986, Congress again amended this provision to expand the exception in subpart (A) beyond its prior limitation to contiguous states, and to eliminate another exception.  See Firearm Owners Protection Act of 1986, Pub. L. No. 99-308, § 102, 100 Stat. 451 (1986).

premises of the licensee for lawful sporting purposes," provided that the person is not otherwise

prohibited from possessing a firearm, the licensee conducts a background check, and the dealer

completes and retains the required records for the transaction.  27 C.F.R. § 478.97; see also 27

C.F.R. §§ 478.96, 478.99.[2]

The second provision, 18 U.S.C. § 922(a)(9), targets recipients of firearms, rather than

sellers.  This provision makes it unlawful "for any person, other than a licensed importer,

licensed manufacturer, licensed dealer, or licensed collector, who does not reside in any State to

receive any firearms unless such receipt is for lawful sporting purposes."  18 U.S.C. § 922(a)(9).

See also 27 C.F.R. § 478.29a.

The effect of these provisions on an individual depends on his or her "State of

Residence," which is defined by regulation as "[t]he State in which an individual resides."  27

C.F.R. § 478.11.  The implementing regulations explain that "[a]n individual resides in a state if

he or she is present in a State with the intention of making a home in that State."  Id.  This

---

[2] A complementary provision, 18 U.S.C. § 922(a)(5), prohibits unlicensed individuals (as distinguished from licensed individuals, who are within § 922(b)(3)'s ambit) from providing firearms to U.S. citizens who do not maintain a residence in the United States, subject to an exception for bequests, and the same exception for sporting purposes.  Thus, this provision prohibits

> any person (other than a licensed importer, licensed manufacturer, licensed dealer, or licensed collector) to transfer, sell, trade, give, transport, or deliver any firearm to any person (other than a licensed importer, licensed manufacturer, licensed dealer, or licensed collector) who the transferor knows or has reasonable cause to believe does not reside in . . . the state in which the transferor resides; except that this paragraph shall not apply to (A) [bequests to individuals who may lawfully possess the firearm under the laws of his state of residence, and] (B) the loan or rental of a firearm to any person for temporary use for lawful sporting purposes.

18 U.S.C. § 922(a)(5); see also 27 C.F.R. § 478.30.

definition applies equally to U.S. citizens who temporarily reside outside the United States for

extended time periods, but who also maintain residency in a particular State.  See ATF Rul.

2010-6 (Nov. 10, 2010), at 2 (attached as Ex. 1).  ATF has ruled that

> [w]here a citizen temporarily resides outside of the country, but also has the
> intention of making a home in a particular State, the citizen is a resident of the
> State during the time he or she actually resides in that State.  In acquiring a
> firearm, the individual must demonstrate to the transferor-licensee that he or she is
> a resident of the State by presenting valid identification documents.

Id. at 2-3.

Under this regulatory framework, although a U.S. citizen who permanently resides abroad

will be restricted from receiving firearms for purposes other than sporting purposes, a U.S.

citizen who resides abroad but also maintains residency in a particular State may purchase

firearms in that State for any purpose while residing in that State.  However, a U.S. citizen who

only resides abroad may lawfully transport firearms into the United States if they are useful for

legitimate hunting and sporting purposes, and may use them in the United States for self-

protection or for sporting purposes.[3]  He or she may also use firearms purchased in the United

---

[3] U.S. law does not require U.S. citizens residing abroad to obtain an import license to do
so.  See http://www.atf.gov/firearms/faq/nonimmigrant-aliens.html#citizen-abroad ("Q: I am a
U.S. citizen living in Canada with no State of residency in the United States. Do I need an import
permit to temporarily bring my gun to the U.S. to hunt or to attend target shooting events?  No.
You are not required to obtain an import permit.  The import permit requirement only applies to
nonimmigrant aliens."); 27 C.F.R. § 478.115(d)(1) (no import permit is required for firearms and
ammunition that are brought into the United States by a "nonresident of the United States for
legitimate hunting or lawful sporting purposes," provided that "such firearms and such
ammunition as remains following such shooting activity are to be taken back out of the territorial
limits of the United States by such person upon conclusion of the shooting activity").  However,
any such nonresidents who do not return the firearms or ammunition to their countries of
residence must obtain an import permit; moreover, they must store the firearm in the United
States in such a manner that preserves their exclusive access to the firearm.  See 18 U.S.C.
§ 922(a)(5); 27 C.F.R. § 478.30 (prohibiting unlicensed individuals from transferring firearms to
any person who does not reside in the State in which the transferor resides).

States before moving abroad.  Additionally, unless otherwise barred by federal or State law, he or she may lawfully possess a firearm owned by another person, such as a relative or friend, to use for lawful sporting purposes while visiting the United States.  He or she may also borrow or rent a firearm from a federally-licensed dealer for lawful sporting purposes.

## II.    Legislative History

Congress enacted the provision restricting sales of firearms to out-of-State residents following a multi-year investigation of violent crime.  In 1963, prompted by "the rise in lawlessness and violent crime in the United States and the relationship between the apparent easy availability of firearms and criminal behavior," a subcommittee of the Senate Judiciary Committee began investigative hearings into the adequacy of existing federal firearms laws. S. Rep. No. 89-1866, at 3 (1966) (attached as Ex. 2).  The subcommittee conducted extensive hearings on this issue in January, March, and May of 1963, March and April of 1964, May, June, and July of 1965, and July and August of 1967.  S. Rep. No. 90-1097, at 75-76 (1968), *reprinted in* 1968 U.S.C.C.A.N. 2112, 2164, 2198; S. Rep. No. 89-1866, at 53.  Numerous witnesses testified both in favor of and opposed to the proposed legislation.  See Federal Firearms Act: Hearings Before the Subcomm. to Investigate Juvenile Delinquency of the Sen. Comm. on the Judiciary, 89th Cong. 685 (1965) ("1965 Hearings") (statement of Sen. Dodd, noting that the subcommittee had heard 23 witnesses in favor of, and 23 witnesses against, the proposed bill).[4]

Witnesses during the hearings included:

*    the Commissioner of the Massachusetts Department of Public Safety, who testified that over a ten-year period, the Massachusetts State Police had traced 87

---

[4]  *Available at* http://www.lexisnexis.com/congcomp/getdoc?HEARING-ID=HRG-1965-SJS-0054.

percent of the 4,506 guns used in crime in that State to purchases in neighboring States, the result being "that [the State's] stringent controls which are applicable to the sale of firearms and primarily handguns, are considerably reduced in effectiveness";[5]

•   the prosecuting attorney of Wayne County, Michigan, which includes the city of Detroit, who testified that "90 out of every 100 crime guns confiscated in Detroit are not purchased and registered in Michigan and that the prime source of these crime guns is by purchases in neighboring Ohio, where controls on firearms are minimal";[6]

•   the attorney general of New Jersey, who testified that "of 1,815 arrests for the illegal carrying of concealed weapons (handguns) only 15 of the guns involved had been purchased legally, that is with the permit to purchase which is required in New Jersey" and "[o]nly six had been registered voluntarily, after purchase outside of that State";[7]

•   the deputy chief of the Washington D.C. Metropolitan Police Department, who discussed the fact that although the District of Columbia had stringent firearms laws, violent crimes including homicides were committed in the District with firearms purchased from nearby States (Maryland and Virginia) with lax firearms laws;[8]

•   a captain of the Los Angeles Police Department, who stated that the provision of the proposed law restricting firearms sales to out-of-State residents "would be especially beneficial to us in that some of our neighboring States have less restricting gun laws and as a result some of our residents who are ineligible to buy

---

[5] S. Rep. No. 89-1866, at 61; 1968 U.S.C.C.A.N. at 2164; 1965 Hearings at 356 (testimony of Richard R. Caples).

[6] 1968 U.S.C.C.A.N. at 2164-65; Federal Firearms Act: Hearings Before the Subcomm. to Investigate Juvenile Delinquency of the Sen. Comm. on the Judiciary, 90th Cong. 369-70 (1967) ("1967 Hearings") (testimony of William L. Cahalan), *available at* http://www.lexisnexis.com/congcomp/getdoc?HEARING-ID=HRG-1967-SJS-0031.

[7] S. Rep. No. 89-1866, at 62; 1965 Hearings at 396 (testimony of Arthur J. Sills).

[8] Juvenile Delinquency: Hearings Before the Subcomm. to Investigate Juvenile Delinquency of the Sen. Comm. on the Judiciary, 88th Cong. 3387 (1963) ("1963 Hearings") (testimony of Capt. James E. Stargel); id. at 3392, 3394 (testimony of Deputy Chief John B. Layton), *available at* http://www.lexisnexis.com/congcomp/getdoc?HEARING-ID=HRG-1963-SJS-0001.

a gun in California cross a border, purchase a gun, and return to commit their crimes," and cited two recent examples of ex-convicts who were ineligible to purchase firearms in California who purchased firearms in neighboring States that they used to murder Los Angeles police officers;[9]

- a sergeant of the Los Angeles Police Department, who testified that "Los Angeles criminals have been known to go to Nevada and Arizona to purchase weapons and then return to their hometown to practice crime";[10]

- a commissioner of the Philadelphia Police Department, who stated that in 1964, sixty-two people were killed in Philadelphia by firearms and "in seven vicious homicides the guns were brought or sent to Pennsylvania from outside the State";[11]

- the chief of the St. Louis, Missouri Police Department, who testified that "many guns come into Missouri from other States," and "many persons under questioning admit they obtained the guns elsewhere";[12]

- the Commissioner of Internal Revenue, who explained that a "major problem area" regarding the effectiveness of State and local firearms regulation "involves individuals going across State lines to procure the firearms which they could not lawfully procure or possess in their own State," especially concealable weapons such as pistols and revolvers, and that over a one-year period, approximately 200 Missouri residents with felony convictions purchased firearms in the neighboring State of Illinois, and over a six-month period, 46 California residents purchased firearms in Nevada, 35 of whom had felony records;[13] and

- the Under Secretary of the Treasury, who reported the findings of the President's Commission on Law Enforcement and Administration of Justice that "State and local laws intended to control traffic in firearms tend to be nullified by the fact that firearms are too often available in neighboring jurisdictions under less

---

[9] 1965 Hearings at 149 (testimony of Capt. Merton W. Howe)

[10] Id. at 162 (testimony of Sgt. J.C. Gonzalez).

