IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| STEPHEN DEARTH, et al., | ) | Case No. 09-CV-0587-RLW |
| | ) | |
| Plaintiffs, | ) | MEMORANDUM OF POINTS AND |
| | ) | AUTHORITIES IN OPPOSITION TO |
| v. | ) | DEFENDANT'S DISPOSITIVE MOTION |
| | ) | AND IN REPLY TO DEFENDANTS' |
| ERIC HOLDER, | ) | OPPOSITION TO PLAINTIFFS' MOTION |
| | ) | FOR SUMMARY JUDGMENT |
| Defendant. | ) | |
| _____ | ) | |

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANT'S DISPOSITIVE MOTION AND IN REPLY TO DEFENDANT'S
OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

**COME NOW** the Plaintiffs Stephen Dearth and the Second Amendment Foundation, Inc.,

by and through undersigned counsel, and submit their Memorandum of Points and Authorities in

Opposition to Defendant's Dispositive Motion and in Reply to Opposition to Plaintiffs' Motion for

Summary Judgment.

Dated:  December 30, 2011

Respectfully submitted,

Alan Gura (D.C. Bar No. 453449)
Gura & Possessky, PLLC
101 N. Columbus Street, Suite 405
Alexandria, VA 22314
703.835.9085/Fax 703.997.7665

By:  /s/Alan Gura
      Alan Gura

Attorney for Plaintiffs

TABLE OF CONTENTS

Table of Authorities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  i

Preliminary Statement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

Summary of Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

I.     THE MOTION FOR JUDGMENT ON THE PLEADINGS IS BARRED BY DEFENDANTS'
       SUMMARY JUDGMENT MOTION.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

II.    SAF'S STANDING CANNOT BE QUESTIONED.  . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

III.   THE COMPLAINT ASSERTS A COMPLETE, REDRESSABLE CLAIM FOR RELIEF,
       AS ALREADY DETERMINED BY THE COURT OF APPEALS, AND DEFENDANT IS
       JUDICIALLY ESTOPPED FROM ASSERTING A NEW, CONTRARY THEORY. . . . . . . . . . . . . .  5

IV.    THE ALLEGED AVAILABILITY OF FIREARMS IN CANADA IS IRRELEVANT TO A
       CLAIM THAT THE FEDERAL GOVERNMENT VIOLATES SECOND AMENDMENT
       RIGHTS WITHIN THE UNITED STATES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

       A.     Americans Cannot Be Told To Go Exercise Their Rights Somewhere Else,
              Let Alone In Foreign Countries. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

       B.     The Availability of Other Arms Is Not a Defense In
              Second Amendment Cases.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8

       C.     Canada, and Other Nations, Do Not Have A Second Amendment.. . . . . . . . . . . .  9

V.     THE CHALLENGED PROVISIONS, DATING TO 1994 AND 1968, ARE NOT
       "LONG-STANDING" AND NOT ENTITLED TO ANY PRESUMPTION OF
       CONSTITUTIONALITY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10

VI.    THE CHALLENGED PROVISIONS FAIL SECOND AMENDMENT SCRUTINY. . . . . . . . . . . . . .  13

       A.     The Challenged Provisions Have More Than A "De Minimis"
              Impact on the Second Amendment Rights of Expatriated Americans.. . . . . . . . . .  13

       B.     Strict, Not Intermediate Scrutiny, Is the Correct Standard of Review
              In This Case.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14

C.    Section 922(a)(9) Would Fail Intermediate Scrutiny................... 16

D.    Section 922(b)(3), As Applied to Expatriated Americans, Would Fail
      Intermediate Scrutiny. ................................................. 19

VII.   THERE IS, IN FACT, A FUNDAMENTAL RIGHT TO TRAVEL,
       AND DEFENDANT VIOLATES IT. ................................................ 21

VIII.  DEFENDANT VIOLATES THE RIGHT TO EQUAL PROTECTION......................... 24

Conclusion. ................................................................... 25

Table of Authorities

Cases

*Aptheker* v. *Sec'y of State*,
378 U.S. 500 (1964) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22

*Califano* v. *Aznavorian*,
439 U.S 170 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Dearth* v. *Holder*,
641 F.3d 499 (D.C. Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4, 6

*District of Columbia* v. *Heller*,
554 U.S. 570 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8-10

*Donovan* v. *United States Postal Service*,
530 F. Supp. 894 (D.D.C. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Environmental Action, Inc.* v. *FERC*,
939 F.2d 1057 (D.C. Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Ezell* v. *City of Chicago*,
651 F.3d 684 (7th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4, 7

*Gay Men's Health Crisis v. Sullivan*,
733 F. Supp. 619 (S.D.N.Y. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Haig* v. *Agee*,
453 U.S. 280 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Heller* v. *District of Columbia*,
2011 U.S. App. LEXIS 20130 (D.C. Cir. Oct. 4, 2011) . . . . . . . . . . . . . . . 11-14, 18

*Hernandez* v. *Cremer*,
913 F.2d 230 (5th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Hunt* v. *Wash. State Apple Adver. Comm'n*,
432 U.S. 333 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Hutchins* v. *District of Columbia*,
188 F.3d 531 (D.C. Cir. 1999) (en banc) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Kent* v. *Dulles*,
357 U.S. 116 (1958) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21-23

*Lujan* v. *Defenders of Wildlife*,
    504 U.S. 555 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*New Hampshire* v. *Maine*,
    532 U.S. 742 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Nordyke* v. *King*,
    644 F.3d 776 (9th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Parker* v. *District of Columbia*,
    478 F.3d 370 (D.C. Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Regan* v. *Wald*,
    468 U.S. 222 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Say* v. *Adams*,
    2008 U.S. Dist. LEXIS 20183 (W.D. Ky. March 14, 2008) . . . . . . . . . . . . . . . . . . . . 17

*Schad* v. *Mt. Ephraim*,
    452 U.S. 61 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Schneider* v. *State*,
    308 U.S. 147 (1939) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Schrader* v. *Holder*,
    2011 U.S. Dist. LEXIS 147717 (D.D.C. Dec. 23, 2011) . . . . . . . . . . . . . . . . . . . . . . 4

*Second Amendment Foundation, Inc.* v. *Suttle*,
    No. 8:11-CV-335 (D. Neb. Nov. 21, 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Smith* v. *South Dakota*,
    781 F. Supp.2d 879 (D.S.D. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*United Food & Commercial Workers Union Local 751* v. *Brown Group*,
    517 U.S. 544 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*United States* v. *Chester*,
    628 F.3d 673 (4th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 18

