# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| STEPHEN DEARTH and SECOND AMENDMENT FOUNDATION, INC., | Case No. 09-cv-0587-RLW |
| **Plaintiffs,** | |
| vs. | |
| ERIC H. HOLDER, Jr., Attorney General of the United States, | |
| **Defendant.** | |

## DEFENDANT'S REPLY BRIEF IN SUPPORT OF HIS MOTION FOR JUDGMENT ON THE PLEADINGS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

## <u>TABLE OF CONTENTS</u>

I.  JUDICIAL ESTOPPEL DOES NOT BAR DEFENDANT FROM ASSERTING
    THAT THE COURT SHOULD RESOLVE THE STATUTORY ISSUE OF
    WHETHER STATE LAW INDEPENDENTLY BARS PLAINTIFF DEARTH'S
    PURCHASE OF A FIREARM. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II. THE COURT SHOULD ENTER SUMMARY JUDGMENT FOR DEFENDANT
    ON PLAINTIFFS' SECOND AMENDMENT CLAIM. . . . . . . . . . . . . . . . . . . . . . . . 4

    A.  The State Residency Requirements Are Presumed Not to Burden Conduct
        Within the Scope of the Second Amendment. . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        1.  Because Laws Conditioning the Purchase or Possession of Firearms
            on Residence in a U.S. State Are Longstanding in American Law, the
            State Residency Requirements Are Presumptively Lawful. . . . . . . . . . . . 5

        2.  Plaintiffs Have Failed to Rebut the Presumption of Legality
            Accorded to the State Residency Requirements. . . . . . . . . . . . . . . . . . . . . 8

    B.  In Any Event, the State Residency Requirements Are Constitutional
        Because They Relate Substantially to the Compelling Government
        Interest in Combating Violent Crime and Protecting Public Safety. . . . . . . . . . 15

        1.  If the Court Were to Determine that the State Residency
            Requirements Impinge on a Right Protected by the Second
            Amendment, It Should Apply No More Than Intermediate Scrutiny. . . . . 15

        2.  The State Residency Requirements Satisfy Intermediate Scrutiny. . . . . . 18

            a.  18 U.S.C. § 922(a)(9) Relates Substantially to the
                Compelling Government Interest in Combating Violent
                Crime and Protecting Public Safety. . . . . . . . . . . . . . . . . . . . . . . . 18

            b.  18 U.S.C. § 922(b)(3) Also Substantially Relates to the
                Compelling Government Interest in Protecting Public Safety
                and Combating Violent Crime. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

III. THE CHALLENGED PROVISIONS DO NOT IMPINGE ON PLAINTIFFS'
     FREEDOM TO TRAVEL INTERNATIONALLY.. . . . . . . . . . . . . . . . . . . . . . . . . . . 30

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

During a seven-year investigation of violent crime, Congress heard testimony about the ease and frequency with which individuals evaded State firearms regulations simply by crossing State lines to buy firearms that they later used in criminal activities.  To further its compelling interest in combating violent crime, and to supplement the States' ability to enforce their own firearms regulations, Congress in 1968 prohibited federally-licensed firearms dealers from selling firearms to individuals who did not reside in the same State in which the dealer conducted business.  Later, Congress became aware of a law enforcement problem posed by nonresident aliens acquiring firearms from licensed dealers through an intermediary, and then smuggling the weapons out of the country.  These aliens could obtain firearms from unlicensed persons by making false statements about their residence, and faced no legal penalty because federal law did not prohibit the making of false statements to non-licensed persons in connection with firearms purchases.  Congress in 1991 responded by prohibiting the receipt of firearms by individuals without a residence in the United States.  These two laws (collectively, "the State residency requirements") are codified at 18 U.S.C. §§ 922(b)(3) and (a)(9).

Plaintiff Stephen Dearth is a U.S. citizen who resides in Canada and has chosen not to maintain any residence in any U.S. State.  He alleges that he seeks to buy firearms in the United States without having federal law apply equally to him.  Despite the existence of longstanding laws restricting the sale or possession of firearms to residents of a U.S. State, Plaintiff Dearth contends that, as applied to him, the State residency requirements violate the Constitution.  But as explained in Defendant's opening brief, this contention has no merit.

As a preliminary matter, the Court should observe the constitutional-avoidance principle and decline to rule on Plaintiffs' constitutional claims until it has decided the threshold issue of whether State law would independently prohibit Plaintiff Dearth from buying firearms.  In any

event, as explained in Defendant's opening brief, Plaintiffs' constitutional challenges to the State

residency requirements lack any merit.  First, Plaintiffs' Second Amendment challenge fails

because the State residency requirements are part of a longstanding regulatory regime and

therefore receive a presumption of legality, and Plaintiffs have failed to rebut that presumption by

showing any substantial burden on Plaintiffs' constitutional rights.  Second, even assuming that

the challenged statutes were not presumptively lawful, they are constitutional because they

substantially relate to the important government interest in combating violent crime and

preserving public safety.  Third, the State residency requirements do not burden Plaintiffs' Fifth

Amendment liberty interest in international travel without due process of law because they

neither restrict Plaintiff Dearth's ability to travel internationally, nor affect his ability to reside

abroad or to travel to the United States.  Fourth, Plaintiffs' equal protection claim fails because

the challenged laws do not burden a fundamental right, and expatriate U.S. citizens are not

similarly situated with U.S. citizens residing in the United States; in any event, Congress

possessed a rational basis for enacting these laws.  As explained further below, Plaintiffs'

responsive brief does virtually nothing to diminish any of these arguments.  Accordingly, the

Court should enter judgment on the pleadings, or summary judgment, for Defendant.

## I.    JUDICIAL ESTOPPEL DOES NOT BAR DEFENDANT FROM ASSERTING THAT THE COURT SHOULD RESOLVE THE STATUTORY ISSUE OF WHETHER STATE LAW INDEPENDENTLY BARS PLAINTIFF DEARTH'S PURCHASE OF A FIREARM.

The Court is obliged to avoid consideration of constitutional issues unless a case cannot

be decided on other grounds.  See Ashwander v. TVA, 297 U.S. 288, 341-56 (1936).

Defendant's opening brief accordingly noted that the Court should observe the constitutional-

avoidance principle and decline to rule on the constitutionality of the State residency

requirements until it first resolves the issue of whether State law would independently bar

Plaintiff Dearth's purchase of firearms.  Mem. Supp. Def. Mot. for Summ. J. ("Def. Mem.") at

16 n.19 [ECF No. 25].  Plaintiff Dearth himself concedes that "[s]ome states might have such a

law."  Pl. Opp. to Def. Mot. for Summ. J. ["Pl. Opp."] at 5 [ECF No. 28].  However, Plaintiffs

contend that judicial estoppel prevents Defendant from raising this argument because when

Plaintiffs previously brought suit in the Southern District of Ohio, Defendant successfully

dismissed for improper venue.  Id. at 5-6.  Plaintiffs are mistaken.

        In November 2006, Plaintiffs commenced suit in the Southern District of Ohio, based on

Plaintiff Dearth's unsuccessful attempt to purchase a firearm in Minnesota.  Dearth v. Gonzales,

2007 WL 1100426, at *1 (S.D. Ohio April 10, 2007).  Defendant moved to dismiss for improper

venue because Plaintiffs did not allege that any events had occurred in Ohio.  See id. at *1, 4.

Contrary to Plaintiffs' representation, Defendant did not contend as the basis for his motion that

"nothing was actually happening in any state," Pl. Opp. at 5, but that "a substantial part of the

events or omissions giving rise to the claim" had not occurred in Ohio.  Dearth, 2007 WL

1100426, at *4.  The district court agreed that Plaintiffs' selected venue was improper, and that

either the District of Minnesota or the District of Columbia would be a proper forum for

Plaintiffs' suit.  Id.  However, because Plaintiffs "expressly asked for the dismissal of this case if

the [district c]ourt determine[d] that venue in the Southern District of Ohio [was] flawed," the

court "[did] not weigh whether transfer [was] more appropriate than dismissal," but instead

dismissed Plaintiffs' action without prejudice.  Id. at *5.  Plaintiffs then filed the present action in

this Court on March 27, 2009.  See Complaint [ECF No. 1].

