1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


STEPHEN DEARTH, et al.,          :     Civil Action No. 09-587
                                 :
              Plaintiff          :
                                 :
v.                               :     Washington, D.C.
                                 :     September 10, 2012
                                 :
ERIC HIMPTON HOLDER, JR.,        :
                                 :
              Defendant          :     3:45 p.m.
. . . . . . . . . . . . . . . .  :     . . . . . . . . . . . .


TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE ROBERT L. WILKINS
UNITED STATES DISTRICT JUDGE


  APPEARANCES:

  For the Plaintiff:            ALAN GURA
                                GURA & POSSESSKY, PLLC
                                101 North Columbus Street
                                Suite 405
                                Alexandria, VA 22314
                                (703) 835-9085


  For the Defendant:            DANIEL RIESS
                                U.S. DEPARTMENT OF JUSTICE
                                20 Massachusetts Avenue, NW
                                Washington, DC 20530
                                (202) 353-3098


  Court Reporter:              REBECCA STONESTREET, RPR, CRR
                               Official Court Reporter
                               Room 6511, U.S. Courthouse
                               Washington, D.C.  20001
                               (202) 354-3249


Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

1        **P R O C E E D I N G S**

2            COURTROOM CLERK:  Civil case number 09-587,

3    Stephen Dearth, et al. versus Eric Himpton Holder, Junior.

4    Counsel, will you please come forward and identify yourself for

5    record.

6            MR. GURA:  Good afternoon, Your Honor.  Alan Gura for

7    the plaintiff.

8            THE COURT:  Good afternoon, Mr. Gura.

9            MR. RIESS:  Good afternoon, Your Honor.  Daniel Riess

10   for defendant.

11           THE COURT:  Sorry to keep you-all waiting.  We're here

12   on I believe it's cross motions for summary judgment that have

13   been filed in this case.  And I would like to have some

14   argument, and I have some specific questions for you on a number

15   of things regarding the statutes at issue and your positions.

16           But I think that perhaps, since ultimately the

17   plaintiff, you've brought this case and are challenging the

18   statute, it probably makes sense for me to hear from you first.

19   So if you would like to come forward.

20           MR. GURA:  Thank you, Your Honor.  Your Honor, we're

21   challenging two specific laws here, and they're both very

22   different.  There's much less to say about the first provision

23   that we're challenging than the second, it would appear.

24           Section 922(a)(9) is an unusual type of firearms

25   prohibition.  Unlike most of the prohibitions - perhaps all of

1    the other prohibitions that this court might see from time to

2    time - this one does not seem to target people who are

3    untrustworthy with firearms.  I suppose if a person is a bank

4    robber or a terrorist or a drug abuser, we don't tell the bank

5    robber:  Sir, you can have a shotgun, but only during hunting

6    season or only if you go target shooting.  We simply make the

7    decision, as Congress has made, that they're dangerous and

8    should be disarmed.

9         But 922(a)(9) targets a specific purpose in having

10   arms.  922(a)(9) bars people who do not reside in the

11   United States from acquiring firearms for anything other than a

12   sporting purpose, which means, by definition, that people who do

13   not reside here cannot acquire firearms for self-defense --

14        THE COURT:  You're using the verb "acquire;" the

15   statute uses the verb "receive."  Is there any court that has

16   construed the term "receive" -- is there any regulation that has

17   construed the term "receive" as used in this statute, which is

18   922(a)(9)?

19        MR. GURA:  I believe that in the early 1970's the

20   Supreme Court had a number of cases arising out of what was then

21   a new Gun Control Act of 1968.  And we know that receipt is not

22   the same thing as possession, and that's a distinction that I

23   believe the government has made before.

24        And that's actually interesting in this case, because

25   nothing bars nonresidents from continuing to possess firearms

1    that they have received prior to departing the United States.

2    In fact, the former plaintiff that we had in this case,

3    Mr. Hodgkins, who has since been dismissed because he moved back

4    to the U.S., had firearms that he acquired prior to leaving the

5    United States, and he could continue freely using them for any

6    purpose while he was visiting.  And so it really targets the

7    receipt and only the receipt, as that word is normally

8    understood.

9         I'm not aware of any specific regulation or precedent

10    that would shed more relevant light on that.  I don't think

11    there's a dispute among the parties as to what receipt means.  I

12    think it's --

13         THE COURT:  Well, when you say -- you say receive is

14    different than possess.  If I loan you my firearm to use for the

15    day to go skeet shooting with, I loan you my shotgun, are you

16    possessing it?

17         MR. GURA:  I'm receiving it.

18         THE COURT:  You've received it?

19         MR. GURA:  Yes.

20         THE COURT:  You're going to give it back to me at --

21    you know, I loan it to you at 9:00 a.m.; you're going to give it

22    back to me at 5:00 p.m.  You're saying that from 9:00 to 5:00,

23    that the act of you getting it at 9:00 o'clock from me, that's a

24    receipt?

25         MR. GURA:  I believe it is.  And in fact, Your Honor,

1    under 922(b)(3), there is a provision that talks about how the

2    firearm cannot be -- I'm sorry, receipt may not -- receipt is

3    not 922(b)(3).  I apologize, and never mind.  But it does talk

4    about loan or rental in that other provision; specifically, loan

5    and rental is mentioned for sporting purposes.

6         But no, if a person does not previously have an

7    ownership interest or has never previously possessed a firearm,

8    and somebody loans that person that firearm, the person has

9    received the firearm.  And once you touch it and acquire

10   dominion and control over it, you've received it, and that would

11   seem to be unlawful if it's not for...

12        THE COURT:  Okay.  I guess what I'm trying to

13   understand is, you used the word "acquire" earlier, and I'm

14   trying to understand whether you're saying that receive means

15   the act of getting the firearm, even if you're going to hold the

16   firearm for a few seconds as opposed to a few days or a few

17   months or a few years.  So if I have my shotgun and you and I

18   happen to bump into each other at the -- or let's just say

19   Mr. Dearth, I bump into him at the shooting range and he says,

20   "Boy, that's a nice shotgun, can I take a look at it," and I

21   unload it and hand it to him, you're saying that I can't -- that

22   would be a receipt?  Just for the purposes of this statute, that

23   that would be a receipt?  Now, we can put aside whether that's

24   for lawful sporting purposes for the moment.

25        MR. GURA:  Sure.

1      THE COURT:  But you're saying that if all I'm doing is

2  just handing it to him because he wants to take a look at it,

3  and then with the understanding that he's going to hand it right

4  back to me, you're saying that's a receipt within the meaning of

5  this statute?

6      MR. GURA:  It could be interpreted that way.  I'm not

7  aware of any such prosecutions where the handing over of the

8  firearm was so minimally -- where the timing -- you know, here,

9  take a look at this, where you're basically demonstrating

10  something.

11      But to follow Your Honor's example, I think if

12  Mr. Dearth in that situation were to say, can I borrow this to

13  use at the shooting lane, I think at that point it would be a

14  receipt.  At that point the person is receiving.  There's a

15  giving and there's a receiving; receiving is the result of

16  giving.

17      So my understanding of the word is that it's used in

18  the statute the way that it would be used in its ordinary

19  meaning.  So yes, it would be a receipt.  And given the very

20  severe criminal penalty for violating Section 922, I think most

21  people would probably not wish to test the government on any

22  sort of temporal limitations.

23      THE COURT:  But given that it is a criminal statute,

24  then shouldn't the rule of lenity and other rules of

25  construction be such?  And especially if I'm to interpret a

1   statute to uphold its constitutionality, where possible, if all

2   of those canons of construction apply, why should I have this

3   stingy definition of receipt if all of those things apply here?

4           MR. GURA:  Because, Your Honor, I don't believe there's

5   a dispute among the parties that in the circumstances of this

6   case, that receipt, as used in the statute, is being discussed.

7   Mr. Dearth would like to receive firearms in the United States,

8   for having them generally available to him for the purpose of

9   self-defense, and of course for other purposes as well, and

10  there's no question that he would be receiving a firearm if

11  anybody were to give him a firearm, either by way of sale or

12  rental or loan or any other way.  And 922(a)(9) specifically

13  bars his receipt of firearms so that he could use them in

14  self-defense.

15          Now, in *Heller*, when the court spoke about the

16  self-defense purpose of the Second Amendment, for example, it

17  defined the term "bear arms."  This is something that we had to

18  argue at the District of Columbia, because they had this

19  militaristic interpretation that let to their collective rights

20  theory.

21          Well, the Supreme Court said that bear arms means you

22  are armed and ready in case of confrontation with another

23  person.  Well, if you're going to receive or get your hands on a

24  firearm so you can be armed and ready in case of confrontation,

25  I think at that point it's not a transient event.  At that point

1    you are receiving a firearm, somebody is giving you the firearm

2    so you can be in that condition for as long as you happen to be

3    in the United States.

4            And so receipt in this case would apply to the conduct

5    which is at issue in the case.

6            THE COURT:  Well the Second Amendment doesn't just say

7    bear arms, it says keep and bear arms.

8            MR. GURA:  That's correct.

9            THE COURT:  And if Mr. Dearth has no residence in the

10   United States, then how is his right to keep and bear arms

11   implicated, to the extent that he doesn't have a home to seek to

12   keep arms in?  If *Heller* says that you have the right to -- your

13   Second Amendment right exists in your home, he's not in his

14   home, he's in a temporary residence where it may be a hotel

15   room, it may be a relative's home, but it's not his home.

16           MR. GURA:  Your Honor, there are two responses to that.

17   First of all, the word "keep" is itself not limited to the home.

18   A person may keep an arm, as Your Honor mentioned, in a hotel

19   room or in somebody else's home, or the act of keeping is

20   normally done in a home but it's also done in other places.  It

21   simply implies having dominion and control over something.

22           THE COURT:  Well, has any court held that the

23   Second Amendment right to keep and bear arms extends beyond

24   their residential home?

25           MR. GURA:  Yes, many courts have done so recently,

1    Your Honor.  This is something we're litigating in other

2    contexts, but I can name three courts off the top of my head.  A

3    case I'm handling, it's currently on appeal in the District of

4    Maryland, *Woollard vs. Sheridan* - on appeal it's *Woollard vs.*

5    *Gallagher* - the District of Maryland struck down Maryland's

6    public safety provision that stated that people must show good

7    and substantial reason for obtaining a handgun carry permit,

8    because the court said that under the Second Amendment you have

9    the right to bear arms in public.

10            The Eastern District of Pennsylvania, in a case called

11   *United States vs. Garvin* - I believe it came out in May - this

12   was a motion to suppress.  There was a gentleman who was seen

13   walking about in Philadelphia with a handgun, and the court

14   reasoned that merely having seen him carrying a handgun was not

15   reason for a *Terry* stop, because carrying a handgun is protected

16   by the Second Amendment.  It was other conduct that Mr. Garvin

17   engaged in that justified the officer's detention of him.

18            In *United States vs. Weaver*, one of the districts in

19   West Virginia - I forget which one - rejected the federal

20   government's argument that there's no right to carry a gun

21   outside the home.  That was a case where a gentleman was

22   prosecuted for essentially providing armed security to the

23   leader of a motorcycle gang, and that person was a prohibited

24   person.  Even though there was no -- I mean --

25            THE COURT:  The person he was protecting was a

1    prohibited person?

2         MR. GURA:  That's correct.  And there's a provision of

3    federal law that bars carrying guns in the employ of somebody

4    who is a prohibited person.  And while that was upheld, the

5    argument that there is no right to carry a gun for self-defense

6    was very forcefully rejected.

7         In *Bateman vs. Perdue*, another case I handled in the

8    Eastern District of North Carolina, there the court struck

9    down - no appeal - a law that forbade people -- various laws,

10   but one of the laws that was struck down was a law that forbade

11   people from carrying handguns for self-defense outside the home

12   during so-called states of emergency.  And we argued - and the

13   court agreed with us - that when public order is broken down and

14   people cannot rely on the police, that is explicitly the time at

15   which the Second Amendment right is most acute.

16        Now, there are courts that have rejected the argument.

17   Usually they do so by declining to reach it.  But there are many

18   reasons why the courts are finding in many instances that there

19   is such a right.

20        For example, in *Heller*, *Heller*, of course, defined "to

21   bear" meaning to carry.  And there's a definition that *Heller*

22   adopted from Justice Ginsburg's dissent in *Muscarello vs. U.S.*

23   where there's a very explicit definition of the right to bear

24   arms as used in the Second Amendment as a right to have a gun on

25   your person or on your body or in your clothing for the purpose

1    of being armed and ready in case of confrontation.

2         *Heller* held that there is no right to carry a gun for

3    any purpose, any time, any place whatsoever, but of course that

4    means that you have a right to carry a gun for some purposes

5    some times, in some places.  We don't question that there are

6    time, place, and manner restrictions that the government is

7    going to impose, but you can't ban it forever.

8         Additionally, the *Heller* court said that there are

9    sensitive places that you cannot carry guns into, and those

10   would be presumptively off limits to people with firearms.

11   Again, it's the exception that proves the rule.  If there's a

12   sensitive place to which you cannot carry a gun, there must be

13   some places that are not sensitive.

14        *Heller* contained a very long exposition of various

15   traditional limitations on the right to bear arms; for example,

16   the right -- it's always been upheld in our tradition of legal

17   thought that states can ban the concealed carrying of handguns.

18   There's no dispute about that.  But as *Heller* recited these

19   cases, when we read all these cases - and there are four of

20   them, if I recall correctly, cited in *Heller* - they all come

21   down to this conditional rule:  The state can ban the concealed

22   carrying of handguns, because that has always been seen as a

23   manner regulation.  The state can regulate the manner in which

24   you carry firearms.  And all of those cases have said, yes, we

25   uphold a ban on the concealed carrying of guns, but we don't

1    mean to suggest that the state can thereby entirely abolish the

2    right.

3            So I could go on.  This is an issue that's going to be

4    litigated -- before this court actually we have --

5            THE COURT:  Well, let me, I guess, just kind of cut to

6    the chase here.  And that is, why wouldn't it be appropriate to

7    construe this statute to say that receive for this context

8    should really be synonymous with sale, and that Mr. Dearth --

9    that this statute does not prevent Mr. Dearth from having rented

10   or loaned to him a firearm?  And to the extent that a firearm

11   can be used for some lawful sporting purpose, this statute does

12   not prohibit it.

13           Now, whether or not that comports with your view of the

14   Second Amendment, let's put that to the side for a moment.  But

15   if my job is initially to try to figure out what this statute

16   means, why isn't that a reasonable interpretation of this

17   statute?

18           MR. GURA:  Several reasons.  First of all, Your Honor,

19   I don't believe that the Court can interpret the term "receipt"

20   to mean purchase.  Those are two very different words.  When the

21   Gun Control Act wants to talk about purchases, it talks about

22   buying and selling specifically.

23           Beyond that, Your Honor, it leads into our second

24   argument, which is that indeed there is a right also to purchase

25   firearms for self-defense, and Section 922(b)(3) prohibits

1    Mr. Dearth from purchasing firearms period, for any purpose.

2    Because he doesn't have a state of residence, he can't complete

3    the transaction, neither for handguns nor for rifles or

4    shotguns.

5         So it doesn't save the Court from having to address the

6    other hurdle here, which is the fact that there is a right to

7    purchase guns, and 922(b)(3) does not allow him to purchase guns

8    even if 922(a)(9) were to allow him to purchase guns in some

9    way.  And it is a very substantial burden on Second Amendment

10   rights to tell someone that they are barred from the entire

11   national market for firearms.

12        I understand the concept that the DC Circuit has

13   upheld, that de minimus burdens don't get heightened scrutiny.

14   And that's true, actually, with all constitutional rights;

15   things that are not a big imposition we don't waste the court's

16   time with.  But to say to someone that they can't acquire at

17   all, anywhere in the United States, for any purpose, goods whose

18   use and possession is specifically enumerated in the

19   Constitution as a protected right, is quite severe.

20        THE COURT:  Why does he have a right to purchase if he

21   has a right -- if it can be loaned to him or if he can rent it,

22   why does it infringe his Second Amendment right if he can't

23   purchase?  He can still keep and bear that firearm if somebody

24   loans or rents it to him.  Right?

25        MR. GURA:  Your Honor, one of the cases upon which

1    *Heller* relied, *Andrews vs. State*, a case from 1871, the

2    Tennessee Supreme Court specifically observed that the right to

3    keep arms necessarily involves the right to purchase them.  And

4    I would submit that's self-evidently correct.  If you have the

5    right to make use and possess a product, whether it be a gun or

6    a book or a religious article or any of the other things that

7    courts around the country have found protection for, you must

8    have the right to purchase them.

9         It seems to be a very dramatic prohibition to say -- we

10   wouldn't say, for example, that we can ban book stores because

11   people can get a library card.  I mean, that would not fly under

12   the First Amendment; that would be seen to be a very severe

13   burden on First Amendment rights.

14        Likewise with guns.  To say, you can't buy guns; it's

15   okay, maybe someone will lend you one.  Well, how is that person

16   supposed to get a gun?  Are they supposed to manufacture it in

17   their garage somehow?  We have the right to buy guns, and of

18   course that can be regulated in the interest of public safety.

19   There's no question about that.

20        THE COURT:  But if the person does not live in the

21   United States, is your argument that he has a right to purchase

22   a gun solely because he has a right, then, to be able to take

23   that gun and leave the country with it?

24        MR. GURA:  No.  I mean, the fact is that people --

25        THE COURT:  So his right to purchase the gun is based

1    on the fact that while he's physically in the United States,

2    during the period of time when he's physically located inside

3    the United States, he should have a right to purchase his gun

4    for his use while he's physically located in the United States?

5         MR. GURA:  And unless there's any good reason barring

6    that person from exporting the firearm, they can export the

7    firearm as well.  But at a minimum, Your Honor is correct.

8    Because you have the right to keep and bear arms within this

9    country - never mind what happens in other countries, never mind

10   our export control laws or what have you, which apply to other

11   articles as well - yes, you must have the right to purchase

12   those firearms.  If one's use and possession of a firearm is

13   constitutionally protected, then one must have the ability to

14   lawfully purchase those.

15        THE COURT:  Well, doesn't Congress -- doesn't a person

16   who has no residence, even if they're a U.S. citizen, if they've

17   got no residence in any state, doesn't that pose special

18   problems and issues that Congress was seeking to protect against

19   with this, I guess, group of statutes?  And someone who is

20   without a residence can evade, or even if they don't have any

21   intent to, they're in kind of a position where they fall outside

22   the normal state regulatory scheme of regulating all of the

23   time, place, manner, and sale restrictions of guns, and

24   particularly handguns.

25        So isn't Congress well within its lawful scope of

1   purpose here to want to regulate in this area someone who does

2   not reside in any particular state?

3          MR. GURA:  No, Your Honor.  First of all, there's no

4   evidence - and the defendant has submitted none - that Congress

5   ever imagined any of these laws' application to expatriated

6   American citizens.  I believe that the answer that they

7   eventually came up with was that there was a concern on the one

8   hand that aliens might abscond with firearms purchased in the

9   U.S., and then on the other hand we wanted not to bar aliens

10  from coming to the U.S. and enjoy hunting and other things that

11  are good for our economy, I guess.

12         So without any thought, Congress created 922(a)(9) with

13  this provision that aliens - or I guess nonresidents, they were

14  saying - can come here and have guns for some purposes, except,

15  of course, for the core purpose for which firearms ownership is

16  protected in America.

17         With respect to the other part, 922(b)(3), Your Honor,

18  there is no federal interest and there is no federal law

19  recognizing any interest in barring the transportation of

20  firearms across state lines.  The only federal law on that

21  subject is 18 926A, which protects people, in their

22  transportation of firearms across state lines, against various

23  local laws that might hinder their interstate travels.

24         The fact is that virtually all states --

25         THE COURT:  Well, generally speaking, I mean, Congress

1    leaves regulation of firearms up to the states as far as

2    everyone is a resident of some state, and to the extent that

3    they have a home in that state, then that state has laws about

4    what you can possess in your home and what if anything you can

5    possess about your person, on or about your person if you leave

6    your home.  Right?

7          And 926A, I'm very familiar with it - I litigated under

8    it back in my old life as a public defender - that merely is to

9    protect your right to travel interstate with your firearm so

10   long as it was legal in the state that you were travelling from

11   and the state that you were travelling to.

12         So I'm not sure what relevance that has to my question,

13   which is the overall scheme of firearm regulation - of course

14   there's some federal laws and federal prohibitions - but

15   generally speaking, the laws about possessing firearms are state

16   laws.  You know, the federal law is like if you're a felon or

17   certain type of prohibited person, you can't have them, and

18   certain things like machine guns, nobody can possess those.

19         MR. GURA:  But Your Honor, in a transaction under

20   922(b)(3), the dealer and the federal government only look to

21   two states, at the most two states.  They don't look to all 50

22   states, they only look to the state in which the transaction is

23   occurring, where the dealer is.  Because obviously we want

24   people to follow the laws of their own state, and it's nice that

25   Congress backs that up.  No dispute there.  And also to protect

1    the interests not of the other 47 or 48 states, but to protect

2    the interests of any state of residence.  Because it's presumed

3    that the person will be going back home; then the law of that

4    state is the one that is looked to.

5         However, here, who are we protecting?  There is no

6    other state that's being protected, so there is no interest,

7    because Mr. Dearth is not a resident of, say, New York or Alaska

8    or whatever state, and we don't want him going to that state

9    with a firearm where he's going to reside and have a firearm

10   that he shouldn't have there as a resident.

11        But the fact that there are states out there that have

12   different firearms laws does not ever come into factor when a

13   firearms transaction is occurring between a dealer in a

14   different state and a person who doesn't live in that state.

15   It's true, if you or I purchase firearms here in Washington or

16   Virginia or Maryland, somewhere in this neighborhood, it is

17   physically possible for us to put those guns in the car, drive

18   them to some part of the map where they would not be legal, and

19   at that point we would be committing a crime.  However, when

20   that purchase is taking place, the dealer doesn't care or

21   shouldn't care about the fact that in theory I might travel

22   anywhere in the United States.

23        THE COURT:  But he does care, or she does care that you

24   are complying with the law in your state of residence.

25        MR. GURA:  That's right.

1          THE COURT:  And they are required to ensure, before

2    they sell you that firearm, that the sale does comport with the

3    law in the purchaser's state of residence.  Right?

4          MR. GURA:  Yeah, if there is a state of residence,

5    Your Honor.  But if there's no state of residence, there's

6    nothing protect.  There's no federal interest, because there's

7    no particular state that's going to see me as a resident coming

8    back to that state with a gun that I shouldn't have there.

9          So this is a law that's designed to protect the

10   relationship between states vis-a-vis their residents.  And

11   Mr. Dearth is not the resident of any state, so there is no

12   state resident relationship that's being protected.

13         THE COURT:  Okay.  So Congress decided, okay, if there

14   is no state resident relationship, then what we will say is,

15   look, so long as you are receiving the firearm for lawful

16   sporting purposes, hey, that's fine.  But if you're not a

17   resident of any state, that's the only purpose that we deemed

18   appropriate for you to possess a firearm, because if you're not

19   a resident of any state, then kind of by definition you're not

20   going to be here very long, and what you need is -- you know,

21   we'll allow you to use a gun for sport, but other than that, you

22   don't really need one for anything else.  Is that what you're

23   saying that Congress' purpose was here?

24         MR. GURA:  I believe that's Congress' result, but

25   that's -- I wouldn't even go so far as to say that they were

1   consciously thinking about any of this when they enacted this

2   particular provision.  There doesn't seem to be any evidence

3   that there was any thought given anywhere in the legislative

4   record to the situation of expatriated Americans.

5           There was thought given to visiting aliens, and I would

6   say that even with respect to those individuals, they also have

7   rights while they're visiting in the United States under our

8   Constitution.  Aliens have all the same basic civil rights that

9   we have.  They're part of the people in this community, so they

10  have a right against unreasonable search and seizure, they have

11  the right to speak freely the same as we might, they have the

12  right to worship, and, yes, they have the right to self-defense.