[11] Id. at 450 (testimony of Commissioner Howard R. Leary).

[12] Id. at 583 (testimony of Curtis Brostron).

[13] 1965 Hearings at 67; 1967 Hearings at 47, 57.

restrictive legislation, or free from any regulation."[14]

Based on the evidence presented during these hearings, Congress made several legislative findings, including:

(1) that the existing Federal controls over the traffic in firearms moving in (or otherwise affecting) interstate or foreign commerce do not adequately enable the States to control the firearms traffic within their own borders through the exercise of their police power;

(2) that the ease with which any person can acquire firearms other than a rifle or shotgun . . . is a significant factor in the prevalence of lawlessness and violent crime in the United States. . . . ;

(3) that only through adequate Federal control over interstate and foreign commerce in these weapons, and over all persons engaging in the business of importing, manufacturing, or dealing in them, can this grave problem be properly dealt with, and effective State and local regulation of this traffic be made possible;

&ast;  &ast;  &ast;  &ast;  &ast;

(5) that the *sale* or other disposition of concealable weapons by importers, manufacturers, and dealers holding Federal licenses, *to nonresidents* of the State in which the licensee's place of business is located, *has tended to make ineffective* the laws, regulations and ordinances in the several States and local jurisdictions regarding such firearms.[15]

1968 U.S.C.C.A.N. at 2197-98 (emphasis added).  Another Senate Judiciary Committee report concluded:

Not only is mail order a means of circumventing State and local law, but the over-the-counter *sale of firearms*, primarily handguns, *to persons who are not residents* of the locale in which the dealer conducts his business, *affords similar circumvention*.  The problem is most prevalent in, but not limited to, those States where stringent firearms regulations are in effect and the purchaser is not able to purchase a firearm in accord with the laws of his State.  As a result, a would-be

---

[14] 1967 Hearings at 38 (testimony of Joseph W. Barr).

[15] As to finding (5), Congress noted that "[t]he existence of this problem has been so well established that even the principal opponents of [the bill] who appeared before the subcommittee conceded the existence of this problem in the course of their subsequent appearances before the House Committee on Ways and Means."  S. Rep. No. 89-1866, at 71.

purchaser travels to a neighboring State with less stringent controls and purchases the firearm which is then misused in his residence State.  This problem was outlined by law-enforcement officers throughout the country. . . .

The lack of adequate Federal controls over this aspect of the commerce in firearms affords circumvention and violation of the laws of several of the States similar to the mail-order methods of purchase.

It is difficult for the States to cope with this aspect of the problem without additional help by the Federal Government.

S. Rep. No. 89-1866, at 3 (emphasis added).  To that end, Congress included, in both the

Omnibus Crime Control Act and Safe Streets Act of 1968, Pub. L. No. 90-351, 82 Stat. 225

("Omnibus Crime Control Act"), and the Gun Control Act of 1968, Pub. L. No. 90-618, 82 Stat.

1218 ("Gun Control Act"), statutory provisions "designed to prevent the avoidance of state and

local laws controlling firearms by the simple expediency of crossing a State line to purchase

one."  H. Rep. No. 90-1577, at 15 (1968); see also 1968 U.S.C.C.A.N. at 2204.

18 U.S.C. § 922(b)(3), which prohibits licensed firearms dealers from selling firearms to

individuals who do not reside in the same State as the dealer's place of business, was specifically

designed to

deal with the serious problem of individuals going across State lines to procure firearms which they could not lawfully obtain or possess in their own State and without the knowledge of their local authorities.  The hearings before the committee have demonstrated the ease with which residents of a particular State, which has laws regulating the purchase of firearms, can circumvent such laws by procuring a firearm in a neighboring jurisdiction which has no such controls on the purchase of firearms.  The hearings have also shown that this is a means by which criminal and lawless elements obtain firearms.

S. Rep. No. 89-1866, at 19-20.[16]  At the same time, Congress explained that "it is not the purpose

_____

[16] See also id. at 61 (explaining that this provision "is justified by the record of the subcommittee's 1965 hearings" and that "[t]he record is replete with testimony documenting the fact that the purchase of firearms by persons in other than their resident State is a serious contributing factor to crime.  Testimony further indicates that large numbers of criminals and juveniles have availed themselves of this source of firearms in order to circumvent the laws of

of this [law] to place any undue or unnecessary Federal restrictions or burdens on law-abiding citizens with respect to the acquisition, possession, or use of firearms appropriate to the purpose of hunting, trapshooting, target shooting, personal protection, or any other lawful activity." Pub. L. No. 90-618, § 101, 82 Stat. 1213-14; see also Pub. L. No. 90-351, § 901(b), 82 Stat. at 226. Accordingly, Congress provided that Section 922(b)(3)'s prohibition would not apply to "the loan or rental of a firearm to any person for temporary use for lawful sporting purposes." Pub. L. No. 90-618, § 101, 82 Stat. 1218.

Congress later identified the emergence of a "law enforcement problem posed by aliens legally in the United States, but not residing in any State, who acquire firearms from Federal firearms licensees by utilizing an intermediary." 137 Cong. Rec. S1369-01, at S1449 (Jan. 31, 1991). "Having acquired firearms in this country, such aliens often smuggle the weapons out of the country." Id. These aliens could obtain firearms from unlicensed persons by making false statements about their residence, and faced no legal penalty because 18 U.S.C. § 922 prohibits the making of false statements to licensed firearms dealers, 18 U.S.C. § 922(a)(6), but contains no analogous prohibition on the making of false statements to non-licensees. See 137 Cong. Rec. at S1450 (noting that such acquisitions "[did] not violate any specific portion of the [Gun Control] Act").

Accordingly, Congress enacted a prohibition on sales to individuals without a residence in the United States, but directed this prohibition to the recipient rather than the seller. See Violent Crime Control and Law Enforcement Act of 1994, § 110514, Pub. L. No. 103-322, 108 Stat. 1796 (1994) (codified at 18 U.S.C. § 922(a)(9)). Congress included in Section 922(a)(9) an

their respective jurisdictions.").

exception for the receipt of firearms for lawful sporting purposes to prevent any interference with "international tourism that is associated with legitimate hunting by licensed persons for sporting purposes." 137 Cong. Rec. S9087-02, S9091 (June 28, 1991).[17]

## STANDARD OF REVIEW

Defendant moves for judgment on the pleadings under Fed. R. Civ. P. 12(c) or, in the alternative, for summary judgment under Fed. R. Civ. P. 56.  In evaluating a motion for judgment on the pleadings under Rule 12(c), courts employ the same standard that governs a Rule 12(b)(6) motion to dismiss.  Jung v. Ass'n of Am. Med. Colls., 339 F. Supp. 2d 26, 35-36 (D.D.C. 2004). To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," and show "more than a sheer possibility that a defendant has acted unlawfully."  Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (citation omitted).  "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief."  Id. (citation and internal punctuation omitted).  In evaluating a motion to dismiss under Rule 12(b)(6), the Court is limited to considering the facts alleged in the complaint, any documents attached to or incorporated in the complaint, matters of which the court may take judicial notice, and matters of public record. See EEOC v. St. Francis Xavier Parochial Sch., 117 F.3d 621, 624 (D.C. Cir. 1997).

---

[17] Congress also explained that: "The section would not prohibit an alien lawfully conducting a firearms business in the United States from receiving firearms in the conduct of such business.  Moreover, the amendment does not affect those aliens who legally import or bring firearms into the United States for legitimate purposes and would not preclude the lawful acquisition of firearms by aliens who have established residency in a State." 137 Cong. Rec. S1369-01, S1449 -S1450 (Jan. 31, 1991).

-13-

Defendant moves, in the alternative, for summary judgment under Fed. R. Civ. P. 56.

Summary judgment is appropriate when the moving party demonstrates that there is no genuine

issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

See Moore v. Hartman, 571 F.3d 62, 66 (D.C. Cir. 2009) (citing Fed. R. Civ. P. 56(c) and

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986)).

## PROCEDURAL BACKGROUND

Plaintiff Dearth, a U.S. citizen who resides in Canada, does not maintain a residence in

the United States.  Compl. ¶ 2.  Dearth alleges that he enjoys visiting his family and friends in the

United States, and intends to continue visiting them.  Id. ¶ 10.  Dearth claims that he "intends to

purchase firearms within the United States, which he would store securely at his relatives' home

in Mount Vernon, Ohio, and which he would access for lawful sporting purposes as well as for

other purposes, including self-defense, while visiting the United States."  Id. ¶ 11.  He also

claims to hold "a valid Utah permit to publicly carry a handgun, which is recognized in numerous

states."  Id. ¶ 12.  Dearth alleges that he attempted to buy firearms within the United States on

two prior occasions, in January 2006 and June 2007, but that the sellers refused to sell him a

firearm because he resides in Canada.  Id. ¶¶ 22, 23.  In his prior lawsuit, Dearth v. Gonzales,

Case No. 2:06-cv-1012 (S.D. Ohio), Dearth alleged that he "legally owns firearms in Canada."[18]

---

[18] See First Am. Compl. ¶ 8, Dearth v. Gonzales, Case No. 2:06-cv-1012 (S.D. Ohio) (Doc. No. 12, filed Feb. 1, 2007) (attached as Ex. 3); Covad Commc'ns Co. v. Bell Atlantic Corp., 407 F.3d 1220, 1222 (D.C. Cir. 2005) (in deciding a Rule 12(b)(6) motion, a court may take judicial notice of public records from other proceedings); Athridge v. Rivas, 421 F. Supp. 2d 140, 151 (D.D.C. 2006) (statements by party in prior pleadings are admissible in subsequent litigation involving party even if drafted and signed by counsel only).  Plaintiff fails to include this admission in his complaint in this case, but the Court may take judicial notice of this public record.