*United States* v. *Flores*,
    2011 U.S. App. LEXIS 24976 (8th Cir. Dec. 16, 2011) (per curiam) . . . . . . . . . . . . . . 16

*United States* v. *Portillo-Munoz*,
    643 F.3d 437 (5th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*United States* v. *Virginia*,
    518 U.S. 515 (1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*United States* v. *Williams*,
    616 F.3d 685 (7th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Vill. of Arlington Heights* v. *Metro. Hous. Dev. Corp.*,
    429 U.S. 252 (1977). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Watt* v. *Energy Action Educ. Found.*,
    454 U.S. 151 (1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Woollard* v. *Sheridan*,
    2010 U.S. Dist. LEXIS 137031 (D. Md. Dec. 29, 2010). . . . . . . . . . . . . . . . . . . . . . 4

*Worthy* v. *United States*,
    328 F.2d 386 (5th Cir. 1964). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Zemel* v. *Rusk,*
    381 U.S. 1 (1965). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Constitutional Provisions

U.S. Const. amend. XII. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

U.S. Const. amend. XIV, § 1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

U.S. Const. amend. XVII. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

U.S. Const. amend. XXIII. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

U.S. Const. art. I, 2, cl. 1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Rules and Statutes

18 U.S.C. § 922(a)(9) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

18 U.S.C. § 922(b)(3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

18 U.S.C. § 922(g)(9). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

18 U.S.C. § 926A. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

42 U.S.C. § 1973ff. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 21

Fed. R. Civ. Proc. 12(d). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2

Fed. R. Civ. Proc. 56. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Ky. R.S. § 237.110(4)(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

N.Y. Penal Law § 265.00(3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Omaha Mun. Code § 20-253(9). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

S.D.C.L. § 23-7-7.1(8). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANT'S DISPOSITIVE MOTION AND IN REPLY TO DEFENDANT'S
OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

PRELIMINARY STATEMENT

To the extent that Defendant moves for a judgment on the pleadings, that motion is barred

under Federal Rule of Civil Procedure 12(d) by Defendant's motion for summary judgment. As a

practical matter, however, the request for a judgment on the pleadings concedes that the case

presents only questions of law. It does not appear that any factual disputes exist among the parties.

Defendants' cross-motion confirms that the case is ready for final disposition by the Court.

As there is no need to burden the Court with another recitation of Plaintiffs' primary

arguments, presented extensively on their motion for summary judgment, those arguments are

merely incorporated by reference here. Instead, this brief responds to the various new arguments

raised by the Defendant, none of which are particularly persuasive.

SUMMARY OF ARGUMENT

The Second Amendment is not limited to "sporting purposes." While sporting purposes, like

the militia purpose, are very much within the American tradition of private firearms ownership, it is

impossible to read the Supreme Court's extensive survey of the right to keep and bear arms and

conclude that Americans have only the right to use arms for one particular traditional use and no

other. Dearth, and other Americans, have the right to use firearms for *self-defense*. Americans have

the right to buy and possess firearms that are suitable primarily for *self-defense*, even if they reside

primarily overseas.

The restrictions here at issue are impossible to justify. And having spent five years fighting

Plaintiffs on venue and standing, the government has a hard time letting go of some of its avoidance

doctrines, even after some of these were rejected by the D.C. Circuit. It also adds a few new fanciful

defenses, such as the idea that Dearth must look to the Canadian government for protection of his

Second Amendment rights in the United States. But the non-substantive claims may be whittled

away, finally exposing the government's rationales for these most indefensible restrictions: (1)

American citizens are barred from acquiring guns for self-defense because aliens must be prevented

from illegally exporting arms, and (2) the government must defend the interests of enforcing the

local laws of Dearth's state of residence----even if he does not reside in any state. As for the

fundamental right to travel, the government simply refuses to acknowledge its existence.

> The government's motion must be denied.

ARGUMENT

I.     THE MOTION FOR JUDGMENT ON THE PLEADINGS IS BARRED BY DEFENDANTS' SUMMARY JUDGMENT MOTION.

Federal Rule of Civil Procedure 12(d) provides:

> *Result of Presenting Matters Outside the Pleadings*. If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion.

Defendant is seeking both a judgment on the pleadings under Rule 12(c), and a summary

judgment under Rule 56, per which he has introduced matters outside the pleadings. Under Rule

12(d), only the latter motion can be heard, as the motion for judgment on the pleadings would be

treated as a summary judgment motion in any event.

II.    SAF'S STANDING CANNOT BE QUESTIONED.

Defendant argues that SAF's organizational standing (as opposed to its representative,

associational standing) is collaterally estopped by this Court's earlier *reversed* opinion. Def. Br.,

42-44. The argument is frivolous.

2

Precedent holding that dismissals without prejudice may have preclusive effect as to standing are irrelevant, because the opinion dismissing the case was *reversed*. This Court's previous opinion in this case has no precedential value and is not law of the case. Had the D.C. Circuit affirmed any part of this Court's earlier decision, it would have stated so explicitly.

The claim's frivolity is obvious when considering its limited extent. The earlier, reversed opinion had held that SAF lacked both organizational and associational standing, yet Defendant does not claim SAF lacks associational standing. If the earlier decision has preclusive effect as to SAF's standing, generally, why would it only be preclusive as to SAF's organizational but not as to its representational standing? If the D.C. Circuit's failure to reach consideration of SAF's standing means that it left intact the lower court's holding in that respect, SAF would lack *all* standing, representational as well as organizational, which even Defendant now implicitly recognizes is impossible given the established fact of Dearth's standing.[1]

Of course, when the D.C. Circuit wrote, "[n]or, because the SAF raises no issue not also raised by Dearth, need we decide whether it has standing," *Dearth* v. *Holder*, 641 F.3d 499, 503 n.* (D.C. Cir. 2011) (citing *Environmental Action, Inc.* v. *FERC*, 939 F.2d 1057, 1061 n.* (D.C. Cir. 1991)), it merely restated the familiar rule that once one party is determined to have standing in a

---

[1]It is unclear what point Defendant tries to make by noting that "Dearth is the only identified SAF member with standing to sue." Def. Br. 44 n.36. In any case, there must be at least one Plaintiff with standing, but that requirement would be satisfied even if the only Plaintiff in a case were an organization properly asserting representational standing—and there is no requirement that an organization list the members whom it represents. *Cf. Ezell* v. *City of Chicago*, 651 F.3d 684, 696 (7th Cir. 2011) (SAF and organizational co-plaintiff "have many members who reside in Chicago and easily meet the requirements for associational standing"). But since Defendant raises the point, the Court should know that Plaintiffs' counsel met and conferred over a motion to add another ex-patriated SAF member as a party plaintiff to this case, and Defendant refused to consent. In the interest of finally moving this case along, considering that it dates back to 2006 and has been on appeal in some form in three different circuits, Plaintiffs opted not to press the matter.