In short, Defendant's position is not "clearly inconsistent with its earlier position," as required to invoke judicial estoppel.  New Hampshire v. Maine, 532 U.S. 742, 750 (2005). Consequently, Defendant is not judicially estopped from arguing that the Court should observe the constitutional-avoidance principle in this case, and decline to rule on the constitutionality of the State residency requirements until it resolves the threshold issue of whether State law independently bars Plaintiff Dearth's purchase of firearms.[1]

## II. THE COURT SHOULD ENTER SUMMARY JUDGMENT FOR DEFENDANT ON PLAINTIFFS' SECOND AMENDMENT CLAIM.

Because "there are certain types of firearms regulations that do not govern conduct within the scope of the [Second] Amendment," the D.C. Circuit has adopted a two-step approach to determining the constitutionality of such regulations.  Heller v. Dist. of Columbia ("Heller II"), __ F.3d __, 2011 WL 4551558, at *5 (D.C. Cir. Oct. 4, 2011) (citations omitted).  "We ask first

---

[1] Defendant's opening brief also explained that, to the extent that Plaintiff Second Amendment Foundation's ("SAF") claims are premised on organizational standing on its own behalf, those claims are barred by collateral estoppel.  Def. Mem. at 42-44.  In any event, SAF fails to demonstrate that it has "suffered injury in fact, including such concrete and demonstrable injury to the organization's activities – with a consequent drain on the organization's resources – constituting more than simply a setback to the organization's abstract social interests."  Nat'l Ass'n of Home Builders v. EPA, __ F.3d __, 2011 WL 6118589, at *2 (D.C. Cir. Dec. 9, 2011). SAF states only that "[o]wing to [its] mission, [its] resources are taxed by inquiries into the operation and consequences of federal firearms restrictions based on residence and travel."  Decl. of Julianne Versnel ¶ 5 [ECF No. 23-4].  This bare assertion does not establish organizational standing.  See Nat'l Ass'n of Home Builders, 2011 WL 6118589, at *3 (association lacked organizational standing; "As for the other expenditures claimed [beyond expenses for the present case], [it] has not shown they were for 'operational costs beyond those normally expended' to carry out its advocacy mission.  Nat'l Taxpayers Union[, Inc., 68 F.3d 1428, 1434 (D.C. Cir. 1995)] (association's 'self-serving observation that it has expended resources to educate its members and others regarding [challenged statutory provision] does not present an injury in fact'); id. ('The mere fact that an organization redirects some of its resources to litigation and legal counseling in response to actions or inactions of another party is insufficient to impart standing upon the organization.' (quotation marks omitted))").

whether a particular provision impinges upon a right protected by the Second Amendment; if it does, then we go on to determine whether the provision passes muster under the appropriate level of constitutional scrutiny." Id. (citations omitted).

Here, as demonstrated in Defendants' opening brief, Def. Mem. at 20-22, the State residency requirements do not burden conduct falling within the Second Amendment's guarantee. Because such laws are longstanding in American law, they are presumptively lawful, and Plaintiffs have failed to rebut this presumption. In any event, as explained below, the State residency requirements pass muster under any level of constitutional scrutiny.

    **A.**    **The State Residency Requirements Are Presumed Not to Burden Conduct Within the Scope of the Second Amendment.**

        **1.**    **Because Laws Conditioning the Purchase or Possession of Firearms on Residence in a U.S. State Are Longstanding in American Law, the State Residency Requirements Are Presumptively Lawful.**

"With respect to the first step" of the two-step approach for determining the constitutionality of firearms regulations, "Heller tells us that 'longstanding' regulations are 'presumptively lawful,' that is, they are presumed not to burden conduct within the scope of the Second Amendment." Heller II, 2011 WL 4551558, at *6 (quoting Dist. of Columbia v. Heller, 554 U.S. 570, 626-27 & n.26 (2008)) (citations omitted). In applying this initial step to the firearms-registration provisions at issue, the D.C. Circuit in Heller II surveyed the earliest-enacted firearms-registration laws of seven States and the District of Columbia (enacted between 1881 and 1932), and concluded that "the basic requirement to register a handgun is longstanding in American law, accepted for a century in diverse states and cities and now applicable to more than one fourth of the Nation by population. Therefore, we presume the District's basic

registration requirement. . . does not impinge upon the right protected by the Second

Amendment." Id. at *7 (internal citation omitted).

Because a similar analysis applies here, the same presumption applies to the State

residency requirement.  Between 1909 and 1939, at least thirteen States[2] and the District of

Columbia enacted laws conditioning the purchase or possession of a firearm on obtaining a

license, and a license applicant was required to establish State residency (or residency in a U.S.

State).  See Def. Mem. at 21-22 & Ex. 4.  Plaintiffs present several objections to this evidence,

none of which has merit.

First, Plaintiffs seek to discount the relevance of laws conditioning the possession,

acquisition, or carrying of a firearm on State residency, as opposed to laws conditioning the

*purchase* of firearms on State residency.  Pl. Opp. at 11, 12.[3]  This distinction is trivial in light of

---

[2] In addition to the eleven States and the District of Columbia cited in Defendant's opening brief, see Def. Mem. at 21-22 & Ex. 4, Georgia and Illinois also enacted laws in the early twentieth century limiting the possession or carrying of handguns (or concealed handguns) to State residents.  See Act of Aug. 12, 1910, No. 432, 1910 Ga. Laws 134 ("[I]t shall be unlawful for any person to have or carry about his person, in any county in the State of Georgia, any pistol or revolver without first taking out a license from the Ordinary of the respective counties in which the party resides. . . "); Act of July 11, 1919, § 4, 1919 Ill. Laws 431, 432 ("It shall be unlawful for any person to carry concealed upon his person, any pistol, revolver, or other firearm, without a written license therefor . . . It shall be the duty of chief police officers in cities, and of justices of the peace and police magistrates elsewhere in the State. . . to issue a license to any citizen of the State of Illinois to carry concealed a pistol or revolver.").

[3] Contrary to Plaintiffs' characterization, the early State laws do not uniformly regulate only the "carrying of handguns in public."  Pl. Opp. at 11.  While some States chose to regulate only public carrying (by permitting owners to possess and carry an unlicensed firearm in his or her home or place of business), other States phrased their statutes broadly to cover both possession and public carrying.  See Act of Aug. 12, 1910, No. 432, 1910 Ga. Laws 134 ("[I]t shall be unlawful for any person to *have or carry about his person*, in any county in the State of Georgia, any pistol or revolver without first taking out a license. . . "); Act of July 11, 1919, § 4, 1919 Ill. Laws 431, 432 ("It shall be unlawful for any person to *carry concealed upon his person*, any pistol, revolver, or other firearm, without a written license therefor. . ."); Act of Feb. 25,

their fundamental resemblance: like the challenged laws, these early State laws regulated

firearms ownership on the basis of whether an individual resided in the State in which the firearm

was purchased, possessed, or carried (or in any U.S. State).

Second, while Plaintiffs contend that State residency requirements are not longstanding

because the challenged laws here were enacted in 1968 and 1994, Pl. Opp. at 10, that is not the

relevant inquiry.[4]   The provisions challenged in Heller II were enacted in 1975 and 2008,

---

1939, ch. 14, 1939 Me. Acts 53 ("No person shall in a threatening manner display, *or shall wear under his clothes*, or *conceal about his person* any firearm . . . or other dangerous or deadly weapon unless first licensed. . ."); Act of May 21, 1913, ch. 608, § 1, 1913 N.Y. Laws 1627, 1628 ("Any person . . .  who shall *have in his possession* in any city, village or town of this state, any . . . firearm of a size which may be concealed upon the person, without a written license therefor. . . shall be guilty of a misdemeanor.") (emphasis added).

[4] Plaintiffs' observation that some of the early State residency requirements are not in effect in 2012, Pl. Opp. at 10 n.2, is similarly misplaced.  The D.C. Circuit concluded that the registration requirements were "longstanding in American law" because they had been "accepted for a century in diverse states and cities and [were] now applicable to more than one fourth of the Nation by population," noting that "[t]oday seven states require registration of some or all firearms."  Heller II, 2011 WL 4551558, at *7 & n. *.  The State residency requirements are similarly longstanding.   The laws of twelve States and the District of Columbia continued to require State residency (or residency in a U.S. State) until at least 1968, when federal law established a nationwide State residency requirement.  See D.C. Code Ann. § 22-3206 (1967); Pickett v. State, 179 S.E.2d 303, 304 (Ga. App. 1970) (citing 1970 text of Ga. Code. Ann. § 26-2903); Burns' Ind. Stat. Ann. § 10-4738(1) (1972 Supp.); Schwanda v. Bonney, 418 A.2d 163, 164 (Me. 1980) (quoting 1980 text of 25 Me. Rev. Stat. Ann. § 2031); MacNutt v. Police Comm'r of Boston, 572 N.E.2d 577, 579 (Mass. App. Ct. 1991) (quoting 1972 text of Mass. Gen. Laws ch. 140, § 131); Act of July 1, 1968, 1968 Mich. Acts 511, 512; Act of June 18, 1967, 1967 Mo. Laws 675; Mont. Crim. Code §§ 94-8-210(1), 94-8-214(4) (1973); State v. Sima, 361 A.2d 58, 60 (N.J. Super. Ct. App. Div. 1976) (quoting 1976 text of N.J. Stat. Ann. § 2A:151-44); N.Y. Penal Law § 265.05(5) (1968); N.C. Gen. Stat. §§ 14-402, 14-403 (1999); Act of May 21, 1975, 1975 R.I. Pub. Laws 738, 741, 744-45; West Virginia Judicial Inquiry Comm'n v. Dostert, 271 S.E.2d 427, 430 n.5 (W. Va. 1980) (quoting 1980 text of W. Va. Code § 61-7-2).  Although in 1925, Illinois repealed its State residency requirement for obtaining a license to carry a concealed firearm, it only did so in the course of repealing its licensing statute altogether, revoking all concealed-weapons licenses, and banning (with limited exceptions) all concealed carrying of firearms.  See Act of July 3, 1925, §§ 4, 9, 1925 Ill. Laws 339, 340-41.

respectively, see 2011 WL 4551558, at *1, but the D.C. Circuit nonetheless concluded that the challenged laws constituted the same type of firearms regulation that had existed since the early twentieth century and were therefore longstanding.  See id. at *6-7.  The same is true here.