13  And so do expatriated American citizens, when they're on

14  American soil.

15          And so when Congress essentially writes pre-*Heller*, in

16  a pre-*Heller*, non-Second Amendment thinking environment, that we

17  can limit people's access to guns only for sporting purposes -

18  and even sporting purposes is something of a limited term, as

19  this court has given it something of a narrow construction; it

20  doesn't relate to casual use of firearms, plinking and that sort

21  of thing, this court has held - that doesn't survive *Heller*.

22  *Heller* does not invalidate everything that Congress has ever

23  done.  But one would imagine that since *Heller* holds that

24  self-defense is the core interest that the Second Amendment

25  right secures, that an act of Congress that says American

1     citizens cannot acquire -- cannot receive guns, cannot purchase

2     guns for self-defense is flatly unconstitutional.

3          The District had this type of law here with its

4     functional firearms ban; we went to the Supreme Court, it was

5     struck down.  *Heller* spends one sentence discussing that law.

6     It simply says -- after going over why there is no self-defense

7     exception as a statutory matter, the court says, "This plainly

8     conflicts with the core essential guarantee of the

9     Second Amendment; it is therefore unconstitutional."  And that's

10    it.  It's literally the type of law that violates an expressed

11    guarantee that one can --

12          THE COURT:  And it's your argument that even if a

13    firearm can be used for lawful sporting purpose, a firearm that

14    can be used for lawful sporting purpose could also be used for

15    self-defense purposes, that that still conflicts with the

16    Second Amendment?

17          MR. GURA:  Yes.  Because we also had this argument in

18    *Heller*.  In *Heller* - also *Parker* at the DC Circuit level - both

19    the DC Circuit and the Supreme Court spoke in very strong terms

20    against the idea that the mere availability of some arms means

21    that the right to others that are constitutionally protected

22    will be suspended.  It's the old argument that, you know, you

23    can read *Time,* so we're going to ban *Newsweek*.

24          And the DC Circuit first said that the argument was

25    frivolous when the District of Columbia government made it.

1    They said, that's like saying that as long as you can have

2    sabers, we can ban all firearms, because sabers might be arms.

3           And at the Supreme Court, the Supreme Court, after

4    first rejecting the question presented on cert when it tried to

5    include this argument in it, on the merits the Supreme Court

6    said it doesn't matter.  We've determined that handguns are the

7    quintessential self-defense weapons - for whatever reason,

8    that's what the American people have chosen to do - so the fact

9    that other guns may or may not be available to them is

10   irrelevant.  Because these particular guns are categorically

11   protected.

12          Now, there are some firearms that we submit are valid

13   both for sporting purpose and for self-defensive purposes --

14          THE COURT:  That are valid for sporting purposes?

15          MR. GURA:  Yes.  But there are also many firearms that

16   are not, that don't fit that description, or at least don't fit

17   that description the way the government interprets sporting

18   purpose.  And so --

19          THE COURT:  But has there been any ATF regulation or

20   list in any of the ATF bulletins or anything else that has

21   construed firearms for lawful sporting purposes and said, these

22   firearms can be used for lawful sporting purposes, and anything

23   that's not on this list then by definition cannot?

24          MR. GURA:  There are some rulings that are made with

25   respect to there are import restrictions, I believe, where

1    sometimes you can't import a firearm because it is itself

2    subject to the sporting purpose test.

3              As far as interpretations under 922(a)(9) and

4    922(b)(3), then, you know, in that context I haven't seen too

5    many rulings, administrative rulings.  But there's a test that

6    the government sometimes discerns whether a particular gun is or

7    is not for a sporting purpose, but it seems evident --

8              THE COURT:  And that, you're saying, is used in the

9    context of import restrictions?

10             MR. GURA:  Sometimes.  Yeah, I have seen that before.

11   It's not an area in which I typically practice, but what I do

12   know is that whether a firearm is --

13             THE COURT:  Well --

14             MR. GURA:  I'm sorry, Your Honor.

15             THE COURT:  But, I mean, handguns can be imported.

16   Right?

17             MR. GURA:  Sometimes.  There's a great deal --

18             THE COURT:  Most handguns.  I mean, most handguns,

19   probably some of the most popular handguns in the United States,

20   used in the United States, are imported.

21             MR. GURA:  Many handguns are imported, Your Honor,

22   that's true.

23             THE COURT:  The Glock, the Sig-Sauer, the Beretta, you

24   can go down the list.  Some of them are manufactured here, but

25   some of them are not.

1          MR. GURA:  That's right.  In any event, sporting

2   purpose is not self-defense.  We know that.  And the issue here

3   does not relate to the type of firearm, it relates to the

4   purpose for which the firearm would be received or purchased.

5   The laws that we are challenging here relate to the conduct of

6   the individual, not the characteristic, necessarily, of the

7   firearm.  So I suppose if a person were to acquire a firearm for

8   self-defense, the government's view that the firearm is

9   inadequate for self-defense, is only adequate for a sporting

10  purpose, is not going to be irrelevant.

11          THE COURT:  Let's suppose Mr. Dearth said, I want to

12  get a shotgun, a 12-gauge pump shotgun, and he says to the

13  dealer, I'm buying this for self-defense while I'm here.  Yeah,

14  I can take it for skeet shooting, but I've never been skeet

15  shooting in my life and will never go skeet shooting.  This is

16  for self-defense.

17          You're saying that he would be in violation of these

18  two statutes if those were the facts?

19          MR. GURA:  I believe so, Your Honor.  Because at that

20  point Mr. Dearth would be announcing that he has no sporting

21  interest at all in the firearm, he wants it for self-defense,

22  and the dealer -- first of all, the dealer couldn't sell him the

23  gun for any purpose because he doesn't have a state of

24  residence.  But even in a loan or rental situation, it has to be

25  for a sporting purpose, and the dealer would be violating the

1   law.

2         THE COURT:  Okay.  Let's take out the contingency of

3   the sale.  Let's just say a friend has a 12-gauge shotgun and

4   they say, okay, well, Mr. Dearth, while you're here in the U.S.,

5   take my shotgun, and you can keep it at your hotel room or

6   wherever you're residing while you're in the U.S., since you

7   want something for self-defense.  You're saying that that -- and

8   then, you know, give it back before you leave the country.

9   You're saying that that would violate 922(a)(9)?

10        MR. GURA:  It would appear to.  At that point

11  Mr. Dearth would be receiving a firearm for a nonsporting

12  purpose, and that would be a violation.

13        And what's interesting, again, Your Honor, is, you're

14  correct, if under those fact scenarios Mr. Dearth would say to

15  his friend, I just want to go skeet shooting, or I want to go

16  deer hunting or whatever - anything that's obviously a sporting

17  purpose - at that point he could lawfully take the firearm, and

18  there would be nothing in the law that prevents him from doing

19  so; notwithstanding all of these concerns about nonresidents

20  being incipient smugglers who are going to somehow get the

21  firearm out of the country without permission, or any other

22  concerns about untrustworthiness or lack of safety with

23  firearms.

24        And this is why this is a very puzzling case to me,

25  because people are either responsible with firearms or they're

1    not.  When a decision has been made that somebody is not

2    responsible, either because they're violent or unstable, or

3    because they're going to smuggle it illegally, then they should

4    be denied access to firearms.  But this idea that, well, we're

5    sort of suspicious that you might do something wrong with it, so

6    we're going to limit the purpose for which you're acquiring the

7    firearm, there's no fit there.  There's no relationship.  It's a

8    nonsensical relationship.

9         Of course, we would probably challenge a law that

10   forbade all access here, but that's not the law that Congress

11   has written.  Congress has written a law that talks about

12   sporting purposes, and that's why it's really a flagrant

13   conflict with the Second Amendment.  There's not a public safety

14   rationale that we can conceive of that entrusts irresponsible

15   people with firearms.

16        THE COURT:  But what about the language in *Heller* that

17   says that -- well, in a footnote it says:  Nothing in this case

18   basically should be taken to cast doubt on laws imposing

19   conditions and qualifications on the commercial sale of firearms

20   which are presumptively lawful.  I'm paraphrasing.

21        MR. GURA:  Well, there are two answers to that.  First

22   of all, the DC Circuit joins most circuits, in *Heller 2*, as

23   looking at the presumptively lawful language of *Heller* as being

24   just that:  A presumption which the court might start with which

25   might then be overcome in some instances.  And various circuits

1    have found, even have referenced possible exceptions to

2    922(g)(1), where they say, well, if it's very old or a long time

3    from now, unlike perhaps something much more drastic.

4            The Third Circuit in *Marzzarella* I think is probably

5    the one circuit which takes a more scope-oriented vision of the

6    presumptively lawful language.  And even then, even though they

7    take a harder view over there - not this circuit, but in the

8    Third Circuit, actually, this list of presumptive lawful things

9    is a carve-out from the Second Amendment scope - even then, in

10   *Marzzarella*, they dropped a footnote saying that that can't be a

11   case for the commercial sale of firearms, because in that

12   instance, that would mean that you could have a total ban of

13   commerce and firearms, which would violate *Heller*.

14           So even that court recognized that the buying and

15   selling of guns is protected to some degree by the

16   Second Amendment.  And I submit that this is no different than

17   laws that might regulate the buying or selling of any other

18   constitutionally protected goods; in some circumstances the

19   government can come up with regulations that would pass, in some

20   cases it wouldn't.

21           And here, we have a law-abiding citizen who is making

22   an interest that goes to the core of the Second Amendment right;

23   namely, self-defense.  The burden is as substantial as can be, a

24   total prohibition on entering the market for firearms.  At that

25   point we're applying strict scrutiny.  But even if we're

1    applying intermediate scrutiny, as the government suggests, you

2    still need to have the government bearing the burden of showing

3    that there's a reasonable fit between the important objective

4    and the regulation which is at issue.  And there is no

5    reasonable fit between concerns relating to smuggling and the

6    purpose for which a person would use a firearm.

7            THE COURT:  So are you saying, then, that someone in

8    Mr. Dearth's situation who does not reside in any state should

9    be able to purchase any firearm that he wants once he comes to

10   the United States, except perhaps for a federally defined

11   machine gun?

12           MR. GURA:  So long as Mr. Dearth or anybody else is

13   complying -- if a person does not live in the United States,

14   Your Honor, and they come to the United States, they must obey

15   the law of whatever state they're in, as well as any relevant

16   federal law - aside from the one we're challenging, of course -

17   that's going to be binding.

18           So if he walks into a store, he must comply with the

19   laws of that state.  Because he doesn't have a state of

20   residence, there is no residential relationship to be concerned

21   with, and of course once he leaves the store, if he chooses --

22           THE COURT:  So how can he comply with the laws of that

23   state if you're saying that he's not a resident of that state?

24           MR. GURA:  Because there are many states that don't

25   require residence to purchase firearms.  Not every state does.

1    Louisiana, for example -- I looked this up, because this is

2    something that the government had in their attempt to go back

3    into standing, which of course I don't think we can do because

4    this has already been up before.  But the fact is that not every

5    state mirrors federal law here.  Some states do and some states

6    do not.  And there are states that Mr. Dearth can go into and

7    there would be no state law prohibiting him from purchasing a

8    firearm on account of lack of domestic residence.  Although if

9    they had such a law, he would have to comply with it, just like

10   he would have to comply with other state laws that we may or may

11   not like.

12          But once he leaves that store and he goes about

13   travelling on the highways, then he's just like one of us.  He

14   travels into some other state with his firearm at his peril, and

15   the onus is on him not to violate any state laws.  I have items

16   in one state perhaps I cannot take into other states.  I'm sure

17   we all do.  Perhaps not firearms, even.  There are some things

18   you can do in one state that you can't do in another one.  You

19   can buy and sell them legally where you are, and it's your duty

20   as an American citizen to not violate the laws of some state

21   you're travelling to.

22          And he should be treated the same way, with the same

23   rights and responsibilities as everyone else, once he's in that

24   position with a firearm.

25          THE COURT:  What authority do you have for why I should

1    apply strict scrutiny -- or let me put it this way:  Can you

2    cite to me any case that has employed strict scrutiny in the

3    Second Amendment context?

4         MR. GURA:  I can cite to two of them very quickly.  One

5    case, I believe we filed a notice of supplemental authority,

6    *Gowder vs. City of Chicago*, which of course also employed other

7    tests as well, but as a backup they employed strict scrutiny.

8         *Bateman vs. Perdue*, which I referenced earlier,

9    Your Honor --

10        THE COURT:  What do you mean, that they employed

11   other -- other --

12        MR. GURA:  Well, in *Gowder* the Northern District of

13   Illinois struck down a Chicago ordinance that barred people from

14   having guns if they had previously been convicted of misdemeanor

15   unlawful use of a firearm.  And the District Court struck it

16   down in about five different ways, and one of them was strict

17   scrutiny.  The court held that the law was vague and ambiguous.

18        The court used a history and tradition test of the sort

19   referenced by Judge Kavanaugh in this circuit in dissenting in

20   *Heller 2*, and then, after the Kavanaugh tradition test, he went

21   down the list and said strict scrutiny, it fails, and then

22   intermediate scrutiny, it fails.

23        *Bateman vs. Perdue*, in the Eastern District of

24   North Carolina, followed actually the Fourth Circuit's

25   instructions in *U.S. vs. Masciandaro*.  And *Masciandaro,* of

1    course, was a Fourth Circuit case where the circuit expressly

2    held -- although it didn't use it in that case because

3    *Masciandaro* was an outside-the-home case.  But the

4    Fourth Circuit held that for things inside the home, we're going

5    to use strict scrutiny, and because in *Bateman* the laws

6    interfered with people's ability to bring guns and ammunition

7    home with them - there were some restrictions on sales as well -

8    the court applied strict scrutiny.

9           In another case, *Ezell vs. City of Chicago*, the court

10   applied what it called not quite strict scrutiny, but indicated

11   that it was clearly more than intermediate, because it

12   distinguished *Skoien*, the earlier Seventh Circuit case that had

13   applied intermediate scrutiny to uphold the domestic violence

14   misdemeanor prohibition.  *Ezell*, of course, dealt with the

15   rights of, again, law-abiding, responsible American citizens to

16   engage in conduct that was plainly contemplated by the

17   Second Amendment - namely the right to use guns at a gun range,

18   which Chicago, in response to *McDonald*, barred completely - and

19   the Seventh Circuit said, no, you can't do that.  This is a core

20   interest, and it's by responsible people, so it's going to be

21   higher up the scale.

22          In *Heller 2* in this circuit, the court did not use

23   strict scrutiny but suggested that it might in the future.  It

24   found that the laws being examined there imposed only a

25   de minimus burden, and therefore it did not go to heightened

1    scrutiny.  But it definitely left open the prospect that

2    heightened scrutiny would apply to laws that involved a greater

3    than de minimus burden.

4          And the DC Circuit also confirmed again, as it had

5    previously in *Parker* - and as have most courts, if not all

6    courts - that Second Amendment frameworks are going to be barred

7    from the First Amendment.  Well, the First Amendment in some

8    cases has strict scrutiny, and one would suppose that if you

9    have Second Amendment claims that are going to the core interest

10   of the right, made by responsible, non-dangerous people, at that

11   point the scrutiny level rises.  If you have peripheral claims

12   by irresponsible people, the scrutiny level drops.

13         So in any event --

14         THE COURT:  So you're saying that I can apply different

15   levels of scrutiny based on whether I believe that the person

16   asserting the right is responsible or irresponsible?

17         MR. GURA:  That's one of the factors the courts look

18   to, and it's been mentioned in many cases.  Virtually all the

19   Fourth Circuit cases on the Second Amendment talk about

20   responsible, law-abiding persons.  That's the language that they

21   use all the time.  And the irresponsibility and criminality of

22   individuals has been used in many 922 challenges, specifically

23   to reduce the level of scrutiny given, because the person making

24   the claim is somebody who might be thought to be at the

25   periphery of Second Amendment claimants.

1          This, of course, is a 922 challenge by people who are

2     not criminals.  And that perhaps might be unusual, but

3     nonetheless it is the case that we've got.  The fact is that

4     *McDonald* also referenced the fact; held - and we had five

5     justices for this proposition - that it's a fundamental right.

6     And we know that fundamental rights are given strict scrutiny in

7     many cases.

8          THE COURT:  I've had you going for a while, and I want

9     to let the government have time to argue.  So if you have any

10    concluding points you want to make, I'll allow you to make them.

11         MR. GURA:  Sure, Your Honor.  We didn't get to talk

12    much at all about the international right to travel, and I won't

13    impose upon the Court.  If the Court doesn't have questions on

14    the issue, then I suppose perhaps the papers would suffice.  I

15    would simply mention that this is a right that is very much

16    recognized, it's been held to be fundamental, and it's violated

17    as well as the Second Amendment right.  And it's a serious issue

18    that we've got here as well.  Thanks.

19         THE COURT:  Thank you.  All right.  Mr. Riess?

20         MR. RIESS:  Thank you, Your Honor.  May it please the

21    Court, this case is about two laws passed by Congress to help

22    states enforce their own firearms regulations and to help combat

23    international gun smuggling.  As plaintiff said, these laws

24    impose a condition on the purchase and the receipt of guns; with

25    limited exceptions, a person needs to buy a gun in the place

1       where he or she lives.

2              As to this Second Amendment claim, for them, as the

3       DC Circuit held in *Heller 2*, there's a two-step inquiry:  Does

4       the law impinge on the Second Amendment right?  If no, the

5       inquiry ends; if yes, we go on to step two.  Does the law pass

6       muster under the appropriate level of scrutiny?  Now, applying

7       that two-part test here shows that the laws are in fact

8       constitutional.

9              So start with step one:  As applied to plaintiff, do

10      these laws impinge on the Second Amendment right.  Well, *Heller*

11      says, as you yourself pointed out, laws imposing conditions and

12      qualifications on the commercial sale of arms are presumptively

13      lawful.  And *Heller 2* said, if it's a type of firearms

14      regulation that's long standing, we presume it's lawful.  Now,

15      we've shown that as applied to plaintiff, the two laws place a

16      condition or qualification on the commercial sale of arms, and

17      the laws are long standing, as *Heller 2* defines them.  So if

18      there's long standing, they're presumed lawful.

19             Now, plaintiff may rebut this by showing the regulation

20      has more than de minimus effect.  We don't think plaintiff has

21      rebutted this presumption, but in any event, the two laws leave

22      open ample alternative channels for plaintiff to exercise his

23      Second Amendment rights.

24             THE COURT:  How do I know when the law is long

25      standing?

1          MR. RIESS:  The DC Circuit in *Heller 2* said -- it

2     looked to laws restricting felons.  I noted that they were

3     passed in the first quarter of the 20th century.  It said

4     presumably that would be long standing, since *Heller* said that

5     such laws were presumptively lawful.  The reason that the

6     DC Circuit gave is because a law, a regulation that's long

7     standing necessarily means the public has long accepted it, and

8     so it isn't likely to burden a constitutional right; it's become

9     part of the fabric that's considered permissible regulation.

10         So you look to age and also to the number of different

11    states that had it.  Although the DC Circuit in *Heller 2* didn't

12    point to a specific number, it pointed to six states, I believe,

13    D.C., and a U.S. territory.

14         THE COURT:  Well, given that these statutes were

15    enacted in the 1970s, and I guess one was amended -- a pertinent

16    amendment occurred in 1986 or so.  Right?  How are they long

17    standing compared to statutes that the circuit referred to which

18    were almost 100 years old?

19         MR. RIESS:  Well, Your Honor, the specific laws

20    challenged in *Heller 2* were brand new.  They were passed by the

21    District following a remand from the Supreme Court.  And so the

22    DC Circuit said, we look to -- is this the type of firearms

23    regulation that's been long standing, and so it looked at

24    different types of laws.

25         I noticed also that they weren't necessarily concerned

1      with whether or not the law at issue there in *Heller 2* was -- it

2      was registration, whether basic registration of handguns was

3      presumptively lawful.  And it wasn't really concerned with

4      whether or not a person gave certain information to the seller

5      of a gun or certain information directly to the government.  It

6      was both types were considered as presumptively long standing.

7            Even if, however, the laws are not considered to be

8      long standing, they pass muster, because, at most, intermediate

9      scrutiny applies under the guidepost, which again is *Heller 2*.

10           I looked at certain factors in determining which level

11     of scrutiny applied - assuming that heightened scrutiny would

12     apply - and it said:  The level of scrutiny depends on the

13     nature of the conduct that's being regulated and the degree to

14     which the challenged law burdens the right.  Substantial burden

15     on the core right of self-defense, you need a strong

16     justification; less substantial burden would be proportionately

17     easier to justify.

18           THE COURT:  If the statutes at issue do not recognize

19     self-defense as kind of a lawful purpose behind either receiving

20     or purchasing a firearm, then why doesn't that impinge upon a

21     core purpose of the Second Amendment?

22           MR. RIESS:  Well, because what *Heller 2* looked to was

23     what options were available under the laws.  So, for example,

24     when they looked at the laws that were banning certain types of

25     semiautomatic rifles and large capacity magazines, it said:

1    These don't prohibit the possession of a handgun, as in *Heller*.

2    They don't prevent a person from keeping a suitable and commonly

3    used weapon for protection in the home or for hunting, whether a

4    handgun or a nonautomatic long gun.  It said:  The prohibition

5    of semiautomatic rifles and the large capacity magazines, that

6    they don't effectually disarm an individual, and they don't

7    substantially affect an individual's ability to defend

8    themselves.  And so it said:  Although we can't be confident

9    that these prohibitions impinge at all on the core right, we're

10   reasonably certain that they don't impose a substantial burden.

11           The same is true here.

12           THE COURT:  Are there any handguns that can be used for

13   lawful sporting purposes?

14           MR. RIESS:  Yes.  For handguns, there's a set of

15   factoring criteria that is used, but it boils down to it's any

16   handgun that can be imported into the U.S.  That means tens of

17   thousands of different types of handguns, including the Glock,

18   the Taurus.  The Glock is the most popular handgun for

19   self-defense purposes.  Up to 95, 98 percent of foreign made

20   handguns are acceptable, and most U.S. handguns are acceptable,

21   too.

22           THE COURT:  So what about my hypothetical?  Mr. Dearth

23   comes to the U.S., he visits with his friend, he says, "I really

24   would like to have a gun for self-defense while I'm visiting in

25   the U.S. during the month of October," and his friend says,

1    "Okay, I'll give you my Glock semiautomatic handgun to use and

2    possess while you're here, and you just have to give it back to

3    me before you leave town, or leave the country."

4         Let's start with 922(a)(9).  Can that take place?

5         MR. RIESS:  No, Your Honor.  Based on the plain text of

6    the statute, it prohibits any person who doesn't reside in any

7    state from receiving a firearm, unless the receipt is for lawful

8    sporting purposes.

9         THE COURT:  So if Mr. Dearth said the same thing as far

10   as, "I want to have a gun for self-defense purposes," and his

11   friend says, "Okay, here's my 12-gauge shotgun.  I use it for

12   skeet shooting, but it's a perfectly good self-defense gun, so

13   you can take that and keep it for the month of October while

14   you're in town," can that be done?

15        MR. RIESS:  No.  If the purpose is not for lawful

16   sporting purposes, then the plain text of the statute (a)(9)

17   would bar it.

18        THE COURT:  Okay.  And what is your position as far as

19   what receive means under -- in this provision?

20        MR. RIESS:  We essentially agree with plaintiff,

21   Your Honor.  We're not aware of any prosecution in which -- that

22   turned on the duration.  We think there certainly could be some

23   de minimus, like your example of handing someone a gun just to

24   examine at a range for a few seconds.

25        THE COURT:  So if in my hypothetical Mr. Dearth said,

1    "You know, September 11th is tomorrow, and I'm just kind of

2    fearful of something happening on September 11th, so just for

3    the day can I borrow your shotgun?  And you use it for sporting

4    purposes, but I want it for self-defense purposes; I'll give it

5    back to you the morning of the 12th," you say that that would be

6    a violation of 922(a)(9)?