Plaintiff Dearth, together with SAF and another individual (Maxwell Hodgkins), filed the present action on March 27, 2009, and premised their claims for relief on the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202.  See Compl. ¶¶ 25-37.  The Court granted Defendant's motion to dismiss for lack of subject-matter jurisdiction on January 5, 2010.  Hodgkins v. Holder, 677 F. Supp. 2d 202 (D.D.C. 2010).  The Court held that past refusals of merchants to sell firearms to the individual plaintiffs, without more, could not provide the basis for an action under the Declaratory Judgment Act.  Id. at 203-04.  It also held that the individual plaintiffs lacked standing based on the threat of future prosecution.  Id. at 204-05.  Finally, the Court held that SAF lacked organizational standing to sue on its own behalf because it had not established an organizational injury, and lacked representational standing to sue on behalf of its members because it failed to identify an individual SAF member with standing.  Id. at 206.

Although Plaintiffs Dearth and SAF appealed the Court's ruling, Plaintiff Hodgkins returned to the United States to reside permanently and thus chose not to appeal.  Br. of Plaintiffs-Appellants at 7-8, Hodgkins v. Holder, No. 10-5062 (D.C. Cir. July 29, 2010).  The D.C. Circuit reversed the District Court's holding that Plaintiff Dearth lacked standing to sue under the Declaratory Judgment Act, finding that "the Government has denied him the ability to purchase a firearm and he thereby suffers an ongoing injury."  Dearth v. Holder, 641 F.3d 499, 502 (D.C. Cir. 2011).  The D.C. Circuit also concluded that in light of its holding, "we need not consider whether Dearth has pre-enforcement standing.  Nor, because the SAF raises no issue not already raised by Dearth, need we decide whether it has standing."  Id. at 503 n.*.

**ARGUMENT**

I.   **THE COURT SHOULD ENTER JUDGMENT ON THE PLEADINGS FOR DEFENDANT ON PLAINTIFFS' SECOND AMENDMENT CLAIM.**

The analysis of Plaintiffs' Second Amendment claim is governed by two recent decisions, District of Columbia v. Heller, 554 U.S. 570 (2008), and Heller v. District of Columbia ("Heller II"), __ F.3d __, 2011 WL 4551558 (D.C. Cir. Oct. 4, 2011).  As confirmed by these decisions, the State residency requirement for purchasing additional firearms does not violate the Second Amendment's guarantee because State residency requirements for the purchase of firearms are longstanding in American law, and thus presumptively lawful.  Even assuming that the challenged provisions were not presumptively lawful, they are constitutional because they substantially relate to the compelling governmental interest in protecting public safety and combating violent crime.[19]

   A.   **The Second Amendment Right to Keep and Bear Arms**

      1.   **District of Columbia v. Heller, 554 U.S. 570 (2008)**

The Second Amendment provides: "A well regulated Militia, being necessary to the

---

[19] As an initial matter, the principle of constitutional avoidance requires that the Court resolve the statutory issue of whether State law independently bars Plaintiff Dearth's purchase of a firearm before deciding the constitutionality of the challenged provisions.  It is well established that if a case can be decided on other than constitutional grounds, the court should avoid reaching the constitutional issue.  See, e.g., Slack v. McDaniel, 529 U.S. 473, 485 (2000); University of Great Falls v. NLRB, 278 F.3d 1335, 1340 (D.C. Cir. 2002).  The Complaint fails to specify the State in which Plaintiff Dearth allegedly intends to purchase firearms, and many States impose limitations on the purchase of firearms that could independently bar his purchase.  For example, the State of Illinois bars the purchase of rifles and shotguns by non-residents of Illinois (except for participation in specific shooting events) unless the non-resident owns a valid hunting license.  See 430 Ill. Comp. Stat. Ann. 65/3a(b).  The Court should therefore observe the principle of constitutional avoidance in this case and decline to rule on the constitutionality of the State residency requirement until it resolves the statutory issue of whether State law independently bars Plaintiff Dearth's purchase of firearms.

security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  In

District of Columbia v. Heller, 554 U.S. 570 (2008), after determining that the Second

Amendment conferred an individual right to keep and bear arms, id. at 595, the Supreme Court

held that "the District's ban on handgun possession in the home violates the Second Amendment,

as does its prohibition against rendering any lawful firearm in the home operable for the purpose

of immediate self defense."  Id. at 635.  The Court's holding was narrow, and addressed only the

"core" right of "law-abiding, responsible citizens to use arms in defense of hearth and home."  Id.

at 634-35; see also id. at 573 ("We consider whether a District of Columbia prohibition on the

possession of usable handguns in the home violates the Second Amendment to the

Constitution."); id. at 576 & n.2 (noting that the D.C. Circuit's construction of the "complaint as

seeking the right to render a firearm operable and carry it about in his home in that condition only

when necessary for self-defense" had "not been challenged"); see also United States v.

Masciandaro, 648 F. Supp. 2d 779, 787 (E.D. Va. 2009) ("Thus, Heller's narrow holding is

explicitly limited to vindicating the Second Amendment 'right of law-abiding, responsible

citizens to use arms in defense of hearth and home.'"), aff'd, 638 F.3d 438 (4th Cir. 2011).

 Like other constitutional rights, the right to keep and bear arms is "not unlimited."

Heller, 554 U.S. at 626.  "From Blackstone through the 19th-century cases, commentators and

courts routinely explained that the right was not a right to keep and carry any weapon whatsoever

in any manner whatsoever and for whatever purpose."  Id.  Although the Supreme Court declined

to "undertake an exhaustive historical analysis . . . of the full scope of the Second Amendment,"

it cautioned that "nothing in [its] opinion should be taken to cast doubt on longstanding

prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the

carrying of firearms in sensitive places such as schools and government buildings, or laws

imposing conditions and qualifications on the commercial sale of arms."  Id. at 626-27.

Furthermore, these "presumptively lawful regulatory measures" were identified "only as

examples," not as an "exhaustive" list.  Id. at 627 n.26.[20]

## 2.   Heller v. District of Columbia ("Heller II"), __ F.3d __, 2011 WL 4551558 (D.C. Cir. Oct. 4, 2011)

The D.C. Circuit recently applied Heller in a case challenging firearms laws enacted by

the District of Columbia.  Heller v. District of Columbia ("Heller II"), __ F.3d __, 2011 WL

4551558 (D.C. Cir. Oct. 4, 2011).  Because "[under] Heller, . . . there are certain types of

firearms regulations that do not govern conduct within the scope of the [Second] Amendment,"

the D.C. Circuit "accordingly adopt[ed], as have other circuits, a two-step approach" to analyzing

claims asserted under that Amendment.  Heller II, 2011 WL 4551558, at *5.  Under this

approach, a reviewing court "ask[s] first whether a particular provision impinges upon a right

protected by the Second Amendment; if it does, then [it] go[es] on to determine whether the

provision passes muster under the appropriate level of constitutional scrutiny."  Id.

The D.C. Circuit further explained that "[w]ith respect to the first step, Heller tells us

---

[20] Plaintiffs severely overread Heller and McDonald v. City of Chicago, 130 S. Ct. 3020 (2010), as establishing that "the Second Amendment secures a fundamental right to possess functional firearms for self-defense," without qualification, for all persons.  Mem. of Points and Auth. in Supp. of Pl. Mot. for Summ. J. [Doc. No. 23-1] at 7.  Neither Heller nor McDonald stated that the right extends so broadly.  See Heller, 554 U.S. at 635 ("Assuming that Heller is not disqualified from the exercise of Second Amendment rights, the District must permit him to register his handgun and must issue him a license to carry it in the home.") (emphasis added). Such disqualifications include "prohibitions on the possession of firearms by felons and the mentally ill," see id. at 626, and prohibitions on the possession of firearms by individuals unlawfully present in the United States, see United States v. Portillo-Munoz, 643 F.3d 437, 440-42 (5th Cir. 2011).

'longstanding' regulations are 'presumptively lawful,' that is, they are presumed not to burden conduct within the scope of the Second Amendment." Id. at *6 (quoting Heller, 554 U.S. at 626-27 & n.26). However, as to regulations that are not longstanding and that "make it considerably more difficult for a person lawfully to acquire and keep a firearm . . . for the purpose of self-defense in the home," a reviewing court should apply a means-end test. Id. at *8. The D.C. Circuit concluded that intermediate scrutiny was the appropriate standard for review of gun registration laws because while such laws may affect a right protected by the Second Amendment, they "'do not severely limit the *possession* of firearms'" and do not "prevent[] an individual from *possessing* a firearm in his home or elsewhere, whether for self-defense or hunting, or any other lawful purpose." Id. at *10 (quoting United States v. Marzzarella, 614 F.3d 85, 97 (3d Cir. 2010) (emphasis added)).

The court also concluded that even assuming that other District laws prohibiting certain semi-automatic rifles impinged on the right protected by the Second Amendment, "intermediate scrutiny is the appropriate standard of review" because "the laws at issue . . . do not prohibit the *possession* of 'the quintessential self-defense weapon,' to wit, the handgun." Id. at *13-14 (quoting Heller, 554 U.S. at 629) (emphasis added). In its analysis, the D.C. Circuit agreed with a Third Circuit decision that applied intermediate scrutiny to a prohibition of unmarked firearms because "the prohibition left a person 'free to possess any otherwise lawful firearm [and thus was] more accurately characterized as a regulation of the manner in which persons may lawfully exercise their Second Amendment rights.'" Id. at *14 (quoting Marzzarella, 614 F.3d at 97).