3

case, the standing inquiry ceases. *Watt* v. *Energy Action Educ. Found.*, 454 U.S. 151, 160 (1981);

*Vill. of Arlington Heights* v. *Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264 (1977); *Gay Men's Health Crisis v. Sullivan*, 733 F. Supp. 619, 631 (S.D.N.Y. 1989).

The D.C. Circuit's application of this principle to SAF, specifically, was one of three such opinions issued within a seven month period. *See also Ezell* v. *City of Chicago*, 651 F.3d 684, 696 n.7 (7th Cir. 2011); *Woollard* v. *Sheridan*, 2010 U.S. Dist. LEXIS 137031 at *2 n.1 (D. Md. Dec. 29, 2010). And only last week, citing the D.C. Circuit's *Dearth* footnote, Judge Collyer declined to consider Holder's challenge to SAF's standing where an individual plaintiff indisputably had standing: "Because the Second Amendment Foundation has not raised issues separate from those raised by Mr. Schrader, the Court need not decide whether it has standing." *Schrader* v. *Holder*, 2011 U.S. Dist. LEXIS 147717 at *10-*11 (D.D.C. Dec. 23, 2011), *on appeal* (citing *Dearth*, 641 F.3d at 503 n.*).

Stephen Dearth has standing. As the D.C. Circuit noted, that ends the inquiry into SAF's standing.

Of course, even if SAF lacked organizational standing, SAF

easily meet[s] the requirements for associational standing: (1) [its] members would otherwise have standing to sue in their own right; (2) the interests [SAF] seeks to protect are germane to [its] organizational purposes; and (3) neither the claim asserted nor the relief requested requires the participation of individual association members in the lawsuit.

*Ezell*, 651 F.3d at 696 (citing *United Food & Commercial Workers Union Local 751* v. *Brown Group*, 517 U.S. 544, 553 (1996); *Hunt* v. *Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977)) (other citation omitted).

III.   THE COMPLAINT ASSERTS A COMPLETE, REDRESSABLE CLAIM FOR RELIEF, AS ALREADY
DETERMINED BY THE COURT OF APPEALS, AND DEFENDANT IS JUDICIALLY ESTOPPED FROM
ASSERTING A NEW, CONTRARY THEORY.

It is easy to see why Defendant buried in a mere footnote his assertion that the Court cannot

decide the case because the Complaint does not describe in which state Dearth would purchase

firearms, and *some* state laws might bar that act. Def. Br., 16 n.19. This Court should know that

Defendant tried out this idea at oral argument before the D.C. Circuit, without success.

And with good reason. *Some* states might have such a law, but if Dearth is successful here,

he can get complete relief on his claim—because he could purchase a firearm in the United States

and use it for self-defense. Dearth only needs to succeed somewhere in the United States to challenge

federal law, he does not need to knock out every unconstitutional law in every state, or even in any

particular state, to obtain complete relief.

Defendant's argument is especially not well-taken considering the government's extensive,

years-long forum shopping effort to navigate this case into the District of Columbia—where the

relevant officials of various states are not obviously subject to this Court's personal jurisdiction.

Recall, however, that the government repeatedly, and successfully, challenged venue in this dispute

on the theory that nothing was actually happening in any state.

Which is it?  Was there truly nothing happening in any particular state because Dearth lives

in Canada? Or is Dearth required to confine his case to some particular state, thus cementing venue

somewhere else? "[J]udicial estoppel generally prevents a party from prevailing in one phase of a

case on an argument and then relying on a contradictory argument to prevail in another phase." *New

Hampshire* v. *Maine*, 532 U.S. 742, 749 (2005) (citations omitted). Judicial estoppel "protect[s] the

integrity of the judicial process . . . by prohibiting parties from deliberately changing positions

according to the exigencies of the moment." *Id.* at 749-50 (citations omitted). The "purpose is to

prohibit litigants from playing 'fast and loose,' or 'blowing hot and cold,' with the courts."
*Donovan* v. *United States Postal Service*, 530 F. Supp. 894, 902 (D.D.C. 1981) (citations omitted). Judicial estoppel bars the government's suggestion, at this stage, that the dispute must be centered in a particular state.

And, of course, the government's constitutional avoidance argument is barred by the D.C. Circuit's opinion in this case. The constitutional avoidance argument is, in reality, yet *another* attack on Dearth's standing. With this claim, the government is essentially asserting that Dearth's claim may not be redressable by the Court as it might require a challenge to a state law, depending on the specific location of his desired firearm acquisition. Redressability is, of course, the familiar third prong of a standing inquiry. *Lujan* v. *Defenders of Wildlife*, 504 U.S. 555 (1992). On that question: "The Government disputes only whether Dearth has suffered a cognizable injury, as the requirements of traceability and redressability are clearly met." *Dearth*, 641 F.3d at 501.

At some point, the relentless attacks on the standing of each and every person who sues the government become a waste of the Court's resources. This stage has been reached here, where the D.C. Circuit has already passed on the matter, and where the government spent years fighting venue on a directly incompatible theory. The unmistakable instruction of the D.C. Circuit's opinion in this case is that the time has arrived to consider this case on the merits.

IV.    THE ALLEGED AVAILABILITY OF FIREARMS IN CANADA IS IRRELEVANT TO A CLAIM THAT THE FEDERAL GOVERNMENT VIOLATES SECOND AMENDMENT RIGHTS WITHIN THE UNITED STATES.

A.    Americans Cannot Be Told To Go Exercise Their Rights Somewhere Else, Let Alone In Foreign Countries.

It is not an answer to a claim that one's rights are being violated, that the plaintiff can go exercise those rights somewhere else. For example, "one is not to have the exercise of his liberty of

expression in appropriate places abridged on the plea that it may be exercised in some other place."