Third, Plaintiffs incorrectly contend that all of the early State residency requirements only applied to handguns, not long guns.  Pl. Opp. at 12.  The early laws of Maine and New Jersey were not so limited.[5]  Contrary to Plaintiffs' suggestion, State laws restricting the possession or purchase of firearms, including long guns, are longstanding in American law, not "novel."

In sum, historical evidence establishes that the basic requirement of residence in a U.S. State as a qualification for the purchase or possession of firearms is longstanding in American law.  The State residency requirements are thus accorded a presumption that they do not impinge on the rights protected by the Second Amendment.

> **2.      Plaintiffs Have Failed to Rebut the Presumption of Legality Accorded to the State Residency Requirements.**

Although a plaintiff may rebut the presumption of legality accorded a longstanding firearms regulation by showing that it has "more than a de minimis effect" on the right protected by the Second Amendment, Heller II, 2011 WL 4551558, at *6, Plaintiffs have failed to make any such demonstration here.  Plaintiffs are incorrect in assuming that "every law which makes a right more difficult to exercise is, ipso facto, an infringement of that right."  Planned Parenthood

---

[5] See Act of Feb. 25, 1939, ch. 14, 1939 Me. Acts 53 ("No person shall in a threatening manner *display*, or shall wear under his clothes, or conceal about his person *any firearm*, slung-shot, knuckles, bowie knife, dirk, stiletto, *or other dangerous or deadly weapon* unless first licensed to do so as herein provided."); Act of March 11, 1924, ch. 137, § 2, 1924 N.J. Acts 305 ("Any person desirous of obtaining a permit to carry a revolver, pistol *or other firearm*, pursuant to the provisions of the act, shall in the first instance, make application therefor to the chief of police of the municipality in which the applicant resides.") (emphasis added).

of Se. Pennsylvania v. Casey, 505 U.S. 833, 873 (1992); see also Eugene Volokh, Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda, 56 UCLA L. Rev. 1443, 1454 (2009) ("A restriction may also be justified on the grounds that it imposes a less than substantial burden on a right, and therefore doesn't unconstitutionally 'infringe[]' the right even though it regulates the right's exercise.").

In Heller, the Supreme Court cautioned that "nothing in [this] opinion should be taken to cast doubt on . . . laws imposing conditions and qualifications on the commercial sale of arms," 554 U.S. at 626-27, and Plaintiffs acknowledge that "[t]o be sure, the government may regulate the acquisition of arms." Mem. Supp. Pl. Mot. for Summ. J. at 8 [ECF No. 23-1]; see also Jennings v. ATF, No. 5:10-CV-140-C (N.D. Tex. Sept. 29, 2011), slip op. at 13 ("Outside the list of examples of presumptively lawful limitations, neither Heller nor its companion case, McDonald v. City of Chicago, 130 S. Ct. 3020 (2010), directly addresses the buying and selling of firearms, let alone holds this to be at the 'core' of the Second Amendment right.") (attached as Ex. 1), *appeal docketed*.  "[T]o uphold the constitutionality of a law imposing a condition on the commercial sale of firearms," therefore, "a court necessarily must examine the nature and extent of the imposed condition."  United States v. Marzzarella, 614 F.3d 85, 92 n.8 (3d Cir. 2010).

Thus, Plaintiffs' contention that for purposes of evaluating their Second Amendment claim, the existence of alternative means for Plaintiff Dearth to obtain firearms is "irrelevant," see Pl. Opp. at 6-10, is simply incorrect.[6]  When deciding whether a regulation of the sale of

---

[6] Plaintiffs also mischaracterize the relevant issue by contending that Defendant is "telling" Plaintiff Dearth that he "should exercise [his] constitutional rights somewhere else."  Pl. Opp. at 7.  Rather, having established that the State residency requirements are accorded a presumption of legality, Defendant is insisting that in order to rebut that presumption, Plaintiff Dearth must demonstrate that the requirement has "more than a de minimis effect upon" his

firearms substantially burdens a plaintiff's Second Amendment rights, a reviewing court should

ask whether the regulation affords the plaintiff reasonable alternative means for obtaining

firearms sufficient for self-defense purposes.  See United States v. Marzzarella, 595 F. Supp. 2d

596, 606 (W.D. Pa. 2009) (finding that even assuming *arguendo* that First Amendment law

"provides a suitable framework for determining the validity of" a ban on guns with obliterated

serial numbers, "a more appropriate standard of review would be the standard applicable to

content-neutral time, place and manner restrictions," and upholding the ban partly because it

"leaves open ample opportunity for law-abiding citizens to own and possess guns"), *aff'd*, 614

F.3d 85 (3d Cir. 2010).  Examining the existence of available means is necessary to determine

whether the challenged laws have only a de minimis effect on a plaintiff's Second Amendment

right, or, alternatively, substantially affect his or her right.

      As explained in Defendant's opening brief, Plaintiff Dearth has reasonable means

available to him to obtain firearms sufficient for self-defense purposes.  Def. Mem. at 6-7, 33.

He legally owns firearms in Canada, where he resides, and may transport them into the United

States during visits – without needing to obtain an import license – if they are useful for

legitimate hunting and sporting purposes.  He may also purchase additional handguns or long

guns in Canada and transport them into the United States without an import license if they are

---

Second Amendment right.  Heller II, 2011 WL 4551558, at *6.  Any such demonstration turns on
the existence of reasonable alternative means available to him for exercising that right.
      In this context, Plaintiffs' reliance on Ezell v. City of Chicago, 651 F.3d 684 (7th Cir. 2011),
is misplaced.  Ezell explained that the "occasional expense and inconvenience of having to travel
to a firing range in the suburbs" was "not the relevant constitutional harm."  651 F.3d at 698.
Rather, the alleged harm stemmed from an unusual regulatory combination: the City of Chicago
mandated range training as a prerequisite to lawful possession of *any* firearms, but
simultaneously banned all firing ranges in the City.  Id. at 698, 689-90.

useful for lawful sporting purposes.  Had he purchased firearms in the United States before moving to Canada, he could use those firearms while visiting the United States.  Because he does not appear to be otherwise barred by law from possessing or using firearms, see Pl. Statement of Undisputed Material Facts ¶ 3 [ECF No. 23-2], while visiting the United States, he may lawfully possess a firearm owned by another person (such as the "many friends and relatives whom he enjoys visiting" in the United States, Compl. ¶ 10) to use for lawful sporting purposes.  He may also borrow or rent a firearm from a licensed dealer for such purposes.  (Firearms useful for lawful sporting purposes may also be used for self-defense.)  Finally, he may choose to establish residency in a particular State, and may purchase firearms for any purpose in that State.

In sum, because Plaintiff Dearth has reasonable means available to him for obtaining firearms sufficient for self-defense purposes, he fails to demonstrate that the challenged laws substantially burden his constitutional rights.  See Casey, 505 U.S. at 873 ("As our jurisprudence relating to all liberties save perhaps abortion has recognized, not every law which makes a right more difficult to exercise is, ipso facto, an infringement of that right."); Peruta v. Cty. of San Diego, 758 F. Supp. 2d 1106, 1114-15 (S.D. Cal. 2010) ("[T]o the extent that [laws regulating concealed firearms] and Defendant's policy burden conduct falling within the scope of the Second Amendment, if at all, the burden is mitigated by [other provisions] that expressly permit loaded open carry for immediate self-defense."), appeal docketed; Kachalsky v. Cacace, __ F. Supp. 2d __, 2011 WL 3962550, at *29 (S.D.N.Y. Sept. 2, 2011) (upholding provision of concealed-license statute requiring proper cause to obtain a concealed-weapons license in part because "[t]he other provisions of [the statute] create alternative means by which applicants may

-11-

secure permits"), *appeal docketed.*[7]

In arguing otherwise, Plaintiffs severely overread prior decisions by contending that "the D.C. Circuit and the Supreme Court have both rejected the notion that in a Second Amendment case, the availability of some arms negates a claim to other arms." Pl. Opp. at 8. Neither Heller nor Parker v. Dist. of Columbia, 478 F.3d 370 (D.C. Cir. 2007), stand for such a broad principle. The relevant issue in both cases was whether a District law could ban the *possession* of *all* handguns by all law-abiding individuals in the District. Parker rejected as "frivolous" the notion that a total ban on handgun possession "does not implicate the Second Amendment because it does not threaten total disarmament." 478 F.3d at 400. Similarly, the Supreme Court explained that it was "no answer to say . . . that it is permissible to *ban the possession* of handguns so long as the possession of other firearms (i.e., long guns) is allowed. . . . Whatever the reason, handguns are the most popular weapon chosen by Americans for self-defense in the home, and a *complete prohibition* of their use is invalid." 554 U.S. at 630 (emphasis added). Additionally, the D.C. Circuit has made clear that "prohibiting certain arms might not meaningfully affect