7          MR. RIESS:  Yes, Your Honor, under the plain text of

8    the statute.  The reason, though, that it does not interfere

9    with the core right of self-defense goes to what the DC Circuit

10   said in *Heller 2:*  What options are open under the challenged

11   laws to someone who wants to possess and use a gun for

12   self-defense?

13         Here, there are a number of different alternative

14   options.  Plaintiff has conceded he possesses legally firearms

15   in Canada; he can bring those into the United States --

16         THE COURT:  Suppose he didn't.  Or suppose he just

17   forgot and just didn't bring them with him, and so he's going to

18   be visiting family here and wants to possess a gun for

19   self-defense while he's here.  What are his options?

20         MR. RIESS:  His options are he can rent a gun from a

21   licensed dealer for sporting purposes, and then use that gun for

22   self-defense.

23         THE COURT:  So he's supposed to lie and say, "I have a

24   sporting purpose that I intend to use it for," when he really

25   doesn't?

1          MR. RIESS:  No, Your Honor.  But his options would be a

2     rental from a licensed dealer or a loan from a friend for

3     sporting purposes, and then to be able to use that gun for

4     self-defense.

5          THE COURT:  Well, how is anyone to know that it's for

6     lawful sporting purposes just because it is possible for that

7     gun to be used for lawful sporting purposes?

8          MR. RIESS:  Because the statute specifically says that

9     the receipt has to be for that purpose.  I suppose if it came up

10    in a prosecution, there would have to be some evidence that the

11    receipt was for hunting or sporting.

12         THE COURT:  And if the evidence was that Mr. Dearth

13    said, "I want it for self-defense," and his friend said, "Look,

14    I'll loan you my shotgun, but you really want it for sporting

15    purposes," wink, nod, and hands it over, and Mr. Dearth says,

16    "Okay, I guess for the record I have to say that, but I really

17    want it for self-defense," you're saying that's compliance with

18    the statute?

19         MR. RIESS:  No, Your Honor, I don't think the law could

20    be evaded, as you say, with a wink and a nod.

21         THE COURT:  Then what options does a person have if

22    their true purpose isn't for lawful sporting purpose?

23         MR. RIESS:  The options that they have are to purchase

24    a gun, or already have them in the country in which they reside,

25    which is presumably the most convenient place to purchase

1    anything.  The fact that, for example, plaintiff here might not

2    prefer that doesn't mean that the option isn't available.

3          We're not aware of any case holding that whether or not

4    a constitutional right is violated turns on whether a person

5    happens to prefer a particular mode of exercising it.  It looks

6    at -- we pointed to a number of cases in the right-to-travel

7    context, and there's also the *Decastro* Second Circuit case we

8    cited as a supplemental authority.  We look to what options are

9    open and available to the plaintiff.  And since he can buy a

10   wide variety of handguns and long guns in Canada and bring them

11   into the U.S. --

12         THE COURT:  And that's undisputed on this record?

13         MR. RIESS:  Plaintiff in -- yes, in an earlier -- yes,

14   it is undisputed.

15         THE COURT:  What if he resided in some country -- I

16   don't know what the laws are in other countries, but let's

17   suppose he lived in Spain, and Spain allowed you to purchase

18   guns there but you could not remove them from the country.  What

19   if he lived in some foreign country where that were the law?

20         MR. RIESS:  That would then -- Your Honor, that option

21   would not be available to him.  However, since plaintiff Dearth

22   is only challenging the right to purchase, and the complaint

23   only says that "I wish to purchase guns for self-defense in the

24   United States," we focused on the degree to which he's barred

25   from alternative options for purchasing.  Whether or not there

1    might be other cases or other instances we don't believe is

2    before the Court.

3            THE COURT:  Well, no, I guess my point is that you're

4    saying that Mr. Dearth has other options; he doesn't have to

5    purchase a gun because he could bring his gun here.  And all I'm

6    saying is, suppose Canada changed their law tomorrow and said

7    that you can't bring your gun to the U.S. or out of Canada, or

8    he lived in some country where that were not possible, but

9    otherwise it's the same case.  What's your argument then as to

10   why there's no violation of his Second Amendment rights?

11           MR. RIESS:  Well, in that instance we would have to

12   look to whether there would be any adequate alternatives

13   available.  But since the challenge is as applied to Mr. Dearth,

14   that's the reason why we focused on that.  To the extent that

15   plaintiff --

16           THE COURT:  So there's no facial challenge to 922(a)(9)

17   or -- I'm forgetting the other statute.  It's (b)...

18           MR. RIESS:  (B)(3).

19           THE COURT:  (B)(3).

20           MR. RIESS:  Plaintiff has said that 922(b)(3) is as

21   applied; (a)(9), the first mention of facial challenge comes in

22   notices of supplemental authority, which we would contend is too

23   late to raise.  The complaint itself doesn't call (a)(9)

24   unlawful on its face, but only contends as applied to all

25   Americans.  That's not the language of a facial challenge, which

1    would be unlawful in all of its applications.

2         But in any event, even if a facial challenge were

3    applicable to (a)(9), it's well established that we look first

4    to whether or not the law as applied is constitutional, because

5    facial challenges and the relief they're under is such strong

6    medicine.  So for that reason, we've focused on an as-applied

7    challenge to Mr. Dearth, and under *Heller 2*, we look to what are

8    the options available to him.

9         Because of those options, he has many widely available

10   options for purchasing a gun - a handgun or long gun - that's

11   useful for self-defense purposes; at most, intermediate scrutiny

12   applies, and the laws here relate substantially or reasonably

13   fit two important governmental purposes, protecting public

14   safety and combatting violent crime.

15        Now, for (b)(3), Congress had ample evidence that

16   persons evade state gun laws and then use the gun laws to commit

17   violent crimes in their state of residence.  Congress tied its

18   provision to state residency; with certain exemptions, you have

19   to abide (sic) in the state of residence.  (A)(9) supplements

20   those protections.  The problem now is nonresident aliens

21   obtaining guns from licensed dealers through an intermediary.

22   So Congress tied it to state residency.  You can't receive a gun

23   if you don't reside in any state.

24        The fit is substantial here.  The purpose is to control

25   interstate commerce of firearms, not to prevent nonresident

1    Americans from using guns for self-defense while visiting the

2    U.S.  And there's a reasonable fit between the goal and the law.

3    Congress determined, quote, "Lawmakers in each state are best

4    able to determine the conditions and needs in their own borders

5    and to pass appropriate legislation."

6         THE COURT:  What about the fact that some states,

7    according to counsel for plaintiff, allow nonresidents to

8    purchase guns in their state?

9         MR. RIESS:  Actually, Your Honor, that goes to our

10   point.  Congress was focused on state residency.  When you're a

11   resident of a state, a state has a certain interest in you as a

12   person within its borders, and consequently has a certain amount

13   of regulatory authority over you.  If you're not a resident of a

14   state, then no state has that authority over you.

15        The two laws here focus on nonresidency.  It's not

16   necessarily just someone living abroad.  Say if you're a nomad,

17   traveling around with no fixed residency, you have no state of

18   residence; that's what Congress was focusing on, people without

19   a state of residence.  They didn't want forum shopping.

20        And by contrast, plaintiff here would be the ultimate

21   forum shopper.  He could be prohibited in certain states; no

22   problem, he can pick and choose a state that doesn't have that

23   prohibition, a state with the least stringent requirement.  And

24   that puts him in a different position from all other resident

25   U.S. citizens.

1          Now, residents can move to another state.  They can

2   move to one with the loosest gun laws, they can move to one with

3   the most stringent gun laws, or anything in between, but then

4   you're subject to all of the other laws.  People don't say,

5   well, I want to be subject to this state's gun laws, but I want

6   this state's speed limit and I want this one's income tax and

7   sales tax.  Under the two laws, it's a package deal, and that is

8   the federal interest in application to plaintiff Dearth here.

9          THE COURT:  Well, as far as Mr. Dearth goes, I mean,

10  isn't he a person who Congress really should have minimal, if

11  any, interest in regulating, in the sense that he's asserting a

12  lawful purpose, which is to protect himself?  He's not a felon

13  or any other kind of prohibited person, and all he wants to

14  do -- he's already got a license to carry, and that's effective

15  in many -- it was issued by one state, and I guess by some means

16  of reciprocity it's recognized in other states, and he has

17  comported and complied with whatever rules and regulations that

18  allow him to purchase a firearm in Canada.

19          So what is Congress' real purpose here?  How is that

20  really manifested with prohibiting Mr. Dearth from purchasing

21  any firearm at all?

22          MR. RIESS:  I guess two points, Your Honor.  First,

23  that a plaintiff is a law-abiding citizen doesn't necessarily

24  entail the highest level of scrutiny.  The same is true with the

25  plaintiffs in *Heller 2*.  They were presumptively law-abiding

1    citizens, and the court applied intermediate scrutiny to those

2    laws.  There are a number of cases across the country that have

3    also done so.  We cited some in our briefs.

4         The second point is that with (a)(9), Congress was

5    concerned about persons without residence.  It didn't

6    specifically say - and could have - "we're limiting (a)(9) just

7    to nonresident aliens."  Because presumably the problem would be

8    similar.  There's an incentive, if the two nearest countries,

9    Canada and Mexico - or any country - has more stringent gun

10   laws, to obtain a gun in a country with laxer laws - the

11   United States - and smuggle it abroad.  That would presumably be

12   an incentive that's available to a nonresident U.S. citizen.

13   We've cited some examples in our reply brief.

14        So the fact that -- when we look at what options are

15   available to plaintiff, he could go into a gun store in Canada

16   and buy any of a wide variety of handguns and long guns

17   tomorrow.  And he can use the guns that he already has and bring

18   them in to possess and use for self-defense.  Possession and use

19   is the core right that was recognized in *Heller*, and --

20        THE COURT:  So you're saying that because -- if he

21   brought his gun from Canada with him, then there's no issue of

22   receiving it, so he can possess and use, and that way he is able

23   to exercise his right to keep and bear arms.  Because even if

24   his possession is only for self-defense purposes, there's no

25   receipt, so there's no violation or implication of 922(a)(9),

1    and there's no sale, so there's no implication of 922(b)(3).

2            MR. RIESS:  That's correct, Your Honor.

3            THE COURT:  While we're just on how the statute should

4    be construed, what does lawful sporting purpose mean?  Do you

5    believe that there's any dispute in the papers here about what

6    that term means?

7            MR. RIESS:  No, Your Honor.  Plaintiff in his papers

8    pointed to two DC Circuit -- well, one DDC and one DC Circuit

9    case, the *Springfield* cases, that talked about lawful purposes,

10   including hunting and sporting.  We would disagree with the

11   characterization that they were necessarily narrow, because most

12   long guns are suitable for sporting purposes - rifles or

13   shotguns - and the vast bulk of handguns are also suitable for

14   sporting purposes.  But to answer your question, Your Honor, no,

15   I don't think there's any dispute.

16           Your Honor, in conclusion, the plaintiff here wants to

17   opt out of requirements of federal law that apply to all U.S.

18   citizens, residents or not.  He seeks to be treated differently

19   from and better than resident U.S. citizens when they visit the

20   U.S.

21           The bottom line is that the two laws here are far

22   removed from anything the courts have recognized as

23   constitutionally suspect under the Second Amendment.  They do

24   relate substantially to the important government purposes of

25   combatting violent crime and protecting public safety; they do

1    not substantially burden the right to possess and use a gun for

2    self-defense.

3            For these reasons, Your Honor, the Court should enter

4    summary judgment for defendant.

5            THE COURT:  I've got a couple of other questions for

6    you.  Thank you.  I mean, is the government taking the position

7    in this case that because Mr. Dearth has no residence in the

8    U.S., that the Second Amendment right as it applies to your

9    right of self-defense in your home is not implicated here?

10           MR. RIESS:  Your Honor, we didn't brief the question of

11   inside of the home and outside of the home, and the reason is

12   because a number of courts, including the DC Circuit and the

13   Supreme Court, have said it's a difficult constitutional issue,

14   and they've taken steps to avoid answering that question.

15           So *Parker*, the DC Circuit case that became *Heller*,

16   said:  "We need not consider the more difficult issue of whether

17   the District can ban the carrying of handguns in public or in

18   cars."  *Heller* itself said:  "We construe plaintiff's" -- the

19   DC Circuit construed the complaint as "seeking only the right to

20   render a firearm operable and carried about his home in that

21   condition only when necessary for self-defense, and that that

22   construction hasn't been challenged here."

23           The Fourth Circuit, especially in the *Masciandaro* case,

24   said:  "*Heller*'s applicability to possession outside the home is

25   a, quote, 'vast terra incognita' courts should enter only on

1    necessity, and then by small degree."

2          The District Courts are split, and we're not aware of

3    any appellate decision that definitively resolves the issue.  So

4    for that reason, we did not brief and take a position on whether

5    and to what extent the right extends to beyond the home.

6          THE COURT:  Does the government -- is the government

7    taking a position here in this case that there is a distinction

8    between the right to purchase a firearm and a right to possess a

9    firearm?  I mean, I know that you're construing the statute as

10   far as what the statute means, but I want to -- in case I don't

11   agree with that construction of the statute or I have to reach

12   this, is the government's position that there is a distinction

13   between the right to purchase and a right to possess?

14         MR. RIESS:  Yes, Your Honor.  At issue in *Heller* was

15   the right to possess and use.  It was a ban on the possession of

16   handguns, and the possession specifically of usable handguns in

17   the home.  Whether or not additional protection would extend to

18   the right to purchase, we do have a District Court case that did

19   not recognize that, the *Jennings* case that we cited in our

20   brief.

21         We would offer that the right -- a broad right to

22   purchase is not consistent with *Heller*'s statement that

23   conditions and qualifications on the sale of guns is

24   presumptively lawful.

25         We would also note that the *Andrews* case that plaintiff

1    mentioned, the point about sale was dictum in that case.  At

2    issue there was I believe whether or not a handgun -- a

3    concealed handgun could be possessed.  And *Heller*, although it

4    did cite *Andrews*, did not cite it for the proposition that the

5    right under the Second Amendment extends to a right to purchase

6    as well.

7           So whether or not there is such a protection, the core

8    right is possession and use.

9           THE COURT:  So just so that we're clear, the

10   government's position in this case is that Mr. Dearth can bring

11   a handgun that he purchased in Canada with him into the

12   United States, even if he states that "I'm not bringing it for

13   lawful sporting purpose, I am bringing it solely for

14   Second Amendment purposes, to the extent that the

15   Second Amendment gives me a right to self-defense."

16          MR. RIESS:  Yes.  And beyond that, Your Honor, it's not

17   just handguns, it's also long guns.  As long as they are

18   suitable for sporting purpose, there's no inquiry as to what the

19   purpose for which they are actually used in the United States.

20          THE COURT:  All right.  Thank you.  You can be seated.

21   Give me just a moment.

22          MR. RIESS:  Thank you, Your Honor.

23          (OFF THE RECORD.)

24          THE COURT:  Mr. Riess, I just have, I think, one final

25   question, and Mr. Gura, I wanted to just follow up with you

1f6e953f80cfc9a6

1    about one thing before we conclude.

2         With respect to the level of scrutiny, the government's

3    position is that if I find that the Second Amendment is

4    implicated, that I employ intermediate scrutiny.

5         MR. RIESS:  Yes, Your Honor.

6         THE COURT:  And you say that *Heller 2* employed

7    intermediate scrutiny.  What do you say in response to the

8    plaintiff's argument that there are courts that have applied

9    strict scrutiny?  Or I guess another way of saying it is, why is

10   intermediate scrutiny the right level of scrutiny based on the

11   precedent that we have to date?

12        MR. RIESS:  To answer the latter question first,

13   intermediate scrutiny is correct, because under *Heller 2*, the

14   laws that were upheld under intermediate scrutiny there - the

15   ban on certain semiautomatic guns and on large capacity

16   magazines - didn't prohibit the possession of a handgun, as in

17   *Heller;* didn't prevent the plaintiff from keeping a suitable

18   commonly used weapon for protection in the home and hunting;

19   didn't effectively disarm plaintiff; did not substantially

20   affect his ability to defend himself.  That's the language that

21   the DC Circuit used with respect to those laws, and the same is

22   true here.

23        Now, with respect to the first question, the other

24   two cases, the *Gowder* case was similar to *Heller* in that the

25   plaintiff was barred from possessing any -- I'm certain not any

1    handgun; perhaps any gun.  And that's certainly distinguishable

2    from the case here.

3            The *Bateman* case related, I believe, to certain

4    emergency purposes, and prevented the plaintiffs there, I

5    believe, from possessing in the home during emergencies.  At the

6    very least it was possessing and using guns for self-defense,

7    and because it was such a stringent right, the District Court

8    there applied strict scrutiny.

9            This is not a law that was passed for either of those

10   purposes.  It's not -- it doesn't, as applied to plaintiff

11   Dearth, meaningfully affect his ability to possess and use a gun

12   for self-defense while he's in the United States.  For that

13   reason, the other cases are inapplicable, and the analysis of

14   the DC Circuit in *Heller 2* should apply.

15           THE COURT:  What's your response to the plaintiff's

16   argument that it's all well and good that he can bring his gun

17   from Canada, but he may forget or he may prefer to use -- prefer

18   to have a different gun that he cannot purchase in Canada for

19   self-defense here, and this is a fundamental right, and just

20   because, like you said, you're not banning him from -- you can't

21   ban him from purchasing a book just because he could get a

22   library card and borrow the book.  What's your response to that

23   argument?

24           MR. RIESS:  I guess there would be two responses.

25   Plaintiff presents no facts to show that he can't meaningfully

1    exercise his right.  *Heller 2* said, even, we don't hold that

2    possession of semiautomatic handguns is outside the

3    Second Amendment's protection, we simply don't read *Heller* as

4    foreclosing every ban on every possible subclass of handguns,

5    or, for that matter, a ban on a subclass of rifles.

6           This isn't a ban on possession and use, as that was,

7    but it clearly indicated that a lesser restriction than that

8    imposed in *Heller* would be acceptable.  And again, the issue is

9    whether there are open adequate alternative means, not

10   identical.

11          As to the argument about the book shop and the library,

12   constitutional rights aren't fungible and interchangeable.  The

13   notion that review of one constitutional right might track

14   another might be superficially appealing, but it doesn't make

15   sense, when scrutinized.  The *Hightower* decision, which we just

16   attached, quoted a District Court case noting that, while some

17   Second Amendment cases, they bar an analytical framework, they

18   don't apply substantive First Amendment rules.

19          And the Fourth Circuit in *Chester*, a concurring

20   opinion, noted that *Heller* refers to the First Amendment, but

21   it's for quite limited purposes.  It's not an invitation to

22   import doctrines that are specific to the First Amendment

23   wholesale into a Second Amendment context.  We can't simply

24   transpose substantive protections of different constitutional

25   rights.  The First Amendment free speech protects ideas, so if

1   there's a limit on the range of ideas that you can access, that

2   goes to the core right.

3           The Second protects access to a weapon for

4   self-defense.  There's a multiplicity of different possible

5   weapons for self-defense.  And the scope is different.  We

6   wouldn't, for example, prevent a felon or a mentally ill person

7   from buying a book or religious articles, but *Heller* said it's

8   fine to prevent them from possessing guns.

9           So to that extent, we don't think that you can simply

10  map First Amendment doctrines onto the Second Amendment where

11  they don't fit.

12          THE COURT:  Did the circuit in *Heller 2* construe the

13  newly enacted D.C. statute as effectively prohibiting the

14  possession of all semiautomatic handguns?

15          MR. RIESS:  Yes, I believe it did.

16          THE COURT:  And it upheld that?

17          MR. RIESS:  It did uphold that law as well.

18          THE COURT:  Okay.  All right.  Thank you, sir.

19          MR. RIESS:  Thank you.

20          THE COURT:  Mr. Gura, if you have anything you want to

21  say in rebuttal, but let me start with the DC Circuit's analysis

22  in *Heller 2*.

23          MR. GURA:  Sure.

24          THE COURT:  Do you agree that the circuit court found

25  that the proper construction of the D.C. laws at issue would

1    foreclose or prohibit the possession of all semiautomatic

2    handguns?

3           MR. GURA:  No, Your Honor, that's not what the D.C. law

4    holds, and it's not what the DC Circuit said.  In *Heller 2*, at

5    issue there was, among other things, there was some registration

6    requirements that were challenged, and some were upheld and some

7    were remanded.  And with respect to categorical weapons

8    restrictions, there were restrictions on so-called assault

9    weapons which were defined by a variety of features.  It's not

10   simply a matter of being semiautomatic.  And D.C. law does in

11   fact allow people to have semiautomatic handguns, and they do.

12          THE COURT:  But wasn't the prohibition against machine

13   guns also at issue in *Heller 2*, and the D.C. definition of

14   machine gun is any firearm capable of basically semiautomatic

15   operation, with a magazine larger than 10?

16          MR. GURA:  I don't believe so, Your Honor.  That used

17   to be the definition pre-*Heller 1*.  I believe that they don't --

18   a machine gun obviously is commonly understood under federal law

19   as a weapon.  We know what that is.

20          THE COURT:  I know what that is.

21          MR. GURA:  I believe they either repealed that or made

22   a sufficient exception.  I don't have the D.C. Code in front of

23   me, Your Honor.  But I know for a fact that the D.C. Code allows

24   the registration of semiautomatic handguns.

25          And in fact, I litigated this in part, because the

1    first thing that the D.C. City Council did is they copied over

2    California's handgun rostering law.  California has a law that

3    says if it's on this list, you can have the handgun; if it's not

4    on the list, you can't have it.  And we sued in a case called --

5    I forget the name of the case.  I have so many cases these days.

6    In any event, we filed the lawsuit, which was actually for a

7    time consolidated with *Heller 2*, and what happened was, in

8    response to our lawsuit, the D.C. City Council amended their

9    law, and in fact got rid of the California roster by amending it

10   so broadly as to include the relevant laws from Maryland and

11   Massachusetts as well, and built in a number of other

12   exceptions.

13        So today, the bottom line -- and it's a complex

14   statutory scheme, but the bottom line is, if a gun is legal to

15   possess in Maryland, if the Maryland Handgun Review Board would

16   put it on its list, then it's registrable in the District of

17   Columbia.  And I know a lot of people have handguns in D.C. that

18   are semiautomatic.

19        Now, you can't have a magazine which has a capacity of

20   over 10 rounds.

21        THE COURT:  Okay.  It used to be that if you could

22   possibly purchase a magazine that would fit in the gun that held

23   more than 10 rounds, it was considered a machine gun, and

24   therefore prohibited in the District of Columbia.  You're saying

25   that that definition had been changed by *Heller 2*, and the court

1     in *Heller 2* did not uphold a law that prohibited basically all

2     semiautomatic handguns?

3          MR. GURA:  No, I don't believe that they did that, and

4     I don't believe there is such a law in D.C. today.  And I know

5     for a fact that people register semiautos all the time here.

6          THE COURT:  Did *Heller 2* -- did the court construe D.C.

7     law in *Heller 2* as foreclosing any particular category of either

8     handguns or weapons?  I understand that the definition of

9     assault weapon was upheld, but other than that, was there any

10    other kind of category of guns that had been prohibited by D.C.

11    law that the court construed?

12         MR. GURA:  I don't believe so, Your Honor.  My

13    recollection of *Heller 2* is that the categorical restrictions

14    pertain to the so-called assault weapons.  That was the

15    controversy there.  And it didn't relate to machine guns, either

16    traditionally or as previously understood in the District, or

17    anything else.

18         I would say, however, that -- just if I may respond,

19    there are a number of things, and this will be brief.  I

20    understand it's been a long argument.

21         When *Heller* referenced long-standing prohibitions, the

22    Supreme Court was referencing 1791.  The idea was, what is

23    within the traditional understanding of the right to bear arms.