-19-

**B.**     **The State Residency Requirement is Presumptively Lawful Because Laws Conditioning the Purchase or Possession of Firearms on Residence in a U.S. State Are Longstanding in American Law.**

In <u>Heller II</u>, the D.C. Circuit explained that longstanding regulations of firearms are presumptively lawful "because a regulation that is 'longstanding,' which necessarily means it has long been accepted by the public, is not likely to burden a constitutional right; concomitantly the activities covered by a longstanding regulation are presumptively not protected from regulation by the Second Amendment." <u>Heller II</u>, 2011 WL 4551558, at *6. In holding that handgun registration requirements were "deeply enough rooted in our history to support the presumption that [such a] registration requirement is constitutional," the court noted that "<u>Heller</u> considered 'prohibitions on the possession of firearms by felons' to be 'longstanding' although courts did not start to enact them until the early 20th century." <u>Id.</u> (citing C. Kevin Marshall, <u>Why Can't Martha Stewart Have a Gun?</u>, 32 Harv. J.L. & Pub. Pol'y 695, 708 (2009), as stating that the "ban on convicts possessing firearms were unknown before World War I" and that a "compilation of laws in mid-1925 indicated that no State banned possession of long guns based on a prior conviction; that only six banned possession of concealable weapons on such basis; [and] that, except for New York, . . . even those laws dated from 1923 or later"). The D.C. Circuit explained that "[a]t just about the same time, states and localities began to require registration of handguns," noting that six States, the District of Columbia, and a U.S. territory (Hawaii) had passed such laws between 1881 and 1932. <u>Id.</u> at *6-7 (citing 1881 Illinois statute, 1910 Georgia statute, 1911 New York statute, 1917 California and Oregon statutes, 1927 Michigan and Hawaii statutes, and 1932 District of Columbia statute). Consequently, because such requirements are "longstanding in American law, accepted for a century in diverse states

-20-

and cities," the court held that it would "presume [that] the District's basic registration

requirement. . . does not impinge on the right protected by the Second Amendment." Id. at *7.

State laws requiring that a purchaser or possessor of firearms be a State resident or U.S.

resident are similarly longstanding.  Beginning over a hundred years ago, States began to enact

such qualifications.  See Earliest Known U.S. or State Residency Restrictions on the Purchase of

Firearms (attached as Ex. 4).  Between 1909 and 1939, at least twelve States and the District of

Columbia imposed such requirements.[21]  Id.  For example, a 1909 West Virginia statute

conditioned the possession of a pistol, revolver "or any other dangerous or deadly weapon of like

kind and character" on the receipt of a state license that could only be "obtain[ed]. . . within any

county in this state" if an individual "publish[ed] a notice in some newspaper in the county *in*

*which he resides*" providing that "on a certain day he will apply to the circuit court *of his county*

for such state license."  Act of Feb. 16, 1909, ch. 51, § 7, 1909 W. Va. Acts 394-98 (emphasis

added).  Similarly, a 1913 New York statute outlawed the possession of "any pistol, revolver or

other firearm of a size which may be concealed upon the person" without a license, and provided

that "no such license shall be issued to any . . . person *not a citizen of and usually resident in the*

*state of New York*," except by a state judge "who shall state in such license the particular reason

for the issuance thereof, and the name[s] of the persons certifying to the good moral character of

the applicant."  Act of May 21, 1913, ch. 608, § 1, 1913 N.Y. Laws 1627-30 (emphasis added).

In sum, laws conditioning the purchase or possession of firearms on residence in a U.S.

State are "longstanding in American law," having been "accepted for a century" in a number of

---

[21] West Virginia (1909), New York (1913), Montana and North Carolina (1919),
Missouri (1921), Massachusetts (1922), Connecticut (1923), New Jersey (1924), Indiana (1925),
Michigan and Rhode Island (1927), District of Columbia (1932), and Maine (1939).

different States.  Heller II, 2011 WL 4551558, at *7.  Such laws are "deeply enough rooted in our history to support the presumption that [they are] constitutional."  Id. at *6.  Accordingly, the State residency requirement at issue here is presumptively lawful.

**C.    In Any Event, the State Residency Requirement Is Constitutional Because It Relates Substantially to the Compelling Government Interest in Combating Violent Crime and Protecting Public Safety.**

The Court's inquiry may end once it finds that the State residency requirement is an example of a longstanding firearms regulation that is presumptively lawful.  See Heller, 554 U.S. at 626-27 & n.26; Heller II, 2011 WL 4551558, at *6-7.[22]  However, if any further analysis is needed, the law passes muster under the second step of the inquiry outlined in Heller II because it substantially relates to the compelling government interest in protecting public safety and combating violent crime.[23]

---

[22] The Ninth Circuit has expressly held that "only regulations which substantially burden the right to keep and to bear arms trigger heightened scrutiny under the Second Amendment."  Nordyke v. King, 644 F.3d 776, 786 (9th Cir. 2011).  Given that "a law does not substantially burden a constitutional right simply because it makes the right more expensive or more difficult to exercise," id. at 787-88, "regulations of gun sales do not substantially burden Second Amendment rights merely because they make it more difficult to obtain a gun," id. at 788 (citation omitted).  That is all that Plaintiffs have alleged here, given that as explained below, see infra I.C.1, Plaintiff Dearth has "reasonable alternative means for obtaining firearms sufficient for self-defense purposes."  Id. at 787.

[23] To satisfy intermediate scrutiny, "a statutory classification must be substantially related to an *important* governmental objective."  Clark v. Jeter, 486 U.S. 456, 461 (1988) (emphasis added).  However, as explained below, see infra I.C.2, the particular government interest at issue here – protecting public safety and combating violent crime – satisfies an even higher standard because it has been held to constitute a *compelling* interest.  Accordingly, Defendant has referred to this interest throughout as a "compelling" government interest.

   1. **The Court Should Apply No More Than Intermediate Scrutiny Because the Laws at Issue Here, Like Those at Issue in <u>Heller II</u>, Do Not Severely Limit the Possession of Firearms.**

  Most courts, including the D.C. Circuit, have applied an intermediate standard of review to Second Amendment challenges.  <u>See</u> <u>Heller II</u>, 2011 WL 4551558, at *10-16; <u>Marzzarella</u>, 614 F.3d at 97-99; <u>United States v. Williams</u>, 616 F.3d 685, 692 (7th Cir. 2010), <u>cert.</u> <u>denied</u>, 131 S. Ct. 805 (2010)); <u>United States v. Reese</u>, 627 F.3d 792, 802 (10th Cir. 2010).  In <u>Heller II</u>, the D.C. Circuit concluded that intermediate scrutiny was the "appropriate standard for review of gun registration laws" because "registration requirements do not severely limit the *possession* of firearms."  <u>Heller II</u>, 2011 WL 4551558, at *10 (citation and internal punctuation omitted) (emphasis added).  The court emphasized that "none of the District's registration requirements prevents an individual from *possessing* a firearm in his home or elsewhere, whether for self-defense or hunting, or any other lawful purpose."  <u>Id.</u> (emphasis added).  "As [it] did in evaluating the constitutionality of certain of the registration requirements," the D.C. Circuit "determine[d] the appropriate standard of review" for laws banning certain semi-automatic rifles "by assessing how severely the prohibitions burden the Second Amendment right."  <u>Id.</u> at *14.  The court began its assessment by noting that "[u]nlike the law held unconstitutional in <u>Heller</u>, the laws at issue here do not prohibit the *possession* of the quintessential self-defense weapon, to wit, the handgun."  <u>Id.</u> (citation and internal punctuation omitted) (emphasis in original).  Accordingly, the D.C. Circuit concluded, "intermediate rather than strict scrutiny is the appropriate standard of review" for such laws.  <u>Id.</u>

  Because the same is true with respect to the laws here, at most, the same standard of review would apply.  The State residency requirement does not prevent Plaintiff Dearth from

possessing a firearm in his home abroad or elsewhere.[24]  Nor does the requirement prevent him

from possessing a firearm in his temporary living space while in the United States.  Rather, this

requirement relates only to his *purchase of additional firearms* while temporarily within the

United States.  Dearth has previously alleged in federal district court that he "legally owns

firearms in Canada."  See supra at Procedural Background.  Therefore, he may lawfully transport

those firearms into the United States if they are useful for legitimate hunting and sporting

purposes and, while in the United States, he may use these firearms for self-defense.[25]

---

[24] Of course, courts have held that constitutional rights do not necessarily apply in the
same manner to U.S. citizens residing abroad.  See, e.g., Reid v. Covert, 354 U.S. 1, 44-45
(1957) (reserving issue of whether Article III and Fifth and Sixth Amendments would apply to
U.S. civilians residing overseas who are not charged with capital crimes) (Frankfurter, J.,
concurring in result); id. at 75 ("[T]here is no rigid and abstract rule that Congress, as a condition
precedent to exercising power over Americans overseas, must exercise it subject to all the
guarantees of the Constitution, no matter what the conditions and considerations are that would
make adherence to a specific guarantee altogether impracticable and anomalous.") (Harlan, J.,
concurring in result); Boumediene v. Bush, 553 U.S. 723, 760-61 (2008) ("The Justices in Reid
. . . properly understood [Ross v. McIntyre, 140 U.S. 453 (1891)] as standing for the proposition
that, at least in some circumstances, the jury provisions of the Fifth and Sixth Amendments have
no application to American citizens tried by American authorities abroad."); King v. Morton, 520
F.2d 1140, 1146-48 (D.C. Cir. 1975) (remanding for district court to consider whether trial by
jury of U.S. citizen residing in U.S. territory would be "impractical and anomalous") (citing
Reid, 354 U.S. at 75).  Additionally, before the enactment of the Overseas Citizens Absentee
Voting Act in 1986, 42 U.S.C. § 1973ff, U.S. citizens residing abroad typically did not enjoy the
right to vote because there was no "State wherein they reside[d]."  U.S. Const. amend. XIV, § 1.
     Similarly, "Americans residing abroad do not have the same rights and obligations under
federal programs and activities as compared to their stateside counterparts. . . . [T]hey are
generally not entitled to Medicare benefits, or, if they reside outside of the United States for more
than 30 days, Supplemental Security Income. . . . . There is nothing in the Constitution, federal
law, or court decisions that would either require the [U.S. Census] Bureau to count [Americans
residing overseas] or not."  U.S. General Accounting Office, 2010 Census: Overseas
Enumeration Test Raises Need for Clear Policy Direction (May 2004), at 3-4, *available at*
www.gao.gov/new.items/d04470.pdf; see also Califano v. Torres, 435 U.S. 1 (1978) (per curiam)
(upholding constitutionality of denial of social security benefits to residents of Puerto Rico).