*Schad* v. *Mt. Ephraim*, 452 U.S. 61, 76-77 (1981) (quoting *Schneider* v. *State*, 308 U.S. 147, 163

(1939)). The Seventh Circuit has recently had occasion to apply this First Amendment concept in a

Second Amendment case. In *Ezell* v. *City of Chicago*, supra, 651 F.3d 684, the District Court

denied a motion to preliminarily enjoin Chicago's gun range ban, theorizing that plaintiffs who

sought to use gun ranges were only harmed by the added expense of traveling outside the city to do

so. The Seventh Circuit reversed. "This reasoning assumes that the harm to a constitutional right is

measured by the extent to which it can be exercised in another jurisdiction. That's a profoundly

mistaken assumption." *Ezell*, 651 F.3d at 697.

 Invoking the rule of *Schad* and *Schneider*, the Seventh Circuit explained:

> The same principle applies here. It's hard to imagine anyone suggesting that Chicago may
> prohibit the exercise of a free-speech or religious-liberty right within its borders on the
> rationale that those rights may be freely enjoyed in the suburbs. That sort of argument
> should be no less unimaginable in the Second Amendment context.

*Id.*

 At least in *Ezell*, the defendant was arguing for the notion that the Plaintiffs should exercise

their constitutional rights somewhere else in the country. Here, the government is telling an

American citizen that he should go exercise his Second Amendment right to buy a gun... in *Canada*,

which has nothing like the Second Amendment. The government would not seriously be heard

arguing that it could ban American citizens who live overseas from buying books, on the theory that

they can buy their books overseas and import them. The argument is no more sensible when applied

to firearms.

B.      The Availability of Other Arms Is Not a Defense In Second Amendment Cases.

The government's argument that Dearth has available to him other firearms is irrelevant.

Even if other arms are available to Dearth in Canada, the D.C. Circuit and the Supreme Court have

both rejected the notion that in a Second Amendment case, the availability of some arms negates a

claim to other arms.

The District of Columbia raised this sort of argument in defense of its handgun ban, but the

D.C. Circuit dismissed the claim as "frivolous." *Parker* v. *District of Columbia*, 478 F.3d 370, 400

(D.C. Cir. 2007), *aff'd sub nom District of Columbia* v. *Heller*, 554 U.S. 570 (2008).  "It could be

similarly contended that all firearms may be banned so long as sabers were permitted. Once it is

determined – as we have done – that handguns are 'Arms' referred to in the Second Amendment, it

is not open to the District to ban them." *Id.* (citation omitted).

Undeterred, District of Columbia officials presented the Supreme Court with the following

question on certiorari: "Whether the Second Amendment forbids the District of Columbia from

banning private possession of handguns while allowing possession of rifles and shotguns." Cert. Pet.

No. 07-290. Heller successfully challenged this question as not accurately reflecting the issues in the

case, and the Supreme Court adopted a very different "Question Presented" along the lines proposed

by Heller, namely, whether the city's laws violated the Second Amendment.

On the merits, the Supreme Court rejected the alternative arms argument. "It is no answer to

say . . . that it is permissible to ban the possession of handguns so long as the possession of other

firearms (i.e., long guns) is allowed. It is enough to note, as we have observed, that the American

people have considered the handgun to be the quintessential self-defense weapon." *Heller*, 554 U.S.

at 629. The Supreme Court then listed various reasons why a handgun might be more suitable for

home self-defense than a long arm, and concluded, "[w]hatever the reason, handguns are the most

8

popular weapon chosen by Americans for self-defense in the home, and a complete prohibition of their use is invalid." *Id.*

Here, the firearms that Dearth might theoretically bring to the United States from Canada might be protected by the Second Amendment. But the availability of such other firearms does not mitigate the fact that Dearth is excluded from the entire domestic firearms market. Defendant's assertion that some "sporting" arms are useful for self-defense, Def. Br. 24-25 n.25, is irrelevant, because the Second Amendment also protects Dearth's ability to use and possess firearms that do not meet the government's ideas of what is suitable for sport—even if the government were correct in that assessment.

      C.      Canada, and Other Nations, Do Not Have A Second Amendment.

The United States was not founded along ethnic, religious, linguistic, or tribal grounds. Rather, the United States was founded on a set of legal principles that found expression in the Constitution and, almost immediately, in its Bill of Rights. For better or (likely) worse, no other nation secures all that is contained in the first ten amendments—including the right to keep and bear arms. Canada is relatively free and on the whole enlightened, but as with all other countries, many of its government's practices would be unconstitutional here—and that is as true for gun rights as it is for other rights.

A full exposition of Canadian firearms laws is unnecessary. Even if Defendant allowed Dearth to import firearms into the United States without regard to their "sporting" characteristics, it is readily apparent that Canada does not allow Dearth (or anyone else) to acquire many firearms whose possession and use is protected by the Second Amendment. For example, Dearth holds a valid Utah permit to carry a handgun for self-defense, which is recognized in numerous states. Dearth Decl., 10/14/2011, ¶ 2; http://publicsafety.utah.gov/bci/FAQother.html (last visited December 30,

2011). But Canada prohibits all .25 and .32 caliber handguns, as well as all handguns with a barrel

length of 105mm or less, which are exceedingly common self-defense handguns in the United States.

*See* http://www.rcmp- grc.gc.ca/cfp-pcaf/fs-fd/rp-eng.htm.(last visited December 30, 2011). *Heller*

specifically noted the compact and lightweight characteristics of handguns as a reason for their

traditional popularity in America and hence, their protection by the Second Amendment. *Heller*,

554 U.S. at 629.

And while Canada does not secure gun rights to the same extent they are secured here, the

situation for expatriates living in other nations is worse still. Former plaintiff Maxwell Hodgkins

lived in a country where handguns are generally banned. So do many expatriated Americans who

cannot be expected to import their Second Amendment rights when visiting the United States.

V.      THE CHALLENGED PROVISIONS, DATING TO 1994 AND 1968, ARE NOT "LONG-STANDING"
        AND NOT ENTITLED TO ANY PRESUMPTION OF CONSTITUTIONALITY.

The laws here at issue, 18 U.S.C. §§ 922(a)(9) and 922(b)(3), were enacted as recently as

1994 and 1968—only seven years before, and nineteen years *after* initial enactment of the laws

struck down in *Heller*—and well within the lifetime of most adult Americans. These are hardly

"long standing" restrictions that inform understanding of the traditional right to arms.