---

[7] Rulings in another constitutional context are also instructive here. While there is a constitutional right to travel *within* the United States, there is no constitutional right to travel by a particular mode of transportation, such as by airplane, even if it might be the most convenient method. See Town of Southold v. Town of E. Hampton, 477 F.3d 38, 54 (2d Cir. 2007) ("[T]ravelers do not have a constitutional right to the most convenient form of travel."); Gilmore v. Gonzales, 435 F.3d 1125, 1136-37 (9th Cir. 2006) (there is no right to air travel even if it is the most convenient means); City of Houston v. FAA, 679 F.2d 1184, 1198 (5th Cir. 1982) (rejecting claim of violation of passengers' constitutional right to travel: "At most, their argument reduces to the feeble claim that passengers have a constitutional right to the most convenient form of travel."). Similarly, Plaintiff Dearth cannot legitimately claim that the right to keep and bear arms dictates that he be afforded access to a particular method of purchasing firearms he happens to prefer (purchase from a U.S. dealer) rather than an alternative method (transporting into the United States firearms he purchases abroad), even if the former method may be viewed as a more convenient method for purchase.

individual self-defense," and thus would not "impinge on the right protected by the Second

Amendment." Heller II, 2011 WL 4551558, at *12 (internal citation and punctuation omitted);

see also id. at *14-16 (upholding ban on certain semi-automatic rifles and magazines holding

more than ten rounds because it does not "prevent a person from keeping a suitable and

commonly used weapon for protection in the home or for hunting, whether a handgun or a non-

automatic long gun").  In any event, the challenged provisions do not ban the possession of either

handguns or long guns; rather, they "impos[e] a condition[] and qualification[] on the

commercial sale of arms," and Heller expressly stated that "nothing in [this] opinion should be

taken to cast doubt on" such laws.  554 U.S. at 626-27.  And neither Heller nor Parker stated that

in evaluating the constitutionality of a law imposing a condition on the commercial sale of arms

(such as State residency), a reviewing court should ignore whether the law provides the plaintiff

with reasonable alternative means for obtaining firearms sufficient for self-defense purposes.[8]

Finally, the sole "evidence" presented to rebut the presumption of legality attaching to the

challenged laws is a conclusory legal allegation in Plaintiff Dearth's affidavit: "The enforcement

of the federal restrictions on firearms acquisition by expatriated Americans is presently

interfering with my efforts to acquire firearms for self-defense."  Decl. of Stephen Dearth ¶ 7

[ECF No. 23-3].  Because this is an unsupported legal conclusion, rather than factual evidence, it

is not entitled to any evidentiary weight.  See Fed. R. Civ. P. 56(c)(4) (affidavits in opposition to

---

[8] Additionally, that Canada's firearms laws are not identical to the laws of the United States, Pl. Opp. at 9-10, is irrelevant, because Plaintiff Dearth does not contend that under Canadian law, he is unable to obtain firearms sufficient for self-defense purposes.  Moreover, any assertion about the challenged laws' purported effect on "former plaintiff Maxwell Hodgkins," Pl. Opp. at 10, is irrelevant because Mr. Hodgkins has moved to the United States and thus lacks standing to challenge the laws at issue.  See Def. Mem. at 15.

or supporting summary judgment must "set out facts that would be admissible in evidence"). Plaintiffs' closing brief also includes two generalized legal conclusions that, in addition to being incorrect, fail to constitute sufficient evidence to rebut the challenged laws' presumption of legality.  Plaintiffs assert broadly that the challenged laws "*forbid*[] expatriated Americans from acquiring all firearms for the core Second Amendment purpose of self-defense" and "*forbid*[] expatriated Americans from purchasing *all firearms* from licensed gun dealers."  Pl. Opp. at 13. Neither assertion is accurate.  Expatriated Americans who maintain a residence in the United States may purchase firearms from a dealer in their State of residence when they visit the United States.  U.S. citizens who have abandoned U.S. residency may rent or borrow handguns or long guns from a federally-licensed dealer while in the United States for lawful sporting purposes and also use such firearms for the purpose of self-defense; they may also lawfully possess firearms owned by another person to use for lawful sporting purposes while visiting the United States, and also use such arms for self-defense.  They may also acquire any firearms they wish, as authorized by the laws of the nation in which they have chosen to reside.  And as explained above, see supra n.7, Plaintiffs cannot legitimately claim that the Constitution mandates that Plaintiff Dearth must have access to a particular method of firearms purchase he happens to prefer, even if that method might be viewed as a more convenient method of purchase.  Moreover, generalized assertions about the laws' purported effect on "expatriated Americans" do nothing to show that *Plaintiff Dearth* cannot obtain firearms sufficient for self-defense purposes (which, as explained above, he has failed to demonstrate).

In sum, Plaintiffs have failed to rebut the presumption of legality accorded to the State residency requirements by demonstrating that they substantially burden Plaintiff Dearth's Second Amendment rights.

**B.     In Any Event, the State Residency Requirements Are Constitutional Because They Relate Substantially to the Compelling Government Interest in Combating Violent Crime and Protecting Public Safety.**

Because Plaintiffs have failed to rebut the presumption that the State residency requirements are lawful, the Court's inquiry may end here.  However, in the event that a "standard of scrutiny" analysis is necessary here, the State residency requirements satisfy the second step of the D.C. Circuit's two-step approach because they relate substantially to the compelling government interest in protecting public safety and combating violent crime.

**1.     If the Court Were to Determine that the State Residency Requirements Impinge on a Right Protected by the Second Amendment, It Should Apply No More Than Intermediate Scrutiny.**

If a reviewing court concludes that "a particular provision impinges upon a right protected by the Second Amendment," it proceeds to "determine whether the provision passes muster under the appropriate level of constitutional scrutiny."  Heller II, 2011 WL 4551558, at *5.  As explained in Defendants' opening brief, the D.C. Circuit, like other Courts of Appeals, applies an intermediate standard of review to Second Amendment challenges.  See Def. Mem. at 23 (citing cases).  Therefore, if the Court deems it necessary to conduct an independent means-end analysis of the State residency requirement, it should adopt the reasoning of these courts, and apply no more than intermediate scrutiny.

In urging this Court to apply strict scrutiny to the State residency requirements, Plaintiffs overlook the fact that "laws imposing conditions and qualifications on the commercial sale of arms" are "presumptively lawful regulatory measures," Heller, 554 U.S. at 626-27 & n.26; McDonald, 130 S. Ct. at 3047.  Strict scrutiny contemplates that a law is "presumptively invalid."  See, e.g., Ysursa v. Pocatello Educ. Ass'n, 555 U.S. 353, 358 (2009) ("Restrictions on

speech based on its content are 'presumptively invalid' and subject to strict scrutiny."); see also Heller, 554 U.S. at 688 (Breyer, J., dissenting) ("[T]he majority implicitly . . . rejects [a "strict scrutiny" test] by broadly approving a set of laws [including] governmental regulation of commercial firearm sales . . . whose constitutionality under a strict scrutiny standard would be far from clear.").  Nor have Plaintiffs provided any cogent reason why the firearms regulations at issue should be subjected to a more stringent standard of constitutional scrutiny than that applied by most other courts reviewing such provisions, including the D.C. Circuit.

Rather, Plaintiffs' threefold argument (Pl. Opp. at 14-15) is mistaken at every step.  First, even if the Second Amendment could be understood as extending some limited protection to the purchase or acquisition of firearms – an assertion that Plaintiffs fail to support with any citation to any federal decision – that protection falls outside the core of the Second Amendment.  See Jennings, slip op. at 13 ("Outside the list of examples of presumptively lawful limitations, neither Heller nor [McDonald] directly addresses the buying and selling of firearms, let alone holds this to be at the 'core' of the Second Amendment right.").  Any contrary conclusion cannot be reconciled with the Supreme Court's statement that "nothing in [Heller] should be taken to cast doubt on . . . laws imposing conditions and qualifications on the commercial sale of firearms," which are "presumptively lawful."  Heller, 554 U.S. at 626-27 & n.26.[9]  Notably, the law held

_____

[9] Although 18 U.S.C. § 922(a)(9) targets the receipt of firearms in addition to their commercial purchase, intermediate scrutiny remains the appropriate analysis because any alleged burden on Plaintiff Dearth falls at least one level outside the core right recognized in Heller.  See Osterweil v. Bartlett, __ F. Supp. 2d __, 2011 WL 1983340, at *10 (N.D.N.Y. May 20, 2011) (intermediate scrutiny was the appropriate level of scrutiny for Second Amendment challenge to state licensing law as applied to out-of-State residents because, inter alia, "the burden imposed by this law falls at least one level outside the core right recognized in Heller, i.e., the right of a law abiding individual to keep and carry a firearm for the purpose of self defense in the home. Although plaintiff still owns a house in New York, which he uses for vacation purposes, that

-16-

unconstitutional in <u>Heller</u> was a ban on handgun *possession*, not a law regulating the purchase or acquisition of firearms. <u>See</u> <u>id.</u> at 635 ("[W]e hold that the District's ban on handgun possession in the home violates the Second Amendment, as does its prohibition against rendering any lawful firearm in the home operable for the purpose of immediate self-defense.").