24    There are some cases where you're dealing with state laws where

25    there's a question that arises, are we in 1791 or 1868, the time

1  of the adoption of the 14th Amendment.  But here we have a

2  federal law; long-standing tradition goes to the law, I believe,

3  as it existed in 1791.

4          922(a)(9) actually only goes back to 1994.  That's when

5  that was created, as far as our reading of the statute is

6  concerned.  And, of course, (b)(3) was substantially rewritten

7  in 1986, and that's...

8          But in any event, 1968, 1994, these are all fairly

9  recent times.  They're within many people's living memory in

10  this country, and that's not something that informs the

11  traditional scope of the understanding of the right.

12          As far as outsourcing people's constitutional rights to

13  a different country, Your Honor, the Supreme Court obviously, in

14  cases we've cited - and also not just at the Supreme Court

15  level, but also *Ezell* in the Seventh Circuit - have dealt with

16  the idea of telling people to go exercise their constitutional

17  rights somewhere else, and that is simply --

18          THE COURT:  Well, it's not telling them to exercise

19  them somewhere else.  I mean, I'm bound by *Heller 2* --

20          MR. GURA:  That's right.

21          THE COURT:  -- and if the court in *Heller 2* said that

22  part of the analysis is trying to understand, in an as-applied

23  challenge, what the real burden is, and therefore what the

24  plaintiff's options are, then aren't I required to undertake

25  that analysis?

 1          MR. GURA:  You are, Your Honor.  But the options cannot

 2     be -- it's never a permissible option in a constitutional case

 3     to say, well, one of the options is to go to another country and

 4     purchase that firearm or purchase that book or purchase that

 5     whatever and then bring it back here.  Because at that point,

 6     *Heller* also told us that you're getting heightened scrutiny if

 7     there's a substantial burden, if there's more than de minimus

 8     burden.

 9          And in *Heller 2* they could say, well, the District is

10     banning these particular types of firearms and they're imposing

11     these particular type of registration procedures, but this is

12     quite a different set of laws that we're dealing with in this

13     case.

14          THE COURT:  But he already owns the handgun in Canada.

15     All he has to do is, when he travels to the U.S., he has to

16     check it, put it in a locked container, comply with Section

17     926(a), and bring it with him.

18          MR. GURA:  926(a) relates to transportation throughout

19     the United States.  To bring a gun across the border is a

20     somewhat more complicated matter.  It's actually not that easy,

21     and Mr. Dearth has tried and he's had some difficulties in doing

22     that.

23          THE COURT:  He hasn't pled that it's not possible for

24     him to do it, though.  Right?

25          MR. GURA:  Sometimes it is and sometimes it isn't.  The

1    problem is -- well, the main problem here - and this is at the

2    heart of our lawsuit, Your Honor - is that there are a lot of

3    guns that Mr. Dearth would like to access here in the

4    United States that he simply cannot obtain in Canada.  One of

5    the things that we cited, for example -- and I'm no expert on

6    Canadian firearms law, but one of the things that leaps out is

7    that there's a prohibition on any handgun with a barrel length

8    over 105 millimeters.  That's 4.13 inches.  There are a great

9    many very common defensive arms - and Mr. Dearth would like to

10   access them here - that don't meet that definition; the

11   Kahr K9, the Colt Officers Special.  I mean, we can go down the

12   list.  A lot of people carry small revolvers or small

13   semiautomatic guns that are longer than 105 millimeters.  That's

14   a very broad restriction.

15        And, of course, Canada does not have our Bill of Rights

16   on any subject.  I mean, it's quite a thing to say, well, the

17   First Amendment and the Second Amendment are a little bit

18   different; it's quite another to say that whatever your rights

19   might be in this country, they are dependent upon your ability

20   to exercise them somewhere else.  And it's not even that much of

21   an argument that we get from the government, because the

22   government claims that there's no right to purchase firearms.

23        So it's not as though Mr. Dearth is doing something in

24   another country that the government would even consider to be a

25   constitutional right over here.  I submit that under *Schad* and

1   *Ezell* and all that line of cases, it is no answer to tell a

2   plaintiff who comes in and says, my constitutional rights are

3   being violated, go somewhere -- go to another country and obtain

4   your constitutionally protected products there, and then maybe

5   you can import them here.  That does not seem to be at all

6   compliant with our laws.

7           As far as what we're seeking in this case, Your Honor,

8   the complaint has on the last page a prayer for relief.  The

9   very first paragraph there discusses the first, third, and fifth

10  claims which relate to (a)(9), and it is a facial challenge.

11          We would also submit that we would assert an as-applied

12  challenge as well to (a)(9), under the idea that we are seeking

13  any other relief that the Court might deem just and appropriate.

14  But at least the phrasing of the first paragraph is that we seek

15  an order permanently enjoining the defendant, and so on, from

16  enforcing 18 U.S.C. Section 922(a)(9) and the corresponding CFR,

17  period.

18          THE COURT:  But that doesn't mean as applied to anybody

19  and everybody.

20          MR. GURA:  Well, we have two arguments.  First, it's

21  unconstitutional on its face because it targets self-defense,

22  and there is no way that there's -- even under intermediate

23  scrutiny.  Of course we want strict scrutiny, Your Honor, but

24  our point is that under any level of scrutiny, even under

25  intermediate scrutiny there wouldn't be --

1          THE COURT:  My point is, how does that language in your

2     complaint put me or anybody else on notice that what you're

3     seeking is an order declaring that the United States cannot

4     enforce that statute as to everybody?

5          MR. GURA:  It says it can't enforce the statute, and

6     that's what we would request.  We don't want that statute

7     enforced, and we're asking for an injunction against the

8     enforcement of that statute.

9          THE COURT:  But the plaintiff, he's an individual

10    plaintiff, and he doesn't use the words "on its face" anywhere

11    in the complaint, right, in the cause of action or anywhere

12    else?

13         MR. GURA:  The complaint we believe should be construed

14    as we are presented here, which is that it seeks both -- we

15    would contend it does seek to facially invalidate 922(a)(9), and

16    also as applied.

17         The (b)(3) allegations are as applied.  Specifically,

18    there's no facial challenge to 922(b)(3).  We don't do that.  We

19    concede that it has appropriate applications in other

20    circumstances not relevant to this particular case.  But it's

21    very clear that there is no legitimate sweep, there is no

22    reasonable fit, there's no real relationship at all between the

23    purpose to which a person would use a firearm and any sort of

24    smuggling interest that the government might have --

25    antismuggling interest that the government might have.

1          And finally, Your Honor, the government mentions the

2    *Bateman* case.  There were several laws at issue in *Bateman*, and

3    the ones that we targeted were a prohibition on the carrying of

4    guns for self-defense during these so-called states of

5    emergency, but also a prohibition against the purchase of guns

6    and ammunition during these times.  And the District Court,

7    following *Masciandaro*, correctly said, well, because the

8    purchase of guns and ammunition relates to the exercise of the

9    right in the home, then under *Masciandaro,* it had to apply

10   strict scrutiny.

11         To the extent that the District Court recognized the

12   right to carry a gun in public, if that were the only issue in

13   the case, it would have applied intermediate scrutiny.  But in

14   any event, it struck down all those laws as being incompatible

15   with the Second Amendment.  It wasn't simply a matter that you

16   couldn't possess a gun that you previously owned in your house.

17   You didn't have to run outside in a hurricane and throw your gun

18   out the window.  It simply meant you couldn't go down to a store

19   and buy ammunition for it, or carry it around in public, if you

20   happened to be caught outside during a bad weather forecast,

21   even, in North Carolina.

22         So again, we submit there's a right to have guns for

23   self-defense; that necessarily means there's a right to purchase

24   them, to bar them.  And whatever interests the government might

25   have in preventing people from smuggling firearms, there's no

1    relationship at all between proclivity to smuggle arms that's

2    been demonstrated in one's residence; there's no relationship at

3    all between smuggling and the purpose to which arms would be

4    used inside the United States.

5            You know, if somebody is intent on acquiring arms for

6    smuggling, they'll say anything to get the gun and they'll go

7    ahead and smuggle it.  So the self-defense restriction seems to

8    be not a good fit for the purported interest that the government

9    has.  Thank you, Your Honor.

10           THE COURT:  Thank you, counsel.

11           MR. RIESS:  Your Honor, may I be heard on a brief

12   point?

13           THE COURT:  Very briefly.

14           MR. RIESS:  Just to correct my answer to your last

15   question, *Heller 2* did say, "Because the plaintiffs failed to

16   present an argument in their briefs questioning the

17   constitutionality of the ban on semiautomatic pistols and

18   shotguns, we construe the challenge to the ban on assault

19   weapons only going to the prohibition on semiautomatic rifles."

20   So it did not construe the ban as applying to semiautomatic

21   pistols and shotguns, only to rifles.

22           THE COURT:  And just so that I'm clear, is it your

23   interpretation of that that the assault weapons ban was

24   construed to prohibit all semiautomatic rifles, or only some

25   semiautomatic rifles?

65

1          MR. RIESS:  Some semiautomatic rifles, so-called

2    assault weapons.

3          THE COURT:  All right.  Thank you.  I'll take the case

4    under advisement.

5          (Proceedings adjourned at 5:40 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                  **CERTIFICATE OF OFFICIAL COURT REPORTER**

2

3           **I, Rebecca Stonestreet, certify that the foregoing is a**

4      **correct transcript from the record of proceedings in the**

5      **above-entitled matter.**

6

7

8

9      _____          _____

10     **SIGNATURE OF COURT REPORTER**                    **DATE**

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**'**

'vast [1] - 48:25

# 0

09-587 [2] - 1:4, 2:2

# 1

1 - 55:17
10 [4] - 1:6, 55:15, 56:20, 56:23
100 [1] - 35:18
101 [1] - 1:15
105 [2] - 60:8, 60:13
11th [2] - 39:1, 39:2
12-gauge [3] - 24:12, 25:3, 38:11
12th [1] - 39:5
14th [1] - 58:1
1791 [3] - 57:22, 57:25, 58:3
18 [2] - 16:21, 61:16
1868 [1] - 57:25
1871 [1] - 14:1
1968 [2] - 3:21, 58:8
1970's [1] - 3:19
1970s [1] - 35:15
1986 [2] - 35:16, 58:7
1994 [2] - 58:4, 58:8

# 2

2 [33] - 26:22, 30:20, 31:22, 34:3, 34:13, 34:17, 35:1, 35:11, 35:20, 36:1, 36:9, 36:22, 39:10, 43:7, 45:25, 51:6, 51:13, 52:14, 53:1, 54:12, 54:22, 55:4, 55:13, 56:7, 56:25, 57:1, 57:6, 57:7, 57:13, 58:19, 58:21, 59:9, 64:15
20 [1] - 1:18
20001 [1] - 1:22
2012 [1] - 1:6
202 [2] - 1:19, 1:23
20530 [1] - 1:19
20th [1] - 35:3
22314 [1] - 1:16

# 3

353-3098 [1] - 1:19
354-3249 [1] - 1:23
3:45 [1] - 1:8

# 4

4.13 [1] - 60:8

405 [1] - 1:15
47 [1] - 18:1
48 [1] - 18:1

# 5

50 [1] - 17:21
5:00 [2] - 4:22
5:40 [1] - 65:5

# 6

6511 [1] - 1:22

# 7

703 [1] - 1:16

# 8

835-9085 [1] - 1:16

# 9

922 [3] - 6:20, 32:22, 33:1
922(a)(9 [15] - 2:24, 3:9, 3:10, 3:18, 7:12, 13:8, 16:12, 23:3, 25:9, 39:6, 42:16, 46:25, 58:4, 61:16, 62:15
922(a)(9) [1] - 38:4
922(b)(3 [7] - 5:1, 12:25, 13:7, 16:17, 17:20, 23:4, 42:20
922(b)(3) [3] - 5:3, 47:1, 62:18
922(g)(1 [1] - 27:2
926(a [2] - 59:17, 59:18
926A [2] - 16:21, 17:7
95 [1] - 37:19
98 [1] - 37:19
9:00 [3] - 4:21, 4:22, 4:23

# A

a)(9 [9] - 38:16, 42:21, 42:23, 43:3, 43:19, 46:4, 46:6, 61:10, 61:12
a.m [1] - 4:21
abide [1] - 43:19
abiding [5] - 27:21, 31:15, 32:20, 45:23, 45:25
ability [6] - 15:13, 31:6, 37:7, 51:20, 52:11, 60:19
able [5] - 14:22, 28:9, 40:3, 44:4, 46:22

abolish [1] - 12:1
above-entitled [1] - 66:5
abroad [2] - 44:16, 46:11
abscond [1] - 16:8
abuser [1] - 3:4
acceptable [3] - 37:20, 53:8
accepted [1] - 35:7
access [7] - 20:17, 26:4, 26:10, 54:1, 54:3, 60:3, 60:10
according [1] - 44:7
account [1] - 29:8
acquire [2] - 3:13, 3:14, 5:9, 5:13, 13:16, 21:1, 24:7
acquired [1] - 4:4
acquiring [3] - 3:11, 26:6, 64:5
Act [2] - 3:21, 12:21
act [4] - 4:23, 5:15, 8:19, 20:25
Action [1] - 1:4
action [1] - 62:11
acute [1] - 10:15
additional [1] - 49:17
additionally [1] - 11:8
address [1] - 13:5
adequate [3] - 24:9, 42:12, 53:9
adjourned [1] - 65:5
administrative [1] - 23:5
adopted [1] - 10:22
adoption [1] - 58:1
advisement [1] - 65:4
affect [3] - 37:7, 51:20, 52:11
afternoon [3] - 2:6, 2:8, 2:9
age [1] - 35:10
agree [3] - 38:20, 49:11, 54:24
agreed [1] - 10:13
ahead [1] - 64:7
aided [1] - 1:25
al [2] - 1:4, 2:3
Alan [1] - 2:6
ALAN [1] - 1:14
Alaska [1] - 18:7
Alexandria [1] - 1:16
aliens [7] - 16:8, 16:9, 16:13, 20:5, 20:8, 43:20, 46:7
allegations [1] - 62:17
allow [7] - 13:7, 13:8, 19:21, 33:10, 44:7,

45:18, 55:11
allowed [1] - 41:17
allows [1] - 55:23
almost [1] - 35:18
alternative [4] - 34:22, 39:13, 41:25, 53:9
alternatives [1] - 42:12
ambiguous [1] - 30:17
amended [2] - 35:15, 56:8
amending [1] - 56:9
amendment [1] - 35:16
Amendment [54] - 7:16, 8:6, 8:13, 8:23, 9:8, 9:16, 10:15, 10:24, 12:14, 13:9, 13:22, 14:12, 14:13, 20:16, 20:24, 21:9, 21:16, 26:13, 27:9, 27:16, 27:22, 30:3, 31:17, 32:6, 32:7, 32:9, 32:19, 32:25, 33:17, 34:2, 34:4, 34:10, 34:23, 36:21, 42:10, 47:23, 48:8, 50:5, 50:14, 50:15, 51:3, 53:17, 53:18, 53:20, 53:22, 53:23, 53:25, 54:10, 58:1, 60:17, 63:15
Amendment's [1] - 53:3
America [1] - 16:16
American [7] - 16:6, 20:13, 20:14, 20:25, 22:8, 29:20, 31:15
Americans [2] - 20:4, 42:25, 44:1
ammunition [4] - 31:6, 63:6, 63:8, 63:19
amount [1] - 44:12
ample [2] - 34:22, 43:15
analysis [4] - 52:13, 54:21, 58:22, 58:25
analytical [1] - 53:17
Andrews [3] - 14:1, 49:25, 50:4
announcing [1] - 24:20
answer [5] - 16:6, 47:14, 51:12, 61:1, 64:14
answering [1] - 48:14
answers [1] - 26:21
antismuggling [1] - 62:25
apologize [1] - 5:3

appeal [3] - 9:3, 9:4, 10:9
appealing [1] - 53:14
appear [2] - 2:23, 25:10
APPEARANCES [1] - 1:13
appellate [1] - 49:3
applicability [1] - 48:24
applicable [1] - 43:3
application [2] - 16:5, 45:8
applications [2] - 43:1, 62:19
applied [21] - 31:8, 31:10, 31:13, 34:9, 34:15, 36:11, 42:13, 42:21, 42:24, 43:4, 43:6, 46:1, 51:8, 52:8, 52:10, 58:22, 61:11, 61:18, 62:16, 62:17, 63:13
applies [3] - 36:9, 43:12, 48:8
apply [6] - 7:2, 7:3, 8:4, 15:10, 30:1, 32:2, 32:14, 36:12, 47:17, 52:14, 53:18, 63:9
applying [4] - 27:25, 28:1, 34:6, 64:20
appropriate [6] - 12:6, 19:18, 34:6, 44:5, 61:13, 62:19
area [2] - 16:1, 23:11
argue [2] - 7:18, 33:9
argued [1] - 10:12
argument [19] - 2:14, 9:20, 10:5, 10:16, 12:24, 14:21, 21:12, 21:17, 21:22, 21:24, 22:5, 42:9, 51:8, 52:16, 52:23, 53:11, 57:20, 60:21, 64:16
arguments [1] - 61:20
arises [1] - 57:25
arising [1] - 3:20
arm [1] - 8:18
armed [4] - 7:22, 7:24, 9:22, 11:1
arms [23] - 3:10, 7:17, 7:21, 8:7, 8:10, 8:12, 8:23, 9:9, 10:24, 11:15, 14:3, 15:8, 21:20, 22:2, 34:12, 34:16, 46:23, 57:23, 60:9, 64:1, 64:3, 64:5
article [1] - 14:6

**articles** [2] - 15:11, 54:7
**as-applied** [3] - 43:6, 58:22, 61:11
**aside** [2] - 5:23, 28:16
**assault** [6] - 55:8, 57:9, 57:14, 64:18, 64:23, 65:2
**assert** [1] - 61:11
**asserting** [2] - 32:16, 45:11
**assuming** [1] - 36:11
**ATF** [2] - 22:19, 22:20
**attached** [1] - 53:16
**attempt** [1] - 29:2
**authority** [6] - 29:25, 30:5, 41:8, 42:22, 44:13, 44:14
**availability** [1] - 21:20
**available** [11] - 7:8, 22:9, 36:23, 41:2, 41:9, 41:21, 42:13, 43:8, 43:9, 46:12, 46:15
**Avenue** [1] - 1:18
**avoid** [1] - 48:14
**aware** [5] - 4:9, 6:7, 38:21, 41:3, 49:2

**B**

**b)(3** [3] - 43:15, 58:6, 62:17
**b)(3)** [2] - 42:18, 42:19
**b)..** [1] - 42:17
**backs** [1] - 17:25
**backup** [1] - 30:7
**bad** [1] - 63:20
**ban** [20] - 11:7, 11:17, 11:21, 11:25, 14:10, 21:4, 21:23, 22:2, 27:12, 48:17, 49:15, 51:15, 52:21, 53:4, 53:5, 53:6, 64:17, 64:18, 64:20, 64:23
**bank** [2] - 3:3, 3:4
**banning** [3] - 36:24, 52:20, 59:10
**bar** [4] - 16:9, 38:17, 53:17, 63:24
**barred** [6] - 13:10, 30:13, 31:18, 32:6, 41:24, 51:25
**barrel** [1] - 60:7
**barring** [2] - 15:5, 16:19
**bars** [4] - 3:10, 3:25, 7:13, 10:3
**based** [4] - 14:25, 32:15, 38:5, 51:10

**basic** [2] - 20:8, 36:2
**Bateman** [6] - 10:7, 30:23, 31:5, 52:3, 63:2
**bateman** [1] - 30:8
**bear** [14] - 7:17, 7:21, 8:7, 8:10, 8:23, 9:9, 10:21, 10:23, 11:15, 13:23, 15:8, 46:23, 57:23
**bearing** [1] - 28:2
**became** [1] - 48:15
**become** [1] - 35:8
**BEFORE** [1] - 1:11
**behind** [1] - 36:19
**Beretta** [1] - 23:23
**best** [1] - 44:3
**better** [1] - 47:19
**between** [8] - 18:13, 19:10, 28:3, 28:5, 44:2, 45:3, 49:8, 49:13, 62:22, 64:1, 64:3
**beyond** [4] - 8:23, 12:23, 49:5, 50:16
**big** [1] - 13:15
**Bill** [1] - 60:15
**binding** [1] - 28:17
**bit** [1] - 60:17
**Board** [1] - 56:15
**body** [1] - 10:25
**boils** [1] - 37:15
**book** [7] - 14:6, 14:10, 52:21, 52:22, 53:11, 54:7, 59:4
**border** [1] - 59:19
**borders** [2] - 44:4, 44:12
**borrow** [3] - 6:12, 39:3, 52:22
**bottom** [3] - 47:21, 56:13, 56:14
**bound** [1] - 58:19
**Boy** [1] - 5:20
**brand** [1] - 35:20
**brief** [6] - 46:13, 48:10, 49:4, 49:20, 57:19, 64:11
**briefly** [1] - 64:13
**briefs** [2] - 46:3, 64:16
**bring** [12] - 31:6, 39:15, 39:17, 41:10, 42:5, 42:7, 46:17, 50:10, 52:16, 59:5, 59:17, 59:19
**bringing** [2] - 50:12, 50:13
**broad** [2] - 49:21, 60:14
**broadly** [1] - 56:10

**broken** [1] - 10:13
**brought** [2] - 2:17, 46:21
**built** [1] - 56:11
**bulk** [1] - 47:13
**bulletins** [1] - 22:20
**bump** [2] - 5:18, 5:19
**burden** [14] - 13:9, 14:13, 27:23, 28:2, 31:25, 32:3, 35:8, 36:14, 36:16, 37:10, 48:1, 58:23, 59:7, 59:8
**burdens** [2] - 13:13, 36:14
**buy** [4] - 14:14, 14:17, 29:19, 33:25, 41:9, 46:16, 63:19
**buying** [5] - 12:22, 24:13, 27:14, 27:17, 54:7

**C**

**California** [2] - 56:2, 56:9
**California's** [1] - 56:2
**Canada** [14] - 39:15, 41:10, 42:6, 42:7, 45:18, 46:9, 46:15, 46:21, 50:11, 52:17, 52:18, 59:14, 60:4, 60:15
**Canadian** [1] - 60:6
**cannot** [14] - 3:13, 5:2, 10:14, 11:9, 11:12, 21:1, 22:23, 29:16, 52:18, 59:1, 60:4, 62:3
**canons** [1] - 7:2
**capable** [1] - 55:14
**capacity** [4] - 36:25, 37:5, 51:15, 56:19
**car** [1] - 18:17
**card** [2] - 14:11, 52:22
**care** [4] - 18:20, 18:21, 18:23
**Carolina** [3] - 10:8, 30:24, 63:21
**carried** [1] - 48:20
**carry** [13] - 9:7, 9:20, 10:5, 10:21, 11:2, 11:4, 11:9, 11:12, 11:24, 45:14, 60:12, 63:12, 63:19
**carrying** [9] - 9:14, 9:15, 10:3, 10:11, 11:17, 11:22, 11:25, 48:17, 63:3
**cars** [1] - 48:18