[25] In addition to rifles and shotguns that are useful for hunting and sporting purposes, a
number of handguns may be used for lawful sporting purposes.  See generally Factoring Criteria

Additionally, he may rent a firearm from a licensed firearms dealer for lawful sporting purposes. He may also lawfully possess a handgun owned by another person, such as a relative or friend, for lawful sporting purposes while visiting the United States.  Thus, because the State residency requirement does not prohibit Dearth's possession of any firearm, if the Court deems it necessary to apply a constitutional means-end analysis, it should apply no more than intermediate scrutiny. See Osterweil v. Bartlett, __ F. Supp. 2d __, 2011 WL 1983340, at *10 (N.D.N.Y. May 20, 2011) (concluding that "intermediate scrutiny is the appropriate level of scrutiny" for statute limiting issuance of firearms permits to New York residents and nonresidents employed in New York because Heller's "description of a list of presumptively lawful regulatory measures is at least implicitly inconsistent with strict scrutiny" and "the burden imposed by this law falls at least one level outside the core right recognized in Heller, i.e., the right of a law abiding individual to keep and carry a firearm for the purposes of self-defense in the home").

Plaintiffs' arguments to the contrary are unpersuasive.  First, the fact that Plaintiffs allege that Dearth is a law-abiding individual does not mandate the application of a more stringent standard of scrutiny, any more than did the laws at issue in Heller II, which were also challenged by self-identified law-abiding individuals.  See Mem. of Points and Auth. in Supp. of Pl. Mot. for Summ. J. [Doc. No. 23-1] ("Pl. MSJ") at 15.[26]  Second, Plaintiffs contend that strict scrutiny is

_____

for Weapons, *available at* www.atf.gov/forms/download/atf-f-5330-5.pdf.  These include the FEG P9M 9 mm pistol, KSN Kareen 9 mm pistol, CZ 75B 9 mm pistol, and the Sig Arms P229S .357 pistol.

[26] See also Kachalsky v. Cacace, __ F. Supp. 2d __, 2011 WL 3962550, at *26 (S.D.N.Y. Sept. 2, 2011) (applying intermediate scrutiny to Second Amendment challenge by law-abiding citizens to New York State firearms licensing laws), appeal docketed; GeorgiaCarry.Org., Inc. v. Georgia, 764 F. Supp. 2d 1306, 1317 (M.D. Ga. 2011) (applying intermediate scrutiny to Second Amendment challenge by nonprofit organization, religious institution, and individuals to law

applicable here because the core right protected by the Second Amendment has been held to be a

fundamental right.  "The [Supreme] Court has not said, however, and it does not logically follow,

that strict scrutiny is called for whenever a fundamental right is at stake."  Heller II, 2008 WL

4551558, at *8 (citing Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989); Marzzarella,

614 F.3d at 96; United States v. Chester, 628 F.3d 673, 682 (4th Cir. 2010); and Adam Winkler,

Scrutinizing the Second Amendment, 105 Mich. L. Rev. 683, 697-98, 700 (2007)).  Therefore,

that the Second Amendment protects rights that are "fundamental," McDonald v. City of

Chicago, 130 S. Ct. 3020, 3036-42 (2010), does not mandate application of strict scrutiny to

Plaintiffs' claim.

     In sum, because the State residency requirement does not prohibit the possession of

firearms by Plaintiff Dearth, if the Court deems it necessary to apply a constitutional means-end

analysis, it should apply no more than intermediate scrutiny.

     **2.**       **The State Residency Requirement Substantially Relates to the Important Governmental Interest in Protecting Public Safety and Combating Violent Crime.**

     To satisfy intermediate scrutiny, "a statutory classification must be substantially related to

an important governmental objective."  Clark v. Jeter, 486 U.S. 456, 461 (1988).  As applied

here, intermediate scrutiny requires a showing of "a tight 'fit' between the [laws] and an

important or substantial governmental interest, a fit that 'employs not necessarily the least

---

prohibiting carrying of firearms in a place of worship), appeal docketed; Peterson v. LaCabe, 783
F. Supp. 2d 1167, 1177-78 (D. Colo. 2011) (applying intermediate scrutiny to Second
Amendment challenge to state law requiring applicant for permit to carry concealed weapon to be
state resident), appeal docketed; Peruta v. County of San Diego, 758 F. Supp. 2d 1106 (S.D. Cal.
2010) (intermediate scrutiny applied to Second Amendment challenge by county residents to
sheriff's policy of requiring applicant for license to carry concealed weapon to demonstrate
"good cause" for its issuance), appeal docketed.

restrictive means but . . . a means narrowly tailored to achieve the desired objective.'" Heller II, 2011 WL 4551558, at *10 (quoting Board of Trustees of State Univ. of N.Y. v. Fox, 492 U.S. 469, 480 (1989)).  This requirement is "satisfied so long as the regulation promotes a substantial governmental interest that would be achieved less effectively absent the regulation, and the means chosen are not substantially broader than necessary to achieve that interest." Id. (quoting Ward, 491 U.S. at 782-83).

Applying intermediate scrutiny, the State residency requirement relates substantially to the important governmental objective of reducing violent crime and protecting public safety. As explained above, the challenged federal laws are part of a comprehensive scheme regulating commerce in firearms by curbing illegal trafficking of firearms between States. See Huddleston v. United States, 415 U.S. 814, 824 (1974).  Congress determined that such restrictions were necessary following a seven-year investigation of violent crime, during which Congress heard testimony from police officials and others about the ease and frequency with which individuals had evaded State requirements for firearms purchases by crossing nearby State lines, and then using the purchased handguns in criminal activities. See supra at 7-13.

Based on this testimony, Congress found "that there is a widespread traffic in firearms moving in or otherwise affecting interstate commerce, and that the existing Federal controls over such traffic do not adequately enable the States to control this traffic within their own borders through the exercise of their police power." Pub. L. No. 90-351, Title IV, § 901(a)(1), 82 Stat. at 225.  It also found that "the ease with which any person can acquire firearms. . . is a significant factor in the prevalence of lawlessness and violent crime in the United States." Id.  The D.C. Circuit has stated that "[t]hese two findings express the widely accepted knowledge that there is a

-27-

vast interstate market in firearms that makes the states unable to control the flow of firearms across their borders or to prevent the crime inevitably attendant to the possession of such weaons once inside their borders."  Navegar, Inc. v. United States, 192 F.3d 1050, 1063 (D.C. Cir. 1999).

Congress also found "that the sale or other disposition of concealable weapons by importers, manufacturers, and dealers holding Federal licenses, to *nonresidents* of the State in which the licensees' places of business are located, *has tended to make ineffective the laws*, regulations, and ordinances *in the several States* and local jurisdictions regarding such firearms." Pub. L. No. 90-351, Title IV, § 901(a)(5), 82 Stat. at 225 (emphasis added).  Congress's investigations revealed a "serious problem of individuals going across State lines to procure firearms which they could not lawfully obtain or possess in their own State and without the knowledge of their local authorities."  Ex. 2 at 19.  The investigation established that "[n]ot only is mail order a means of circumventing State and local law, but the over-the-counter sale of firearms, primarily handguns, to persons who are not residents of the locale in which the dealer conducts his business, affords similar circumvention."  Id. at 3.  Congress therefore concluded "that only through adequate Federal control over interstate and foreign commerce in these weapons, and over all persons engaging in the business of importing, manufacturing, or dealing in them, can this grave problem be properly dealt with, and effective State and local regulation of this traffic be made possible."  Pub. L. No. 90-351, Title IV, § 901(a)(3), 82 Stat. at 225.

To that end, Congress included, in both the Omnibus Crime Control Act and the Gun Control Act, statutory provisions "designed to prevent the avoidance of state and local laws controlling firearms by the simple expediency of crossing a State line to purchase one."  H. Rep. No. 90-1577, at 14; see also 1968 U.S.C.C.A.N. at 2204.  These provisions included 18 U.S.C.

-28-

§ 922(b)(3), which prohibits licensed firearms dealers from selling firearms to individuals who do not reside in the same State as the dealer's place of business.

Congress also determined that "the lawmakers of each State are best able to determine the conditions and needs within their own borders and to pass appropriate legislation in regard to the use of handguns." Ex. 2 at 5.  Accordingly, Congress "endeavored to draft legislation which would give State and local officials notice of the flow of handguns into their jurisdictions so as to enable them to regulate their use as dictated by applicable local laws." Id.  Under Section 922(b)(3), federal firearms licensees may provide "the loan or rental of a firearm to any person for temporary use for lawful sporting purposes." 18 U.S.C. § 922(b)(3)(B).  A licensee may also sell or deliver "any rifle or shotgun to a resident of a State other than a State in which the licensee's place of business is located if the transferee meets in person with the transferor to accomplish the transfer, and the sale, delivery, and receipt fully comply with the legal conditions of sale in both such States." Id. § 922(b)(3)(A).  But the licensee may not transfer a handgun to a non-licenseholder whom "the licensee knows or has reasonable cause to believe does not reside in . . . the State in which the licensee's place of business is located." Id. § 922(b)(3).