Defendant's "long-standing" argument is based on a handful of inapposite laws which

required the registration of handguns or the licensing of handgun carrying. What this has to do with

barring expatriated Americans from acquiring arms, all arms, for self-defense is unclear. Even were

these laws enacted "long" ago, many are no longer "standing," and upon examination, they do not

have the scope ascribed to them by Defendant.[2]

_____

[2]Of the states whose laws are cited by Defendant, only New York today neither licenses non-resident handgun carry nor recognizes at least some out-of-state handgun carry permits. The District of Columbia's total prohibition of handgun possession by non-residents was not questioned in *Heller*

Eight of the thirteen "early laws" cited by Defendant—from the District of Columbia, Indiana, Maine, Massachusetts, Montana, New Jersey, Rhode Island and West Virginia—relate solely to licenses to carry handguns. But nothing in the provisions challenged here speaks to the carrying of handguns in public. Indeed, since Defendant (erroneously) asserts the Second Amendment protects only the right to possess and use a firearm in the home, by Defendant's own argument, these laws are irrelevant. Connecticut's cited law relates also a requirement that handgun dealers be licensed, which is plainly not relevant to this case. Plaintiffs are not seeking to exercise the right to sell guns.

The other four states whose early laws are mentioned by Defendant—Michigan, Missouri, New York, North Carolina—licensed the purchase of handguns or similar concealable arms in addition to licensing the carrying of handguns.[3] Ironically, the existence of laws that require local police pre-approval for handgun purchases eviscerates Section 922(b)(3)'s rationale of advancing compliance with local state gun laws, because Section 922(b)(3) explicitly allows for interstate purchases of rifles and shotguns on the theory that gun dealers can self-police compliance with the laws of other jurisdictions.  If dealers can sell firearms to non-residents who comply with their home state's laws, there is no reason to suppose dealers cannot honor the pistol purchase license issued to a non-resident.[4]

---

v. *District of Columbia*, 2011 U.S. App. LEXIS 20130 (D.C. Cir. Oct. 4, 2011), but it will be tested. *Palmer* v. *District of Columbia*, No. 09-CV-1482-FJS. In any event, this type of law is quite rare today.

[3] New York's law references "firearms," but the definition of "firearm" in New York law excludes most rifles and shotguns. N.Y. Penal Law § 265.00(3).

[4] This issue is being separately litigated. *Lane* v. *Holder*, U.S. Ct. of Appeals, 4th Cir. No. 11-1847. The District Court dismissed *Lane* on standing grounds, but even then, to avoid liability, the District of Columbia subsequently repealed its municipal regulation limiting its residents' ability to

Of course, none of the laws cited by Defendant ever approached the scope of Section 922(b)(3)'s application to expatriated Americans. None of these laws prohibited the sale of *all* firearms to non-residents, and indeed, Section 922(b)(3) itself does not prohibit all non-resident firearm sales, with its significant exceptions for rifles and shotguns. At most, Defendant's exhibit might prove that four states between 1913 and 1927 enacted a requirement that handgun purchasers obtain a permit to buy a handgun.

In this circuit, that is insufficient to draw broad, generalized conclusions about the traditional scope of the right to bear arms. In *Heller* v. *District of Columbia*, 2011 U.S. App. LEXIS 20130 (D.C. Cir. Oct. 4, 2011), the D.C. Circuit found that some *handgun* registration laws were "longstanding," but also found that

> These early registration requirements, however, applied with only a few exceptions solely to handguns -- that is, pistols and revolvers -- and not to long guns. Consequently, we hold the basic registration requirements are constitutional only as applied to handguns. With respect to long guns they are novel, not historic.

*Heller II*, 2011 U.S. App. LEXIS 20130 at *23.

Section 922(b)(3) is not a registration law. Even if it were, it applies well beyond handguns and is thus "novel" to the extent it bars expatriated Americans' acquisition of rifles and shotguns, something it does not do to most people.

With respect to Section 922(a)(9), the laws cited by Defendant are clearly inapposite. If *ever* prior to 1994 there had been any law forbidding non-residents from acquiring firearms for the purpose of self-defense, or any law limiting *anyone*'s acquisition of firearms to "sporting purposes," Defendant has not cited it.

---

take out-of-state delivery of handguns.

12

VI.   THE CHALLENGED PROVISIONS FAIL SECOND AMENDMENT SCRUTINY.

There is no need to recount all the reasons offered in Plaintiffs' opening brief as to why the challenged provisions violate the Second Amendment. However, some response to Defendants' contrary assertion is warranted.

A.   The Challenged Provisions Have More Than A "De Minimis" Impact on the Second Amendment Rights of Expatriated Americans.

Even if barring Americans living overseas from acquiring firearms for defensive purposes, or limiting all firearms acquisition to in-state residents, were "long standing" laws, that would not end the matter. "[T]he phrase 'presumptively lawful regulatory measures' suggests the possibility that one or more of these 'longstanding' regulations 'could be unconstitutional in the face of an as-applied challenge.'" *United States* v. *Chester*, 628 F.3d 673, 679 (4th Cir. 2010) (quoting *United States* v. *Williams*, 616 F.3d 685, 692 (7th Cir. 2010)).

Perhaps more critically, the D.C. Circuit has adopted the view that a "long standing" regulation is only presumptively constitutional to the extent it has a de minimis impact on Second Amendment rights. "A plaintiff may rebut this presumption by showing the regulation does have more than a de minimis effect upon his right." *Heller II*, 2011 U.S. App. LEXIS 20130 at *18.

In *Heller II*, basic handgun registration laws were found to have only a de minimis impact on Second Amendment rights, as the registration requirement only had an incidental burden on the possession of handguns. That is evidently not the case here. Section 922(a)(9) *forbids* expatriated Americans from acquiring all firearms for the core Second Amendment purpose of self-defense. Section 922(b)(3) *forbids* expatriated Americans from purchasing *all firearms* from licensed gun dealers. To describe the impacts of these provisions is to see that their impact on the right to keep and bear arms is hardly "de minimis."

B.      Strict, Not Intermediate Scrutiny, Is the Correct Standard of Review In This Case.

Defendant's reliance on *Nordyke* v. *King*, 644 F.3d 776 (9th Cir. 2011), *see* Def. Br., at 22 n.22, was premature. As predicted by Plaintiffs, Pl. Br., 10/14/2011 at 14 n.6, that opinion has been vacated. *See* 2011 U.S. App. LEXIS 23703 (9th Cir. November 28, 2011).

It is misleading and incomplete to offer that "[m]ost courts, including the D.C. Circuit, have applied an intermediate standard of review to Second Amendment challenges." Def. Br., at 23 (citing cases). That is also true of the First Amendment right of free speech (indeed, with respect to the First Amendment, the word "most" could safely be omitted). As outlined in Plaintiff's brief, the D.C. Circuit and many others have suggested that because the Second Amendment should be analyzed under First Amendment frameworks, intermediate scrutiny is sometimes appropriate— and sometimes, it is not.