Second, Plaintiffs incorrectly contend that as to Plaintiff Dearth, the State residency requirements bar the purchase or acquisition of protected arms and therefore also constitute a ban on possession. Pl. Opp. at 15. As explained above, <u>see</u> <u>supra</u> II.A.2, both contentions are incorrect. Plaintiff Dearth may purchase or otherwise acquire firearms sufficient to use for self-defense purposes in his nation of residence and transport them to the United States during visits. He may therefore possess those arms, both in his nation of residence and when he visits the United States. Moreover, Plaintiffs' argument is fundamentally at odds with <u>Heller II</u>. Having concluded that certain semi-automatic rifles warranted protection under the Second Amendment, the D.C. Circuit explained that "intermediate rather than strict scrutiny is the appropriate standard of review" because "[u]nlike the law held unconstitutional in <u>Heller</u>, the laws at issue here do not prohibit the *possession* of 'the quintessential self-defense weapon,' to wit, the handgun. Nor does the ban on keeping certain semi-automatic rifles prevent a person from *keeping* a suitable and commonly used weapon for protection in the home or for hunting, whether a handgun or a non-automatic long gun." <u>Heller II</u>, 2011 WL 4551558, at *14 (quoting <u>Heller</u>, 554 U.S. at 629) (emphasis added).

So too here. The State residency requirements do not prevent Plaintiff Dearth from

---

house is no longer his 'home.'") (emphasis added), *appeal docketed*. Moreover, Plaintiff Dearth alleges only that he seeks to "*purchase* firearms within the United States." Compl. ¶ 11 (emphasis added).

keeping a suitable and commonly used weapon for protection, whether a handgun or long gun.

He may possess both handguns and long guns useful for sporting purposes in the United States

by transporting those firearms into the United States.[10]  Thus, if the Court deems it necessary to

apply a constitutional means-end analysis, intermediate scrutiny is the appropriate standard.

    **2.**       **The State Residency Requirements Satisfy Intermediate Scrutiny.**

        **a.**       **18 U.S.C. § 922(a)(9) Relates Substantially to the Compelling Government Interest in Combating Violent Crime and Protecting Public Safety.**

As explained in Defendant's opening brief, Congress enacted 18 U.S.C. § 922(a)(9) in

response to the law enforcement problem posed by nonresident aliens obtaining firearms in the

United States from licensed firearms dealers using an intermediary, to whom they could make

false statements about their residence with no criminal penalty.  Def. Mem. at 12-13.  To prevent

such acquisition (which often preceded smuggling of the weapons out of the country), Congress

generally prohibited the receipt of firearms by any person who does not reside in any State.  Id.

Although Plaintiffs question whether Defendant has offered sufficient support that

Section 922(a)(9) advances the goals of protecting public safety and combating violent crime, Pl.

Opp. at 17, available evidence since its enactment has underscored Congress's concerns about

aliens obtaining firearms in the United States before smuggling these weapons abroad.  Between

2002 and 2011, the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") referred for

prosecution at least 207 cases involving aliens present in the United States in which two or more

firearms were believed to have been trafficked.  Declaration of Christopher A. Pellettiere ¶¶ 2-3

---

[10] In addition to rifles and shotguns, a number of handguns are useful for lawful sporting purposes.  Def. Mem. at 24 & n.25.

(attached as Ex. 2).  The 207 identified cases involved approximately 3,887 firearms believed to have been trafficked.  Id. ¶ 3.

Moreover, Mexican drug trafficking organizations represent a significant organized crime threat to the United States.  See U.S. Department of Justice, National Drug Intelligence Center, National Drug Threat Assessment (2011), at 1-3.[11]  Based on the number of firearms seized in Mexico and successfully traced by ATF to non-licensed purchasers, the U.S. Government Accountability Office has concluded that "a large proportion of the firearms fueling Mexican drug violence originated in the United States."  U.S. Government Accountability Office, Firearms Trafficking: U.S. Efforts to Combat Arms Trafficking to Mexico Face Planning and Coordination Challenges (June 2009) ("Firearms Trafficking") at 3.[12]  According to the Congressional Research Service ("CRS"), "[t]he Mexican government estimates that 2,000 firearms are smuggled across the Southwest border daily."  Vivian S. Chu & William J. Krouse, Gun Trafficking and the Southwest Border (Sept. 21, 2009), at 2.[13]  During fiscal year 2008, U.S. Immigrations and Customs Enforcement ("ICE") "initiated 103 cases involving Mexico-related weapons smuggling" and ATF "referred 73 cases involving arms trafficking to Mexico for

---

[11] *Available at* http://www.justice.gov/ndic/pubs44/44849/44849p.pdf.

[12] According to eTrace reports from ATF, over 20,000 firearms seized by Mexican authorities and traced from fiscal year 2004 to fiscal year 2008 originated in the United States. Firearms Trafficking at 15.  "While the eTrace data only represents data from gun trace requests submitted from seizures in Mexico and not all the guns seized, it is currently the only systematic data available, and the conclusions from its use that the majority of firearms seized and traced originated in the United States were consistent with conclusions reached by U.S. and Mexican government and law enforcement officials involved personally in combating arms trafficking to Mexico."  Id. at 16.

[13] *Available at* fpc.state.gov/documents/organization/128845.pdf.

prosecution" by U.S. Attorneys Offices.  <u>Firearms Trafficking</u> at 43-44.  In 2009, ICE provided a

detailed explanation of the target of one of its weapons smuggling investigations, Ernesto Tornel

Olvera-Garza of Monterrey, Mexico:

> During the course of the investigation, agents learned that between 2006 and the time of
> his arrest in October 2007, he trafficked in high-powered, high-capacity handguns and
> assault rifles.  Since his temporary visa did not allow him to legally buy guns in the
> United States, Mr. Olvera-Garza instead paid people in the United States to buy guns for
> him and lied about who the guns were for.  Mr. Olvera-Garza organized and led the gun-
> smuggling conspiracy, which included at least nine "straw purchasers" who purchased
> firearms on his behalf.  More than 50 weapons were purchased and smuggled to Mexico
> as part of this ring.  One of Mr. Olvera-Garza's smuggled pistols was recovered in
> Mexico after it was used in a running gun battle where two Mexican soldiers were killed.
> Mr. Olvera-Garza has pleaded guilty and is pending sentencing.

<u>Escalating Violence in Mexico and the Southwest Border as a Result of the Illicit Drug Trade:</u>

<u>Hearings Before the Subcomm. on Crime, Terrorism, and Homeland Security of the House</u>

<u>Comm. on the Judiciary</u>, 111th Cong. 44 (2009) (testimony of Janice Ayala, Deputy Assistant

Director, Office of Investigations, U.S. Immigration and Customs Enforcement).[14]  ICE reported

that an operation begun in 2008 to combat weapons smuggling had "seized 1,440 weapons,

122,410 rounds of ammunition and arrested 329 individuals on criminal charges, resulting in 94

criminal indictments and 51 convictions to date."  <u>Id.</u>  Additionally, CRS has noted that "the

cross-border flow of illegal firearms has also been an issue for Canada, because Canadian gun

laws are also generally much stricter than U.S. gun laws."  Chu & Krouse, <u>Gun Trafficking and</u>

<u>the Southwest Border</u>, at 3.

Additionally, the "fit" between this goal and Section 922(a)(9) is substantial.  Although

Plaintiffs question Section 922(a)(9)'s exception for lawful sporting purposes, Pl. Opp. at 16, that

---

[14] *Available at* http://judiciary.house.gov/hearings/printers/111th/111-25_49476.PDF.

exception does not undermine the objectives for which the law was enacted.  Congress sought to prevent nonresident aliens from obtaining firearms from unlicensed persons and then smuggling the firearms out of the United States.  At the same time – as explained in Defendant's opening brief – Congress did not want to hinder the hunting and tourist industry by prohibiting international hunters.  See Def. Mem. at 12-13.[15]  Congress recognized that an outright prohibition on the receipt of firearms by nonresident aliens might inhibit the lawful use of such weapons by hunters visiting the United States.  By excepting the receipt of weapons for sporting purposes, no such prohibition was necessary.  Thus, the sporting-purposes exception is consistent with the concern expressed by Congress in 1994 – the acquisition of weapons by aliens lawfully in the United States in order to smuggle them beyond U.S. borders.