**carve** [1] - 27:9
**carve-out** [1] - 27:9
**case** [55] - 2:2, 2:13, 2:17, 3:24, 4:2, 7:6, 7:22, 7:24, 8:4, 8:5, 9:3, 9:10, 9:21, 10:7, 11:1, 14:1, 25:24, 26:17, 27:11, 30:2, 30:5, 31:1, 31:2, 31:3, 31:9, 31:12, 33:3, 33:21, 41:3, 41:7, 42:9, 47:9, 48:7, 48:15, 48:23, 49:7, 49:10, 49:18, 49:19, 49:25, 50:1, 50:10, 51:24, 52:2, 52:3, 53:16, 56:4, 56:5, 59:2, 59:13, 61:7, 62:20, 63:2, 63:13, 65:3
**cases** [21] - 3:20, 11:19, 11:24, 13:25, 27:20, 32:8, 32:18, 32:19, 33:7, 41:6, 42:1, 46:2, 47:9, 51:24, 52:13, 53:17, 56:5, 57:24, 58:14, 61:1
**cast** [1] - 26:18
**casual** [1] - 20:20
**categorical** [2] - 55:7, 57:13
**categorically** [1] - 22:10
**category** [2] - 57:7, 57:10
**caught** [1] - 63:20
**century** [1] - 35:3
**cert** [1] - 22:4
**certain** [14] - 17:17, 17:18, 36:4, 36:5, 36:10, 36:24, 37:10, 43:18, 44:11, 44:12, 44:21, 51:15, 51:25, 52:3
**certainly** [2] - 38:22, 52:1
**CERTIFICATE** [1] - 66:1
**certify** [1] - 66:3
**CFR** [1] - 61:16
**challenge** [13] - 26:9, 33:1, 42:13, 42:16, 42:21, 42:25, 43:2, 43:7, 58:23, 61:10, 61:12, 62:18, 64:18
**challenged** [5] - 35:20, 36:14, 39:10, 48:22, 55:6
**challenges** [2] -

32:22, 43:5
**challenging** [6] - 2:17, 2:21, 2:23, 24:5, 28:16, 41:22
**changed** [2] - 42:6, 56:25
**channels** [1] - 34:22
**characteristic** [1] - 24:6
**characterization** [1] - 47:11
**chase** [1] - 12:6
**check** [1] - 59:16
**Chester** [1] - 53:19
**Chicago** [4] - 30:6, 30:13, 31:9, 31:18
**choose** [1] - 44:22
**chooses** [1] - 28:21
**chosen** [1] - 22:8
**Circuit** [31] - 13:12, 21:18, 21:19, 21:24, 26:22, 27:4, 27:8, 31:1, 31:4, 31:12, 31:19, 32:4, 32:19, 34:3, 35:1, 35:6, 35:11, 35:22, 39:9, 41:7, 47:8, 48:12, 48:15, 48:19, 48:23, 51:21, 52:14, 53:19, 55:4, 58:15
**circuit** [8] - 27:5, 27:7, 30:19, 31:1, 31:22, 35:17, 54:12, 54:24
**Circuit's** [2] - 30:24, 54:21
**circuits** [2] - 26:22, 26:25
**circumstances** [3] - 7:5, 27:18, 62:20
**cite** [4] - 30:2, 30:4, 50:4
**cited** [7] - 11:20, 41:8, 46:3, 46:13, 49:19, 58:14, 60:5
**citizen** [5] - 15:16, 27:21, 29:20, 45:23, 46:12
**citizens** [8] - 16:6, 20:13, 21:1, 31:15, 44:25, 46:1, 47:18, 47:19
**City** [2] - 56:1, 56:8
**city** [2] - 30:6, 31:9
**Civil** [1] - 1:4
**civil** [2] - 2:2, 20:8
**claim** [2] - 32:24, 34:2
**claimants** [1] - 32:25
**claims** [4] - 32:9, 32:11, 60:22, 61:10
**clear** [3] - 50:9, 62:21,

64:22
**clearly** [2] - 31:11, 53:7
**CLERK** [1] - 2:2
**clothing** [1] - 10:25
**Code** [2] - 55:22, 55:23
**collective** [1] - 7:19
**Colt** [1] - 60:11
**COLUMBIA** [1] - 1:2
**Columbia** [4] - 7:18, 21:25, 56:17, 56:24
**Columbus** [1] - 1:15
**combat** [1] - 33:22
**combatting** [2] - 43:14, 47:25
**coming** [2] - 16:10, 19:7
**commerce** [2] - 27:13, 43:25
**commercial** [4] - 26:19, 27:11, 34:12, 34:16
**commit** [1] - 43:16
**committing** [1] - 18:19
**common** [1] - 60:9
**commonly** [3] - 37:2, 51:18, 55:18
**community** [1] - 20:9
**compared** [1] - 35:17
**complaint** [7] - 41:22, 42:23, 48:19, 61:8, 62:2, 62:11, 62:13
**complete** [1] - 13:2
**completely** [1] - 31:18
**complex** [1] - 56:13
**compliance** [1] - 40:17
**compliant** [1] - 61:6
**complicated** [1] - 59:20
**complied** [1] - 45:17
**comply** [5] - 28:18, 28:22, 29:9, 29:10, 59:16
**complying** [2] - 18:24, 28:13
**comport** [1] - 19:2
**comported** [1] - 45:17
**comports** [1] - 12:13
**computer** [1] - 1:25
**computer-aided** [1] - 1:25
**concealed** [4] - 11:17, 11:21, 11:25, 50:3
**concede** [1] - 62:19
**conceded** [1] - 39:14
**conceive** [1] - 26:14
**concept** [1] - 13:12

**concern** [1] - 16:7
**concerned** [5] - 28:20, 35:25, 36:3, 46:5, 58:6
**concerns** [3] - 25:19, 25:22, 28:5
**conclude** [1] - 51:1
**concluding** [1] - 33:10
**conclusion** [1] - 47:16
**concurring** [1] - 53:19
**condition** [4] - 8:2, 33:24, 34:16, 48:21
**conditional** [1] - 11:21
**conditions** [4] - 26:19, 34:11, 44:4, 49:23
**conduct** [5] - 8:4, 9:16, 24:5, 31:16, 36:13
**confident** [1] - 37:8
**confirmed** [1] - 32:4
**conflict** [1] - 60:3
**conflicts** [2] - 21:8, 21:15
**confrontation** [3] - 7:22, 7:24, 11:1
**Congress** [22] - 3:7, 15:15, 15:18, 15:25, 16:4, 16:12, 16:25, 17:25, 19:13, 20:15, 20:22, 20:25, 26:10, 26:11, 33:21, 43:15, 43:22, 44:3, 44:10, 44:18, 45:10, 46:4
**congress** [1] - 43:17
**Congress'** [3] - 19:23, 19:24, 45:19
**consciously** [1] - 20:1
**consequently** [1] - 44:12
**consider** [2] - 48:16, 60:24
**considered** [4] - 35:9, 36:6, 36:7, 56:23
**consistent** [1] - 49:22
**consolidated** [1] - 56:7
**Constitution** [2] - 13:19, 20:8
**constitutional** [14] - 13:14, 34:8, 35:8, 41:4, 43:4, 48:13, 53:12, 53:13, 53:24, 58:12, 58:16, 59:2, 60:25, 61:2
**constitutionality** [2] - 7:1, 64:17
**constitutionally** [5] - 15:13, 21:21, 27:18, 47:23, 61:4
**construction** [6] -

6:25, 7:2, 20:19, 48:22, 49:11, 54:25
**construe** [6] - 12:7, 48:18, 54:12, 57:6, 64:18, 64:20
**construed** [8] - 3:16, 3:17, 22:21, 47:4, 48:19, 57:11, 62:13, 64:24
**construing** [1] - 49:9
**contained** [1] - 11:14
**container** [1] - 59:16
**contemplated** [1] - 31:16
**contend** [2] - 42:22, 62:15
**contends** [1] - 42:24
**context** [6] - 12:7, 23:4, 23:9, 30:3, 41:7, 53:23
**contexts** [1] - 9:2
**contingency** [1] - 25:2
**continue** [1] - 4:5
**continuing** [1] - 3:25
**contrast** [1] - 44:20
**control** [4] - 5:10, 8:21, 15:10, 43:24
**Control** [2] - 3:21, 12:21
**controversy** [1] - 57:15
**convenient** [1] - 40:25
**convicted** [1] - 30:14
**copied** [1] - 56:1
**core** [13] - 16:15, 20:24, 21:8, 27:22, 31:19, 32:9, 36:15, 36:21, 37:9, 39:9, 46:19, 50:7, 54:2
**correct** [9] - 8:8, 10:2, 14:4, 15:7, 25:14, 47:2, 51:13, 64:14, 66:4
**correctly** [2] - 11:20, 63:7
**corresponding** [1] - 61:16
**Council** [2] - 56:1, 56:8
**counsel** [3] - 2:4, 44:7, 64:10
**countries** [1] - 15:9, 41:16, 46:8
**country** [20] - 14:7, 14:23, 15:9, 25:8, 25:21, 38:3, 40:24, 41:15, 41:18, 41:19, 42:8, 46:2, 46:9, 46:10, 58:10, 58:13, 59:3, 60:19, 60:24,

61:3
**couple** [1] - 48:5
**course** [17] - 7:9, 10:20, 11:3, 14:18, 16:15, 17:13, 26:9, 28:16, 28:21, 29:3, 30:6, 31:1, 31:14, 33:1, 58:6, 60:15, 61:23
**court** [26] - 3:1, 3:15, 7:15, 8:22, 9:8, 9:13, 10:8, 10:13, 11:8, 12:4, 20:19, 20:21, 21:7, 26:24, 27:14, 30:17, 30:18, 31:8, 31:9, 31:22, 46:1, 54:24, 56:25, 57:6, 57:11, 58:21
**COURT** [92] - 1:1, 2:8, 2:11, 3:14, 4:13, 4:18, 4:20, 5:12, 6:1, 6:23, 8:6, 8:9, 8:22, 9:25, 12:5, 13:20, 14:20, 14:25, 15:15, 16:25, 18:23, 19:1, 19:13, 21:12, 22:14, 22:19, 23:8, 23:13, 23:15, 23:18, 23:23, 24:11, 25:2, 26:16, 28:7, 28:22, 29:25, 30:10, 32:14, 33:8, 33:19, 34:24, 35:14, 36:18, 37:12, 37:22, 38:9, 38:18, 38:25, 39:16, 39:23, 40:5, 40:12, 40:21, 41:12, 41:15, 42:3, 42:16, 42:19, 44:6, 45:9, 46:20, 47:3, 48:5, 49:6, 50:9, 50:20, 50:24, 51:6, 52:15, 54:12, 54:16, 54:18, 54:20, 54:24, 55:12, 55:20, 56:21, 57:6, 58:18, 58:21, 59:14, 59:23, 61:18, 62:1, 62:9, 64:10, 64:13, 64:22, 65:3, 66:1, 66:10
**Court** [29] - 1:21, 1:21, 3:20, 7:21, 12:19, 13:5, 14:2, 21:4, 21:19, 22:3, 22:5, 30:15, 33:13, 33:21, 35:21, 42:2, 48:3, 48:13, 49:18, 52:7, 53:16, 57:22, 58:13, 58:14, 61:13, 63:6, 63:11
**court's** [1] - 13:15

**Courthouse** [1] - 1:22
**COURTROOM** [1] - 2:2
**courts** [22] - 8:25, 9:2, 10:16, 10:18, 14:7, 32:5, 32:6, 32:17, 47:22, 48:12, 48:25, 51:8
**Courts** [1] - 49:2
**created** [2] - 16:12, 58:5
**crime** [3] - 18:19, 43:14, 47:25
**crimes** [1] - 43:17
**criminal** [2] - 6:20, 6:23
**criminality** [1] - 32:21
**criminals** [1] - 33:2
**criteria** [1] - 37:15
**cross** [1] - 2:12
**CRR** [1] - 1:21
**cut** [1] - 12:5

# D

**D.C** [16] - 1:6, 1:22, 35:13, 54:13, 54:25, 55:3, 55:10, 55:13, 55:22, 55:23, 56:1, 56:8, 56:17, 57:4, 57:6, 57:10
**dangerous** [2] - 3:7, 32:10
**Daniel** [1] - 2:9
**DANIEL** [1] - 1:17
**date** [1] - 51:11
**DATE** [1] - 66:10
**days** [2] - 5:16, 56:5
**DC** [22] - 1:19, 13:12, 21:18, 21:19, 21:24, 26:22, 32:4, 34:3, 35:1, 35:6, 35:11, 35:22, 39:9, 47:8, 48:12, 48:15, 48:19, 51:21, 52:14, 54:21, 55:4
**DDC** [1] - 47:8
**de** [6] - 13:13, 31:25, 32:3, 34:20, 38:23, 59:7
**deal** [2] - 23:17, 45:7
**dealer** [10] - 17:20, 17:23, 18:13, 18:20, 24:13, 24:22, 24:25, 39:21, 40:2
**dealers** [1] - 43:21
**dealing** [2] - 57:24, 59:12
**dealt** [2] - 31:14, 58:15
**Dearth** [36] - 2:3, 5:19,

6:12, 7:7, 8:9, 12:8, 12:9, 13:1, 18:7, 19:11, 24:11, 24:20, 25:4, 25:11, 25:14, 28:12, 29:6, 37:22, 38:9, 38:25, 40:12, 40:15, 41:21, 42:4, 42:13, 43:7, 45:8, 45:9, 45:20, 48:7, 50:10, 52:11, 59:21, 60:3, 60:9, 60:23
**DEARTH** [1] - 1:4
**Dearth's** [1] - 28:8
**Decastro** [1] - 41:7
**decided** [1] - 19:13
**decision** [4] - 3:7, 26:1, 49:3, 53:15
**declaring** [1] - 62:3
**declining** [1] - 10:17
**deem** [1] - 61:13
**deemed** [1] - 19:17
**deer** [1] - 25:16
**defend** [2] - 37:7, 51:20
**defendant** [4] - 2:10, 16:4, 48:4, 61:15
**Defendant** [2] - 1:8, 1:17
**defender** [1] - 17:8
**defense** [53] - 3:13, 7:9, 7:14, 7:16, 10:5, 10:11, 12:25, 20:12, 20:24, 21:2, 21:6, 21:15, 22:7, 24:2, 24:8, 24:9, 24:13, 24:16, 24:21, 25:7, 27:23, 36:15, 36:19, 37:19, 37:24, 38:10, 38:12, 39:4, 39:9, 39:12, 39:19, 39:22, 40:4, 40:13, 40:17, 41:23, 43:11, 44:1, 46:18, 46:24, 48:2, 48:9, 48:21, 50:15, 52:6, 52:12, 52:19, 54:4, 54:5, 61:21, 63:4, 63:23, 64:7
**defensive** [2] - 22:13, 60:9
**defined** [4] - 7:17, 10:20, 28:10, 55:9
**defines** [1] - 34:17
**definitely** [1] - 32:1
**definition** [11] - 3:12, 7:3, 10:21, 10:23, 19:19, 22:23, 55:13, 55:17, 56:25, 57:8, 60:10
**definitively** [1] - 49:3
**degree** [4] - 27:15,

36:13, 41:24, 49:1
**demonstrated** [1] - 64:2
**demonstrating** [1] - 6:9
**denied** [1] - 26:4
**departing** [1] - 4:1
**DEPARTMENT** [1] - 1:18
**dependent** [1] - 60:19
**description** [2] - 22:16, 22:17
**designed** [1] - 19:9
**detention** [1] - 9:17
**determine** [1] - 44:4
**determined** [2] - 22:6, 44:3
**determining** [1] - 36:10
**dictum** [1] - 50:1
**different** [20] - 2:22, 4:14, 12:20, 18:12, 18:14, 27:16, 30:16, 32:14, 35:10, 35:24, 37:17, 39:13, 44:24, 52:18, 53:24, 54:4, 54:5, 58:13, 59:12, 60:18
**differently** [1] - 47:18
**difficult** [2] - 48:13, 48:16
**difficulties** [1] - 59:21
**directly** [1] - 36:5
**disagree** [1] - 47:10
**disarm** [2] - 37:6, 51:19
**disarmed** [1] - 3:8
**discerns** [1] - 23:6
**discussed** [1] - 7:6
**discusses** [1] - 61:9
**discussing** [1] - 21:5
**dismissed** [1] - 4:3
**dispute** [6] - 4:11, 7:5, 11:18, 17:25, 47:5, 47:15
**dissent** [1] - 10:22
**dissenting** [1] - 30:19
**distinction** [3] - 3:22, 49:7, 49:12
**distinguishable** [1] - 52:1
**distinguished** [1] - 31:12
**DISTRICT** [3] - 1:1, 1:2, 1:11
**District** [22] - 7:18, 9:3, 9:5, 9:10, 10:8, 21:3, 21:25, 30:12, 30:15, 30:23, 35:21, 48:17, 49:2, 49:18,

52:7, 53:16, 56:16, 56:24, 57:16, 59:9, 63:6, 63:11
**districts** [1] - 9:18
**doctrines** [2] - 53:22, 54:10
**domestic** [2] - 29:8, 31:13
**dominion** [2] - 5:10, 8:21
**done** [6] - 8:20, 8:25, 20:23, 38:14, 46:3
**doubt** [1] - 26:18
**down** [14] - 9:5, 10:9, 10:10, 10:13, 11:21, 21:5, 23:24, 30:13, 30:16, 30:21, 37:15, 60:11, 63:14, 63:18
**dramatic** [1] - 14:9
**drastic** [1] - 27:3
**drive** [1] - 18:17
**dropped** [1] - 27:10
**drops** [1] - 32:12
**drug** [1] - 3:4
**duration** [1] - 38:22
**during** [8] - 3:5, 10:12, 15:2, 37:25, 52:5, 63:4, 63:6, 63:20
**duty** [1] - 29:19

## E

**early** [1] - 3:19
**easier** [1] - 36:17
**Eastern** [3] - 9:10, 10:8, 30:23
**easy** [1] - 59:20
**economy** [1] - 16:11
**effect** [1] - 34:20
**effective** [1] - 45:14
**effectively** [2] - 51:19, 54:13
**effectually** [1] - 37:6
**either** [8] - 7:11, 25:25, 26:2, 36:19, 52:9, 55:21, 57:7, 57:15
**emergencies** [1] - 52:5
**emergency** [3] - 10:12, 52:4, 63:5
**employ** [2] - 10:3, 51:4
**employed** [5] - 30:2, 30:6, 30:7, 30:10, 51:6
**enacted** [3] - 20:1, 35:15, 54:13
**ends** [1] - 34:5
**enforce** [3] - 33:22, 62:4, 62:5

**enforced** [1] - 62:7
**enforcement** [1] - 62:8
**enforcing** [1] - 61:16
**engage** [1] - 31:16
**engaged** [1] - 9:17
**enjoining** [1] - 61:15
**enjoy** [1] - 16:10
**ensure** [1] - 19:1
**entail** [1] - 45:24
**enter** [2] - 48:3, 48:25
**entering** [1] - 27:24
**entire** [1] - 13:10
**entirely** [1] - 12:1
**entitled** [1] - 66:5
**entrusts** [1] - 26:14
**enumerated** [1] - 13:18
**environment** [1] - 20:16
**ERIC** [1] - 1:7
**Eric** [1] - 2:3
**especially** [2] - 6:25, 48:23
**essential** [1] - 21:8
**essentially** [3] - 9:22, 20:15, 38:20
**established** [1] - 43:3
**et** [2] - 1:4, 2:3
**evade** [1] - 15:20, 43:16
**evaded** [1] - 40:20
**event** [8] - 7:25, 24:1, 32:13, 34:21, 43:2, 56:6, 58:8, 63:14
**eventually** [1] - 16:7
**evidence** [5] - 16:4, 20:2, 40:10, 40:12, 43:15
**evident** [1] - 23:7
**evidently** [1] - 14:4
**examine** [1] - 38:24
**examined** [1] - 31:24
**example** [11] - 6:11, 7:16, 10:20, 11:15, 14:10, 29:1, 36:23, 38:23, 41:1, 54:6, 60:5
**examples** [1] - 46:13
**except** [2] - 16:14, 28:10
**exception** [3] - 11:11, 21:7, 55:22
**exceptions** [3] - 27:1, 33:25, 56:12
**exemptions** [1] - 43:18
**exercise** [7] - 34:22, 46:23, 53:1, 58:16, 58:18, 60:20, 63:8

**exercising** [1] - 41:5
**existed** [1] - 58:3
**exists** [1] - 8:13
**expatriated** [3] - 16:5, 20:4, 20:13
**expert** [1] - 60:5
**explicit** [1] - 10:23
**explicitly** [1] - 10:14
**export** [2] - 15:6, 15:10
**exporting** [1] - 15:6
**exposition** [1] - 11:14
**expressed** [1] - 21:10
**expressly** [1] - 31:1
**extend** [1] - 49:17
**extends** [3] - 8:23, 49:5, 50:5
**extent** [8] - 8:11, 12:10, 17:2, 42:14, 49:5, 50:14, 54:9, 63:11
**Ezell** [4] - 31:9, 31:14, 58:15, 61:1

## F

**fabric** [1] - 35:9
**face** [3] - 42:24, 61:21, 62:10
**facial** [7] - 42:16, 42:21, 42:25, 43:2, 43:5, 61:10, 62:18
**facially** [1] - 62:15
**fact** [22] - 4:2, 4:25, 13:6, 14:24, 15:1, 16:24, 18:11, 18:21, 22:8, 25:14, 29:4, 33:3, 33:4, 34:7, 41:1, 44:6, 46:14, 55:11, 55:23, 55:25, 56:9, 57:5
**factor** [1] - 18:12
**factoring** [1] - 37:15
**factors** [2] - 32:17, 36:10
**facts** [2] - 24:18, 52:25
**failed** [1] - 64:15
**fails** [2] - 30:21, 30:22
**fairly** [1] - 58:8
**fall** [1] - 15:21
**familiar** [1] - 17:7
**family** [1] - 39:18
**far** [11] - 17:1, 19:25, 23:3, 38:9, 38:18, 45:9, 47:21, 49:10, 58:5, 58:12, 61:7
**fearful** [1] - 39:2
**features** [1] - 55:9
**federal** [16] - 9:19, 10:3, 16:18, 16:20,

17:14, 17:16, 17:20, 19:6, 28:16, 29:5, 45:8, 47:17, 55:18, 58:2
**federally** [1] - 28:10
**felon** [3] - 17:16, 45:12, 54:6
**felons** [1] - 35:2
**few** [5] - 5:16, 5:17, 38:24
**fifth** [1] - 61:9
**figure** [1] - 12:15
**filed** [3] - 2:13, 30:5, 56:6
**final** [1] - 50:24
**finally** [1] - 63:1
**fine** [2] - 19:16, 54:8
**firearm** [56] - 4:14, 5:2, 5:7, 5:8, 5:9, 5:15, 5:16, 6:8, 7:10, 7:11, 7:24, 8:1, 12:10, 13:23, 15:6, 15:7, 15:12, 17:9, 17:13, 18:9, 19:2, 19:15, 19:18, 21:13, 23:1, 23:12, 24:3, 24:4, 24:7, 24:8, 24:21, 25:11, 25:17, 25:21, 26:7, 28:6, 28:9, 29:8, 29:14, 29:24, 30:15, 36:20, 38:7, 45:18, 45:21, 48:20, 49:8, 49:9, 55:14, 59:4, 62:23
**firearms** [49] - 2:24, 3:3, 3:11, 3:13, 3:25, 4:4, 7:7, 7:13, 11:10, 11:24, 12:25, 13:1, 13:11, 15:12, 16:8, 16:15, 16:20, 16:22, 17:1, 17:15, 18:12, 18:13, 18:15, 20:20, 21:4, 22:2, 22:12, 22:15, 22:21, 22:22, 25:23, 25:25, 26:4, 26:15, 26:19, 27:11, 27:13, 27:24, 28:25, 29:17, 33:22, 34:13, 35:22, 39:14, 43:25, 59:10, 60:6, 60:22, 63:25
**First** [10] - 14:12, 14:13, 32:7, 53:18, 53:20, 53:22, 53:25, 54:10, 60:17
**first** [20] - 2:18, 2:22, 8:17, 12:18, 16:3, 21:24, 22:4, 24:22, 26:21, 35:3, 42:21, 43:3, 45:22, 51:12,