As Congress made clear, the goal of the State residency requirement is to protect public safety and combat violent crime – a well-established *compelling* government interest.  See United States v. Salerno, 481 U.S. 739, 748, 750 (1987) (noting that the Supreme Court has "repeatedly held that the Government's regulatory interest in community safety can, in appropriate circumstances, outweigh an individual's liberty interest" and that the government's "general interest in preventing crime is compelling"); Schall v. Martin, 467 U.S. 253, 264 (1984) ("The legitimate and compelling state interest in protecting the community from crime cannot be

doubted.") (citation and internal punctuation omitted); see also Heller II, 2011 WL 4551558, at

*10 (explaining that it is an "important governmental interest[]" to "aid in crime control").

Specifically, the general restriction on interstate transactions in firearms was designed to "to aid

state and local gun control efforts by reducing the flow of firearms from loose-control to

tight-control states."  Franklin E. Zimring, Firearms and Federal Law: The Gun Control Act of

1968, 4 J. Legal Stud. 133, 134 (1975).

　　　The challenged provisions, as applied to Plaintiffs, substantially relate to this purpose.[27]

Permitting the class of citizens who reside abroad (or any non-U.S. resident) to purchase firearms

in any State would undermine Congress's intent to curb illegal trafficking between States and

would give greater rights to visitors to the United States than to residents.[28]  Because 18 U.S.C. §

922(a)(3)'s general restriction on bringing firearms obtained outside one's State of residence into

the State where one resides cannot apply to U.S. citizens who do not reside in any State, U.S.

citizens who reside abroad would be permitted to purchase a handgun (or many handguns) in

States with the most lenient firearms laws.  They could then – as "stateless" individuals not

subject to § 922(a)(3) – transport these firearms to any other U.S. State.  But it is this specific

---

　　　[27] Plaintiff Dearth may not challenge the State residency requirement except as it applies
to him. See Broadrick v. Oklahoma, 413 U.S. 601, 610 (1973) ("[A] person to whom a statute
may constitutionally be applied will not be heard to challenge that statute on the ground that it
may conceivably be applied unconstitutionally to others, in other situations not before the Court.
A closely related principle is that constitutional rights are personal and may not be asserted
vicariously.") (citations omitted).  And as explained below, Plaintiff SAF may not challenge this
requirement except to sue as a representative of its member Stephen Dearth.  See infra Part V.

　　　[28] U.S. citizens who reside in a State may only purchase a handgun in the State in which
they reside.  They may purchase a rifle or shotgun from a licensed dealer in a State in which they
do not reside if they appear in person and if the sale complies with the laws of their State of
residence and the dealer's State of residence.  See 18 U.S.C. § 922(b)(3)(A).

problem – "the flow of firearms from loose-control to tight-control states"[29] – that Congress

aimed to redress in enacting the challenged provisions.  Notably, while Plaintiff Dearth alleges

that he plans to "store" the firearms he wishes to purchase "at his relatives' home in Mount

Vernon, Ohio," Compl. ¶ 11, he never states that he intends to *buy* these firearms in the State of

Ohio.  And if Plaintiff Dearth were to purchase these firearms in a State with more lenient

firearms laws than the State in which he intends to use them, he will be undermining the purpose

for which Congress enacted the State residency requirement.

Moreover, the "fit" between this goal and the State residency requirement is substantial.

The purpose of the challenged provisions is to control the interstate commerce of firearms, not to

prohibit non-resident Americans from using firearms while they are visiting the United States.

Congress was justifiably concerned about the ease and frequency with which individuals could

avoid State-law requirements for firearms purchases simply by crossing State lines, and the

acquisition of firearms by legal aliens, who frequently smuggled such weapons out of the

country.[30]  At the same time, Congress did not wish to place any unnecessary restrictions on non-

---

[29] Zimring, Firearms and Federal Law, 4 J. Legal Stud. at 134; see also supra at 7-13.

[30] Plaintiffs' contention that "[t]he possibility that overseas residents might be engaging in
disqualifying criminal activity undetectable to domestic authorities is irrelevant" to the means-
end analysis because "convictions in foreign courts do not disqualify Americans from possessing
guns under federal law," Pl. MSJ at 17, misses the point.  The relevant issue is not convictions
abroad, but the compelling circumstances that brought Congress to enact the State residency
requirement.  These concerns continue to be relevant today.  Firearms trafficking – the movement
of firearms from the legal marketplace to illicit markets – is "one of the most pressing problems
in the firearms industry today," one that "reaches across U.S. borders, affecting other countries
and U.S. citizens living abroad."  ATF Publication 3317.6, Project Gunrunner: The Southwest
Border Initiative, *available at* www.atf.gov/publications/download/p/atf-p-3317-6-pdf.
Eliminating the State residency requirement would open up additional avenues for firearms
traffickers to obtain weapons, which would undermine the significant law enforcement concerns
that prompted the requirement's passage.

State residents temporarily visiting another State who wished to use firearms for lawful sporting purposes such as hunting, trapshooting, or target shooting.  Rather than prohibiting altogether the transfer of firearms to non-State residents, Congress decided to permit federal firearms licensees to loan or rent firearms to any person for temporary use for lawful sporting purposes.

Thus, Plaintiffs are mistaken in contending that the "sporting purposes" exceptions of §§ 922(a)(9) and 922(b)(3) are at odds with the purposes for which Congress enacted these provisions.  See Pl. MSJ at 11, 17.  To the contrary, these exceptions are appropriate and entirely consistent with the underlying purpose of the State residency requirement.  As explained above, in enacting the Gun Control Act – which included the provision now codified as 18 U.S.C. § 922(b)(3) – Congress expressly stated that it did not wish to "place any undue or unnecessary Federal restrictions or burdens on law-abiding citizens with respect to the acquisition, possession, or use of firearms appropriate to the purpose of hunting, trapshooting, target shooting, personal protection, or any other lawful activity."  Pub. L. No. 90-351, § 901(b), 82 Stat. at 226.  And the exception in Section 922(a)(9) was included to avoid the "disastrous effect upon the international tourism that is associated with legitimate hunting by licensed persons for sporting purposes, in our Western States in particular," that a complete prohibition on receipt of firearms by non-residents would have had.  See 137 Cong. Rec. S9087-02, S9091 (June 28, 1991).  Congress concluded that the exception would not contribute to the interstate flow of firearms from loose-control to tight-control States, as any "receipt . . . for lawful sporting purposes" by non-resident U.S. citizens, 18 U.S.C. § 922(a)(9), would occur only in the time-bounded context of "a loan or rental of a firearm . . . for *temporary* use for lawful sporting purposes."  18 U.S.C. § 922(a)(5), (b)(3) (emphasis added).  Accordingly, the sporting purposes provisions represent

sensible exceptions to the general prohibition on the acquisition of firearms by non-State-residents and are not at odds with the purposes for which the State residency requirement was enacted.

Furthermore, the vast majority of U.S. citizens reside in the United States and will not be prevented from purchasing firearms by these provisions. Cf. Osterweil, __ F. Supp. 2d __, 2011 WL 1983340, at *11 (firearms statute that "burdens only a narrow class of persons, i.e., otherwise qualified out-of-state residents who wish to obtain a license to carry a firearm in New York" satisfied intermediate scrutiny); Peterson v. LaCabe, 783 F. Supp. 2d 1167, 1177 (D. Colo. 2011) (firearms law satisfied intermediate scrutiny because, inter alia, it "burdens only a narrow class of persons, i.e., otherwise qualified out-of-state residents who wish to obtain a license to carry a concealed weapon in Colorado"), appeal docketed.  The likely small subset of U.S. citizens who reside solely overseas but wish to use firearms while visiting the United States may (1) rent firearms for lawful sporting purposes during their visit, see 18 U.S.C. § 922(a)(5), (b)(3) & (a)(9); (2) access firearms purchased before moving abroad; (3) transport into the United States firearms they lawfully possess in their countries of residence that are useful for legitimate hunting and sporting purposes, see 18 U.S.C. § 925(d)(3); and (4) possess a firearm owned by another person, such as a friend or relative, for lawful sporting purposes.[31]  As applied to Plaintiff Dearth, the State residency requirement does not prevent him from transporting into the United States the firearms he legally owns in Canada that are useful for legitimate sporting purposes, renting firearms from an licensed dealer in the United States for lawful sporting purposes, or

---

[31] Moreover, U.S. citizens who reside abroad but continue to "maintain a home" in the United States may purchase a firearm for any lawful purpose in the state in which that home is located.  27 C.F.R. § 478.11.

borrowing firearms from another person for lawful sporting purposes.

Thus, the restriction on the purchase of firearms only by "stateless" American citizens substantially relates to the general policy of supplementing State firearms laws by regulating the interstate flow of firearms.  Cf. Navegar, 192 F.3d at 1063 (Congress's findings in enacting the Gun Control Act "attest to Congress' concern over a significant interstate commerce in firearms, and the need to regulate possession of firearms to control the unwanted flow of firearms across state lines."); United States v. Petrucci, 486 F.2d 329, 331 (9th Cir. 1973) ("Illegal intrastate transfer of firearms is part of a pattern which affects the national traffic and Congress can validly enact a comprehensive program regulating all transfers of firearms.").  The challenged provisions therefore do not violate the Second Amendment.