As Defendant correctly suggests, the D.C. Circuit determines the appropriate level of review "by assessing how severely the prohibitions burden the Second Amendment right." Def. Br., at 23 (quoting *Heller II*, 2011 U.S. App. LEXIS 20310 at *44). But then Defendant offers that "[t]he State residency requirement does not prevent Plaintiff Dearth from possessing a firearm in his home abroad or elsewhere. Nor does the requirement prevent him from possessing a firearm in his temporary living space while in the United States." Def. Br., at 23-24 (footnote omitted). This statement is both wrong, and misleading on several counts.

First and foremost, as explained in Plaintiffs' moving brief, the Second Amendment right includes the right to purchase and otherwise acquire firearms. It would be exceptionally frivolous for the Defendant to maintain that there is a right to possess firearms, but not the right to acquire firearms. The challenged laws directly target acquisition, not possession.

14

Second, because the provisions bar Dearth (and others) from acquiring protected firearms, they necessarily bar the possession of protected firearms.

Third, Section 922(a)(9) bars the acquisition of protected arms for the purpose of self-defense. It necessarily bars the possession of protected arms for self-defense.

Finally with respect to the level of scrutiny, in a single-spaced footnote occupying over half a page, Defendant asserts that "courts have held that constitutional rights do not necessarily apply in the same manner to U.S. citizens residing abroad." Def. Br., at 24 n.24 (citing cases). While courts have wrestled with difficult questions of whether, and to what extent, Americans enjoy constitutional rights overseas, no court has ever suggested that an American citizen, *on American soil*, enjoys reduced constitutional protection by virtue of residing overseas.

When Stephen Dearth sought to buy a gun, he did not do so on a military base overseas, or as a prisoner at Guantanamo Bay. Defendant's footnote does not explain the rationale for adopting such a breathtaking position, based largely on the decidedly non-legal source of a GAO report observing that statutory benefits (to which there is no positive constitutional right) can be limited to U.S. residents, and that the census is only supposed to count people within the United States. Defendant's citation to the fact that Americans residing overseas could not vote until enactment of the Overseas Citizens Absentee Voting Act of 1986, 42 U.S.C. § 1973ff is unhelpful, as it is doubtful that overseas residents have a constitutional right to vote in federal elections absent the consent of their states.[5]

_____

[5]The Constitution provides that Members of the House of Representatives "shall be ... chosen every second Year by the People *of the several States*, and the Electors *in each State* shall have the Qualifications requisite for Electors of the most numerous Branch of the State Legislature." U.S. Const. art. I, 2, cl. 1 (emphasis added).  Similarly, the Senate "shall be composed of two Senators from each State, *elected by the people thereof* . . . The electors *in each State* shall have the qualifications requisite for electors of the most numerous branch of the State legislatures." U.S.

C.      Section 922(a)(9) Would Fail Intermediate Scrutiny.

Even under intermediate scrutiny, Section 922(a)(9)'s prohibition on the acquisition of firearms by nonresidents for self-defense would fail. There is absolutely no fit whatsoever, let alone a reasonable fit, between the proffered justification for this law and the way it actually functions.

Defendant asserts that all nonresidents should be barred from purchasing firearms, because some aliens might illegally export firearms. Def. Br., at 12. Yet these incipient arms smugglers are allowed to acquire weapons for "sporting purposes." If the idea is that aliens might safely be able to have firearms "in the time bounded context of 'a loan or rental of a firearm,'" Def. Br., at 33 (quoting 18 U.S.C. § 922(a)(9)), why can't aliens borrow or rent a firearm *for self-defense?* Are aliens who hunt less likely to smuggle their borrowed or rented firearms than aliens who wish to exercise the right to keep and bear arms for self-defense?  This is not explained.

Of course, aliens who visit our country are generally thought to enjoy constitutional rights. Aliens cannot have their worship or speech curtailed, of be deprived of due process, in ways that are unacceptable with respect to American citizens. While two courts have declined to extend Second Amendment rights to *illegal* aliens, *United States* v. *Flores*, 2011 U.S. App. LEXIS 24976 (8th Cir. Dec. 16, 2011) (per curiam); *United States* v. *Portillo-Munoz*, 643 F.3d 437 (5th Cir. 2011), petition for cert. filed (U.S. Nov. 2, 2011) (No. 11-7200), at least three courts have struck down laws that discriminate against lawfully admitted aliens with respect to the use of firearms. *Second Amendment Foundation, Inc.* v. *Suttle*, No. 8:11-CV-335 (D. Neb. Nov. 21, 2011) (enjoining

---

Const. amend. XVII. "All persons born or naturalized in the United States and subject to the jurisdiction thereof, are citizens . . . of the State wherein they reside." U.S. Const. amend. XIV, § 1.That Presidential Electors must be residents of the state they represent in the Electoral College is suggested by the requirement that the Electors "shall meet in their respective States," U.S. Const. amend. XII, except that the District of Columbia's Electors "shall meet in the District." U.S. Const. amend. XXIII.

Omaha Mun. Code § 20-253(9), barring aliens from registering handguns); *Smith* v. *South Dakota*, 781 F. Supp.2d 879 (D.S.D. 2011) (striking down S.D.C.L. § 23-7-7.1(8)'s requirement of U.S. citizenship to have concealed handgun license); *Say* v. *Adams*, 2008 U.S. Dist. LEXIS 20183 (W.D. Ky. March 14, 2008) (striking down citizenship requirement of Ky. R.S. § 237.110(4)(b)).

There is, quite simply, no reason why aliens should be—or could be—deprived of their Second Amendment right to keep and bear arms for self-defense.

Even if *aliens* "frequently smuggl[e]" arms out of the country, Def. Br., at 31, a dubious proposition for which no empirical support is offered and which would not warrant legislation even if correct,[6] and even if aliens could be deprived of Second Amendment rights, Dearth and the people represented by SAF in this case are not aliens. Is there any evidence that expatriated American citizens frequently smuggle arms? And if so, why are our stringent export control laws and border policing insufficient to bar the illegal export of firearms—not just by aliens and visiting expatriates, but by the vast majority of the citizen population?