None of Plaintiffs' attempts to undermine the "fit" between Section 922(a)(9) and its compelling goals succeed.  First, Plaintiffs assert that nonresident aliens should enjoy rights similar to those accorded to U.S. citizens.  Pl. Opp. at 16-17.  They do.  Nonresident aliens are treated in the same manner under Section 922(a)(9) as nonresident U.S. citizens.[16]

---

[15] See also 137 Cong. Rec. S9072 (June 28, 1991) ("I have been trying to pin down the meaning of the provision. . . dealing with receipt of firearms by a nonresident. . . . [I]t was called to my attention as being a provision that might have a serious impact upon foreign visitors who come to a State such as mine to hunt and to buy guns.  They usually end up by giving them to their guides or leaving them in this country.  This provision, as I understand it, would bar anybody from even delivering to that person a gun for such a time period."); id. ("If this is going to seriously impede the very substantial guide business for foreign hunters in my State, then I have no alternative but to object.") (statements of Sen. Ted Stevens).

[16] Additionally, ATF is revising its regulations to ensure that the State residency requirements will apply in the same manner to U.S. resident citizens and resident aliens.  See Open Letter to All Federal Firearms Licensees (Dec. 22, 2011), available at http://www.atf.gov/press/releases/2011/12/122211-atf-open-letter-state-of-residence.pdf.

Second, Plaintiffs question why Section 922(a)(9) should apply to Plaintiff Dearth, who is a nonresident U.S. citizen rather than a nonresident alien.  Pl. Opp. at 17.  It is true that the specific problem addressed by Section 922(a)(9) is the problem of nonresident aliens purchasing firearms from unlicensed persons and smuggling them out of the United States.  By imposing criminal liability for the receipt of firearms by an individual who does not reside in any State, Section 922(a)(9) aims to discourage such behavior.  But if Sections 922(a)(9) and (b)(3) did not apply to nonresident U.S. citizens – the result that Plaintiffs desire here – this loophole would encourage similar behavior by nonresident citizens (including residents of Canada and Mexico), who have also obtained firearms from licensed dealers and non-licensees in order to smuggle them out of the country.[17]  Given the demand for such weapons to be smuggled out of the United States, it is not surprising that nonresident U.S. citizens have a financial motive to do so.

---

[17] See Leader of International Firearms Trafficking Network Sentenced to 32 Years in Prison, U.S. Federal News, May 5, 2009, 2009 WLNR 8517185 (Westlaw) (U.S. citizen living in Canada admitted to smuggling approximately 500 firearms into Canada); Three Sentenced for Involvement in a 100+ Firearm Straw Purchase and Export Ring, Dec. 20, 2011 (two U.S. citizens residing in Mexico sentenced for smuggling 36 firearms from the United States to Mexico), available at http://www.justice.gov/usao/txs/1News/Releases/2011%20December/ 111220%20Bravo-Hernandez.html; Rafael Romo, American Citizen in Mexican Custody on Arms Trafficking Allegation, Sept. 6, 2011 (U.S. citizen residing in Mazatlan, Mexico arrested for purchasing weapons in United States, then smuggling the weapons to Mexico), available at http://www.borderlandbeat.com/2011/09/american-citizen-in-mexican-custody-on.html; Naxiely Lopez, 15 High-Powered Rifles Seized After Traffic Stop, The Monitor (McAllen, Texas), Jan. 13, 2011, 2011 WLNR 709786 (two U.S. citizens living in Mexico arrested for attempting to smuggle 15 AK-47 rifles into Mexico); Naxiely Lopez, Man Sentenced for Straw Purchase of Guns, The Monitor (McAllen, Texas), Jan. 5, 2011, 2011 WLNR 264059 (U.S. citizen living in Mexico bought nine AK-47 type rifles and four pistols to smuggle to Mexico); Prison Term Set for Gun Smuggler, San Antonio Express-News, Aug. 27, 2009, 2009 WLNR 16829243 (U.S. citizen residing in Mexico convicted for attempting to smuggle converted semi-automatic machine gun, AK-47 rifle, and 3000 rounds of ammunition into Mexico); Diana Washington Valdez, Firearms in Mexico Have Ties to El Paso, El Paso Times, Dec. 14, 2008, 2008 WLNR 24011948 (U.S. citizen residing in Mexico indicted for smuggling weapons to Mexico).

Additionally, as explained in Defendant's opening brief, because the vast majority of U.S. citizens reside in the United States, the State residency requirements affect only a narrow class of persons.  Def. Mem. at 33.  Plaintiffs mischaracterize this explanation as asserting that a law that has been demonstrated to be unconstitutional cannot be upheld on the basis that it violates the rights of only a small number of persons.  Pl. Opp. at 17-18.  Defendant is not making any such assertion.  Plaintiffs' mistake is to *assume* as a foregone conclusion precisely what the D.C. Circuit's two-step inquiry aims to determine: whether a firearms regulation violates the Second Amendment.  And in applying the second step (a constitutional means-end analysis), a reviewing court may analyze the degree of fit between the means used by the law and its proposed end by examining the number of persons affected by the law.  See Osterweil v. Bartlett, __ F. Supp. 2d __, 2011 WL 1983340, at *11 (N.D.N.Y. May 20, 2011) ("[T]here is a substantial relationship between New York's residency requirement and the government's significant interest.  The statute burdens only a narrow class of persons, i.e., otherwise qualified out-of-state residents who wish to obtain a license to carry a firearm in New York."), *appeal docketed*; Peterson v. LaCabe, 783 F. Supp. 2d 1167, 1177 (D. Colo. 2011) ("I disagree [with plaintiff] that the statute should be reviewed under strict scrutiny and conclude, like the cases discussed above, that intermediate scrutiny is appropriate [because, inter alia], the statute burdens only a narrow class of persons, i.e., otherwise qualified out-of-state residents who wish to obtain a license to carry a concealed weapon in Colorado."), *appeal docketed*.

Furthermore, "intermediate scrutiny, by definition, permits legislative bodies to paint with a broader brush than strict scrutiny. . . . As a consequence, the degree of fit between" the State residency requirements "and the well-established goal of promoting public safety need not be

perfect; it must only be substantial." Heller II, 698 F. Supp. 2d 179, 191 (D.D.C. 2010) (citations

and internal punctuation omitted), aff'd in relevant part, __ F.3d __, 2011 WL 4551558, at *10;

see also Osterweil, 2011 WL 1983340, at *11 ("Although prohibiting gun possession by nearly

all nonresidents [of New York State] might not be the most precisely focused means to achieve

this end, intermediate scrutiny, by definition, permits the government to paint with a broader

brush.  Morever, because the government objective is exceptionally compelling in this area, the

State must be afforded wider latitude to combat the great social harm inflicted by gun violence.")

(footnote omitted).  Here, Defendant has established that Section 922(a)(9) substantially relates

to the compelling governmental goals of preventing violent crime and protecting public safety.

> **b.      18 U.S.C. § 922(b)(3) Also Substantially Relates to the**
> **Compelling Government Interest in Protecting Public Safety**
> **and Combating Violent Crime.**

In 1968, Congress enacted restrictions on the commercial purchase of firearms outside the

State in which an individual resides, in response to testimony about individuals' evasion of State

firearms laws by crossing State lines and then using the purchased weapons in criminal activities.

See Def. Mem. at 7-13.  As the D.C. Circuit has recognized, the findings made by Congress in

1968 "express the widely accepted knowledge that there is a vast interstate market in firearms

that makes the states unable to control the flow of firearms across their borders or to prevent the

crime inevitably attendant to the possession of such weapons once inside their borders."

Navegar, Inc. v. United States, 192 F.3d 1050, 1063 (D.C. Cir. 1999).

Plaintiffs' opposition brief fails to undermine the conclusion that Section 922(b)(3)

relates substantially to the goals of preventing violent crime and protecting public safety.  First,

Plaintiffs mistakenly contend that the rationale underlying Section 922(b)(3) "is overstated"

because as amended, the Gun Control Act permits the interstate sales of rifles and shotguns.  Pl.

Opp. at 19.  In enacting the Gun Control Act in 1968, Congress declined to "indiscriminately

place further restrictions on the acquisition of all types of firearms."  S. Rep. No. 89-1866, at 4

(Def. Mem., Ex. 2) [ECF No. 25-2].[18]  "Rather, in seeking to reduce the criminal use of firearms,"

Congress "especially concern[ed] itself with the particular type of weapon that is predominantly

used by the criminal."  Id.  The handgun's "size, weight, and compactness make it easy to carry,

to conceal, to dispose of, or to transport," and "[a]ll these factors make it the weapon most

susceptible to criminal use."  Id.  "The evidence before" Congress, moreover, "overwhelmingly

demonstrated that the handgun is the type of firearm that is principally used in the commission of

serious crime."  Id. at 7.[19]  Congress thus enacted different requirements for the transfer of

_____

[18] For example, Congress recognized the widespread use of long guns for lawful sporting
purposes.  See 114 Cong. Rec. 21657, 21773 (July 17, 1968) ("I feel that a sportsman or a hunter
who goes into a noncontiguous State on a lawful hunting trip and loses his rifle or shotgun or
breaks it, or has it stolen, he should not have to return to his State of residence to purchase
another gun.  I know many, many hunters in my district who are not financially able to do this,
but they may be financially able to purchase a used weapon or even a new weapon in the State
where they are hunting.") (statement of Rep. Del Latta), id. at 21796 ("Mr. Chairman, suppose
the gentleman from Illinois goes from the State of Illinois on a hunting trip out to Wyoming, and
his gun is stolen, or it in some way becomes damaged, how is the gentleman going to get a gun to
complete his hunting trip in Wyoming?") (statement of Rep. Basil Whitener); id. at 21806 ("We
have many big-game hunting guides in my State and they have hunters coming from 'Outside' as
we call it – from other States, hunters who want to hunt in Alaska; and these guides oftentimes
lend the hunters guns.  Under this legislation, if the hunters are from another jurisdiction, they
would be prohibited from borrowing a gun for hunting purposes.  I do not see any reason for that
kind of a law.") (statement of Rep. Howard Pollock).