51:23, 56:1, 61:9, 61:14, 61:20
**fit** [12] - 22:16, 26:7, 28:3, 28:5, 43:13, 43:24, 44:2, 54:11, 56:22, 62:22, 64:8
**five** [2] - 30:16, 33:4
**fixed** [1] - 44:17
**flagrant** [1] - 26:12
**flatly** [1] - 21:2
**fly** [1] - 14:11
**focus** [1] - 44:15
**focused** [4] - 41:24, 42:14, 43:6, 44:10
**focusing** [1] - 44:18
**follow** [3] - 6:11, 17:24, 50:25
**followed** [1] - 30:24
**following** [2] - 35:21, 63:7
**footnote** [2] - 26:17, 27:10
**FOR** [1] - 1:2
**for..** [1] - 5:11
**forbade** [3] - 10:9, 10:10, 26:10
**forcefully** [1] - 10:6
**forecast** [1] - 63:20
**foreclose** [1] - 55:1
**foreclosing** [2] - 53:4, 57:7
**foregoing** [1] - 66:3
**foreign** [2] - 37:19, 41:19
**forever** [1] - 11:7
**forget** [3] - 9:19, 52:17, 56:5
**forgetting** [1] - 42:17
**forgot** [1] - 39:17
**former** [1] - 4:2
**forum** [2] - 44:19, 44:21
**forward** [2] - 2:4, 2:19
**four** [1] - 11:19
**Fourth** [6] - 30:24, 31:1, 31:4, 32:19, 48:23, 53:19
**framework** [1] - 53:17
**frameworks** [1] - 32:6
**free** [1] - 53:25
**freely** [2] - 4:5, 20:11
**friend** [7] - 25:3, 25:15, 37:23, 37:25, 38:11, 40:2, 40:13
**frivolous** [1] - 21:25
**front** [1] - 55:22
**functional** [1] - 21:4
**fundamental** [4] - 33:5, 33:6, 33:16, 52:19

**fungible** [1] - 53:12
**future** [1] - 31:23

# G

**Gallagher** [1] - 9:5
**gang** [1] - 9:23
**garage** [1] - 14:17
**Garvin** [2] - 9:11, 9:16
**generally** [3] - 7:8, 16:25, 17:15
**gentleman** [2] - 9:12, 9:21
**Ginsburg's** [1] - 10:22
**given** [8] - 6:19, 6:23, 20:3, 20:5, 20:19, 32:23, 33:6, 35:14
**Glock** [4] - 23:23, 37:17, 37:18, 38:1
**goal** [1] - 44:2
**goods** [2] - 13:17, 27:18
**government** [25] - 3:23, 6:21, 11:6, 17:20, 21:25, 22:17, 23:6, 27:19, 28:1, 28:2, 29:2, 33:9, 36:5, 47:24, 48:6, 49:6, 60:21, 60:22, 60:24, 62:24, 62:25, 63:1, 63:24, 64:8
**government's** [5] - 9:20, 24:8, 49:12, 50:10, 51:2
**governmental** [1] - 43:13
**Gowder** [3] - 30:6, 30:12, 51:24
**great** [2] - 23:17, 60:8
**greater** [1] - 32:2
**group** [1] - 15:19
**guarantee** [2] - 21:8, 21:11
**guess** [12] - 5:12, 12:5, 15:19, 16:11, 16:13, 35:15, 40:16, 42:3, 45:15, 45:22, 51:9, 52:24
**guidepost** [1] - 36:9
**Gun** [2] - 3:21, 12:21
**gun** [63] - 9:20, 10:5, 10:24, 11:2, 11:4, 11:12, 14:5, 14:16, 14:22, 14:23, 14:25, 15:3, 19:8, 19:21, 23:6, 24:23, 28:11, 31:17, 33:23, 33:25, 36:5, 37:4, 37:24, 38:10, 38:12, 38:23, 39:11, 39:18, 39:20,

39:21, 40:3, 40:7, 40:24, 42:5, 42:7, 43:10, 43:16, 43:22, 45:2, 45:3, 45:5, 46:9, 46:10, 46:15, 46:21, 48:1, 52:1, 52:11, 52:16, 52:18, 55:14, 55:18, 56:14, 56:22, 56:23, 59:19, 63:12, 63:16, 63:17, 64:6
**guns** [46] - 10:3, 11:9, 11:25, 13:7, 13:8, 14:14, 14:17, 15:23, 16:14, 17:18, 18:17, 20:17, 21:1, 21:2, 22:9, 22:10, 27:15, 30:14, 31:6, 31:17, 33:24, 41:10, 41:18, 41:23, 43:21, 44:1, 44:8, 46:16, 46:17, 47:12, 49:23, 50:17, 51:15, 52:6, 54:8, 55:13, 57:10, 57:15, 60:3, 60:13, 63:4, 63:5, 63:8, 63:22
**Gura** [4] - 2:6, 2:8, 50:25, 54:20
**GURA** [54] - 1:14, 1:14, 2:6, 2:20, 3:19, 4:17, 4:19, 4:25, 5:25, 6:6, 7:4, 8:8, 8:16, 8:25, 10:2, 12:18, 13:25, 14:24, 15:5, 16:3, 17:19, 18:25, 19:4, 19:24, 21:17, 22:15, 22:24, 23:10, 23:14, 23:17, 23:21, 24:1, 24:19, 25:10, 26:21, 28:12, 28:24, 30:4, 30:12, 32:17, 33:11, 54:23, 55:3, 55:16, 55:21, 57:3, 57:12, 58:20, 59:1, 59:18, 59:25, 61:20, 62:5, 62:13

# H

**hand** [4] - 5:21, 6:3, 16:8, 16:9
**Handgun** [1] - 56:15
**handgun** [19] - 9:7, 9:13, 9:14, 9:15, 37:1, 37:4, 37:16, 37:18, 38:1, 43:10, 50:2, 50:3, 50:11, 51:16, 52:1, 56:2, 56:3, 59:14, 60:7
**handguns** [33] - 10:11, 11:17, 11:22,

13:3, 15:24, 22:6, 23:15, 23:18, 23:19, 23:21, 36:2, 37:12, 37:14, 37:17, 37:20, 41:10, 46:16, 47:13, 48:17, 49:16, 50:17, 53:2, 53:4, 54:14, 55:2, 55:11, 55:24, 56:17, 57:2, 57:8
**handing** [3] - 6:2, 6:7, 38:23
**handled** [1] - 10:7
**handling** [1] - 9:3
**hands** [2] - 7:23, 40:15
**harder** [1] - 27:7
**head** [1] - 9:2
**hear** [1] - 2:18
**heard** [1] - 64:11
**HEARING** [1] - 1:10
**heart** [1] - 60:2
**heightened** [5] - 13:13, 31:25, 32:2, 36:11, 59:6
**held** [10] - 8:22, 11:2, 20:21, 30:17, 31:2, 31:4, 33:4, 33:16, 34:3, 56:22
**Heller** [72] - 7:15, 8:12, 10:20, 10:21, 11:2, 11:8, 11:14, 11:18, 11:20, 14:1, 20:15, 20:16, 20:21, 20:22, 20:23, 21:5, 21:18, 26:16, 26:22, 26:23, 27:13, 30:20, 31:22, 34:3, 34:10, 34:13, 34:17, 35:1, 35:4, 35:11, 35:20, 36:1, 36:9, 36:22, 37:1, 39:10, 43:7, 45:25, 46:19, 48:15, 48:18, 49:14, 50:3, 51:6, 51:13, 51:17, 51:24, 52:14, 53:1, 53:3, 53:8, 53:20, 54:7, 54:12, 54:22, 55:4, 55:13, 55:17, 56:7, 56:25, 57:1, 57:6, 57:7, 57:13, 57:21, 58:19, 58:21, 59:6, 59:9, 64:15
**Heller's** [2] - 48:24, 49:22
**help** [2] - 33:21, 33:22
**higher** [1] - 31:21
**highest** [1] - 45:24
**Hightower** [1] - 53:15
**highways** [1] - 29:13
**HIMPTON** [1] - 1:7

**Himpton** [1] - 2:3
**himself** [2] - 45:12,
51:20
**hinder** [1] - 16:23
**history** [1] - 30:18
**Hodgkins** [1] - 4:3
**hold** [2] - 5:15, 53:1
**Holder** [1] - 2:3
**HOLDER** [1] - 1:7
**holding** [1] - 41:3
**holds** [2] - 20:23, 55:4
**home** [29] - 8:11, 8:13,
8:14, 8:15, 8:17,
8:19, 8:20, 8:24,
9:21, 10:11, 17:3,
17:4, 17:6, 18:3,
31:3, 31:4, 31:7,
37:3, 48:9, 48:11,
48:20, 48:24, 49:5,
49:17, 51:18, 52:5,
63:9
**Honor** [56] - 2:6, 2:9,
2:20, 4:25, 7:4, 8:16,
8:18, 9:1, 12:18,
12:23, 13:25, 15:7,
16:3, 16:17, 17:19,
19:5, 23:14, 23:21,
24:19, 25:13, 28:14,
30:9, 33:11, 33:20,
35:19, 38:5, 38:21,
39:7, 40:1, 40:19,
41:20, 44:9, 45:22,
47:2, 47:7, 47:14,
47:16, 48:3, 48:10,
49:14, 50:16, 50:22,
51:5, 55:3, 55:16,
55:23, 57:12, 58:13,
59:1, 60:2, 61:7,
61:23, 63:1, 64:9,
64:11
**Honor's** [1] - 6:11
**HONORABLE** [1] -
1:11
**hotel** [3] - 8:14, 8:18,
25:5
**house** [1] - 63:16
**hunting** [7] - 3:5,
16:10, 25:16, 37:3,
40:11, 47:10, 51:18
**hurdle** [1] - 13:6
**hurricane** [1] - 63:17
**hypothetical** [2] -
37:22, 38:25

**idea** [5] - 21:20, 26:4,
57:22, 58:16, 61:12
**ideas** [2] - 53:25, 54:1
**identical** [1] - 53:10
**identify** [1] - 2:4

**ill** [1] - 54:6
**illegally** [1] - 26:3
**Illinois** [1] - 30:13
**imagine** [1] - 20:23
**imagined** [1] - 16:5
**impinge** [4] - 34:4,
34:10, 36:20, 37:9
**implicated** [3] - 8:11,
48:9, 51:4
**implication** [2] -
46:25, 47:1
**implies** [1] - 8:21
**import** [5] - 22:25,
23:1, 23:9, 53:22,
61:5
**important** [2] - 28:3,
43:13, 47:24
**imported** [4] - 23:15,
23:20, 23:21, 37:16
**impose** [4] - 11:7,
33:13, 33:24, 37:10
**imposed** [1] - 31:24,
53:8
**imposing** [3] - 26:18,
34:11, 59:10
**imposition** [1] - 13:15
**inadequate** [1] - 24:9
**inapplicable** [1] -
52:13
**incentive** [2] - 46:8,
46:12
**inches** [1] - 60:8
**incipient** [1] - 25:20
**include** [2] - 22:5,
56:10
**including** [3] - 37:17,
47:10, 48:12
**incognita'** [1] - 48:25
**income** [1] - 45:6
**incompatible** [1] -
63:14
**indeed** [1] - 12:24
**indicated** [2] - 31:10,
53:7
**individual** [3] - 24:6,
37:6, 62:9
**individual's** [1] - 37:7
**individuals** [2] - 20:6,
32:22
**information** [2] - 36:4,
36:5
**informs** [1] - 58:10
**infringe** [1] - 13:22
**injunction** [1] - 62:7
**inquiry** [3] - 34:3,
34:5, 50:18
**inside** [4] - 15:2, 31:4,
48:11, 64:4
**instance** [2] - 27:12,
42:11

**instances** [3] - 10:18,
26:25, 42:1
**instructions** [1] -
30:25
**intend** [1] - 39:24
**intent** [2] - 15:21, 64:5
**interchangeable** [1] -
53:12
**interest** [17] - 5:7,
14:18, 16:18, 16:19,
18:6, 19:6, 20:24,
24:21, 27:22, 31:20,
32:9, 44:11, 45:8,
45:11, 62:24, 62:25,
64:8
**interesting** [2] - 3:24,
25:13
**interests** [3] - 18:1,
18:2, 63:24
**interfere** [1] - 39:8
**interfered** [1] - 31:6
**intermediary** [1] -
43:21
**intermediate** [15] -
28:1, 30:22, 31:11,
31:13, 36:8, 43:11,
46:1, 51:4, 51:7,
51:10, 51:13, 51:14,
61:22, 61:25, 63:13
**international** [2] -
33:12, 33:23
**interpret** [2] - 6:25,
12:19
**interpretation** [3] -
7:19, 12:16, 64:23
**interpretations** [1] -
23:3
**interpreted** [1] - 6:6
**interprets** [1] - 22:17
**interstate** [3] - 16:23,
17:9, 43:25
**invalidate** [2] - 20:22,
62:15
**invitation** [1] - 53:21
**involved** [1] - 32:2
**involves** [1] - 14:3
**irrelevant** [2] - 22:10,
24:10
**irresponsibility** [1] -
32:21
**irresponsible** [3] -
26:14, 32:12, 32:16
**issue** [21] - 2:15, 8:5,
12:3, 24:2, 28:4,
33:14, 33:17, 36:1,
36:18, 46:21, 48:13,
48:16, 49:3, 49:14,
50:2, 53:8, 54:25,
55:5, 55:13, 63:2,
63:12

**issued** [1] - 45:15
**issues** [1] - 15:18
**items** [1] - 29:15
**itself** [4] - 8:17, 23:1,
42:23, 48:18

### J

**Jennings** [1] - 49:19
**job** [1] - 12:15
**joins** [1] - 26:22
**JR** [1] - 1:7
**Judge** [1] - 30:19
**JUDGE** [1] - 1:11
**judgment** [2] - 2:12,
48:4
**Junior** [1] - 2:3
**Justice** [1] - 10:22
**JUSTICE** [1] - 1:18
**justices** [1] - 33:5
**justification** [1] -
36:16
**justified** [1] - 9:17
**justify** [1] - 36:17

### K

**K9** [1] - 60:11
**Kahr** [1] - 60:11
**Kavanaugh** [2] -
30:19, 30:20
**keep** [13] - 2:11, 8:7,
8:10, 8:12, 8:17,
8:18, 8:23, 13:23,
14:3, 15:8, 25:5,
38:13, 46:23
**keeping** [5] - 8:19,
37:2, 51:17
**kind** [7] - 12:5, 15:21,
19:19, 36:19, 39:1,
45:13, 57:10

### L

**lack** [2] - 25:22, 29:8
**lane** [1] - 6:13
**language** [7] - 26:16,
26:23, 27:6, 32:20,
42:25, 51:20, 62:1
**large** [3] - 36:25, 37:5,
51:15
**larger** [1] - 55:15
**last** [2] - 61:8, 64:14
**late** [1] - 42:23
**latter** [1] - 51:12
**law** [56] - 10:3, 10:9,
10:10, 16:18, 16:20,
17:16, 18:3, 18:24,
19:3, 19:9, 21:3,
21:5, 21:10, 25:1,
25:18, 26:9, 26:10,

26:11, 27:21, 28:15,
28:16, 29:5, 29:7,
29:9, 30:17, 31:15,
32:20, 34:4, 34:5,
34:24, 35:6, 36:1,
36:14, 40:19, 41:19,
42:6, 43:4, 44:2,
45:23, 45:25, 47:17,
52:9, 54:17, 55:3,
55:10, 55:18, 56:2,
56:9, 57:1, 57:4,
57:7, 57:11, 58:2,
60:6
**law-abiding** [5] -
27:21, 31:15, 32:20,
45:23, 45:25
**lawful** [29] - 5:24,
12:11, 15:25, 19:15,
21:13, 21:14, 22:21,
22:22, 26:20, 26:23,
27:6, 27:8, 34:13,
34:14, 34:18, 35:5,
36:3, 36:19, 37:13,
38:7, 38:15, 40:6,
40:7, 40:22, 45:12,
47:4, 47:9, 49:24,
50:13
**lawfully** [2] - 15:14,
25:17
**Lawmakers** [1] - 44:3
**laws** [61] - 2:21, 10:9,
10:10, 15:10, 16:23,
17:3, 17:14, 17:15,
17:16, 17:24, 18:12,
24:5, 26:18, 27:17,
28:19, 28:22, 29:10,
29:15, 29:20, 31:5,
31:24, 32:2, 33:21,
33:23, 34:7, 34:10,
34:11, 34:15, 34:17,
34:21, 35:2, 35:5,
35:19, 35:24, 36:7,
36:23, 36:24, 39:11,
41:16, 43:12, 43:16,
44:15, 45:2, 45:3,
45:4, 45:5, 45:7,
46:2, 46:10, 47:21,
51:14, 51:21, 54:25,
56:10, 57:24, 59:12,
61:6, 63:2, 63:14
**laws'** [1] - 16:5
**lawsuit** [3] - 56:6,
56:8, 60:2
**laxer** [1] - 46:10
**leader** [1] - 9:23
**leads** [1] - 12:23
**leaps** [1] - 60:6
**least** [4] - 22:16,
44:23, 52:6, 61:14
**leave** [6] - 14:23, 17:5,

25:8, 34:21, 38:3
**leaves** [3] - 17:1, 28:21, 29:12
**leaving** [1] - 4:4
**left** [1] - 32:1
**legal** [4] - 11:16, 17:10, 18:18, 56:14
**legally** [2] - 29:19, 39:14
**legislation** [1] - 44:5
**legislative** [1] - 20:3
**legitimate** [1] - 62:21
**lend** [1] - 14:15
**length** [1] - 60:7
**lenity** [1] - 6:24
**less** [2] - 2:22, 36:16
**lesser** [1] - 53:7
**level** [12] - 21:18, 32:11, 32:12, 32:23, 34:6, 36:10, 36:12, 45:24, 51:2, 51:10, 58:15, 61:24
**levels** [1] - 32:15
**library** [3] - 14:11, 52:22, 53:11
**license** [1] - 45:14
**licensed** [3] - 39:21, 40:2, 43:21
**lie** [1] - 39:23
**life** [2] - 17:8, 24:15
**light** [1] - 4:10
**likely** [1] - 35:8
**likewise** [1] - 14:14
**limit** [4] - 20:17, 26:6, 45:6, 54:1
**limitations** [2] - 6:22, 11:15
**limited** [4] - 8:17, 20:18, 33:25, 53:21
**limiting** [1] - 46:6
**limits** [1] - 11:10
**line** [4] - 47:21, 56:13, 56:14, 61:1
**lines** [2] - 16:20, 16:22
**list** [9] - 22:20, 22:23, 23:24, 27:8, 30:21, 56:3, 56:4, 56:16, 60:12
**literally** [1] - 21:10
**litigated** [3] - 12:4, 17:7, 55:25
**litigating** [1] - 9:1
**live** [3] - 14:20, 18:14, 28:13
**lived** [3] - 41:17, 41:19, 42:8
**lives** [1] - 34:1
**living** [2] - 44:16, 58:9
**loan** [9] - 4:14, 4:15, 4:21, 5:4, 7:12,

24:24, 40:2, 40:14
**loaned** [2] - 12:10, 13:21
**loans** [2] - 5:8, 13:24
**local** [1] - 16:23
**located** [2] - 15:2, 15:4
**locked** [1] - 59:16
**long-standing** [2] - 57:21, 58:2
**look** [15] - 5:20, 6:2, 6:9, 17:20, 17:21, 17:22, 19:15, 32:17, 35:10, 35:22, 41:8, 42:12, 43:3, 43:7, 46:14
**Look** [1] - 40:13
**looked** [7] - 18:4, 29:1, 35:2, 35:23, 36:10, 36:22, 36:24
**looking** [1] - 26:23
**looks** [1] - 41:5
**loosest** [1] - 45:2
**Louisiana** [1] - 29:1

## M

**machine** [8] - 1:24, 17:18, 28:11, 55:12, 55:14, 55:18, 56:23, 57:15
**magazine** [3] - 55:15, 56:19, 56:22
**magazines** [3] - 36:25, 37:5, 51:16
**main** [1] - 60:1
**manifested** [1] - 45:20
**manner** [4] - 11:6, 11:23, 15:23
**manufacture** [1] - 14:16
**manufactured** [1] - 23:24
**map** [2] - 18:18, 54:10
**market** [2] - 13:11, 27:24
**Maryland** [6] - 9:4, 9:5, 18:16, 56:10, 56:15
**Maryland's** [1] - 9:5
**Marzzarella** [2] - 27:4, 27:10
**Mascandaro** [6] - 30:25, 31:3, 48:23, 63:7, 63:9
**Massachusetts** [2] - 1:18, 56:11
**matter** [7] - 21:7, 22:6, 53:5, 55:10, 59:20, 63:15, 66:5

**McDonald** [2] - 31:18, 33:4
**mean** [19] - 9:24, 12:1, 12:20, 14:11, 14:24, 16:25, 23:15, 23:18, 27:12, 30:10, 41:2, 45:9, 47:4, 48:6, 49:9, 58:19, 60:11, 60:16, 61:18
**meaning** [3] - 6:4, 6:19, 10:21
**meaningfully** [2] - 52:11, 52:25
**means** [15] - 3:12, 4:11, 5:14, 7:21, 11:4, 12:16, 21:20, 35:7, 37:16, 38:19, 45:15, 47:6, 49:10, 53:9, 63:23
**meant** [1] - 63:18
**medicine** [1] - 43:6
**meet** [1] - 60:10
**memory** [1] - 58:9
**mentally** [1] - 54:6
**mention** [2] - 33:15, 42:21
**mentioned** [4] - 5:5, 8:18, 32:18, 50:1
**mentions** [1] - 63:1
**mere** [1] - 21:20
**merely** [2] - 9:14, 17:8
**merits** [1] - 22:5
**Mexico** [1] - 46:9
**might** [22] - 3:1, 16:8, 16:23, 18:21, 20:11, 22:2, 26:5, 26:24, 26:25, 27:17, 31:23, 32:24, 33:2, 41:1, 42:1, 53:13, 53:14, 60:19, 61:13, 62:24, 62:25, 63:24
**militaristic** [1] - 7:19
**millimeters** [2] - 60:8, 60:13
**mind** [3] - 5:3, 15:9
**minimal** [1] - 45:10
**minimally** [1] - 6:8
**minimum** [1] - 15:7
**minimus** [6] - 13:13, 31:25, 32:3, 34:20, 38:23, 59:7
**mirrors** [1] - 29:5
**misdemeanor** [2] - 30:14, 31:14
**mode** [1] - 41:5
**moment** [3] - 5:24, 12:14, 50:21
**month** [2] - 37:25, 38:13
**months** [1] - 5:17

**morning** [1] - 39:5
**most** [16] - 2:25, 6:20, 10:15, 17:21, 23:18, 23:19, 26:22, 32:5, 36:8, 37:18, 37:20, 40:25, 43:11, 45:3, 47:11
**motion** [1] - 9:12
**MOTION** [1] - 1:10
**motions** [1] - 2:12
**motorcycle** [1] - 9:23
**move** [2] - 45:1, 45:2
**moved** [1] - 4:3
**MR** [89] - 2:6, 2:9, 2:20, 3:19, 4:17, 4:19, 4:25, 5:25, 6:6, 7:4, 8:8, 8:16, 8:25, 10:2, 12:18, 13:25, 14:24, 15:5, 16:3, 17:19, 18:25, 19:4, 19:24, 21:17, 22:15, 22:24, 23:10, 23:14, 23:17, 23:21, 24:1, 24:19, 25:10, 26:21, 28:12, 28:24, 30:4, 30:12, 32:17, 33:11, 33:20, 35:1, 35:19, 36:22, 37:14, 38:5, 38:15, 38:20, 39:7, 39:20, 40:1, 40:8, 40:19, 40:23, 41:13, 41:20, 42:11, 42:18, 42:20, 44:9, 45:22, 47:2, 47:7, 48:10, 49:14, 50:16, 50:22, 51:5, 51:12, 52:24, 54:15, 54:17, 54:19, 54:23, 55:3, 55:16, 55:21, 57:3, 57:12, 58:20, 59:1, 59:18, 59:25, 61:20, 62:5, 62:13, 64:11, 64:14, 65:1
**multiplicity** [1] - 54:4
**Muscarello** [1] - 10:22
**must** [7] - 9:6, 11:12, 14:7, 15:11, 15:13, 28:14, 28:18
**muster** [2] - 34:6, 36:8