## II.   THE CHALLENGED PROVISIONS DO NOT INFRINGE PLAINTIFFS' FREEDOM TO TRAVEL INTERNATIONALLY.

Plaintiffs' claim that 18 U.S.C. §§ 922(a)(9) and (b)(3) violate the Fifth Amendment "right to international travel," Pl. MSJ at 20-25, is similarly meritless.  First, as the Supreme Court has made clear, "the 'right' of international travel has been considered to be no more than an aspect of the 'liberty' protected by the Due Process Clause of the Fifth Amendment.  As such this 'right,' the Court has held, can be regulated within the bounds of due process." Haig v. Agee, 453 U.S. 280, 306-07 (1981) (citation omitted).  Second, because these provisions do not prevent Plaintiff Dearth from traveling internationally, they do not implicate any Fifth Amendment liberty interest in international travel.  Nor is there any incidental effect on Plaintiffs' liberty interest in traveling internationally, but even if there were such an incidental effect, it would be rationally related to the legitimate legislative purpose of regulating interstate

commerce in firearms to combat violent crime.

Plaintiffs' reliance on Kent v. Dulles, 357 U.S. 116 (1958), for the proposition that a "right to international travel" exists is sorely misplaced.  The Supreme Court has explained that "[b]oth Kent and Aptheker [v. Sec'y of State, 378 U.S. 500 (1964)] . . . were qualified the following term in Zemel v. Rusk, 381 U.S. 1 (1965)."  Regan v. Wald, 468 U.S. 222, 241 (1984).  As the Supreme Court clarified, "[i]n Kent, . . . the constitutional right to travel within the United States and the right to travel abroad were treated indiscriminately.  That position has been rejected in subsequent cases."  Id. at 241 n.25 (citing Haig, 453 U.S. at 306; Califano v. Aznavorian, 439 U.S. 170, 176-77 (1978)).

As a result, it is now well established that "the *freedom* to travel outside the United States must be distinguished from the *right* to travel within the United States," and that the former is "subject to reasonable governmental regulation."  Haig, 453 U.S. at 306-07 (emphasis in original).  Thus, as one constitutional law scholar has observed: "The Supreme Court has held that there is not a fundamental right to international travel and that therefore only a rational basis test will be used in evaluating restrictions on foreign travel."  Erwin Chemerinsky, Constitutional Law: Principles and Policies 838 (2d ed. 2002).

Second, the caselaw relied on by Plaintiffs is inapplicable because the cited cases involve direct restrictions on the ability to travel internationally, such as the denial of a passport application.  See Kent, 357 U.S. at 125-30 (employing the rule of constitutional avoidance to hold that Congress had not authorized the Secretary of State to deny plaintiffs' passports solely on account of their affiliation with the Communist Party because a contrary construction of the statute would implicate plaintiffs' ability to travel internationally, which the Supreme Court

viewed as "a part of the 'liberty' of which the citizen cannot be deprived without due process of law under the Fifth Amendment"); Aptheker, 378 U.S. at 514 (holding unconstitutional a provision of the Subversive Activities Control Act of 1950 that forbade issuance of a passport to a Communist Party member); Schneider v. Rusk, 377 U.S. 163, 164, 167-69 (1964) (denial of a passport to a naturalized U.S. citizen because she had resided for three years in the country of her birth was unconstitutional).  Unlike the regulations or decisions at issue in these cases, the challenged provisions here do not restrict Plaintiffs' ability to travel internationally and thus do not implicate a Fifth Amendment liberty interest in international travel.  The Fifth Circuit recognized this distinction in United States v. Lebman, 464 F.2d 68 (5th Cir. 1972).  In dispensing with a similar challenge to Section 922(b)(3) based on the broader right to inter*state* travel, the Fifth Circuit found itself "unable to discern any inhibition on the non-resident firearm purchaser's right to travel occasioned by a statute regulating the sale of firearms to a non-resident by a licensed dealer."  Lebman, 464 F.2d at 74.  Similarly, here, the challenged provisions do not implicate any Fifth Amendment liberty interest or impose any restriction on travel.

Rather, at most, the challenged provisions, in combination with the definition of residency in 27 C.F.R. § 278.11, place a condition on Plaintiff Dearth's ability to purchase additional firearms in the United States for purposes other than sporting purposes – namely, that he must establish legal U.S. residency.  But the Supreme Court has never held that the "the freedom to travel outside the United States," Haig, 453 U.S. at 306, includes the right to access all the rights of U.S. citizens with domestic residence.  Indeed, the Court has suggested that Congress may validly regulate on the basis of individuals' residence in the United States.  See Aznavorian, 439 U.S. at 177-78 (even plaintiff who challenged a provision restricting social

security benefits of individuals who had traveled abroad for thirty days for an additional thirty

days after their return, did "not question the constitutional validity of the basic decision of

Congress to limit SSI payments to residents of the United States"); Califano v. Torres, 435 U.S. 1

(1978) (per curiam) (upholding constitutionality of denial of social security benefits to residents

of Puerto Rico, who may be U.S. citizens); see also Romeu v. Cohen, 265 F.3d 118, 126-27 (2d

Cir. 2001) ("A citizen's decision to move away from her State of residence will inevitably

involve certain losses.  She will lose the right to participate in that State's local elections, as well

as its federal elections, the right to receive that State's police protection at her place of residence,

the right to benefit from the State's welfare programs, and the right to the full benefits of the

State's public education system.  Such consequences of the citizen's choice do not constitute an

unconstitutional interference with the right to travel.").  Plaintiff Dearth's freedom to travel

outside the United States is therefore not implicated by the challenged provisions.

      But even if the provisions could be viewed as having an "incidental effect" on Plaintiff

Dearth's liberty interest in traveling internationally, the Supreme Court has made clear that the

"constitutionality [of such laws] does not depend on compelling justifications."  Aznavorian, 439

U.S. at 177-78.[32]  Instead, "[i]t is enough if the provision[s] [are] rationally based."  Id. at 178.

---

[32] The caselaw cited by Plaintiffs does not establish otherwise.  See Pl. MSJ at 21.  These cases stand for the proposition that reviewing courts should "construe narrowly" statutes that "curtail or dilute" the liberty interest in traveling internationally, not that such statutes must survive strict scrutiny.  (And as explained above, to the extent that Aptheker could have been understood as establishing otherwise, that understanding has been superseded.)  In any event, Plaintiffs have failed to demonstrate that the challenged provisions directly restrict Dearth's ability to travel internationally, as in the cited cases.  See Aptheker, 378 U.S. at 502 (denial of passport to individuals registered with Communist organizations); Lynd v. Rusk, 389 F.2d 940, 942-43 (D.C. Cir. 1967) (denial of passport to individuals who declined to provide absolute assurances that they would not travel to restricted areas); Hernandez v. Cremer, 913 F.2d 230, 232-33 (5th Cir. 1990) (U.S. citizen who presented authentic documents that conclusively

As noted above, the Supreme Court's decisions after <u>Kent</u> and <u>Aptheker</u> demonstrate that the

so-called "right to international travel" is "no more than an aspect of liberty that is subject to

reasonable government regulation within the bounds of due process." <u>Hutchins v. District of</u>

<u>Columbia</u>, 188 F.3d 531, 537 (D.C. Cir. 1999) (citing <u>Haig</u>, 453 U.S. at 306-07).[33]  As

demonstrated <u>supra</u> Part I.C.2, the challenged provisions not only survive rational basis review

but also intermediate scrutiny because they relate substantially to Congress's compelling interest

in combating violent crime and protecting public safety.  As the Fifth Circuit has observed, "the

distinction in Section 922(b)(3) between residents and non-residents" furthers Congress's

objectives in enacting the statute, especially in light of Congress's explicit finding that "the sale

or other disposition of concealable weapons . . . to non-residents of the State in which the

licensees' places of business are located, has tended to make ineffective the laws, regulations,

and ordinances in the several States and local jurisdictions regarding such firearms." <u>Lebman</u>,

464 F.2d at 74 (citing Omnibus Crime Control Act, Title IV, § 901(a)).  For the same reasons,

---

established U.S. citizenship was denied entry to United States for 46 days because INS agent
suspected the documents might be counterfeit).

[33] Plaintiffs' reliance on <u>Woodward v. Rogers</u>, 344 F. Supp. 974 (D.D.C. 1972), for the
proposition that "[c]ourts are sensitive to even coincidental infringements of international travel,"
Pl. MSJ at 22, is misplaced.  Like the other caselaw cited by Plaintiffs, <u>Woodward</u> involved a
direct restriction on a U.S. citizen's ability to travel internationally, namely, the denial of a
passport application for failure to swear to an oath of allegiance.  The court determined that no
statutory provision expressly required such an oath, 344 F. Supp. at 982-85, and its decision
emphasized the fact that the State Department had previously eliminated the oath-of-allegiance
requirement before reinstating it.  <u>See id.</u> at 988 ("[T]he Court. . . is at a loss to understand why
the Oath requirement, which defendants apparently viewed as unnecessary from 1966 to 1971, is
now so essential.") (footnote omitted).  By contrast, the State residency requirement does not
impose a direct restriction on the ability to travel internationally (such as a passport denial), and
is expressly authorized by statute.  Additionally, as explained above, Congress enacted this
requirement after hearing evidence that such a requirement was necessary to prevent the easy
evasion of State firearms laws simply by crossing State lines.

Plaintiffs' challenge to the State residency requirement under the comparatively narrower interest in international travel must fail.