Finally, Defendant asserts that the expatriate ban is constitutional because "the vast majority of U.S. citizens reside in the United States and will not be prevented from purchasing firearms." Def. Br. at 33. After all, the laws impact a "[l]ikely small subset of U.S. citizens." *Id.* The argument is frivolous. An unconstitutional law cannot be defended because it only violates the rights of a minority of the people. The very purpose of having judicial review to enforce constitutional standards is to protect the rights of political minorities from excesses of the majority, whether political power was exercised maliciously or, as more likely the case here, merely without regard for the rights of others. For example, the government cannot violate only the Constitutional rights of

---

[6]For example, aliens may, like American citizens, frequently commit traffic violations, yet they are allowed to drive here.

17

Delaware or District of Columbia residents, who comprise a "small subset of U.S. citizens." Nor, in this case, is the argument even factually correct. *All* Americans are put to the choice of living here or forfeiting their right to keep and bear arms, and that condition is unconstitutional.

Courts applying intermediate scrutiny require much, much more from governmental defendants than just self-serving declarations of some nebulous purpose. In *Chester*, the Fourth Circuit reversed the District Court's decision upholding the constitutionality of 18 U.S.C. § 922(g)(9)'s firearm prohibition leveled at domestic violence misdemeanants. While there may be little doubt that the provision is, at least on its face, constitutional, the Fourth Circuit held the government failed to meet its burden under intermediate scrutiny:

> The government has offered numerous plausible *reasons* why the disarmament of domestic violence misdemeanants is substantially related to an important government goal; however, it has not attempted to offer sufficient *evidence* to establish a substantial relationship between § 922(g)(9) and an important governmental goal.

*Chester*, 628 F.3d at 683 (emphasis original).

Here, even the reasons offered are not plausible, and there is not even the argument, let alone evidence, linking the government's interest in preventing smuggling to the acquisition of firearms by *anyone*, let alone citizens (as opposed to aliens) for self-defense.

The D.C. Circuit has instructed that it, too, will demand actual evidence in applying intermediate scrutiny. Reversing the District Court's decision upholding novel firearm registration requirements, the D.C. Circuit stated that the District of Columbia "needs to present some meaningful evidence, not mere assertions, to justify its predictive judgments." *Heller II*, 2011 U.S. App. LEXIS 20130 at *37.

Here, the government has had the benefit of briefing a summary judgment motion with the guidance of *Chester* and *Heller II*, and still, it has come up with zero evidence linking expatriated

18

Americans to arms smuggling, let alone in any special degree that is greater than domestic residents, or in any manner linked to self-defense as opposed to sporting uses of firearms, or in any way that cannot be addressed by export controls and border security.

The justification for Section 922(a)(9) is not merely flimsy. It is entirely absent.

D.      Section 922(b)(3), As Applied to Expatriated Americans, Would Fail Intermediate Scrutiny.

Defendant does a serviceable job laying out Congress's original rationale for enacting Section 922(b)(3)'s prohibition on interstate firearm sales, all the while burying discussion of how that statute has evolved since 1968. Defendant then offers a *different* rationale for applying that provision to expatriated American citizens. And, as with his effort with respect to Section 922(a)(9), Defendant offers no relevant evidence that could meet his heavy burden under intermediate scrutiny, were that the standard.

First, it is important to identify the actual federal interest asserted by Congress in enacting Section 922(b)(3): the alleged federal interest in ensuring that individuals do not circumvent the laws of their own states by purchasing weapons in other states. The provision was aimed at the "serious problem of individuals going across State lines to procure firearms which they could not lawfully obtain or possess in their own State and without the knowledge of their local authorities." Def. Br., at 28 (quoting S. Rep. No. 89-1866, at 19 (1966)).

Yet Plaintiffs are constrained to point out the rationale is overstated, having been largely superceded by the 1986 amendments to Section 922(b)(3), which now allows for interstate sales of rifles and shotguns. The original 1968 theory of Section 922(b)(3) has been retained only for handguns. No reason exists—certainly, Defendant offers none—as to why with respect to rifles and shotguns, 922(b)(3) should apply only to expatriated Americans such as Dearth, and no one else.

19

Perhaps recognizing the essential problem that Dearth does not live in any state whose firearms laws he would be circumventing, Defendant invents a new excuse for applying Section 922(b)(3) to expatriated American citizens:

> as "stateless" individuals not subject to § 922(a)(3) [they could] transport these firearms to any other U.S. State. But it is this specific problem—"the flow of firearms from loose control to tight-control states"—that Congress aimed to redress in enacting the challenged provisions.

Def. Br., at 30-31.

The argument is improper. First, even under intermediate scrutiny, the government's "justification must be genuine, not hypothesized or invented post hoc in response to litigation." *United States* v. *Virginia*, 518 U.S. 515, 533 (1996). There is no evidence that Congress ever considered the application of the challenged provisions to expatriated Americans. Indeed, neither Section 922(a)(3), nor any of the challenged provisions— *nor any federal law*—bar the interstate transportation of firearms into a state where an individual does *not* reside. Indeed, the Firearm Owners Protection Act of 1986, 18 U.S.C. § 926A, guarantees the right of safe passage among the States with firearms.

Every day, Americans freely transport their firearms into states where they do not live—for hunting, for self-defense, and for other purposes. Virtually all states allow non-residents to possess at least some firearms while visiting, to say nothing of the broad array of reciprocity agreements by which states recognize each others' handgun carry permits. As noted *supra*, over half the states would welcome Dearth into their borders while carrying a concealed handgun.

It is irrational to argue that because Dearth might need a special license to possess handguns in a very small handful of U.S. jurisdictions, he should be barred from purchasing all firearms everywhere. This sort of logic could justify a total national handgun ban, as after all, nothing

prevents a lawful handgun purchaser in State A from driving that handgun into State B. This is not the reasonable fit between restriction and purpose required under intermediate scrutiny.

Requiring that a domestic purchaser comply with the laws of her home state might be defensible on the theory that the firearms are primarily used in their owner's state of residence (until the owner exercises her right to relocate to another state and, as millions of Americans do every year, legally packs the firearms on the moving truck along with toaster and sofa bed). But there is no federal interest in barring the interstate transportation of firearms per se, and any law enacted to effect such a policy would constitute a radical departure from the way in which Americans currently exercise the right to keep and bear arms.

Finally, there is, of course, no reasoned conjecture, let alone required *evidence*, linking expatriated Americans to illicit gun trafficking, or to any sort of crime. Stephen Dearth is not a prohibited individual, like some felon, drug addict, or domestic abuser. He simply lives with his family in Manitoba. If expatriated Americans posed any sort of smuggling challenge, a more narrowly tailored response could easily be crafted. And the government could easily demand proof of overseas residence to establish an exclusion from 922(b)(3), just as it might when administering the non-resident voting scheme of 42 U.S.C. § 1973ff.