[19] For example, the FBI reported that "handguns were used in 70 percent of the murders
committed with firearms" during the preceding year, id. at 5, and in 78 percent of the
firearm-related homicides of police officers killed in the line of duty.  Federal Firearms Act:
Hearings Before the Subcomm. to Investigate Juvenile Delinquency of the Sen. Comm. on the
Judiciary ("1967 Hearings"), 90th Cong. 873 (1967), available at
http://www.lexisnexis.com/congcomp/getdoc?HEARING-ID=HRG-1967-SJS-0031.

handguns, as opposed to rifles and shotguns, because it found that "concealable weapons" presented a particular challenge for state and local law enforcement authorities, Pub. L. No. 90-351, Title IV, § 901(a)(2), (4), (5), (6), 82 Stat. at 225, and that "the sale or other disposition of *concealable weapons* by importers, manufacturers, and dealers holding Federal licenses, to nonresidents of the State in which the licensees' places of business are located, has tended to make ineffective the laws, regulations, and ordinances in the several States and local jurisdictions regarding such firearms." Id. § 901(a)(5), 82 Stat. at 225 (emphasis added).[20] Thus, contrary to Plaintiffs' suggestion, the rationale for Section 922(b)(3) has not been "overstated."

Second, as applied to Plaintiff Dearth, Section 922(b)(3) substantially relates to the purpose for which it was enacted: "to aid state and local gun control efforts by reducing the flow of firearms from loose-control to tight-control states." Def. Mem. at 30 (quoting Franklin E. Zimring, Firearms and Federal Law: The Gun Control Act of 1968, 4 J. Legal Stud. 133, 134 (1975)). Plaintiffs' contention that such reduction was not the goal of the State residency requirements but is instead a post hoc rationale invented in response to litigation, Pl. Opp. at 20, is mistaken. The legislative history of the Gun Control Act of 1968 is replete with testimony about State and local firearms regulations being undermined by the flow of firearms purchased in

_____

[20] Homicide statistics reveal the disproportionate threat that handguns continue to pose to the public safety. From 2005-2009, at least 70 percent of those killed by firearms across the country were killed by handguns. See Federal Bureau of Investigation, Uniform Crime Reports ("FBI Crime Reports"), table 8, *available at* http://www2.fbi.gov/ucr/cius2009/offenses/expanded_information/data/shrtable_08.html. In 2009, at least 70 percent of the people murdered by firearms in the District of Columbia were killed with handguns. See FBI Crime Reports, table 20, *available at* http://www2.fbi.gov/ucr/cius2009/data/table_20.html. Handguns were used in 72 percent of the 490 firearm-related felony homicides of law enforcement officers killed in the line of duty from 2000 through 2009. See FBI Crime Reports, table 27, *available at* http://www2.fbi.gov/ucr/killed/2009/data/table_27.html.

jurisdictions with more lax firearms requirements.[21]   Section 922(b)(3)'s restriction on the sale

_____

[21] See, e.g., S. Rep. No. 89-1866, at 3 ("Not only is mail order a means of circumventing State and local law, but the over-the-counter sale of firearms, primarily handguns, to persons who are not residents of the locale in which the dealer conducts his business, affords similar circumvention."); Federal Firearms Act: Hearings Before the Subcomm. to Investigate Juvenile Delinquency of the Sen. Comm. on the Judiciary, 89th Cong. 67 (1965) ("A third major problem area [with respect to interstate traffic in firearms] involves individuals going across State lines to procure the firearms which they could not lawfully procure or possess in their own State, or in other cases, in order to circumvent certain local waiting periods and police notification requirements.") (statement of Sheldon S. Cohen, Commissioner of Internal Revenue), *available at* http://www.lexisnexis.com/congcomp/getdoc?HEARING-ID=HRG-1965-SJS-0054; id. at 124 ("[O]ur big problem is that we have absolutely no control of the weapons coming in [to California]. . . . An honest citizen in California buying a handgun must go through a certain procedure and this must be registered with my office.  And it is just a normal registration procedure.  The less honest citizen who does not want to have it a matter of record that he has a gun can go over to Arizona or to Nevada, which in some instances is just going a mile or two, and purchase a gun over-the-counter, without any record either there, or in the State of California.") (statement of Thomas C. Lynch, Attorney General, State of California); id. at 404 ("Although under present New Jersey law a permit to carry a pistol or revolver is required, there is no way to detect weapons which are smuggled into New Jersey without a permit to purchase or carry.  [The proposed bill] would go a long way to ameliorate this situation.") (statement of Arthur J. Sills, Attorney General, Department of Law and Public Safety, State House, Trenton, New Jersey); 1967 Hearings at 46-47 ("The other major loophole in State enforcement of firearms laws [other than mail-order purchase] involves purchase across State lines.  It is well known among law enforcement officers that the crossing of State lines to avoid State law in the acquisition of firearms is common practice. . . . Special surveys undertaken by the [Treasury Department's] Alcohol and Tobacco Tax Division clearly reveal the frustration of strict State gun laws by out-of-State purchase.  The State of Massachusetts requires a permit to purchase a handgun.  It was determined from police records in Massachusetts that over 86 percent of weapons used in murders and holdups had been purchased in the States of Maine and New Hampshire, and particularly in those counties that are a short driving distance from Massachusetts.  Maine and New Hampshire have no permit requirement. . . . Missouri State law also requires a permit to purchase a concealable weapon.  It was found that during the period February 1966 to February 1967 approximately 5,000 persons who gave a residence address in the city or county of St. Louis, Mo., purchased firearms – primarily handguns – in the neighboring State of Illinois which has no permit requirement.  Approximately 200 of these purchasers were determined to have records of felony convictions. . . . Detroit, Mich., also has a serious problem enforcing its rather strict firearms laws.  Dealers in nearby Toledo, Ohio, brazenly advertise 'No Permit Required' to buy guns and some estimate that 90 percent of their customers are from Michigan, principally Detroit.") (testimony of Sheldon S. Cohen, Commissioner of Internal Revenue); id. at 407 ("I think for easier administration of law enforcement, we should say, no sale of handguns to a nonresident, period.  And then each of our

of firearms by licensed dealers to individuals who do not reside in the State where the licensee does business was aimed at strengthening these State and local regulations.

And as applied to Plaintiff Dearth, Section 922(b)(3) substantially relates to this purpose by preventing him from evading State and local firearms regulations simply by traveling to a different State where firearms regulations are more lax.[22]  Many States impose particular conditions on the commercial sale of firearms.  For example, the District of Columbia prohibits the sale of certain semi-automatic rifles, pistols, and shotguns.  D.C. Code §§ 7-2501.01(3A)(A), 7-2502.02(a)(6).  Similarly, California bars the sale of certain semiautomatic pistols, Cal. Penal Code § 12276.1(4), and conditions the receipt of a handgun from a licensed dealer on a demonstration of the receiver's ability to handle a handgun safely and properly operate its safety features.  Id. § 12071(8).  Without Section 922(b)(3), if a non-resident U.S. citizen decided to visit the District of Columbia or California, he or she could circumvent these requirements

---

communities could enforce our own gun laws.")  (statement of William L. Cahalan, Prosecuting Attorney, Wayne County, Michigan); Federal Firearms Legislation: Hearings Before the Subcomm. to Investigate Juvenile Delinquency of the Sen. Comm. on the Judiciary, 90th Cong. 91 (1968), *available at* http://www.lexisnexis.com/congcomp/getdoc?HEARING-ID=HRG-1968-SJS-0021 ("The interstate shipment of guns allows easy circumvention of local laws.  The Crime Commission found strong indications that out-of-State sources provide a substantial number of guns to those who commit crimes.  It also cited studies by the Massachusetts State Police showing that 87 percent of concealable firearms used to commit crimes in Massachusetts in a recent year were obtained outside the State.  In New York City, although there are only 18,000 permits for handguns we also find that many more residents own pistols and they are purchased out-of-State, either through the mail or in person.") (statement of Mayor John V. Lindsay, New York City).

[22] As noted in Defendant's opening brief, the Complaint fails to specify the State in which Plaintiff Dearth allegedly intends to purchase firearms.  Def. Mem. at 16 n.19.

simply by crossing State lines.[23]

Third, Plaintiffs incorrectly contend that Plaintiff Dearth is being treated differently under Section 922(b)(3) than other U.S. citizens.  Pl. Opp. at 19.  To the contrary, it is Plaintiff Dearth who is demanding to be able to "opt out" of requirements of federal law that apply to all U.S. citizens, whether they reside in the United States or not.  Simply put, Plaintiff Dearth seeks to be treated differently from, and better than, resident U.S. citizens, and not equally with them.