## N

**name** [2] - 9:2, 56:5
**namely** [2] - 27:23, 31:17
**narrow** [2] - 20:19, 47:11
**national** [1] - 13:11
**nature** [1] - 36:13
**nearest** [1] - 46:8
**necessarily** [8] - 14:3,

24:6, 35:7, 35:25, 44:16, 45:23, 47:11, 63:23
**necessary** [1] - 48:21
**necessity** [1] - 49:1
**need** [5] - 19:20, 19:22, 28:2, 36:15, 48:16
**needs** [3] - 33:25, 44:4
**neighborhood** [1] - 18:16
**never** [7] - 5:3, 5:7, 15:9, 24:14, 24:15, 59:2
**New** [1] - 18:7
**new** [2] - 3:21, 35:20
**newly** [1] - 54:13
**Newsweek** [1] - 21:23
**nice** [1] - 5:20, 17:24
**nobody** [1] - 17:18
**nomad** [1] - 44:16
**non** [2] - 20:16, 32:10
**non-dangerous** [1] - 32:10
**non-Second** [1] - 20:16
**nonautomatic** [1] - 37:4
**none** [1] - 16:4
**nonetheless** [1] - 33:3
**nonresidency** [1] - 44:15
**nonresident** [4] - 43:20, 43:25, 46:7, 46:12
**nonresidents** [4] - 3:25, 16:13, 25:19, 44:7
**nonsensical** [1] - 26:8
**nonsporting** [1] - 25:11
**normal** [1] - 15:22
**normally** [2] - 4:7, 8:20
**North** [4] - 1:15, 10:8, 30:24, 63:21
**Northern** [1] - 30:12
**note** [1] - 49:25
**noted** [2] - 35:2, 53:20
**nothing** [4] - 3:25, 19:6, 25:18, 26:17
**notice** [2] - 30:5, 62:2
**noticed** [1] - 35:25
**notices** [1] - 42:22
**noting** [1] - 53:16
**notion** [1] - 53:13
**notwithstanding** [1] - 25:19
**number** [11] - 2:2, 2:14, 3:20, 35:10,

35:12, 39:13, 41:6, 46:2, 48:12, 56:11, 57:19
**NW** [1] - 1:18

## O

**o'clock** [1] - 4:23
**obey** [1] - 28:14
**objective** [1] - 28:3
**observed** [1] - 14:2
**obtain** [3] - 46:10, 60:4, 61:3
**obtaining** [2] - 9:7, 43:21
**obviously** [4] - 17:23, 25:16, 55:18, 58:13
**occurred** [1] - 35:16
**occurring** [2] - 17:23, 18:13
**October** [2] - 37:25, 38:13
**OF** [5] - 1:2, 1:10, 1:18, 66:1, 66:10
**OFF** [1] - 50:23
**offer** [1] - 49:21
**officer's** [1] - 9:17
**Officers** [1] - 60:11
**OFFICIAL** [1] - 66:1
**Official** [1] - 1:21
**old** [4] - 17:8, 21:22, 27:2, 35:18
**once** [5] - 5:9, 28:9, 28:21, 29:12, 29:23
**one** [36] - 3:2, 9:18, 9:19, 10:10, 13:25, 14:15, 15:13, 16:7, 18:4, 19:22, 20:23, 21:5, 21:11, 27:5, 28:16, 29:13, 29:16, 29:18, 30:4, 30:16, 32:8, 32:17, 34:9, 35:15, 45:2, 45:15, 47:8, 50:24, 51:1, 53:13, 59:3, 60:4, 60:6
**one's** [3] - 15:12, 45:6, 64:2
**ones** [1] - 63:3
**onus** [1] - 29:15
**open** [5] - 32:1, 34:22, 39:10, 41:9, 53:9
**operable** [1] - 48:20
**operation** [1] - 55:15
**opinion** [1] - 53:20
**opposed** [1] - 5:16
**opt** [1] - 47:17
**option** [3] - 41:2, 41:20, 59:2
**options** [18] - 36:23,

39:10, 39:14, 39:19, 39:20, 40:1, 40:21, 40:23, 41:8, 41:25, 42:4, 43:8, 43:9, 43:10, 46:14, 58:24, 59:1, 59:3
**order** [3] - 10:13, 61:15, 62:3
**ordinance** [1] - 30:13
**ordinary** [1] - 6:18
**oriented** [1] - 27:5
**otherwise** [1] - 42:9
**outside** [9] - 9:21, 10:11, 15:21, 31:3, 48:11, 48:24, 53:2, 63:17, 63:20
**outside-the-home** [1] - 31:3
**outsourcing** [1] - 58:12
**overall** [1] - 17:13
**overcome** [1] - 26:25
**own** [3] - 17:24, 33:22, 44:4
**owned** [1] - 63:16
**ownership** [2] - 5:7, 16:15
**owns** [1] - 59:14

## P

**p.m** [4] - 1:8, 4:22, 65:5
**package** [1] - 45:7
**page** [1] - 61:8
**papers** [3] - 33:14, 47:5, 47:7
**paragraph** [2] - 61:9, 61:14
**paraphrasing** [1] - 26:20
**Parker** [3] - 21:18, 32:5, 48:15
**part** [7] - 16:17, 18:18, 20:9, 34:7, 35:9, 55:25, 58:22
**particular** [10] - 16:2, 19:7, 20:2, 22:10, 23:6, 41:5, 57:7, 59:10, 59:11, 62:20
**particularly** [1] - 15:24
**parties** [2] - 4:11, 7:5
**pass** [4] - 27:19, 34:5, 36:8, 44:5
**passed** [4] - 33:21, 35:3, 35:20, 52:9
**penalty** [1] - 6:20
**Pennsylvania** [1] - 9:10
**people** [30] - 3:2, 3:10,

3:12, 6:21, 9:6, 10:9, 10:11, 10:14, 11:10, 14:11, 14:24, 16:21, 17:24, 20:9, 22:8, 25:25, 26:15, 30:13, 31:20, 32:10, 32:12, 33:1, 44:18, 45:4, 55:11, 56:17, 57:5, 58:16, 60:12, 63:25
**people's** [4] - 20:17, 31:6, 58:9, 58:12
**percent** [1] - 37:19
**Perdue** [3] - 10:7, 30:8, 30:23
**perfectly** [1] - 38:12
**perhaps** [9] - 2:16, 2:25, 27:3, 28:10, 29:16, 29:17, 33:2, 33:14, 52:1
**peril** [1] - 29:14
**period** [3] - 13:1, 15:2, 61:17
**peripheral** [1] - 32:11
**periphery** [1] - 32:25
**permanently** [1] - 61:15
**permissible** [2] - 35:9, 59:2
**permission** [1] - 25:21
**permit** [1] - 9:7
**person** [38] - 3:3, 5:6, 5:8, 6:14, 7:23, 8:18, 9:23, 9:24, 9:25, 10:1, 10:4, 10:25, 14:15, 14:20, 15:6, 15:15, 17:5, 17:17, 18:3, 18:14, 24:7, 28:6, 28:13, 32:15, 32:23, 33:25, 36:4, 37:2, 38:6, 40:21, 41:4, 44:12, 45:10, 45:13, 54:6, 62:23
**persons** [3] - 32:20, 43:16, 46:5
**pertain** [1] - 57:14
**pertinent** [1] - 35:15
**Philadelphia** [1] - 9:13
**phrasing** [1] - 61:14
**physically** [4] - 15:1, 15:2, 15:4, 18:17
**pick** [1] - 44:22
**pistols** [2] - 64:17, 64:21
**place** [9] - 11:3, 11:6, 11:12, 15:23, 18:20, 33:25, 34:15, 38:4, 40:25
**places** [4] - 8:20, 11:5, 11:9, 11:13
**plain** [3] - 38:5, 38:16,

39:7
**plainly** [2] - 21:7, 31:16
**plaintiff** [33] - 2:7, 2:17, 4:2, 33:23, 34:9, 34:15, 34:19, 34:20, 34:22, 38:20, 39:14, 41:1, 41:9, 41:13, 41:21, 42:15, 42:20, 44:7, 44:20, 45:8, 45:23, 46:15, 47:7, 47:16, 49:25, 51:17, 51:19, 51:25, 52:10, 52:25, 61:2, 62:9, 62:10
**Plaintiff** [2] - 1:5, 1:14
**plaintiff's** [4] - 48:18, 51:8, 52:15, 58:24
**plaintiffs** [4] - 45:25, 52:4, 64:15
**pled** [1] - 59:23
**plinking** [1] - 20:20
**PLLC** [1] - 1:14
**point** [19] - 6:13, 6:14, 7:25, 18:19, 24:20, 25:10, 25:17, 27:25, 32:11, 35:12, 42:3, 44:10, 46:4, 50:1, 59:5, 61:24, 62:1, 64:12
**pointed** [4] - 34:11, 35:12, 41:6, 47:8
**points** [2] - 33:10, 45:22
**police** [1] - 10:14
**popular** [2] - 23:19, 37:18
**pose** [1] - 15:17
**position** [10] - 15:21, 29:24, 38:18, 44:24, 48:6, 49:4, 49:7, 49:12, 50:10, 51:3
**positions** [1] - 2:15
**possess** [19] - 3:25, 4:14, 14:5, 17:4, 17:5, 17:18, 19:18, 38:2, 39:11, 39:18, 46:18, 46:22, 48:1, 49:8, 49:13, 49:15, 52:11, 56:15, 63:16
**possessed** [2] - 5:7, 50:3
**possesses** [1] - 39:14
**possessing** [6] - 4:16, 17:15, 51:25, 52:5, 52:6, 54:8
**possession** [15] - 3:22, 13:18, 15:12, 37:1, 46:18, 46:24, 48:24, 49:15, 49:16,

50:8, 51:16, 53:2, 53:6, 54:14, 55:1
**POSSESSKY** [1] - 1:14
**possible** [8] - 7:1, 18:17, 27:1, 40:6, 42:8, 53:4, 54:4, 59:23
**possibly** [1] - 56:22
**practice** [1] - 23:11
**prayer** [1] - 61:8
**pre** [3] - 20:15, 20:16, 55:17
**pre-Heller** [3] - 20:15, 20:16, 55:17
**precedent** [2] - 4:9, 51:11
**prefer** [4] - 41:2, 41:5, 52:17
**present** [1] - 64:16
**presented** [2] - 22:4, 62:14
**presents** [1] - 52:25
**presumably** [4] - 35:4, 40:25, 46:7, 46:11
**presume** [1] - 34:14
**presumed** [2] - 18:2, 34:18
**presumption** [2] - 26:24, 34:21
**presumptive** [1] - 27:8
**presumptively** [10] - 11:10, 26:20, 26:23, 27:6, 34:12, 35:5, 36:3, 36:6, 45:25, 49:24
**prevent** [6] - 12:9, 37:2, 43:25, 51:17, 54:6, 54:8
**prevented** [1] - 52:4
**preventing** [1] - 63:25
**prevents** [1] - 25:18
**previously** [6] - 5:6, 5:7, 30:14, 32:5, 57:16, 63:16
**problem** [5] - 43:20, 44:22, 46:7, 60:1
**problems** [1] - 15:18
**procedures** [1] - 59:11
**proceedings** [1] - 66:4
**Proceedings** [2] - 1:24, 65:5
**proclivity** [1] - 64:1
**produced** [1] - 1:24
**product** [1] - 14:5
**products** [1] - 61:4
**prohibit** [5] - 12:12, 37:1, 51:16, 55:1, 64:24
**prohibited** [9] - 9:23,

10:1, 10:4, 17:17, 44:21, 45:13, 56:24, 57:1, 57:10
**prohibiting** [3] - 29:7, 45:20, 54:13
**prohibition** [11] - 2:25, 14:9, 27:24, 31:14, 37:4, 44:23, 55:12, 60:7, 63:3, 63:5, 64:19
**prohibitions** [5] - 2:25, 3:1, 17:14, 37:9, 57:21
**prohibits** [2] - 12:25, 38:6
**proper** [1] - 54:25
**proportionately** [1] - 36:16
**proposition** [2] - 33:5, 50:4
**prosecuted** [1] - 9:22
**prosecution** [2] - 38:21, 40:10
**prosecutions** [1] - 6:7
**prospect** [1] - 32:1
**protect** [7] - 15:18, 17:9, 17:25, 18:1, 19:6, 19:9, 45:12
**protected** [11] - 9:15, 13:19, 15:13, 16:16, 18:6, 19:12, 21:21, 22:11, 27:15, 27:18, 61:4
**protecting** [4] - 9:25, 18:5, 43:13, 47:25
**protection** [6] - 14:7, 37:3, 49:17, 50:7, 51:18, 53:3
**protections** [2] - 43:20, 53:24
**protects** [3] - 16:21, 53:25, 54:3
**proves** [1] - 11:11
**providing** [1] - 9:22
**provision** [9] - 2:22, 5:1, 5:4, 9:6, 10:2, 16:13, 20:2, 38:19, 43:18
**public** [12] - 9:6, 9:9, 10:13, 14:18, 17:8, 26:13, 35:7, 43:13, 47:25, 48:17, 63:12, 63:19
**pump** [1] - 24:12
**purchase** [42] - 12:20, 12:24, 13:7, 13:8, 13:20, 13:23, 14:3, 14:8, 14:21, 14:25, 15:3, 15:11, 15:14, 18:15, 18:20, 21:1,

28:9, 28:25, 33:24, 40:23, 40:25, 41:17, 41:22, 41:23, 42:5, 44:8, 45:18, 49:8, 49:13, 49:18, 49:22, 50:5, 52:18, 56:22, 59:4, 60:22, 63:5, 63:8, 63:23
**purchased** [3] - 16:8, 24:4, 50:11
**purchaser's** [1] - 19:3
**purchases** [1] - 12:21
**purchasing** [7] - 13:1, 29:7, 36:20, 41:25, 43:10, 45:20, 52:21
**purported** [1] - 64:8
**purpose** [45] - 3:9, 3:12, 4:6, 7:8, 7:16, 10:25, 11:3, 12:11, 13:1, 13:17, 16:1, 16:15, 19:17, 19:23, 21:13, 21:14, 22:13, 22:18, 23:2, 23:7, 24:2, 24:4, 24:10, 24:23, 24:25, 25:12, 25:17, 26:6, 28:6, 36:19, 36:21, 38:15, 39:24, 40:9, 40:22, 43:24, 45:12, 45:19, 47:4, 50:13, 50:18, 50:19, 62:23, 64:3
**purposes** [38] - 5:5, 5:22, 5:24, 7:9, 11:4, 16:14, 19:16, 20:17, 20:18, 21:15, 22:13, 22:14, 22:21, 22:22, 26:12, 37:13, 37:19, 38:8, 38:10, 38:16, 39:4, 39:21, 40:3, 40:6, 40:7, 40:15, 43:11, 43:13, 46:24, 47:9, 47:12, 47:14, 47:24, 50:14, 52:4, 52:10, 53:21
**put** [7] - 5:23, 12:14, 18:17, 30:1, 56:16, 59:16, 62:2
**puts** [1] - 44:24
**puzzling** [1] - 25:24

**Q**

**qualification** [1] - 34:16
**qualifications** [3] - 26:19, 34:12, 49:23
**quarter** [1] - 35:3
**questioning** [1] - 64:16
**questions** [3] - 2:14, 33:13, 48:5

**quickly** [1] - 30:4
**quintessential** [1] - 22:7
**quite** [6] - 13:19, 31:10, 53:21, 59:12, 60:16, 60:18
**quote** [4] - 44:3, 48:25
**quoted** [1] - 53:16

**R**

**raise** [1] - 42:23
**range** [4] - 5:19, 31:17, 38:24, 54:1
**rationale** [1] - 26:14
**reach** [2] - 10:17, 49:11
**read** [3] - 11:19, 21:23, 53:3
**reading** [1] - 58:5
**ready** [3] - 7:22, 7:24, 11:1
**real** [3] - 45:19, 58:23, 62:22
**really** [11] - 4:6, 12:8, 19:22, 26:12, 36:3, 37:23, 39:24, 40:14, 40:16, 45:10, 45:14
**reason** [11] - 9:7, 9:15, 15:5, 22:7, 35:5, 39:8, 42:14, 43:6, 48:11, 49:4, 52:13
**reasonable** [5] - 12:16, 28:3, 28:5, 44:2, 62:22
**reasonably** [2] - 37:10, 43:12
**reasoned** [1] - 9:14
**reasons** [3] - 10:18, 12:18, 48:3
**REBECCA** [1] - 1:21
**Rebecca** [1] - 66:3
**rebut** [1] - 34:19
**rebuttal** [1] - 54:21
**rebutted** [1] - 34:21
**receipt** [22] - 3:21, 4:7, 4:11, 4:24, 5:2, 5:22, 5:23, 6:4, 6:14, 6:19, 7:3, 7:6, 7:13, 8:4, 12:19, 33:24, 38:7, 40:9, 40:11, 46:25
**receive** [11] - 3:15, 3:16, 3:17, 4:13, 5:14, 7:7, 7:23, 12:7, 21:1, 38:19, 43:22
**received** [5] - 4:1, 4:18, 5:9, 5:10, 24:4
**receiving** [11] - 4:17, 6:14, 6:15, 7:10, 8:1, 19:15, 25:11, 36:19,

38:7, 46:22
**recent** [1] - 58:9
**recently** [1] - 8:25
**reciprocity** [1] - 45:16
**recited** [1] - 11:18
**recognize** [2] - 36:18, 49:19
**recognized** [6] - 27:14, 33:16, 45:16, 46:19, 47:22, 63:11
**recognizing** [1] - 16:19
**recollection** [1] - 57:13
**RECORD** [1] - 50:23
**record** [5] - 2:5, 20:4, 40:16, 41:12, 66:4
**reduce** [1] - 32:23
**referenced** [5] - 27:1, 30:8, 30:19, 33:4, 57:21
**referencing** [1] - 57:22
**referred** [1] - 35:17
**refers** [1] - 53:20
**regarding** [1] - 2:15
**register** [1] - 57:5
**registrable** [1] - 56:16
**registration** [5] - 36:2, 55:5, 55:24, 59:11
**regulate** [3] - 11:23, 16:1, 27:17
**regulated** [2] - 14:18, 36:13
**regulating** [2] - 15:22, 45:11
**regulation** [12] - 3:16, 4:9, 11:23, 17:1, 17:13, 22:19, 28:4, 34:14, 34:19, 35:6, 35:9, 35:23
**regulations** [3] - 27:19, 33:22, 45:17
**regulatory** [2] - 15:22, 44:13
**rejected** [3] - 9:19, 10:6, 10:16
**rejecting** [1] - 22:4
**relate** [7] - 20:20, 24:3, 24:5, 43:12, 47:24, 57:15, 61:10
**related** [1] - 52:3
**relates** [3] - 24:3, 59:18, 63:8
**relating** [1] - 28:5
**relationship** [9] - 19:10, 19:12, 19:14, 26:7, 26:8, 28:20, 62:22, 64:1, 64:2
**relative's** [1] - 8:15
**relevance** [1] - 17:12

**relevant** [4] - 4:10, 28:15, 56:10, 62:20
**relied** [1] - 14:1
**relief** [3] - 43:5, 61:8, 61:13
**religious** [2] - 14:6, 54:7
**rely** [1] - 10:14
**remand** [1] - 35:21
**remanded** [1] - 55:7
**remove** [1] - 41:18
**removed** [1] - 47:22
**render** [1] - 48:20
**rent** [2] - 13:21, 39:20
**rental** [5] - 5:4, 5:5, 7:12, 24:24, 40:2
**rented** [1] - 12:9
**rents** [1] - 13:24
**repealed** [1] - 55:21
**reply** [1] - 46:13
**reported** [1] - 1:24
**REPORTER** [2] - 66:1, 66:10
**Reporter** [2] - 1:21, 1:21
**request** [1] - 62:6
**require** [1] - 28:25
**required** [2] - 19:1, 58:24
**requirement** [1] - 44:23
**requirements** [2] - 47:17, 55:6
**reside** [8] - 3:10, 3:13, 16:2, 18:9, 28:8, 38:6, 40:24, 43:23
**resided** [1] - 41:15
**residence** [22] - 8:9, 8:14, 13:2, 15:16, 15:17, 15:20, 18:2, 18:24, 19:3, 19:4, 19:5, 24:24, 28:20, 28:25, 29:8, 43:17, 43:19, 44:18, 44:19, 46:5, 48:7, 64:2
**residency** [4] - 43:18, 43:22, 44:10, 44:17
**resident** [14] - 17:2, 18:7, 18:10, 19:7, 19:11, 19:12, 19:14, 19:17, 19:19, 28:23, 44:11, 44:13, 44:24, 47:19
**residential** [2] - 8:24, 28:20
**residents** [3] - 19:10, 45:1, 47:18
**residing** [1] - 25:6
**resolves** [1] - 49:3
**respect** [7] - 16:17,

20:6, 22:25, 51:2,
51:21, 51:23, 55:7
**respond** [1] - 57:18
**response** [5] - 31:18,
51:7, 52:15, 52:22,
56:8
**responses** [2] - 8:16,
52:24
**responsibilities** [1] -
29:23
**responsible** [7] -
25:25, 26:2, 31:15,
31:20, 32:10, 32:16,
32:20
**restricting** [1] - 35:2
**restriction** [3] - 53:7,
60:14, 64:7
**restrictions** [8] - 11:6,
15:23, 22:25, 23:9,
31:7, 55:8, 57:13
**result** [2] - 6:15, 19:24
**Review** [1] - 56:15
**review** [1] - 53:13
**revolvers** [1] - 60:12
**rewritten** [1] - 58:6
**rid** [1] - 56:9
**Riess** [3] - 2:9, 33:19,
50:24
**RIESS** [38] - 1:17, 2:9,
33:20, 35:1, 35:19,
36:22, 37:14, 38:5,
38:15, 38:20, 39:7,
39:20, 40:1, 40:8,
40:19, 40:23, 41:13,
41:20, 42:11, 42:18,
42:20, 44:9, 45:22,
47:2, 47:7, 48:10,
49:14, 50:16, 50:22,
51:5, 51:12, 52:24,
54:15, 54:17, 54:19,
64:11, 64:14, 65:1
**rifles** [10] - 13:3,
36:25, 37:5, 47:12,
53:5, 64:19, 64:21,
64:24, 64:25, 65:1
**right-to-travel** [1] -
41:6
**rights** [17] - 7:19,
13:10, 13:14, 14:13,
20:7, 20:8, 29:23,
31:15, 33:6, 34:23,
42:10, 53:12, 53:25,
58:12, 58:17, 60:18,
61:2
**Rights** [1] - 60:15
**rises** [1] - 32:11
**robber** [2] - 3:4, 3:5
**ROBERT** [1] - 1:11
**Room** [1] - 1:22
**room** [3] - 8:15, 8:19,

25:5
**roster** [1] - 56:9
**rostering** [1] - 56:2
**rounds** [2] - 56:20,
56:23
**RPR** [1] - 1:21
**rule** [3] - 6:24, 11:11,
11:21
**rules** [3] - 6:24, 45:17,
53:18
**rulings** [3] - 22:24,
23:5
**run** [1] - 63:17