III.    **BECAUSE THE CHALLENGED PROVISIONS DO NOT VIOLATE THE SECOND OR FIFTH AMENDMENTS, THEY DO NOT IMPLICATE THE UNCONSTITUTIONAL CONDITIONS DOCTRINE.**

Plaintiffs' contention that the State residency requirement violates the "unconstitutional conditions doctrine," Pl. MSJ at 23-25, lacks merit.  The Supreme Court recently defined this doctrine as the rule that "the government may not deny a benefit to a person on a basis that infringes his constitutionally protected . . . freedom of speech even if he has no entitlement to that benefit."  Rumsfeld v. Forum for Academic & Institutional Rights ("FAIR"), 547 U.S. 47, 59 (2006) (quotation marks omitted).  Whatever the scope of this doctrine outside the First Amendment context, however, it is of no aid to Plaintiffs because "[a] finding of an unconstitutional condition presupposes that there is a relinquishment of a constitutional right." FAIR v. Rumsfeld, 291 F. Supp. 2d 269, 301 (D.N.J. 2003).  In short, the "unconstitutional conditions doctrine" does not give rise to an independent constitutional claim; the challenged condition must actually cause a constitutional violation.  See FAIR, 547 U.S. at 59-60 ("It is clear that a funding condition cannot be unconstitutional if it could be constitutionally imposed directly.  Because the First Amendment would not prevent Congress from directly imposing the [statute's requirement], the statute does not place an unconstitutional condition on the receipt of federal funds.").  Consequently, because as shown above, the State residency requirement does not violate either the Second or Fifth Amendments, Plaintiffs' claim under the unconstitutional

conditions doctrine necessarily fails as well.[34]

## IV.   THE STATE RESIDENCY REQUIREMENT DOES NOT VIOLATE THE EQUAL PROTECTION COMPONENT OF THE DUE PROCESS CLAUSE.

Plaintiffs' equal protection claim is similarly unfounded.  See Pl. MSJ at 26.  Although the Equal Protection Clause expressly applies only to the States, the Supreme Court has found that its protections are encompassed by the Due Process Clause of the Fifth Amendment and therefore applicable to the federal government.  See Bolling v. Sharpe, 347 U.S. 497, 498-99 (1954).  Congress is presumed to act within its powers when it passes legislation, however, and federal statutes challenged for denial of equal protection are entitled to deferential review as long as the "legislative classification or distinction 'neither burdens a fundamental right nor targets a suspect class.'"  Vacco v. Quill, 521 U.S. 793, 799 (1997) (quoting Romer v. Evans, 517 U.S. 620, 631 (1996)).

Plaintiffs concede that Americans living abroad do not "constitute a suspect class for purposes of equal protection analysis."  Pl. MSJ at 26.  Nevertheless, they allege that the challenged laws violate equal protection principles because they "classif[y] differently. . . Americans who are otherwise identically situated."  Id.  This argument fails for two reasons.

---

[34] The cited caselaw by Plaintiffs does not suggest otherwise, see Pl. MSJ at 23-25, because each case involves statutes or court rulings imposing coercive conditions that Congress could not have imposed directly.  See United States v. Jackson, 390 U.S. 570, 571-72 (1968) (striking down provision of the Federal Kidnaping Act that conditioned the removal of the death penalty as a punishment option only if a criminal defendant waived trial by jury); Simmons v. United States, 390 U.S. 377, 393-94 (1968) (court could not condition testimony by criminal defendant in support of motion to suppress evidence under the Fourth Amendment only if he waived his right under the Fifth Amendment not to have such testimony admitted against him at trial); Aptheker, 378 U.S. at 505-17 (State Department could not condition issuance of a passport – and thus prevent any international travel by U.S. citizens who were Communist Party members – on the waiver of their First Amendment right to free association).

First, expatriated U.S. citizens are not identically, or even similarly situated to resident U.S.

citizens for purposes of the claims Plaintiffs raise.  Expatriated U.S. citizens cannot rely on the

Second Amendment in order to purchase, acquire, or possess firearms in the nations in which

they reside, nor are they required to comply with firearms regulations that otherwise would apply

to them if they resided in the United States.  Additionally, to the extent that Plaintiffs seek to

eliminate the State residency requirement as it applies to expatriated U.S. citizens, that

requirement would continue to apply to U.S. resident citizens.  The relief sought by Plaintiffs

would thus allow expatriated U.S. citizens simply to "opt out" of requirements of the Gun

Control Act that otherwise apply to U.S. citizens.  Consequently, Plaintiffs fail to demonstrate

that Plaintiff Dearth is similarly situated to U.S. citizens residing in the United States.  Cf.

Osterweil, __ F. Supp. 2d __, 2011 WL 1983340, at *11; Peterson, 783 F. Supp. 2d at 1178;

Peruta, 758 F. Supp. 2d at 1118 (all concluding that non-State residents were not similarly

situated to State residents with respect to firearms permit and licensing laws in terms of the

State's ability to obtain information about and monitor potential recipients' eligibility for permit

or license).[35]

Second, the challenged provisions survive rational-basis review, which applies to

classifications that do not target a suspect class, including legislation that distinguishes on the

basis of residence.  See Dumaguin v. Sec'y of Health & Human Servs., 28 F.3d 1218, 1222 (D.C.

Cir. 1994) ("Courts have uniformly applied rational basis review to other residency requirements

the SSA has applied to adopted children who are United States citizens.").  As explained above,

---

[35] As shown above, see supra n.24, persons moving out of State or out of the country
cannot necessarily expect identical treatment to individuals who remain behind.

-41-

the challenged statutes satisfy the requirements of intermediate scrutiny.  See supra Part I.C.2.

By definition, then, they also satisfy the more relaxed standards of rational basis review.

Plaintiffs further allege that the challenged laws violate equal protection principles

because they "burden" Dearth's Second and Fifth Amendment rights.  Pl. MSJ at 26.  This claim

is similarly meritless.  As specifically held in the Second Amendment context,

> although the right to keep and bear arms for self-defense is a fundamental right,
> that right is more appropriately analyzed under the Second Amendment.  Cf.
> Albright v. Oliver, 510 U.S. 266, 273 (1994) ("Where a particular Amendment
> provides an explicit textual source of constitutional protection against a particular
> sort of government behavior, that Amendment, not the more generalized notion of
> substantive due process, must be the guide for analyzing these claims.").

Nordyke v. King, 644 F.3d 776, 794 (9th Cir. 2011) (internal citations and punctuation omitted).

The same is true with respect to claims asserted under the Fifth Amendment.  See Whittaker v.

County of Lawrence, 674 F. Supp. 2d 668, 691 n.7 (W.D. Pa. 2009) (rejecting equal protection

claim that a classification burdened plaintiffs' exercise of a fundamental right as duplicative of

plaintiffs' Taking Clause claim); cf. Plyler v. Doe, 457 U.S. 202, 231-32 (1982) ("[S]trict

scrutiny under the Equal Protection Clause is unnecessary when classifications infringing

enumerated constitutional rights are involved.").  Thus, Plaintiffs cannot maintain an independent

equal protection claim that the challenged provisions allegedly burden Dearth's Second or Fifth

Amendment rights, because that claim would be redundant of their arguments under those

Amendments.

**V.     TO THE EXTENT THAT SAF'S CLAIMS ARE PREMISED ON AN ASSERTION
OF ORGANIZATIONAL STANDING, THOSE CLAIMS ARE BARRED BY
COLLATERAL ESTOPPEL.**

Plaintiffs' summary judgment motion appears to assert claims on behalf of Plaintiff SAF

in its own right, rather than as a representative of its member Stephen Dearth.  See Pl. MSJ at 1

(SAF "joins in this lawsuit, as it and its members and supporters are likewise impacted by

operation of these laws"); see also id. at 5.  However, in its prior opinion in this case, the Court

held that SAF lacked standing to sue on its own behalf because it failed to allege sufficient

injury.  Hodgkins, 677 F. Supp. 2d at 206.  Specifically, the Court held that although SAF

"contends that the work it must do fielding questions from constituents about the laws at issue

justifies standing, its voluntary act of teaching cannot plausibly be the basis for a claim of

constitutional injury."  Id.  The Court also held that SAF lacked standing to sue on behalf of its

members because it failed to allege that it had any members who would otherwise have standing

to sue in their own right.  Id.  Accordingly, the Court dismissed SAF's claims for lack of subject-

matter jurisdiction.

 The D.C. Circuit expressly declined to consider the issue of whether SAF possessed

organizational standing to sue on its own behalf.  Dearth, 641 F.3d at 503 n.*.  The doctrine of

collateral estoppel (or issue preclusion) therefore bars SAF from raising the jurisdictional issue of

organizational standing, which it litigated and lost in this Court.  See Kasap v. Folger Nolan

Fleming & Douglas, 166 F.3d 1243, 1248 (D.C. Cir. 1999) ("[U]nder principles of issue

preclusion, even a case dismissed *without* prejudice has preclusive effect on the jurisdictional

issue litigated.") (emphasis in original); Brereton v. Bountiful City Corp., 434 F.3d 1213, 1218-

19 (10th Cir. 2006) ("It cannot be gainsaid that even a dismissal without prejudice will have a

preclusive effect on the standing issue in a future action.").  Thus, to the extent that Plaintiff

SAF's claims are premised on organizational standing to sue on its own behalf, rather than

representational standing to sue on behalf of Plaintiff Dearth, the Court should enter judgment

for Defendant on those claims.[36]

## CONCLUSION

For the foregoing reasons, Defendant respectfully requests that this Court enter judgment on the pleadings for Defendant or, in the alternative, enter summary judgment for Defendant.

Dated: November 21, 2011

Respectfully Submitted,

TONY WEST
Assistant Attorney General

RONALD C. MACHEN
United States Attorney


SANDRA M. SCHRAIBMAN
(D.C. Bar No. 188599)
Assistant Branch Director
U.S. Department of Justice
Civil Division, Federal Programs Branch

  /s/ Daniel Riess
DANIEL RIESS
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, NW, Room 6122
Washington, D.C. 20530
(202) 353-3098
Daniel.Riess@usdoj.gov

*Attorneys for Defendant*

---

[36] Plaintiff Dearth is the only identified SAF member with standing to sue. See Pl. Statement of Undisputed Material Facts [Doc. No. 23-2], ¶ 16. Maxwell Hodgkins resides in the United States, and has been dismissed from this action. See supra Procedural Background.