VII.   THERE IS, IN FACT, A FUNDAMENTAL RIGHT TO TRAVEL, AND DEFENDANT VIOLATES IT.

Defendant's assertion that there is no fundamental right to international travel is overstated. The United States is not North Korea. People can leave. Contrary to Defendant's assertions, neither *Kent* v. *Dulles*, 357 U.S. 116 (1958), nor *Aptheker* v. *Sec'y of State*, 378 U.S. 500 (1964) have been overruled. With all due respect to Prof. Chemerinsky, Def. Br., at 35, federal appellate judges writing long after the intervening Supreme Court decisions cited by Defendant have continued to describe the right of international travel as fundamental.

21

Defendant's reliance on *Hutchins* v. *District of Columbia*, 188 F.3d 531, 537 (D.C. Cir.

1999) (en banc), for the proposition that the right to travel is always subject to rational basis review

is misplaced. First, the quoted language is dictum. *Hutchins* did not relate at all to international

travel. And that particular portion of the Court's opinion commanded only the votes of a plurality.

*See Hutchins*, 188 F.3d at 549 n.1 (Edwards, J., concurring in part); *Hutchins*, 188 F.3d at 553 n.1

(Rogers, J., concurring in part and dissenting in part).

Moreover, in *Hutchins*, writing for herself and for Judges Tatel and Wald, Judge Rogers

offered:

> The Supreme Court's jurisprudence on the right to "move" encompasses several distinct
> concepts. The discrete components include the right to relocate from state to state, the right
> to cross state borders for purposes other than relocation, *the right to cross national borders*,
> and the right to intrastate or localized movement. These rights are "fundamental" under
> established doctrine.

*Hutchins*, 188 F.3d at 560 (Rogers, J., concurring in part and dissenting in part) (footnote citing,

inter alia, *Aptheker*, 378 U.S. at 517 and *Kent*, 357 U.S. at 126).

Would the D.C. Circuit, perhaps in this or some other case, reach the opposite conclusion, it

would place itself in direct conflict with the Fifth Circuit, which held as recently as 1990 that an

American citizen entering the country "was exercising a fundamental Constitutional right."

*Hernandez* v. *Cremer*, 913 F.2d 230, 235 (5th Cir. 1990). "[T]he right of a United States citizen to

enter the country is a right 'which the fundamental law has conferred upon him.'" *Hernandez*, 913

F.2d at 237 (quoting *Worthy* v. *United States*, 328 F.2d 386, 394 (5th Cir. 1964)). "[T]he right of a

citizen to re-enter the United States after lawfully traveling abroad -- is fundamental." *Hernandez*,

913 F.2d at 238.

It bears repeating that the Supreme Court has used very strong fundamental rights language in describing the right of international travel: "Travel abroad, like travel within the country, may be necessary for a livelihood. It may be as close to the heart of the individual as the choice of what he eats, or wears, or reads. Freedom of movement is basic in our scheme of values." *Kent*, 357 U.S. at 126 (citations omitted).

Of course, just because the right to international travel is fundamental does not mean that the government would lose every case in which it is implicated. The cases primarily relied upon by Defendant are hardly incompatible with a fundamental right to international travel. For example, in *Haig* v. *Agee*, 453 U.S. 280 (1981), the Court addressed an international travel right claimed by an ex-CIA agent who practically declared war on the agency, "caus[ing] serious damage to the national security or foreign policy of the United States." *Haig*, 453 U.S. at 282. Obviously, the government's strong interest in national security will justify more restrictions on the right of international travel than a mere interest in regulating interstate commerce. *See also Regan* v. *Wald*, 468 U.S. 222, 242 (1984) (restrictions "justified by weighty concerns of foreign policy") (footnote omitted).

Notably, Justice Blackmun concurred in *Haig*, offering that the Court was "cutting back somewhat upon the opinions in [*Kent*] and [*Zemel* v. *Rusk,* 381 U.S. 1 (1965)] sub silentio," only "aspects" of which he would have preferred been "disavow[ed] forthrightly." *Haig*, 453 U.S. at 310 (Blackmun, J., concurring). That the majority did not join this observation is telling.

Defendant's reliance on *Califano* v. *Aznavorian*, 439 U.S 170 (1978), is likewise misplaced. In *Califano*, the Supreme Court held that the law there at issue did not have a "direct . . . impact on the freedom to travel internationally . . . It does not limit the right to travel on grounds that may be in tension with the First Amendment. It merely withdraws a governmental benefit

23

during and shortly after an extended absence from this country." *Id.*, at 177. In other words, the impact of the law at issue was slight, justifying a lesser standard of review.

Here, there are no weighty concerns of foreign policy. There is no rogue CIA turncoat endangering the lives of other agents and the national security of the United States. But there is a fairly direct and severe impact upon the right of international travel, one justified by a generalized commerce clause interest, and not too well at that. Indeed, even under a rational basis regime, it is hard to see how the challenged provisions could survive. There is no need to repeat what has been said before: it simply makes no sense to suppose that the acquisition of firearms for self-defense by law-abiding citizens causes any sort of harm, merely because those citizens reside overseas.

Apart from arguing that there is no fundamental right to travel, and that the challenged provisions do not violate the Second Amendment, Defendant's response to the argument under the unconstitutional conditions doctrine is that the doctrine "does not give rise to an independent constitutional claim." Def. Br., at 39. That much is true. The Complaint contains no such independent claim.

VIII.   DEFENDANT VIOLATES THE RIGHT OF EQUAL PROTECTION.

Defendant asserts that the equal protection claims cannot be asserted because other enumerated rights (the Second Amendment and, presumably, the international travel right as "enumerated" by the Due Process Clause) are already present. But since the Defendant also argues that the Complaint does not actually implicate the Second Amendment or a right to international travel, the argument that the existence of these claims bars the equal protection theory appears precluded. This is why plaintiffs generally argue claims under all available constitutional provisions.

In any event, for the same reasons discussed at length here and in the original moving papers, the challenged provisions would not survive equal protection review.

24

CONCLUSION

The challenged provisions are plainly unconstitutional. Defendant's motion must be denied.

Dated: December 30, 2011                    Respectfully submitted,

                                            Alan Gura
                                            Gura & Possessky, PLLC
                                            101 N. Columbus Street, Suite 405
                                            Alexandria, VA 22314
                                            703.835.9085/Fax 703.997.7665

                                    By:     /s/Alan Gura
                                            Alan Gura

                                            Attorney for Plaintiffs

:

.

25