_____

[23] See also, e.g., Conn. Gen. Stat. §§ 29-37a (two-week waiting period for purchasing long guns); Iowa Code § 724.15 (annual permit required to purchase handgun, conditioned upon, inter alia, the permit holder having "no history of repeated acts of violence"); Md. Code Ann., Crim. Law §§ 4-305(b); 5-101(c), (g); 5-134(b)(2), (b)(14); 5-406(a)(2) (prohibiting purchase of a detachable magazine with a capacity of more than 20 rounds of ammunition for a firearm; prohibiting sale of certain firearms if the purchaser has been convicted of certain disqualifying crimes, or if the purchaser fails to complete a certified firearms safety training course; prohibiting sale of handguns not on handgun roster); Mich. Comp. Laws § 28.422 (purchaser of handgun must obtain license from chief of police or county sheriff and score 70% on a basic pistol safety review questionnaire); N.C. Gen. Stat. § 14-402 (prohibiting purchase of pistol without a permit from the sheriff in the county where the purchaser resides, or a valid North Carolina concealed handgun permit held by a North Carolina resident); N.J. Stat. Ann. §§ 2C:58-3(a), (b) (prohibiting purchase of handgun without permit, and purchase of rifle or shotgun without firearms purchaser identification card); Or. Rev. Stat. §§ 166.412(2)(c), 166.470(g) (requiring dealers to obtain thumbprints from firearms purchasers and retain them for five years; prohibiting sale of firearm to individual convicted of certain violent misdemeanors within the previous four years); 18 Pa. Cons. Stat. §§ 6102, 6112, 6113, 6142 (all firearms sales must be made by a State-licensed dealer; no sale of firearms unless purchaser either buys or is provided with a locking device for the firearm); R.I. Gen. Laws Ann. § 11-47-35 (before applying for the purchase of a handgun, a buyer must receive a state-issued handgun safety card by completing a safety course); Tenn. Code Ann. § 39-17-1316(a)(1) (no sale of firearms to individuals convicted of the offense of stalking); Va. Code. Ann. § 18.2-308.2:2(P)(1) (requiring completion of an "enhanced background check" for the purchase of more than one handgun within a 30-day period from a licensed dealer); Wash. Rev. Code §§ 9.41.090(1), (5) (purchaser of pistol must provide identifying information, including driver's license or state identification number, to dealer; dealer must wait 60 days before delivering pistol to buyer if the buyer has not resided in the State for the previous 90 days).

Fourth, Plaintiffs mistakenly contend that Section 922(b)(3) could not satisfy intermediate scrutiny if the government's interests could feasibly be served by demanding proof of overseas residence.  Pl. Opp. at 21.  But "intermediate scrutiny does not require that a regulation be the least intrusive means of achieving the relevant government objective, or that there be no burden whatsoever on the individual right in question."  United States v. Masciandaro, 638 F.3d 458, 474 (4th Cir. 2011), cert. denied, _ S. Ct. _, 2011 WL 2516854 (Nov. 28, 2011); see also Heller II, 2011 WL 4551558, at *10 (under intermediate scrutiny, the "fit" between a law between a firearms regulation and an important or substantial governmental objective may "employ[] not necessarily the least restrictive means but a means narrowly tailored to achieve the desired objective") (quoting Bd. of Trustees of State Univ. v. Fox, 492 U.S. 469, 480 (1989) (internal punctuation omitted)).[24]

In sum, 18 U.S.C. § 922(b)(3) plainly satisfies intermediate scrutiny.

## III.   THE CHALLENGED PROVISIONS DO NOT IMPINGE ON PLAINTIFFS' FREEDOM TO TRAVEL INTERNATIONALLY.

Defendants' opening brief demonstrated that Plaintiffs' challenge based on an alleged fundamental constitutional right to international travel was meritless.  Def. Mem. at 34-39. In particular, Plaintiffs' reliance on Kent v. Dulles, 357 U.S. 116 (1958), and Aptheker v. Sec'y of State, 378 U.S. 500 (1964), for the proposition that an alleged fundamental "right to international travel" exists is severely misplaced because "[b]oth Kent and Aptheker . . . were qualified the following term in Zemel v. Rusk, 381 U.S. 1 (1965)."  Regan v. Wald, 468 U.S.

---

[24] In any event, demanding proof of overseas residence would not feasibly serve the government's interests because it would not prevent U.S. citizens (in this instance, U.S. citizens residing abroad) from circumventing State firearms laws simply by traveling to a State in which firearms laws are more lax, which is the very problem Section 922(b)(3) seeks to remedy.

222, 241 (1984).[25]  Although "[i]n <u>Kent</u>. . . the constitutional right to travel within the United

States and the right to travel abroad were treated indiscriminately," the Supreme Court made

clear that "[t]hat position has been rejected in subsequent cases."  <u>Id.</u> at 241 n.25 (citing <u>Haig</u>,

453 U.S. at 306; <u>Califano v. Aznavorian</u>, 439 U.S. 170, 176-77 (1978)).  Consequently – and

contrary to the impression conveyed by Plaintiffs – it is now well established that "the *freedom* to

travel outside the United States must be distinguished from the *right* to travel within the United

States," and that the former is "subject to reasonable governmental regulation."  <u>Haig</u>, 453 U.S.

at 306-07 (emphasis in original).  In perhaps its clearest statement on this issue, the Supreme

Court declared:

> Aznavorian urges that the freedom of international travel is basically equivalent to
> the constitutional right to interstate travel, recognized by this Court for over 100
> years.  But this Court has often pointed out the crucial difference between the
> freedom to travel internationally and the right of interstate travel.  The
> constitutional right of interstate travel is virtually unqualified.  By contrast the
> 'right' of international travel has been considered to be no more than an aspect of
> the 'liberty' protected by the Due Process Clause of the Fifth Amendment.  As
> such this 'right,' the Court has held, can be regulated within the bounds of due
> process.  Thus, legislation which is said to infringe the freedom to travel abroad is
> not to be judged by the same standard applied to laws that penalize the right of
> interstate travel, such as durational residency requirements imposed by the States.

<u>Aznavorian</u>, 439 U.S at 176-77 (citations and internal punctuation omitted).

Plaintiffs do not contend that the Supreme Court has ever repudiated its statements in

<u>Haig</u>, <u>Regan</u>, or <u>Aznavorian</u>.  Instead, Plaintiffs rely unduly on <u>Kent</u> and <u>Aptheker</u>, as well as a

Fifth Circuit case, <u>Hernandez v. Cremer</u>, 913 F.3d 230 (5th Cir. 1990), which involved a U.S.

---

[25] Contrary to Plaintiffs' characterization (Pl. Opp. at 21), Defendant never stated that
<u>Kent</u> or <u>Aptheker</u> had been formally overruled, but only that in light of subsequent Supreme
Court cases, Plaintiffs' reliance on these cases for the proposition that an alleged fundamental
"right to international travel" exists was severely misplaced.

citizen who was barred from entering the country.  Plaintiff Dearth does not contend (nor can he)

that he is barred from entering the United States.  Far more on point is a different Fifth Circuit

case, United States v. Lebman, 464 F.2d 68 (5th Cir. 1972), in which the defendant challenged

Section 922(b)(3) as unconstitutionally infringing the much broader right to inter*state* travel.

The Fifth Circuit held that this argument failed because it was "unable to discern any inhibition

on the non-resident firearms purchaser's right to travel occasioned by a statute regulating the sale

of firearms to a non-resident by a licensed dealer," especially "in light of the explicit

Congressional finding that "the sale or other disposition of concealable weapons to nonresidents

of the State in which the licensees' places of business are located, has tended to make ineffective

the laws, regulations, and ordinances in the several States and local jurisdictions regarding such

firearms." Id. at 74 (citation and internal punctuation omitted).  Plaintiffs' similar argument

based on the narrower right to inter*national* travel similarly fails.[26]

## CONCLUSION

For the reasons stated above and in Defendant's opening brief, the Court should enter

judgment on the pleadings for Defendant or, in the alternative, enter summary judgment for

Defendant.

Dated: February 1, 2012                    Respectfully Submitted,

                                           TONY WEST
                                           Assistant Attorney General

                                           RONALD C. MACHEN
                                           United States Attorney

---

[26] The equal protection argument in Plaintiffs' closing brief (Pl. Opp. at 24) relies only on arguments previously asserted by Plaintiffs.  Defendant has previously responded to these arguments. Def. Mem. at 40-42.

SANDRA M. SCHRAIBMAN
(D.C. Bar No. 188599)
Assistant Branch Director
U.S. Department of Justice
Civil Division, Federal Programs Branch


  /s/ Daniel Riess
DANIEL RIESS
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, NW, Room 6122
Washington, D.C. 20530
(202) 353-3098
Daniel.Riess@usdoj.gov

*Attorneys for Defendant*