## S

**sabers** [2] - 22:2
**safety** [6] - 9:6, 14:18,
25:22, 26:13, 43:14,
47:25
**sale** [12] - 7:11, 12:8,
15:23, 19:2, 25:3,
26:19, 27:11, 34:12,
34:16, 47:1, 49:23,
50:1
**sales** [2] - 31:7, 45:7
**Sauer** [1] - 23:23
**save** [1] - 13:5
**scale** [1] - 31:21
**scenarios** [1] - 25:14
**Schad** [1] - 60:25
**scheme** [3] - 15:22,
17:13, 56:14
**scope** [5] - 15:25,
27:5, 27:9, 54:5,
58:11
**scope-oriented** [1] -
27:5
**scrutinized** [1] - 53:15
**scrutiny** [46] - 13:13,
27:25, 28:1, 30:1,
30:2, 30:7, 30:17,
30:21, 30:22, 31:5,
31:8, 31:10, 31:13,
31:23, 32:1, 32:2,
32:8, 32:11, 32:12,
32:15, 32:23, 33:6,
34:6, 36:9, 36:11,
36:12, 43:11, 45:24,
46:1, 51:2, 51:4,
51:7, 51:9, 51:10,
51:13, 51:14, 52:8,
59:6, 61:23, 61:24,
61:25, 63:10, 63:13
**search** [1] - 20:10
**season** [1] - 3:6
**seated** [1] - 50:20
**second** [3] - 2:23,
12:23, 46:4
**Second** [46] - 7:16,

8:6, 8:13, 8:23, 9:8,
9:16, 10:15, 10:24,
12:14, 13:9, 13:22,
20:16, 20:24, 21:9,
21:16, 26:13, 27:9,
27:16, 27:22, 30:3,
31:17, 32:6, 32:9,
32:19, 32:25, 33:17,
34:2, 34:4, 34:10,
34:23, 36:21, 41:7,
42:10, 47:23, 48:8,
50:5, 50:14, 50:15,
51:3, 53:3, 53:17,
53:23, 54:3, 54:10,
60:17, 63:15
**seconds** [2] - 5:16,
38:24
**section** [1] - 2:24
**Section** [4] - 6:20,
12:25, 59:16, 61:16
**secures** [1] - 20:25
**security** [1] - 9:22
**see** [2] - 3:1, 19:7
**seek** [3] - 8:11, 61:14,
62:15
**seeking** [5] - 15:18,
48:19, 61:7, 61:12,
62:3
**seeks** [2] - 47:18,
62:14
**seem** [4] - 3:2, 5:11,
20:2, 61:5
**seizure** [1] - 20:10
**self** [55] - 3:13, 7:9,
7:14, 7:16, 10:5,
10:11, 12:25, 14:4,
20:12, 20:24, 21:2,
21:6, 21:15, 22:7,
22:13, 24:2, 24:8,
24:9, 24:13, 24:16,
24:21, 25:7, 27:23,
36:15, 36:19, 37:19,
37:24, 38:10, 38:12,
39:4, 39:9, 39:12,
39:19, 39:22, 40:4,
40:13, 40:17, 41:23,
43:11, 44:1, 46:18,
46:24, 48:2, 48:9,
48:21, 50:15, 52:6,
52:12, 52:19, 54:4,
54:5, 61:21, 63:4,
63:23, 64:7
**self-defense** [53] -
3:13, 7:9, 7:14, 7:16,
10:5, 10:11, 12:25,
20:12, 20:24, 21:2,
21:6, 21:15, 22:7,
24:2, 24:8, 24:9,
24:13, 24:16, 24:21,
25:7, 27:23, 36:15,

36:19, 37:19, 37:24,
38:10, 38:12, 39:4,
39:9, 39:12, 39:19,
39:22, 40:4, 40:13,
40:17, 41:23, 43:11,
44:1, 46:18, 46:24,
48:2, 48:9, 48:21,
50:15, 52:6, 52:12,
52:19, 54:4, 54:5,
61:21, 63:4, 63:23,
64:7
**self-defensive** [1] -
22:13
**self-evidently** [1] -
14:4
**sell** [3] - 19:2, 24:22,
29:19
**seller** [1] - 36:4
**selling** [3] - 12:22,
27:15, 27:17
**semiautomatic** [20] -
36:25, 37:5, 38:1,
51:15, 53:2, 54:14,
55:1, 55:10, 55:11,
55:14, 55:24, 56:18,
57:2, 60:13, 64:17,
64:19, 64:20, 64:24,
64:25, 65:1
**semiautos** [1] - 57:5
**sense** [3] - 2:18,
45:11, 53:15
**sensitive** [3] - 11:9,
11:12, 11:13
**sentence** [1] - 21:5
**September** [3] - 1:6,
39:1, 39:2
**serious** [1] - 33:17
**set** [2] - 37:14, 59:12
**Seventh** [3] - 31:12,
31:19, 58:15
**several** [2] - 12:18,
63:2
**severe** [3] - 6:20,
13:19, 14:12
**shed** [1] - 4:10
**Sheridan** [1] - 9:4
**shooting** [9] - 3:6,
4:15, 5:19, 6:13,
24:14, 24:15, 25:15,
38:12
**shop** [1] - 53:11
**shopper** [1] - 44:21
**shopping** [1] - 44:19
**shorthand** [1] - 1:24
**shotgun** [11] - 3:5,
4:15, 5:17, 5:20,
24:12, 25:3, 25:5,
38:11, 39:3, 40:14
**shotguns** [4] - 13:4,
47:13, 64:18, 64:21

36:19, 37:19, 37:24,
38:10, 38:12, 39:4,
39:9, 39:12, 39:19,
39:22, 40:4, 40:13,
40:17, 41:23, 43:11,
44:1, 46:18, 46:24,
48:2, 48:9, 48:21,
50:15, 52:6, 52:12,
52:19, 54:4, 54:5,
61:21, 63:4, 63:23,
64:7
**self-defensive** [1] -
22:13
**self-evidently** [1] -
14:4
**sell** [3] - 19:2, 24:22,
29:19
**seller** [1] - 36:4
**selling** [3] - 12:22,
27:15, 27:17
**semiautomatic** [20] -
36:25, 37:5, 38:1,
51:15, 53:2, 54:14,
55:1, 55:10, 55:11,
55:14, 55:24, 56:18,
57:2, 60:13, 64:17,
64:19, 64:20, 64:24,
64:25, 65:1
**semiautos** [1] - 57:5
**sense** [3] - 2:18,
45:11, 53:15
**sensitive** [3] - 11:9,
11:12, 11:13
**sentence** [1] - 21:5
**September** [3] - 1:6,
39:1, 39:2
**serious** [1] - 33:17
**set** [2] - 37:14, 59:12
**Seventh** [3] - 31:12,
31:19, 58:15
**several** [2] - 12:18,
63:2
**severe** [3] - 6:20,
13:19, 14:12
**shed** [1] - 4:10
**Sheridan** [1] - 9:4
**shooting** [9] - 3:6,
4:15, 5:19, 6:13,
24:14, 24:15, 25:15,
38:12
**shop** [1] - 53:11
**shopper** [1] - 44:21
**shopping** [1] - 44:19
**shorthand** [1] - 1:24
**shotgun** [11] - 3:5,
4:15, 5:17, 5:20,
24:12, 25:3, 25:5,
38:11, 39:3, 40:14
**shotguns** [4] - 13:4,
47:13, 64:18, 64:21

**show** [2] - 9:6, 52:25
**showing** [1] - 28:2,
34:19
**shown** [1] - 34:15
**shows** [1] - 34:7
**sic** [1] - 43:19
**side** [1] - 12:14
**Sig** [1] - 23:23
**Sig-Sauer** [1] - 23:23
**sIGNATURE** [1] -
66:10
**similar** [2] - 46:8,
51:24
**simply** [12] - 3:6, 8:21,
21:6, 33:15, 53:3,
53:23, 54:9, 55:10,
58:17, 60:4, 63:15,
63:18
**situation** [4] - 6:12,
20:4, 24:24, 28:8
**six** [1] - 35:12
**skeet** [6] - 4:15, 24:14,
24:15, 25:15, 38:12
**Skoien** [1] - 31:12
**small** [3] - 49:1, 60:12
**smuggle** [4] - 26:3,
46:11, 64:1, 64:7
**smugglers** [1] - 25:20
**smuggling** [6] - 28:5,
33:23, 62:24, 63:25,
64:3, 64:6
**so-called** [5] - 10:12,
55:8, 57:14, 63:4,
65:1
**soil** [1] - 20:14
**solely** [2] - 14:22,
50:13
**someone** [9] - 13:10,
13:16, 14:15, 15:19,
16:1, 28:7, 38:23,
39:11, 44:16
**sometimes** [6] - 23:1,
23:6, 23:10, 23:17,
59:25
**somewhat** [1] - 59:20
**somewhere** [5] -
18:16, 58:17, 58:19,
60:20, 61:3
**sorry** [3] - 2:11, 5:2,
23:14
**sort** [5] - 6:22, 20:20,
26:5, 30:18, 62:23
**Spain** [2] - 41:17
**speaking** [2] - 16:25,
17:15
**Special** [1] - 60:11
**special** [1] - 15:17
**specific** [7] - 2:14,
2:21, 3:9, 4:9, 35:12,
35:19, 53:22

**specifically** [10] - 5:4, 7:12, 12:22, 13:18, 14:2, 32:22, 40:8, 46:6, 49:16, 62:17
**speech** [1] - 53:25
**speed** [1] - 45:6
**spends** [1] - 21:5
**split** [1] - 49:2
**sport** [1] - 19:21
**sporting** [40] - 3:12, 5:5, 5:24, 12:11, 19:16, 20:17, 20:18, 21:13, 21:14, 22:13, 22:14, 22:17, 22:21, 22:22, 23:2, 23:7, 24:1, 24:9, 24:20, 24:25, 25:16, 26:12, 37:13, 38:8, 38:16, 39:3, 39:21, 39:24, 40:3, 40:6, 40:7, 40:11, 40:14, 40:22, 47:4, 47:10, 47:12, 47:14, 50:13, 50:18
**Springfield** [1] - 47:9
**standing** [13] - 29:3, 34:14, 34:17, 34:18, 34:25, 35:4, 35:7, 35:17, 35:23, 36:6, 36:8, 57:21, 58:2
**start** [4] - 26:24, 34:9, 38:4, 54:21
**state** [73] - 11:21, 11:23, 12:1, 13:2, 14:1, 15:17, 15:22, 16:2, 16:20, 16:22, 17:2, 17:3, 17:10, 17:11, 17:15, 17:22, 17:24, 18:2, 18:4, 18:6, 18:8, 18:14, 18:24, 19:3, 19:4, 19:5, 19:7, 19:8, 19:11, 19:12, 19:14, 19:17, 19:19, 24:23, 28:8, 28:15, 28:19, 28:23, 28:25, 29:5, 29:7, 29:10, 29:14, 29:15, 29:16, 29:18, 29:20, 38:7, 43:16, 43:17, 43:18, 43:19, 43:22, 43:23, 44:3, 44:8, 44:10, 44:11, 44:14, 44:17, 44:19, 44:22, 44:23, 45:1, 45:15, 57:24
**state's** [2] - 45:5, 45:6
**statement** [1] - 49:22
**states** [23] - 10:12, 11:17, 16:24, 17:1, 17:21, 17:22, 18:1, 18:11, 19:10, 28:24,

29:5, 29:6, 29:16, 33:22, 35:11, 35:12, 44:6, 44:21, 45:16, 50:12, 63:4
**STATES** [2] - 1:1, 1:11
**States** [30] - 3:11, 4:1, 4:5, 7:7, 8:3, 8:10, 9:11, 9:18, 13:17, 14:21, 15:1, 15:3, 15:4, 18:22, 20:7, 23:19, 23:20, 28:10, 28:13, 28:14, 39:15, 41:24, 46:11, 50:12, 50:19, 52:12, 59:19, 60:4, 62:3, 64:4
**statute** [30] - 2:18, 3:15, 3:17, 5:22, 6:5, 6:18, 6:23, 7:1, 7:6, 12:7, 12:9, 12:11, 12:15, 12:17, 38:6, 38:16, 39:8, 40:8, 40:18, 42:17, 47:3, 49:9, 49:10, 49:11, 54:13, 58:5, 62:4, 62:5, 62:6, 62:8
**statutes** [6] - 2:15, 15:19, 24:18, 35:14, 35:17, 36:18
**statutory** [2] - 21:7, 56:14
**step** [3] - 34:3, 34:5, 34:9
**STEPHEN** [1] - 1:4
**Stephen** [1] - 2:3
**steps** [1] - 48:14
**still** [3] - 13:23, 21:15, 28:2
**stingy** [1] - 7:3
**STONESTREET** [1] - 1:21
**Stonestreet** [1] - 66:3
**stop** [1] - 9:15
**store** [5] - 28:18, 28:21, 29:12, 46:15, 63:18
**stores** [1] - 14:10
**Street** [1] - 1:15
**strict** [16] - 27:25, 30:1, 30:2, 30:7, 30:16, 30:21, 31:5, 31:8, 31:10, 31:23, 32:8, 33:6, 51:9, 52:8, 61:23, 63:10
**stringent** [4] - 44:23, 45:3, 46:9, 52:7
**strong** [3] - 21:19, 36:15, 43:5
**struck** [7] - 9:5, 10:8, 10:10, 21:5, 30:13, 30:15, 63:14

**subclass** [2] - 53:4, 53:5
**subject** [5] - 16:21, 23:2, 45:4, 45:5, 60:16
**submit** [6] - 14:4, 22:12, 27:16, 60:25, 61:11, 63:22
**submitted** [1] - 16:4
**substantial** [8] - 9:7, 13:9, 27:23, 36:14, 36:16, 37:10, 43:24, 59:7
**substantially** [6] - 37:7, 43:12, 47:24, 48:1, 51:19, 58:6
**substantive** [2] - 53:18, 53:24
**sued** [1] - 56:4
**suffice** [1] - 33:14
**sufficient** [1] - 55:22
**suggest** [1] - 12:1
**suggested** [1] - 31:23
**suggests** [1] - 28:1
**suitable** [5] - 37:2, 47:12, 47:13, 50:18, 51:17
**Suite** [1] - 1:15
**summary** [2] - 2:12, 48:4
**superficially** [1] - 53:14
**supplemental** [3] - 30:5, 41:8, 42:22
**supplements** [1] - 43:19
**suppose** [10] - 3:3, 24:7, 24:11, 32:8, 33:14, 39:16, 40:9, 41:17, 42:6
**supposed** [3] - 14:16, 39:23
**suppress** [1] - 9:12
**Supreme** [13] - 3:20, 7:21, 14:2, 21:4, 21:19, 22:3, 22:5, 35:21, 48:13, 57:22, 58:13, 58:14
**survive** [1] - 20:21
**suspect** [1] - 47:23
**suspended** [1] - 21:22
**suspicious** [1] - 26:5
**sweep** [1] - 62:21
**synonymous** [1] - 12:8

**T**

**talks** [3] - 5:1, 12:21, 26:11

**target** [2] - 3:2, 3:6
**targeted** [1] - 63:3
**targets** [3] - 3:9, 4:6, 61:21
**Taurus** [1] - 37:18
**tax** [2] - 45:6, 45:7
**temporal** [1] - 6:22
**temporary** [1] - 8:14
**Tennessee** [1] - 14:2
**tens** [1] - 37:16
**term** [6] - 3:16, 3:17, 7:17, 12:19, 20:18, 47:6
**terms** [1] - 21:19
**terra** [1] - 48:25
**territory** [1] - 35:13
**terrorist** [1] - 3:4
**Terry** [1] - 9:15
**test** [6] - 6:21, 23:2, 23:5, 30:18, 30:20, 34:7
**tests** [1] - 30:7
**text** [3] - 38:5, 38:16, 53:13
**that's..** [1] - 58:7
**THE** [92] - 1:2, 1:11, 2:8, 2:11, 3:14, 4:13, 4:18, 4:20, 5:12, 6:1, 6:23, 8:6, 8:9, 8:22, 9:25, 12:5, 13:20, 14:20, 14:25, 15:15, 16:25, 18:23, 19:1, 19:13, 21:12, 22:14, 22:19, 23:8, 23:13, 23:15, 23:18, 23:23, 24:11, 25:2, 26:16, 28:7, 28:22, 29:25, 30:10, 32:14, 33:8, 33:19, 34:24, 35:14, 36:18, 37:12, 37:22, 38:9, 38:18, 38:25, 39:16, 39:23, 40:5, 40:12, 40:21, 41:12, 41:15, 42:3, 42:16, 42:19, 44:6, 45:9, 46:20, 47:3, 48:5, 49:6, 50:9, 50:20, 50:23, 50:24, 51:6, 52:15, 54:12, 54:16, 54:18, 54:20, 54:24, 55:12, 55:20, 56:21, 57:6, 58:18, 58:21, 59:14, 59:23, 61:18, 62:1, 62:9, 64:10, 64:13, 64:22, 65:3
**themselves** [1] - 37:8
**theory** [2] - 7:20, 18:21
**thereby** [1] - 12:1
**therefore** [4] - 21:9,

31:25, 56:24, 58:23
**they've** [2] - 15:16, 48:14
**thinking** [2] - 20:1, 20:16
**Third** [2] - 27:4, 27:8
**third** [1] - 61:9
**thousands** [1] - 37:17
**three** [1] - 9:2
**throughout** [1] - 59:18
**throw** [1] - 63:17
**tied** [2] - 43:17, 43:22
**timing** [1] - 6:8
**today** [2] - 56:13, 57:4
**tomorrow** [3] - 39:1, 42:6, 46:17
**top** [1] - 9:2
**total** [2] - 27:12, 27:24
**touch** [1] - 5:9
**town** [2] - 38:3, 38:14
**track** [1] - 53:13
**tradition** [4] - 11:16, 30:18, 30:20, 58:2
**traditional** [3] - 11:15, 57:23, 58:11
**traditionally** [1] - 57:16
**transaction** [4] - 13:3, 17:19, 17:22, 18:13
**transcript** [2] - 1:24, 66:4
**TRANSCRIPT** [1] - 1:10
**transcription** [1] - 1:25
**transient** [1] - 7:25
**transportation** [3] - 16:19, 16:22, 59:18
**transpose** [1] - 53:24
**travel** [4] - 17:9, 18:21, 33:12, 41:6
**traveling** [1] - 44:17
**travelling** [4] - 17:10, 17:11, 29:13, 29:21
**travels** [3] - 16:23, 29:14, 59:15
**treated** [2] - 29:22, 47:18
**tried** [2] - 22:4, 59:21
**true** [7] - 13:14, 18:15, 23:22, 37:11, 40:22, 45:24, 51:22
**try** [1] - 12:15
**trying** [3] - 5:12, 5:14, 58:22
**turned** [1] - 38:22
**turns** [1] - 41:4
**two** [24] - 2:21, 8:16, 12:20, 17:21, 24:18, 26:21, 30:4, 33:21,

34:3, 34:5, 34:7, 34:15, 34:21, 43:13, 44:15, 45:7, 45:22, 46:8, 47:8, 47:21, 51:24, 52:24, 61:20
**two-part** [1] - 34:7
**two-step** [1] - 34:3
**type** [8] - 2:24, 17:17, 21:3, 21:10, 24:3, 34:13, 35:22, 59:11
**types** [5] - 35:24, 36:6, 36:24, 37:17, 59:10
**typically** [1] - 23:11

## U

**U.S** [25] - 1:18, 1:22, 4:4, 10:22, 15:16, 16:9, 16:10, 25:4, 25:6, 30:25, 35:13, 37:16, 37:20, 37:23, 37:25, 41:11, 42:7, 44:2, 44:25, 46:12, 47:17, 47:19, 47:20, 48:8, 59:15
**U.S.C** [1] - 61:16
**ultimate** [1] - 44:20
**ultimately** [1] - 2:16
**unconstitutional** [3] - 21:2, 21:9, 61:21
**under** [29] - 5:1, 9:8, 14:11, 17:7, 17:19, 20:7, 23:3, 25:14, 34:6, 36:9, 36:23, 38:19, 39:7, 39:10, 43:5, 43:7, 45:7, 47:23, 50:5, 51:13, 51:14, 55:18, 60:25, 61:12, 61:22, 61:24, 63:9, 65:4
**understood** [3] - 4:8, 55:18, 57:16
**undertake** [1] - 58:24
**undisputed** [2] - 41:12, 41:14
**UNITED** [2] - 1:1, 1:11
**United** [30] - 3:11, 4:1, 4:5, 7:7, 8:3, 8:10, 9:11, 9:18, 13:17, 14:21, 15:1, 15:3, 15:4, 18:22, 20:7, 23:19, 23:20, 28:10, 28:13, 28:14, 39:15, 41:24, 46:11, 50:12, 50:19, 52:12, 59:19, 60:4, 62:3, 64:4
**unlawful** [4] - 5:11, 30:15, 42:24, 43:1
**unless** [2] - 15:5, 38:7
**unlike** [2] - 2:25, 27:3
**unload** [1] - 5:21

**unreasonable** [1] - 20:10
**unstable** [1] - 26:2
**untrustworthiness** [1] - 25:22
**untrustworthy** [1] - 3:3
**unusual** [2] - 2:24, 33:2
**up** [10] - 16:7, 17:1, 17:25, 27:19, 29:1, 29:4, 31:21, 37:19, 40:9, 50:25
**upheld** [7] - 10:4, 11:16, 13:13, 51:14, 54:16, 55:6, 57:9
**uphold** [5] - 7:1, 11:25, 31:13, 54:17, 57:1
**usable** [1] - 49:16
**useful** [1] - 43:11
**uses** [1] - 3:15

## V

**VA** [1] - 1:16
**vague** [1] - 30:17
**valid** [2] - 22:12, 22:14
**variety** [3] - 41:10, 46:16, 55:9
**various** [4] - 10:9, 11:14, 16:22, 26:25
**vast** [1] - 47:13
**verb** [2] - 3:14, 3:15
**versus** [1] - 2:3
**view** [3] - 12:13, 24:8, 27:7
**violate** [4] - 25:9, 27:13, 29:15, 29:20
**violated** [3] - 33:16, 41:4, 61:3
**violates** [1] - 21:10
**violating** [2] - 6:20, 24:25
**violation** [5] - 24:17, 25:12, 39:6, 42:10, 46:25
**violence** [1] - 31:13
**violent** [4] - 26:2, 43:14, 43:17, 47:25
**Virginia** [2] - 9:19, 18:16
**virtually** [2] - 16:24, 32:18
**vis** [2] - 19:10
**vis-a-vis** [1] - 19:10
**vision** [1] - 27:5
**visit** [1] - 47:19
**visiting** [6] - 4:6, 20:5, 20:7, 37:24, 39:18,

44:1
**visits** [1] - 37:23
**vs** [12] - 9:4, 9:11, 9:18, 10:7, 10:22, 14:1, 30:6, 30:8, 30:23, 30:25, 31:9

## W

**waiting** [1] - 2:11
**walking** [1] - 9:13
**walks** [1] - 28:18
**wants** [8] - 6:2, 12:21, 24:21, 28:9, 39:11, 39:18, 45:13, 47:16
**Washington** [4] - 1:6, 1:19, 1:22, 18:15
**waste** [1] - 13:15
**ways** [1] - 30:16
**weapon** [5] - 37:3, 51:18, 54:3, 55:19, 57:9
**weapons** [9] - 22:7, 54:5, 55:7, 55:9, 57:8, 57:14, 64:19, 64:23, 65:2
**weather** [1] - 63:20
**weaver** [1] - 9:18
**West** [1] - 9:19
**whatsoever** [1] - 11:3
**wholesale** [1] - 53:23
**wide** [2] - 41:10, 46:16
**widely** [1] - 43:9
**WILKINS** [1] - 1:11
**window** [1] - 63:18
**wink** [2] - 40:15, 40:20
**wish** [2] - 6:21, 41:23
**Woollard** [2] - 9:4
**word** [4] - 4:7, 5:13, 6:17, 8:17
**words** [2] - 12:20, 62:10
**worship** [1] - 20:12
**writes** [1] - 20:15
**written** [2] - 26:11

## Y

**years** [2] - 5:17, 35:18
**York** [1] - 18:7
**you-all** [1] - 2:11
**yourself** [2] - 2:4, 34:11